David S. Meyer (*pro hac vice* pending)
Jessica C. Peet (*pro hac vice* pending)
**VINSON & ELKINS LLP**
The Grace Building
1114 Avenue of the Americas, 32nd Floor
New York, New York 10036-7708
Telephone:        (212) 237-0000
Facsimile:        (212) 237-0100

Matthew J. Pyeatt (*pro hac vice* pending)
Trevor G. Spears (*pro hac vice* pending)
**VINSON & ELKINS LLP**
Trammell Crow Center
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
Telephone:        (214) 220-7700
Facsimile:        (214) 220-7716

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| ENVIVA INC., *et al.*, | ) ) | Case No. 24–10453 (BFK) |
| Debtors.[1] | ) ) ) | (Joint Administration Requested) |

## DECLARATION OF GLENN NUNZIATA IN SUPPORT
## OF CHAPTER 11 PETITIONS

I, Glenn Nunziata, declare the following under 28 U.S.C. § 1746:

---

[1] Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been requested, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/enviva.  The location of the Debtors' corporate headquarters is:  7272 Wisconsin Avenue, Suite 1800, Bethesda, MD 20814.

1.      I am the Interim Chief Executive Officer and Chief Financial Officer of Enviva Inc., a corporation organized under Delaware law ("***Enviva***" or, together with the Debtor and Non-Debtor Affiliates defined below, the "***Company***").[2]

2.      I joined Enviva in August 2023 as Executive Vice President and Chief Financial Officer.  Since November 2023, I have served in my current role as Interim Chief Executive Officer and Chief Financial Officer, and since December 2023, I have served as a director of Enviva, among other Debtors (as defined below).  As a result, I am familiar with the Company's day-to-day operations, business and financial affairs, books and records, and employees.  I hold a Bachelor of Science and a Master's degree in Accounting from James Madison University.  I have more than 25 years of experience in finance, strategy, accounting, treasury, and risk management with various organizations.  Before joining Enviva, I was the Chief Financial Officer of Smithfield Foods Inc., a vertically integrated food company that generated approximately $18 billion in global revenue with contributions from over 60,000 employees.  Before that, I spent approximately 19 years at Ernst & Young, with my last position as a partner in assurance services.

3.      On the date hereof (the "***Petition Date***"), each of the above-captioned debtors and debtors in possession (collectively, the "***Debtors***") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Eastern District of Virginia (the "***Court***").

---

[2]     I am also the Interim Chief Executive Officer and Chief Financial Officer of a number of Enviva's subsidiaries, including Enviva MLP International Holdings, LLC, Enviva Partners Finance Corp., Enviva Aircraft Holdings Corp., Enviva Development Finance Company, LLC, Enviva Energy Services, LLC, Enviva GP, LLC, Enviva Holdings GP, LLC, Enviva Management Company, LLC, Enviva Pellets, LLC, Enviva Pellets Amory II, LLC, Enviva Pellets Bond, LLC, Enviva Pellets Epes, LLC, Enviva Pellets Epes Holdings, LLC, Enviva Pellets Greenwood, LLC, Enviva Pellets Lucedale, LLC, Enviva Pellets Waycross, LLC, Enviva Port of Pascagoula, LLC, and Enviva Shipping Holdings, LLC.

4.      I am authorized to submit this Declaration on behalf of the Debtors.  I am over 21 years of age, and, if called upon to testify, I would testify competently to the facts and opinions set forth herein.  All facts and opinions in this declaration (the "***Declaration***") are based on:  (a) my knowledge of the Debtors' day-to-day operations, business and financial affairs, books and records, and employees; (b) information I learned from my review of relevant documents; (c) information supplied to me or verified by other members of the Company's management or its third-party financial advisors; or (d) my experience and knowledge generally, including my knowledge of accounting and other financial matters.  Unless otherwise indicated, any financial information contained in this Declaration is unaudited and subject to change but true and correct as of the date of this Declaration.  Such financial information is presented on a consolidated basis for the Company, except where specifically noted.

5.      This Declaration is organized into three parts.  Part I provides background information on the Company and its operations.  Part II provides an overview of the Debtors' prepetition capital structure.  Part III describes the challenges the Company has faced and strategies the Company has implemented in response.

## I.      THE COMPANY'S BUSINESSES

6.      The Company is the world's largest producer of industrial wood pellets, a renewable and sustainable energy source produced by aggregating a natural resource—predominantly waste wood fiber—and processing it into a transportable form.  Our facilities where wood pellets are produced are designed to operate 24 hours per day, 365 days per year, with minimal scheduled maintenance.  The backbone of the Company is its workforce of over 1,200 full or part-time employees and more than 50 temporary employees and independent contractors—most of whom live in the communities where our various facilities are located and many of whom have specialized industry knowledge and a longstanding relationship with the

Company.  Ultimately, wood pellets produced by the Company are sold to our customers, many of which are making efforts to accelerate the transition away from conventional fossil-fuel energy sources and potentially reduce greenhouse-gas emissions in sectors where carbon emissions have historically been difficult to abate.

7.      The Company owns and operates ten industrial-scale wood-pellet production plants located in Virginia, North Carolina, South Carolina, Georgia, Florida, and Mississippi.  The Company has been developing and constructing two additional plants; the first near Epes, Alabama, and the second near Bond, Mississippi.

8.      The Company exports its wood pellets to global markets through owned deep-water marine terminals at the Ports of Chesapeake, Virginia; Wilmington, North Carolina; and Pascagoula, Mississippi, and from leased third-party deep-water marine terminals in Savannah, Georgia; Mobile, Alabama; and Panama City, Florida.  The Company sells most of its wood-pellet volumes through long-term, take-or-pay offtake contracts with customers in the United Kingdom (the "*U.K.*"), the European Union (the "*E.U.*"), and Japan.

9.      The Company's corporate headquarters is located in Bethesda, Maryland, and its operations headquarters is located in Raleigh, North Carolina.  The map below depicts the Company's network of facilities.



### A.    The Company's History

10.    Enviva was formed on November 12, 2013, as Enviva Partners, LP (the "***Partnership***").  The Partnership began trading on the New York Stock Exchange on April 29, 2015, as a publicly traded master limited partnership under the ticker symbol "EVA." During this time, Enviva Holdings, LP ("***Holdings***") was the ultimate indirect holder of a substantial portion of the Partnership's limited partner units, with various public unitholders holding the balance.[3] Holdings, in turn, was owned by certain entities associated with Riverstone Holdings LLC ("***Riverstone***").

---

[3]    More specifically, the Partnership's limited partner units were directly owned by Enviva MLP HoldCo, LLC ("***MLP HoldCo***"), Enviva Collateral PledgeCo, LLC ("***Enviva PledgeCo***"), and various public unitholders, with Enviva Partners GP, LLC ("***Enviva Partners GP***") serving as the Partnership's non-economic general partner. MLP HoldCo, Enviva PledgeCo, and Enviva Partners GP were each in turn wholly owned, directly or indirectly, by Holdings.

11.     On July 22, 2020, Holdings underwent a series of transactions in which two entities associated with Riverstone—Riverstone Echo Continuation Holdings, L.P. and Riverstone Echo Rollover Holdings, L.P.—acquired substantial limited partner interests in Holdings and, indirectly, became the sole members of the general partner of Holdings, through new equity contributions and incremental equity commitments of Riverstone affiliates.

12.     On December 31, 2021, the Partnership converted from a publicly traded master limited partnership into a corporation—Enviva Inc.—through a transaction in which each outstanding limited-partner unit was converted into a share of common stock.  As of the Petition Date, Riverstone Echo Rollover Holdings, L.P., Riverstone Echo Continuation Holdings, L.P., and Riverstone Echo PF Holdings, L.P. collectively are the largest shareholders of Enviva, which remains publicly traded.

### B.    The Company's Operations

13.     The Company's operations revolve around the production, transportation, and sale of utility-grade wood pellets to be used and consumed as an energy source.  Enviva's wood pellets are designed to meet the criteria I understand were recently established by the E.U.'s Renewable Energy Directive III, which includes biomass as a qualifying renewable energy resource.  Most of the world's current wood-pellet production plants are owned by small, private companies, with few companies owning or operating multiple plants.  Enviva is one of the few companies that has the scale, production, technical expertise, access to sustainable fiber baskets, and commercial infrastructure necessary to consistently supply utility-grade wood pellets under large, long-term offtake contracts to its counterparties.

14.     Enviva's contracts serve a variety of customers in the biomass power production industry.  They include operators of some of the world's highest capacity biomass power plants and renewable-focused firms with significant energy production business components.  In addition

to their prominent positions in biomass power production, Enviva's customers play a major role in a wide range of complementary sectors, such as construction and transmission infrastructure. Collectively, they build, operate, and service power plants fueled not only by wood-pellet biomass, but also by gas, coal, hydrogen, and multiple other forms of biomass.

1.      *Supply of Raw-Wood Fiber*

15.     The wood fiber used for Enviva's wood pellets is mainly sourced from the southeastern United States, one of the world's most robust areas of forest growth and sustainable management, which is home to the Company's production plants.  As a result of the fragmented nature of tract ownership in that area of the United States, Enviva procures raw materials from hundreds of landowners, loggers, and timber industry participants, with no individual landowner representing a material percentage of the Company's needs.  Enviva's fiber-supply chains are routinely audited by independent third parties, and the Company maintains the traceability of the primary wood that is delivered directly from forests using its proprietary Track & Trace® system, which it makes available to the public on its website.



*Map of Enviva primary wood supply locations as demonstrated by Track & Trace®*



*Detailed map of Enviva harvest area as demonstrated by Track & Trace®*

16.     Some jurisdictions in Europe and Asia offer certain biomass-fuel-related renewable

energy incentives, which have contributed to the demand for wood pellets as a source of fuel, but

also impose requirements related both to the materials comprising eligible fuels and the sustainability of the manner in which such materials were sourced. To effectively meet customer needs under such initiatives, Enviva's production process is designed to comply with these content and sustainability standards.

### 2.    Production and Manufacturing

17.    After harvesting, the raw-wood fiber is sent to a production plant where it is then milled into uniform chips. Those chips enter a biomass-fueled dryer to reduce the natural moisture content of the wood. The dry fiber is then sent to the plant's hammermills to further reduce its size and refine the fiber for pelletizing. In the final production stage, the dry fiber is pushed through a specialty pellet press at high pressure. This pressing causes the naturally occurring lignin adhesive in the wood to form a crisp sheath around the biomass within, creating both the final pellet shape and a protective layer that holds the product together without the aid of added chemicals. The final result is an energy-dense, low-moisture, and uniformly sized wood fuel that provides efficient, reliable combustion.



*Ahoskie, NC Plant*                    *Wood chips loaded on a conveyor belt*

 

*Wood pellets moving through the production and transport process*

18.     Enviva's customers are typically seeking to achieve specific requirements for air quality and carbon emissions, which are impacted by their selection of fuel.  The Company therefore strives to optimize the "mix" of various wood fibers to create high-quality, consistent pellets that will allow its customers to meet those goals.  To maintain quality, Enviva has established quality-control laboratories at each plant and port location to monitor outputs through a variety of tests.  This allows the Company to optimize its manufacturing processes and ensure that it is producing high-quality pellets.

19.     To accomplish this, Enviva takes steps to understand the characteristics of different tree species and how their properties can change from one season to the next.  The Company uses its own quality-control laboratories and partners with several universities on modeling, chemical-composition research, and product testing to predict pellet behavior and energy content.

*3.       Shipping and Logistics*

20.     After the manufacturing process is complete, the finished wood pellets are loaded into railcars, trucks, and/or barges for transportation to deep-water marine terminals, which feature domes, barges, and warehouses used to store the pellets prior to shipping.  The Company owns or

leases six such terminals, which are strategically located to receive pellets from multiple production facilities, minimize transportation, and accumulate necessary volumes for bulk shipments.  These terminals operate 24 hours per day, seven days per week, and maintain a cumulative storage capacity equal to 397,000 metric tons of wood pellets.  From the terminals, wood pellets are then loaded onto large, dry bulk oceangoing cargo vessels (which the Company charters from third-party ship owners) and shipped to overseas ports for delivery to customers.



*Enviva storage and shipping at the Port of Wilmington*

### 4. *Market Utility and Competitiveness*

21.     In addition to the long-term, take-or-pay offtake contracts described above, the Company also has entered into other contracts with shorter duration and/or smaller offtake quantities.  As part of this activity, the Company monitors wood pellet spot markets in order to opportunistically transact when, among other things, it believes pricing dynamics and contract flexibility provide avenues to generate incremental gross margin.

22.     As of December 31, 2023, the total weighted-average remaining term of the Company's long-term take-or-pay offtake contracts was approximately 13.7 years, with a total

contracted revenue backlog of approximately $21.6 billion.  These contracts serve customers, which include major utility providers and operators of some of the highest capacity biomass power plants in the world, across a variety of jurisdictions, such as the U.K., E.U., and Japan.

23.     Wood pellets enable major power, heat, or combined heat-and-power generators to profitably generate electricity and heat in a manner that reduces the overall cost of compliance with certain mandatory greenhouse gas emissions limits and renewable energy targets, while also allowing companies to diversify their sources of renewable feedstock supply.  For many of Enviva's customers, wood pellets are used as a substitute for coal.  Enviva's pellets are used in an increasing variety of applications around the world to help reduce the life-cycle greenhouse gas emissions generated by customers in energy generation and industrial processes.  Unlike intermittent sources of renewable power generation (*i.e.*, wind and solar power), wood-pellet-fired plants are capable of consistently meeting baseload electricity demand and are dispatchable (*i.e.*, power output can be switched on or off or adjusted based on demand).

24.     In Europe, Asia, and other regions of the world, renewable-energy generators and utility providers—the Company's primary customers—have invested, and continue to invest, in both converting power plants and building new generating assets that either co-fire wood pellets with coal or, in some cases, are fully dedicated wood-pellet-fired plants.  These developments help generators maintain and increase baseload generating capacity and comply with climate change regulations and other emissions-reduction targets.

25.     The relatively quick, and, in many instances, cost effective, process of converting coal-fired plants to biomass-fired generation can be an attractive benefit for generators whose generation assets are no longer viable as coal plants, as a matter of policy or economics, due to the expiration of operating permits, regulatory phase-out of coal-fired power generation, the

introduction of taxes, or other restrictions on fossil fuel usage or emissions of greenhouse gases and other pollutants. Additionally, the E.U.'s Emissions Trading System—an E.U. climate-change policy mechanism which sets certain caps on the amount of greenhouse gases a company can annually emit, but allows the companies to purchase additional emissions allowances—continues to demonstrate a durable, constructive market for carbon, which assists biomass in being more cost effective for energy generation than carbon-intensive fuels such as coal and natural gas, even in markets where there are no direct incentives or subsidies for renewable energy generation.

26.    I believe there will continue to be significant demand growth in Europe and Asia for wood pellets as a preferred fuel source and as an alternative to fossil fuels for district heating loops, residential and commercial heating, and the production of heat for industrial sites.

27.    Enviva's wood pellets also have potential applicability to industries where reducing carbon emissions has historically been either cost prohibitive or technologically impossible with the currently available abatement technology.  In these industries, wood pellets are used as bio-based raw-material feedstock to displace inputs to industrial processes formerly provided by fossil fuels to reduce greenhouse-gas emissions on a lifecycle basis.  In addition to the customer applications outlined above, the Company is working with customers and potential customers who intend to use Enviva's wood pellets as raw material feedstocks in the refinement of bio-liquids like biodiesel and sustainably produced aviation fuel, as well as to generate process steam and heat in heavy industrial manufacturing for products like lime, sugar, and others.

28.    The Company competes with other utility-grade wood-pellet producers for long-term, take-or-pay offtake contracts with major power and heat-generation customers and increasingly with customers in sectors where carbon emissions have historically been difficult to abate.  Competition in the wood-pellet industry is based on the price, quantity, quality, and

consistency of the wood pellets produced, the reliability and scale of wood pellet deliveries, and the producer's ability to verify and document, through customer and third-party audits, that their wood pellets meet the regulatory sustainability standards and use requirements of a particular customer.

### 5. *Growth & Construction of New Capacity Plants.*

29.     The Company historically has employed a "build-and-copy" approach to the construction of new capacity plants, meaning that new plants are generally built and operated using approaches copied from prior projects.  This allows for efficiencies in the engineering, design, construction, and operation of the Company's facilities.

30.     In 2022, Enviva commenced development and construction of two additional wood-pellet production plants located near Epes, Alabama (the "***Epes Plant***"), and Bond, Mississippi (the "***Bond Plant***").  Immediately prior to filing these chapter 11 cases, the Company's expectation was for the Epes Plant to begin operations in the first half of 2025, and completing the Epes Plant remains a key aspect of the Company's strategic plan.  The Company has contemplated potentially delaying construction of the Bond Plant to support management's overall liquidity strategies and will continue to evaluate the appropriate next steps.

### 6. *The Company's Management*

31.     Enviva is led by an experienced management team, including the following individuals:

| Name | Title |
|------|-------|
| Glenn Nunziata | Interim Chief Executive Officer and Chief Financial Officer |
| Thomas Meth | President |
| Mark Coscio | Executive Vice President and Chief Operating Officer |

14

| | |
|---|---|
| Jason E. Paral | Executive Vice President; General Counsel; and Secretary |
| James P. Geraghty | Executive Vice President, Finance |
| Brandi Colander | Senior Vice President; Chief Sustainability Officer and Government Affairs |
| Craig A. Lorraine | Senior Vice President, Fiber, Logistics, and Port Operations |
| John-Paul ("JP") D. Taylor | Senior Vice President and Chief Commercial Officer |
| Kathryn R. Walsh | Senior Vice President, Investor Relations and Corporate Communications |
| Mark Haser | Vice President, Operations |

32.    Thomas Meth and John Keppler, the co-founders of the Company, are also the two most recent past Chief Executive Officers of Enviva.  Mr. Keppler served as CEO from 2004 until November 2022, when he resigned to pursue treatment for a health issue.[4]  Mr. Meth then became CEO, while retaining his existing role as Enviva's President.[5]  In January 2023, Enviva announced three substitutions to its senior office roster:  the Company appointed John-Paul Taylor as its Chief Commercial Officer, Brandi Colander as its Chief Sustainability Officer, and Jason Paral as its General Counsel.[6]  Immediately prior to Mr. Paral's appointment, William Schmidt voluntarily retired from his position as Executive Vice President, Corporate Development and General

---

[4]    The Company reported this event at Enviva Inc., Current Report (Form 8-K) (Nov. 14, 2022), https://www.sec.gov/Archives/edgar/data/1592057/000110465922118609/tm2230419d1_8k.htm.

[5]    The Company reported this event at Enviva Inc., Current Report (Form 8-K) (Nov. 14, 2022), https://www.sec.gov/Archives/edgar/data/1592057/000110465922118609/tm2230419d1_8k.htm.

[6]    The Company reported Mr. Paral's appointment at Enviva Inc., Current Report (Form 8-K) (Jan. 20 2023), https://www.sec.gov/Archives/edgar/data/1592057/000110465923005469/tm233847d1_8k.htm.    Additionally the Company announced Mr. Taylor, Ms. Colander, and Mr. Paral's appointments together in a press release. Press Release, Enviva Inc., Enviva Announces Four Senior Officer Appointments (Jan. 19, 2023), https://ir.envivabiomass.com/news/news-details/2023/Enviva-Announces-Four-Senior-Officer-Appointments/default.aspx.

Counsel.[7]   In August 2023, I joined Enviva as its new Chief Financial Officer both to replace the existing CFO, Shai Even, who immediately separated from the Company at that time, and to support the Company's efforts to improve its processes and performance through, among other things, an increased focus on the cost structure, management reporting, and profitability of its plants, contracts, and supply chain.[8]   As these efforts became increasingly central to the Company's focus, my role continued to expand, and in November 2023, I was appointed as interim CEO to succeed Mr. Meth.[9]   Mr. Meth remained President with a focus on improving customer-contract profitability.   On the same day, Enviva appointed Mark Coscio to be the Company's new Chief Operating Officer.[10]

33.     The Company's management team is supported by mid-level executives who are vital to the Company's operations and the Debtors' successful reorganization.   Among other things, their skills, knowledge, and understanding of the Debtors' operations are essential to preserving operational stability, safety, and efficiency.   In many instances, these employees are highly trained personnel with specialized skills who are not easily replaced.   Recognizing these factors, prior to the Petition Date, the board of directors of Enviva approved a cash-based retention/incentive program to retain such employees during this period of uncertainty and increased workload, and to reward such employees upon satisfaction of critical goals.

---

[7]     The Company reported this resignation at Current Report (Form 8-K) (Jan. 20 2023), https://www.sec.gov/Archives/edgar/data/1592057/000110465923005469/tm233847d1_8k.htm.   Mr. Schmidt has, however, remained as a senior advisor since his resignation.

[8]     The Company reported this event at Enviva Inc., Current Report (Form 8-K) (Aug. 30, 2023), https://www.sec.gov/Archives/edgar/data/1592057/000159205723000034/eva-20230829.htm.

[9]     The Company reported this event at Enviva Inc., Current Report (Form 8-K) (Nov. 9, 2023), https://www.sec.gov/Archives/edgar/data/1592057/000159205723000053/eva-20231109.htm.

[10]     The Company reported this event at Enviva Inc., Current Report (Form 8-K) (Nov. 9, 2023), https://www.sec.gov/Archives/edgar/data/1592057/000159205723000053/eva-20231109.htm.

### C.    The Company's Organizational Structure

34.    The Company's organizational structure consists of thirty-four entities.[11] Twenty-one of the Company entities are Debtors in these chapter 11 cases, including each guarantor under the Prepetition Funded Debt (as defined below).  A simplified organization chart of the Company, with the Debtor entities outlined in blue, is attached as **Exhibit A**.

#### 1.    The Non-Debtor Affiliates

35.    The Company's organization structure includes a number of subsidiaries that have not filed a chapter 11 case.[12]  These Non-Debtor Affiliates are all either:  (a) foreign subsidiaries organized under the laws of the U.K., Japan, or Germany that operate to service transactions with the Company's customers in those foreign jurisdictions and bear no obligations under the Company's funded debt documents; (b) non-wholly owned joint ventures with third parties in the ordinary course of business; or (c) wholly owned domestic subsidiaries that bear no obligations under the Company's funded debt documents.

##### (a)    Enviva Wilmington Holdings, LLC

36.    Enviva Wilmington Holdings, LLC ("***EWH***"), a Delaware limited liability company, is a Non-Debtor Affiliate that is a joint venture formed in 2016 and owned approximately 50/50 by Debtor Enviva, LP, on the one hand, and Hancock Natural Resources Group, Inc., John Hancock Life Insurance Company (U.S.A.) ("***JHLIC USA***"), and John Hancock Life Insurance Company of New York ("***JHLIC***" and, collectively with Hancock Natural Resources Group, Inc. and JHLIC USA, "***John Hancock***"), on the other.

---

[11]    This figure includes one legal entity that has been recently dissolved:  Enviva Energy Services (Jersey) Limited.

[12]    These subsidiaries are: IHE Holdings, LLC, Enviva Management International Holdings, Limited, Enviva Management Germany GmbH, Enviva Management Japan K.K., Enviva Management UK, Limited, African Isabelle Shipping Co. Ltd (Bahamas), African Sisters Shipping Co. Ltd (Bahamas), Enviva Wilmington Holdings, LLC, Enviva Pellets Hamlet, LLC, Enviva Energy Services Cooperatief, U.A., Enviva Pellets Amory II, LLC, and Enviva Tooling Services Company, LLC (the "***Non-Debtor Affiliates***").

37.     EWH is governed by the *Fourth Amended and Restated Limited Liability Company Agreement of Enviva Wilmington Holdings, LLC*, dated December 29, 2016 (as further amended, restated, amended and restated, or otherwise modified from time to time, the "***EWH LLCA***"). Under the EWH LLCA, Enviva, LP serves as EWH's "Managing Member" and "Operator," and holds substantially all of the management and decision-making authority for EWH.  The EWH LLCA purports to afford John Hancock certain rights upon a bankruptcy of Enviva, LP. Immediately after filing these chapter 11 cases, however, Enviva, LP is providing notice to John Hancock of, among other things, the filing of these chapter 11 cases and the applicability of the automatic stay to any actions or attempts to enforce such rights under the EWH LLCA or applicable state law.

38.     Among other assets, EWH is the sole member and manager of Enviva Pellets Hamlet, LLC, which owns a wood-pellet production plant located in Hamlet, North Carolina (the "***Hamlet Plant***").  The Hamlet Plant produces approximately 1,500 metric tons of wood pellets per day.

39.     On January 22, 2016, EWH entered into a *Biomass Supply Agreement* (the "***MGT Agreement***") with MGT Teesside Limited ("***MGT***"), a company organized under English and Welsh law.  By its terms, the MGT Agreement continues until the end of December 31, 2034, unless earlier terminated through its default and termination provisions.  MGT is a material customer relationship for EWH, and the MGT Agreement is a key strategic contract in the Company's portfolio.  As of the Petition Date, MGT is EWH's sole non-Debtor customer.

40.     In connection with the MGT Agreement, MGT, Enviva Holdings, LP ("***Enviva Holdings***"), and JHLIC USA entered into a *Guarantee and Indemnity*, dated January 22, 2016 (the "***Guarantee Agreement***") in which Enviva Holdings and JHLIC USA agreed to guarantee all of

EWH's obligations, subject to a cap, under the MGT Agreement.  Separately, Enviva Holdings entered into an agreement with JHLIC USA in which it promised to indemnify JHLIC USA for the performance of Enviva Holdings under the Guarantee Agreement (the "***Indemnification Agreement***").  Additionally, Enviva, LP pledged its equity interests in EWH to JHLIC USA (via a "***Share Pledge***") to secure Enviva Holdings's obligations under the Guarantee Agreement and Indemnification Agreement. In addition, EWH is the borrower under a senior, unsecured facility extended by Enviva, LP, which, as of the Petition Date, was drawn in the amount of approximately $44.0 million (the "***EWH Revolver***").  Unlike the Guarantee Agreement and the Indemnification Agreement, these obligations in favor of Enviva, LP under the EWH Revolver are direct obligations owing by EWH.

41.    In recent years, MGT has encountered liquidity constraints and financial headwinds.  As a result, MGT had an unpaid accounts receivable balance owed to EWH under the MGT Agreement, as described in more detail below.

## II.     PREPETITION CAPITAL STRUCTURE[13]

42.     As of the Petition Date, the Debtors' funded debt totals approximately $1.8 billion

(the "***Prepetition Funded Debt***").  The Debtors' Prepetition Funded Debt includes:

| Credit Group Debt | | |
|---|---|---|
| **Facility** | **Maturity** | **Approx. Principal Outstanding** |
| Senior Secured Credit Facility | June 30, 2027 | $568,545,880 (revolver) $103,950,000 (term loan) |
| 2026 Notes | January 15, 2026 | $750,000,000 |
| Epes Note | July 15, 2052 | $250,000,000 |
| Bond MS Note | July 15, 2047 | $100,000,000 |

| Operational Subsidiary Debt | | |
|---|---|---|
| **Facility** | **Maturity** | **Approx. Principal Outstanding** |
| NMTC Loans | June 27, 2029; June 27, 2052 | $42,030,000 |
| United Bank Loans | June 27, 2029 | $30,402,000 |
| FiberCo Notes | December 12, 2025; March 29, 2026; June 30, 2026; October 27, 2026; March 16, 2027; May 10, 2027 | $3,308,284 |
| Amory Seller Note | August 4, 2017[14] | $2,000,000 |

---

[13]    The following description of the Debtors' prepetition capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

[14]    Although the Amory Seller Note "matured" on August 4, 2017, it remains outstanding. Please refer to Section II.G for additional information.

43.    In November 2023, at or around the time the Company filed its Quarterly Report (Form 10-Q) for the period ended September 30, 2023, certain holders of claims formed an ad hoc group (the "*Ad Hoc Group*").  Initially, the Ad Hoc Group consisted of holders of primarily the 2026 Notes. As of the Petition Date, the Ad Hoc Group now holds approximately 95% of the outstanding principal amount of the 2026 Notes, approximately 72% of the Company's outstanding debt under the Senior Secured Credit Facility, approximately 78% of the aggregate outstanding principal amount of the Epes Green Bonds, and approximately 45% of the aggregate outstanding principal amount of the Bond Green Bonds.

44.    In addition to the Prepetition Funded Debt, the Debtors have trade claims and additional general unsecured claims, some of which are contingent, unliquidated, and/or disputed. Additional information about some of these trade claims is contained in the *Declaration of Mark Rajcevich in Support of Chapter 11 Petitions and First-Day Motions*, filed contemporaneously herewith (the "*Rajcevich Declaration*").

45.    The Company's organizational chart, included as **Exhibit A**, reflects the distribution of its assets, including production plants and terminals, and contract obligations.

### A.    Senior Secured Credit Facility

46.    In 2018, the Company entered into a senior secured credit facility (the "*Senior Secured Credit Facility*") with Barclays Bank PLC ("*Barclays*") serving as the administrative agent and collateral agent (the "*Senior Secured Credit Facility Agent*") and certain lenders party thereto.  On January 17, 2024, Barclays resigned from its position as the Senior Secured Credit Facility Agent.   On February 16, 2024, Ankura Trust Company, LLC was appointed as replacement Senior Secured Credit Facility Agent.

47.    The terms of the Senior Secured Credit Facility are governed by an *Amended and Restated Credit Agreement*, dated October 18, 2018 (as amended, restated, or otherwise modified

or supplemented from time to time, the "***Senior Secured Credit Facility Agreement***") under which, among other things, Enviva and Enviva, LP (the "***Senior Secured Credit Facility Borrowers***"), as borrowers, obtained certain revolving loans (the "***Revolving Loans***") and incremental term loans (the "***Term Loans***") from the lenders thereunder.[15]  Each subset of loans under the Senior Secured Credit Facility matures on the earlier to occur of (a) June 30, 2027, or (b) 90 days before the maturity of the 2026 Notes.

48.    The Company understands that the collective obligations under the Senior Secured Credit Facility are secured by first-priority liens on and security interests in substantially all of the assets of the Senior Secured Credit Facility Obligors, other than, among other things: (a) a long-term lease for the use of a port in Pascagoula owned by Enviva Port of Pascagoula, LLC; (b) a long-term lease for the use of a wood-pellet production facility in Waycross, Georgia owned by Enviva Pellets Waycross, LLC; and (c) the real estate owned at the Company's wood-pellet production plant under development in Bond, Mississippi.  The liens securing the obligations under the Senior Secured Credit Facility also do not encumber assets or property of the Debtors that are not Senior Secured Credit Facility Obligors, such as the Epes Plant or cash held in bank accounts of Debtor Enviva MLP International Holdings, LLC (discussed more fully below), which will include the initial proceeds of funding from the Debtors' proposed DIP Facility.

49.    As of the Petition Date, the Senior Secured Credit Facility Obligors owe approximately $672.5 million in aggregate principal amount outstanding under the Senior Secured

---

[15]    Debtors Enviva GP, LLC, Enviva Partners Finance Corp., Enviva Aircraft Holdings Corp., Enviva Holdings GP, LLC, Enviva Holdings, LP, Enviva Shipping Holdings, LLC, Enviva Management Company, LLC, Enviva Development Finance Company, LLC, Enviva Pellets, LLC, Enviva Pellets Lucedale, LLC, Enviva Pellets Waycross, LLC, Enviva Port of Pascagoula, LLC, Enviva Energy Services, LLC, Enviva Pellets Greenwood, LLC, and Enviva Pellets Bond, LLC (collectively, the "***Senior Secured Credit Facility Guarantors***") each guarantee the obligations of Enviva and Enviva, LP, as borrowers under the Senior Secured Credit Facility.  The Senior Secured Credit Facility Guarantors, collectively with the Senior Secured Credit Facility Borrowers, are referred to herein as the "***Senior Secured Credit Facility Obligors***."

Credit Facility, which represents principal obligations arising under the Revolving Loans in the approximate amount of $568.5 million and Incremental Term Loans in the approximate amount of $104.0 million.

50.     As of the Petition Date, there are also $1.4 million in aggregate principal amount of letter of credit commitments outstanding under the Senior Secured Credit Facility.  The Debtors intend to either (i) cash collateralize these letter of credit, (ii) replace such letters of credit with cash collateralized letters of credit provided by a new issuing bank to be determined, or (iii) provide cash collateral directly to the holders of the Company's obligations underlying such letters of credit during the course of these chapter 11 cases.

51.     As holders of approximately 72% of the Company's outstanding debt under the Senior Secured Credit Facility, the Ad Hoc Group has been able to provide consents of the lenders thereunder where a "Required Lender" vote is necessary, including with respect to certain prepetition forbearances, the Debtors' proposed consensual use of cash collateral and adequate protection for lenders and certain other matters.

**B.      2026 Notes**

52.     On December 9 and December 12, 2019, Enviva and Enviva Partners Finance Corp. (together, the "*2026 Notes Issuers*") issued $550.0 million and $50.0 million, respectively, in principal amount of senior unsecured notes with an aggregate principal amount of $600.0 million and interest rate of 6.5%, due to be repaid on January 15, 2026.  The terms of these notes are governed by the *6.500% Senior Notes Due 2026 Indenture* dated as of December 9, 2019 (as amended, restated, or otherwise modified or supplemented from time to time, the "*2026 Notes Indenture*"), which designated Wilmington Savings Fund Society, FSB as trustee (the "*2026 Notes Trustee*").  On July 15, 2020, the 2026 Notes Issuers issued an additional $150.0 million in principal amount under the 2026 Notes Indenture (together with the notes issued on December 9

and December 12, 2019, the "*2026 Notes*").[16]  On March 1, 2023, Wilmington Trust, N.A. resigned from its position as the 2026 Notes Trustee, and Wilmington Savings Fund Society, FSB, was appointed as successor 2026 Notes Trustee.

53.    Under the terms of the 2026 Notes, the 2026 Notes Issuers are required to make semi-annual interest payments in arrears on January 15 and July 15 of each year.  Additionally, the 2026 Notes Issuers may elect to redeem all or a portion of the 2026 Notes at any time at the applicable redemption price, plus accrued and unpaid interest, if any, subject to the right of the relevant holders to receive any interest due prior to the redemption and, in some cases, an additional make-whole premium.

54.    As previously stated, the Ad Hoc Group collectively holds approximately 95% of the 2026 Notes.

55.    In January 2024, the Company elected to take advantage of its contractual 30-day grace period under the 2026 Notes Indenture and not make the semiannual interest payment of approximately $24.4 million otherwise due January 16, 2024, to, among other things, enhance its short-term financial flexibility and preserve liquidity, as described in greater detail below.  The Company's entry into the grace period did not result in a cross-default under any other debt facilities, and because the Company entered into the February 15, 2024 Forbearance Agreements described below, the January 16, 2024 semiannual interest payment remains unpaid as of the date hereof.

---

[16]    Debtors Enviva GP, LLC, Enviva Holdings GP, LLC, Enviva Holdings, LP, Enviva Shipping Holdings, LLC, Enviva Management Company, LLC, Enviva Aircraft Holdings Corp., Enviva, LP, Enviva Development Finance Company, LLC, Enviva Pellets, LLC, Enviva Pellets Lucedale, LLC, Enviva Pellets Waycross, LLC, Enviva Port of Pascagoula, LLC, Enviva Energy Services, LLC, Enviva Pellets Greenwood, LLC, and Enviva Pellets Bond, LLC guarantee the 2026 Note Issuers' obligations under the 2026 Notes Indenture and the 2026 Notes (collectively, the "*2026 Notes Guarantors*").

### C.      Epes Green Bonds

56.      On July 15, 2022, the Industrial Development Authority of Sumter County, Alabama (the "*Epes Green Bonds Issuer*") issued certain Exempt Facilities Revenue Bonds (Enviva Inc. Project), Series 2022 (Green Bonds) (the "*Epes Green Bonds*") in the aggregate principal amount of $250.0 million, under an *Indenture of Trust* dated as of July 1, 2022 (the "*Epes Green Bonds Indenture*").  The Epes Green Bonds Indenture named Wilmington Trust, N.A. as the trustee (the "*Epes Green Bonds Trustee*") over the administration of the Epes Green Bonds. After issuance to bondholders (the "*Epes Bondholders*"), the Epes Green Bonds Issuer then loaned the proceeds of the Epes Green Bonds offering to Enviva on an unsecured basis under a *Loan and Guaranty Agreement* dated July 1, 2022 (the "*Epes Loan Agreement*"), and a promissory note, dated July 15, 2022, issued by Enviva to the Epes Green Bonds Issuer (the "*Epes Note*").[17]  Then, the Epes Green Bonds Issuer assigned the Epes Note and substantially all its rights under Epes Loan Agreement to the Epes Green Bonds Trustee.

57.      The Epes Note is a senior unsecured obligation of Enviva and matures in full on July 15, 2052.  However, the Epes Note is subject to mandatory tender for purchase by the Company on July 15, 2032, at a purchase price equal to 100% of the principal amount of the Epes Green Bonds, plus accrued interest.  Such prepayment may be required prior to maturity. The terms of the Epes Loan Agreement generally restrict the net proceeds received from the Epes Note to being used to fund a portion of the costs of the acquisition, construction, equipping, and financing of the Epes Plant.  Interest on the principal of the Epes Note accrues at 6.00% per annum.

---

[17]   Additionally, Enviva, LP, Enviva GP, LLC, Enviva Partners Finance Corp., Enviva Aircraft Holdings Corp., Enviva Holdings GP, LLC, Enviva Holdings, LP, Enviva Shipping Holdings, LLC, Enviva Management Company, LLC, Enviva Development Finance Company, LLC, Enviva Pellets, LLC, Enviva Pellets Lucedale, LLC, Enviva Pellets Waycross, LLC, Enviva Port of Pascagoula, LLC, Enviva Pellets Bond, LLC, Enviva Pellets Greenwood, LLC, and Enviva Energy Services, LLC (collectively, the "*Epes Loan Guarantors*") each agreed to guarantee Enviva Inc.'s obligations under the Epes Loan.

The Epes Loan Agreement requires bi-annual payments of all accrued and unpaid interest, on January 15 and July 15 of each year, beginning on January 15, 2023. The Company is current on its interest payments under the Epes Loan Agreement.

58.    As of the Petition Date, the Ad Hoc Group collectively holds approximately 78% of the aggregate outstanding principal amount of the Epes Green Bonds.

**D.    Bond Green Bonds**

59.    On November 22, 2022, the Mississippi Business Finance Corporation (the "***Bond Green Bonds Issuer***") issued certain Exempt Facilities Revenue Bonds (Enviva Inc. Project), Series 2022 (Green Bonds) (the "***Bond Green Bonds***"), in the aggregate principal amount of $100.0 million, under an *Indenture of Trust* dated as of November 1, 2022 (the "***Bond Green Bonds Indenture***"). The Bond Green Bonds Indenture named Wilmington Trust, N.A. as the trustee (the "***Bond Green Bonds Trustee***") over the administration of the Bond Green Bonds. After issuance to bondholders (the "***Bond Bondholders***"), the Bond Green Bonds Issuer then loaned the proceeds of the Bond Green Bonds offering to Enviva on an unsecured basis under a *Loan and Guaranty Agreement*, dated November 1, 2022 (the "***Bond MS Loan Agreement***"), and a promissory note, dated November 22, 2022, issued by Enviva to the Bond Green Bonds Issuer (the "***Bond MS Note***").[18] Then, as security for the Bond Green Bonds, the Bond Green Bonds Issuer assigned the Bond MS Note and substantially all its rights under Bond MS Loan Agreement to the Bond Green Bonds Trustee.

---

[18]    Additionally, Enviva, LP, Enviva GP, LLC, Enviva Partners Finance Corp., Enviva Aircraft Holdings Corp., Enviva Holdings GP, LLC, Enviva Holdings, LP, Enviva Shipping Holdings, LLC, Enviva Management Company, LLC, Enviva Development Finance Company, LLC, Enviva Pellets, LLC, Enviva Pellets Lucedale, LLC, Enviva Pellets Waycross, LLC, Enviva Port of Pascagoula, LLC, Enviva Pellets Bond, LLC, Enviva Pellets Greenwood, LLC, and Enviva Energy Services, LLC (collectively, the "***Bond MS Loan Guarantors***") each agreed to guarantee Enviva Inc.'s obligations under the Bond MS Loan Agreement.

60.     The Bond MS Note is a senior unsecured obligation of Enviva and matures in full

on July 15, 2047.  However, the Bond MS Note is subject to mandatory tender for purchase by the

Company on July 15, 2032, at a purchase price equal to 100% of the principal amount of the Bond

Green Bonds, plus accrued interest.  Such prepayment may be required prior to maturity.  The

terms of the Bond MS Loan Agreement generally restrict the net proceeds received from the Bond

MS Note to being used to fund a portion of the costs of the acquisition, construction, equipping,

and financing of the Company's wood-pellet production plant being constructed near Bond,

Mississippi.  Interest on the principal of the Bond MS Note accrues at 7.75% per annum.  The

Bond MS Loan Agreement requires bi-annual payments of all accrued and unpaid interest, on

January 15 and July 15 of each year, with the first payment due on January 15, 2023.  The Company

is current on its interest payments under the Bond MS Loan Agreement.

61.     As of the Petition Date, the Ad Hoc Group collectively holds approximately 45%

of the aggregate outstanding principal amount of the Bond Green Bonds, and another institution

holds a majority of the exposure under that instrument.  As described further below, the Debtors

have also separately entered into a restructuring support agreement, attached hereto as **Exhibit B**,

with the largest holder of the Bond Green Bonds ("***Bond Green Bond RSA***").

**E.     NMTC Transaction**

62.     In June 2022, the Company closed on a qualified New Markets Tax Credit

financing transaction (the "***NMTC Transaction***").  The NMTC program is a federal community

investment program carried out by the U.S. Department of Treasury that is intended to promote

capital investment in qualifying communities by allowing taxpayers to claim certain federal

income tax credits related to equity investments in qualifying community development entities

("***CDEs***").  The Company's participation in the NMTC Transaction allowed it to obtain new

financing subject to certain tax advantages resulting from the NMTC program.  The Company

entered into two loan agreements as part of the NMTC Transaction.

63.     First, the Company entered into a *Loan Agreement* dated June 27, 2022, by and

between Enviva Pellets Epes Finance Company, LLC ("***Enviva Epes Finance***") (as borrower) and

United Bank[19] (as lender) (together with the underlying Promissory Note, the "***United Bank***

***Loans***"), by which Enviva Epes Finance borrowed an aggregate principal amount of

approximately $31.4 million.  That principal balance accrues interest at 5.63% per annum.[20]

64.     Second, the Company entered into a *Loan Agreement*, dated June 27, 2022, by and

among Enviva Pellets Epes, LLC ("***Enviva Epes***") (as borrower), NIF SUB IV, LLC, UBCD, SUB

CDE Midway, LLC, PBCIF SUB-CDE4, LLC, and Munistrategies SUB-CDE#41, LLC

(collectively, the "***CDE Lenders***"), and Enviva[21] (along with the underlying notes, the "***NMTC***

***Loans***") by which Enviva Epes borrowed an aggregate principal amount of approximately $42.0

million.  That principal balance accrues interest at a weighted average rate of 2.9% per annum.

Additionally, the NMTC Loans are secured by first-priority liens on and security interests in the

Epes Plant.

65.     As of the Petition Date, Enviva Epes owes approximately $42.0 million of

aggregate principal obligations under the NMTC Loans, of which approximately $30.4 million is

---

[19]   United Bank is a community bank in Southwest Alabama & Northwest Florida.

[20]   To secure its performance under the United Bank Loans, the Company pledged as collateral:  (a) Enviva Epes
Finance's interest in certain collateral that was pledged to secure a loan it had issued to a third party; (b) the
Company's bank account held by United Bank; and (c) Enviva Epes Finance's interest in a Contribution
Agreement between Enviva Inc., Enviva Pellets, LLC, Enviva Pellets Epes Holdings, LLC, Enviva Epes Finance
and Enviva Pellets Epes, LLC (collectively, the "***United Bank Loans Collateral***").

[21]   Enviva fulfilled a limited role in the NMTC Loans, its only obligation being to maintain certain financial
covenants.

attributable to aggregate principal obligations that are owed by Enviva Epes Finance under the United Bank Loans.  The Company is current on its interest payments under the NMTC Loans.

### F.    FiberCo Notes

66.    In 2021, Enviva FiberCo, LLC ("***Enviva FiberCo***") entered into two promissory notes with John Deere and Merchant Bank (the "***2021 Promissory Notes***") to fund the purchase of certain pieces of equipment.  On December 27, 2021, Enviva FiberCo merged with a number of other Enviva entities to form Enviva Pellets Northampton, LLC (the "***Northampton Merger***"), which then later changed its name to Enviva Pellets, LLC ("***Enviva Pellets***").  In the Northampton Merger, Enviva Pellets inherited Enviva FiberCo's obligations under the 2021 Promissory Notes.  In 2022 and 2023, Enviva Pellets entered into additional promissory notes (together with the 2021 Promissory Notes, the "***FiberCo Notes***") with John Deere, Northland Capital, and JP Morgan Chase Bank, N.A. (together with Merchant Bank, the "***FiberCo Note Lenders***"), which the Company used to fund the purchase of additional equipment.

67.    Together, the initial principal amount of the FiberCo Notes totaled approximately $4.9 million.  The execution date, principal, interest rate, and maturity date of each of the FiberCo Notes are as follows:

| Note | Execution Date | Initial Principal | Interest Rate (per annum) | Maturity Date |
|---|---|---|---|---|
| John Deere Note Payable #1 | October 27, 2021 | $1,001,600 | 2.50% | October 27, 2026 |
| John Deere Note Payable #2 | May 10, 2022 | $939,780 | 3.80% | May 10, 2027 |
| Northland Capital Note Payable #1 | March 16, 2022 | $154,000 | 6.07% | March 16, 2027 |
| Merchant Bank Note Payable #1 | June 30, 2021 | $293,490 | 4.95% | June 30, 2026 |
| JP Morgan Note Payable #1 | December 12, 2022 | $1,449,749 | 6.40% | December 12, 2025 |
| JP Morgan Note Payable #2 | March 29, 2023 | $1,044,118 | 6.42% | March 29, 2026 |

68.     Each individual FiberCo Note is secured by the equipment that was purchased with the financing provided by that FiberCo Note.

69.     As of the Petition Date, Enviva Pellets owes approximately $3.3 million in aggregate principal obligations under the FiberCo Notes.  The Company is current on its interest payments under the FiberCo Notes.

**G.     Amory Seller Note**

70.     On August 4, 2010, the Company, through its subsidiary Enviva Pellets Amory, LLC ("***Enviva Amory***"), acquired all of the purchased assets of CKS Energy, Inc. and land held by CKS Realty, Inc.  To pay a portion of the purchase price, Enviva Amory issued a Convertible Subordinated Promissory Note, dated August 4, 2010, to CKS Energy, Inc. for a principal amount of $2 million (the "***Amory Seller Note***").  On December 27, 2021, Enviva Amory also participated in the Northampton Merger.  In that merger, Enviva Pellets inherited Enviva Amory's obligations under the Amory Seller Note.

71.     The principal balance of the Amory Seller Note accrues interest at 6.00% per annum, and fully matured on August 4, 2017.  However, notwithstanding the maturity date, the

Amory Seller Note dictates that no payments of principal or interest shall be made until Enviva Amory's former sole member, Intrinergy Operating, L.P. ("*Intrinergy*"), is first fully paid an amount equal to (a) all capital contributions made by Intrinergy to Enviva Amory, plus (b) 15.00% interest per annum accruing on such unrepaid contributions (together, the "*Intrinergy Preferred Return*").  To date, the Intrinergy Preferred Return has yet to be satisfied in full, and therefore there have been no payments made to CKS Energy, Inc. on the Amory Seller Note.

72.    As of the Petition Date, the Debtors owe $2 million in aggregate principal obligations under the Amory Seller Note.

**H.    Other Financial Obligations**

73.    As described in further detail below, RWEST (as defined below) has claimed entitlement to certain termination payments totaling approximately $348.7 million.

74.    Additionally, the Debtors have trade claims and additional general unsecured claims, some of which are contingent and/or unliquidated and/or disputed.

**I.    Common Stock**

75.    Enviva's common stock (the "*Common Stock*") is listed on the New York Stock Exchange ("*NYSE*") under the symbol "EVA."  On January 23, 2024, Enviva was notified by the NYSE that the average closing price of Common Stock had fallen below $1.00 per share over a period of 30 consecutive trading days, which I understand is the minimum average closing price required to maintain continued listing on the NYSE.  I understand that the NYSE allows listed companies to cure such deficiency within the following six months if, on the last trading day of any calendar month during the cure period, the company has a closing share price of at least $1.00 and an average closing share price of at least $1.00 over the 30-trading day period ending on the last trading day of that month.  On February 2, 2024, the Company notified the NYSE of its intent to cure this deficiency.

76.    As of the Petition Date, Enviva has approximately 74.7 million shares of Common Stock outstanding, trading at approximately $0.40 per share.  Riverstone Echo Rollover Holdings, L.P., Riverstone Echo Continuation Holdings, L.P., and Riverstone Echo PF Holdings, L.P. collectively hold approximately 32.4 million of these shares.

## III.    EVENTS LEADING TO THE CHAPTER 11 CASES

77.    Over roughly the past 18 months, the Company has faced significant financial and operational pressures.  In response, the Company proactively has taken steps to control costs, manage its balance sheet, address near-term obligations, and otherwise maximize value for stakeholders.  In addition, the Company retained financial and legal advisors and implemented strategic initiatives targeted at, among other things, (a) renegotiating its sales agreements to terms that could sustain the Company's operations and future financial health and (b) securing additional funding to sustain the Company's business until such agreements were successfully amended.

78.    Given the Company's sizable debt facilities, other financial obligations coming due in the near-term, and the results of extensive arm's-length negotiations with potential new capital providers as described below, it became clear to the Company that an out-of-court restructuring would not be supported by the new capital providers, and the Company ultimately determined that an out-of-court restructuring would be inadequate and infeasible and that entering into the RSA (as defined below) and filing these chapter 11 cases was necessary to right-size the Company's capital structure, address its financial obligations, and maximize value for all stakeholders.

### A.    Challenges Facing the Company

#### 1.    *Negative Cost, Operational, and Revenue Pressures*

79.    The Company historically was successful in prioritizing contracted revenue and EBITDA growth but, recently, has financially struggled due to, among other things, elevated and increasing operational costs, plant production issues, new production delays, rising debt levels,

increasing costs to service that debt, and a failure of contractual escalators to appropriately scale with actual costs. As the Company strove to increase revenue by increasing both production and production capacity, cost increases followed due to, among other things, capital expenditures, increased maintenance, buying higher-priced wood fiber, increased labor costs due to utilizing temporary labor caused by increasing employee turnover, and the contemporaneous increase in overall inflation which magnified the impact of these factors.

80.     Many of the Company's customers are established utility and energy providers with significant demands for wood pellets and a committed investment in renewable energy who purchase on long-term, take-or-pay offtake contracts. Despite substantial production capacity, the Company historically has been modestly "short" in its ability to produce enough pellets to fulfill contractual requirements and satisfy customer demand. To fill its short position, in addition to its efforts to maximize production capacity, the Company would procure pellets under short-term contracts and on the spot market. When spot prices were more in-line with historical levels, these purchases allowed the Company to continue growing revenue and EBITDA while satisfying demand beyond its production capacity.

81.     In 2022, however, the spot market for industrial wood pellets reached an all-time high. Under those circumstances, the Company could not affordably fill its short position in the spot market, which, among other factors, was a motivation for the Q4 2022 Transactions, defined and described more fully below, in which the Company contracted to purchase a significant quantity of wood pellets over the course of several years.

82.     The Company also paid some customers to defer or cancel pellet shipments under lower-margin long-term contracts so that the Company could sell the pellets on the spot market at higher prices and greater profitability. Although these strategies had a positive impact on revenue

and EBITDA in the relevant current period, the transactions resulted in reduced pricing (in the form of discounts on future contracted volumes) for the remainder of the contracted period.

83.     In early 2023, spot prices for wood pellets fell significantly, and at the same time the combined effect of increased production costs and historically high inflation reduced the Company's margins on its long-term, take-or-pay offtake contracts.  Although these contracts provide stable sources of revenue and tend to include provisions that provide margin protection and price escalators, certain of these escalators were tied to foreign price indices rather than U.S. price indices and proved to be insufficient to offset the cost increases, particularly due to U.S. inflation, and other pressures the Company has faced.

84.     Interest rates on the debt carried by the Company also have climbed over the past two years, further increasing the Company's operating costs.  Specifically, the rate of interest on the Revolving Loans and Term Loans is tied to the secured overnight financing rate ("***SOFR***"), a rate which has increased significantly in the past two years.  More recent debt that the Company incurred to address liquidity issues and operational pressures and to facilitate what it believed were opportunistic transactions likewise bears higher interest rates than certain older debt.

### 2.     *Events Impacting Plant Operations and Production*

85.     Certain national and global events have increased the operational and cost pressures on the Company.  The Company's third-party shipping partners' operations have experienced severe dislocations, which has incrementally impacted the Company's distribution costs related to demurrage and to loading, transporting, and unloading its wood pellets.  The Company also has seen an increase in incremental costs to support continued services from third-party fiber suppliers and trucking service providers.  In addition, the war in Ukraine has impacted operations since 2022, including through an immediate spike in energy prices in February 2022.  Initially, that increase was significantly offset by an increase in demand for wood pellets and spot market sale

opportunities, spurred on by the sudden unavailability of Russian natural gas.  The spike in demand, however, eventually cooled as pellet-fueled generation in certain parts of the E.U. and U.K. declined.

86.     Further, during 2022, the Omicron variant of COVID-19 impacted the Company's operations by increasing rates of infection, impacting the availability of healthy workers, and forcing elevated absences in the Company's hourly workforce as infected workers quarantined at home.  Increased levels of personnel turnover further impacted the Company's business in terms of both labor costs and productivity, as it is costly and time consuming to train new employees.  Those challenges resulted in their own incremental costs, reduced availability at the Company's facilities, and depressed aggregate production levels—all of which made the Company more vulnerable to a subsequent sustained change in wood-pellet pricing and costs, especially with the Company being reliant on procurement to fulfill demand.

87.     Other events also have caused direct obstacles to domestic operations.  For example, in March 2023, a strong tornado touched down in Amory, Mississippi, which caused damage to the Company's wood-pellet production plant located in Amory, Mississippi (the "***Amory Plant***").  Operations at the Amory Plant, which typically produces approximately 104,000 metric tons of pellets per year, were immediately suspended.  The Company invested $11 million in capital expenditures to resume operations at the Amory Plant, which reopened in the fourth quarter of 2023.  The Company maintains insurance coverage for property damage, inclusive of business interruption and casualty.  The Company has received some insurance recovery to date, and expects to recover additional amounts subject to deductibles and retentions.  Although insurance covered some of the direct loss stemming from this natural disaster, the temporary loss

of the production from the Amory Plant contributed nonetheless to the operational pressures negatively impacting the Company.

3.     *Challenges with Existing Customers*

(a)     RWE Supply & Trading GmbH

88.     RWE Supply & Trading GmbH ("***RWEST***") is a longstanding transaction counterparty and customer.  Until recently, the Company maintained two long-term contracts, entered into in 2010 and 2011 (the "***Master Agreements***"), as well as a FOB Master Agreement, entered into in 2012, which governed the sale of wood pellets to RWEST and the purchase of wood pellets from RWEST and provided basic terms for future transaction-specific agreements, called "Confirmations." Enviva, LP was the Company entity party to the 2011 and 2012 Master Agreements, and Enviva Pellets Waycross, LLC ("***Enviva Waycross***") was the Company entity party to the 2010 Master Agreement.

89.     In the fourth quarter of 2022, Enviva and RWEST agreed to a series of transactions (the "***Q4 2022 Transactions***") whereby Enviva:  (a) agreed to sell to RWEST a large quantity of wood pellets in order to opportunistically transact on the significantly elevated spot pellet prices experienced during late 2022, and (b) agreed to purchase from RWEST in the future an even larger quantity of wood pellets at prices that were below management's expectations for future market prices, but (due to the then-current market pricing) higher than historical average prices, in order to secure future pellet volumes for sale by the Company to third parties.  The sales component of the Q4 2022 Transactions allowed the Company to profit from the significantly elevated spot pellet prices; however, the longer-dated and fixed-price purchase components of the Q4 2022 Transactions were unhedged, and because the price for the to-be-purchased future volumes was significantly higher than the sales prices under pre-existing sales contracts for the corresponding periods, the profitability of the Q4 2022 Transactions ultimately depended on the Company's

36

ability to resell the to-be-purchased wood pellets under future short-term contracts or spot agreements at sales prices higher than the fixed future purchase price.

90.    In early 2023, however, market prices for wood pellets fell well below the prices experienced in the fourth quarter of 2022 and significantly lower than the fixed prices at which the Company agreed to purchase pellets from RWEST.  Those prices have not recovered.  The purchase components of the Q4 2022 Transactions thus failed to produce positive economic results and, if completed as scheduled, would have put significant liquidity pressure on the Company.  As described below, the Q4 2022 Transactions ultimately resulted in RWEST claiming entitlement to an early termination fee when the Company did not execute on the scheduled purchase of a substantial portion of the contracted volumes from RWEST and RWEST therefore terminated the Master Agreements.

91.    The board of directors of Enviva (the "***Board of Directors***" or the "***Board***") initiated an independent investigation in early November 2023, to be conducted by a special committee of the Board, to review, among other things, the Q4 2022 Transactions, including the corporate authorizations in connection therewith.  Despite their magnitude, the Q4 2022 Transactions were not disclosed to, considered, or approved by the Board when entered into by management.  Baker Botts LLP is currently in the process of conducting an independent investigation at the direction of the special committee of the Board.

(b)    MGT

92.    As referenced above, EWH is party to an agreement with MGT in which it is obligated to supply MGT with an annual base quantity of approximately 1 million metric tons of wood pellets each year for use at MGT's biomass power station.

93.    The MGT Agreement is a large, and to the extent MGT performs, highly profitable supply contract.  In recent years, however, MGT has encountered its own liquidity constraints,

operational challenges, and financial headwinds, including difficulties converting and consistently keeping online the plant in which the wood pellets were to be used, and, in 2023, undertook certain restructuring efforts under U.K. law.  MGT then requested and received more favorable payment terms from EWH, which, in turn, resulted in an elevated account receivable in favor of EWH. MGT paid down that receivable over time and, as of March 1, 2024, owed EWH approximately $13 million.

94.     Despite the progress made, MGT's failure to repay the outstanding balance created risk to the go-forward relationship with MGT and with respect to the Agreement.  Additionally, MGT had been performing its payment obligations on a "pay-as-burn" basis, whereby MGT did not pay EWH for the delivered wood pellets until it actually used and consumed the pellets as fuel, and the delivered, but unused wood pellets stored at MGT facilities remained the property of EWH. Given the importance and profitability of the MGT Agreement to Enviva, EWH initially approved this course of action through a series of agreements with MGT in August 2022 (the "***Arrangement Period Agreements***"), which were designed to give some measure of relief to MGT as it worked through strategic and financial issues.  Although the Arrangement Period Agreements expired by their own terms in September 2023, MGT continued to perform only on a "pay-as-burn" basis, which was not compliant with the MGT Agreement.  MGT communicated that it would be unable to move away from "pay-as-burn" performance without first addressing its accounts receivable balance and certain working capital needs.

95.     On March 7, 2024, Enviva Inc. and MGT entered into an agreement to provide MGT with a $23 million working capital loan (the "***Working Capital Loan***").  As consideration for the Working Capital Loan, on the same day, MGT entered into a standstill agreement (the "***MGT Standstill***") whereby MGT agreed to not take any action to terminate the MGT

Agreement, including as a result of the Company's chapter 11 filings, during the standstill period.
Subject to its terms, the MGT Standstill will remain in effect through the earlier of the effective
date of any chapter 11 plan or May 15, 2025, subject to certain termination rights, including if the
Debtors solicit a chapter 11 plan that does not provide for the Debtors' assumption of the MGT
Standstill.

96.     Under the terms of the Working Capital Loan, Enviva will provide MGT with
(a) $13 million in cash, which MGT will use to pay off the remainder of its accounts receivable
balance with EWH; and (b) a shipment of wood pellets from Enviva's inventory—not
EWH's—the price of which would otherwise equal approximately $10 million. MGT is required
to repay the amounts owed under the Working Capital Loan in installments to be completed by the
effective date of the Company's forthcoming chapter 11 plan, or, alternatively, no later than May
15, 2025.

97.     Among other things, the MGT Standstill is intended to assure that the MGT
Agreement is insulated from the Company's bankruptcy. EWH and its stakeholders, including the
Company, stand to benefit from EWH's operations proceeding fully and in the ordinary course.
Moreover, the MGT Standstill helps to assure that no claims are asserted under the Guarantee
Agreement or the Indemnification Agreement relating to MGT, minimizing potential exposure for
the Company and for JHLIC USA to their mutual benefit.

**B.      Prepetition Remediation and Liquidity Preservation Strategies**

98.     As the cost issues, volatile spot pricing, operational and trade pressures, and
macroeconomic environment continued to unfold and pressure the Company (including with
respect to covenants in its funded debt), it became clear to the Company that, despite its best efforts
to control costs and address certain aspects of its finances on its own, additional time,

consideration, and expertise would be necessary to effectively navigate its financial distress.  As a result, it undertook certain remediation and liquidity-preservation strategies as set forth below.

### 1.    *The Company Bolsters its Liquidity*

99.    In January 2023, the Company engaged with lenders under its Senior Secured Credit Facility to close on a term loan providing $105 million in new loans, referred to as the "Incremental Term Loans," which will mature on June 30, 2027.  The Company used this financing to repay a portion of the principal outstanding on the Revolving Loans, along with related interest and costs.  This transaction, in conjunction with the PIPE described below, allowed the Company to strategically eliminate certain higher-interest debt, thereby positively affecting its short-term cash flow and liquidity.

100.    In March 2023, the Company entered into a private placement of public equity transaction ("***PIPE***") to fund its growth capital program, as well as repay borrowings under its Senior Secured Credit Facility, and for general corporate purposes.  To effectuate the PIPE, the Company engaged with various investors including its two largest shareholders and reached a deal that ultimately brought approximately $250 million into the Company.[22]

101.    The Company has further engaged in cost-cutting measures.  With respect to certain plants and ports, it has made changes in fiber procurement strategies, increased cost discipline with respect to maintenance and repair expenditures, and adjusted manufacturing processes to raise production rates, thereby improving fixed-cost absorption.  The Company also has reduced overhead through reductions in force and reductions in office lease expenses.  In addition, the Company eliminated its quarterly dividend in May 2023.

---

[22] The Company reported this event at Enviva Inc., Current Report (Form 8-K) (February 28, 2023), https://www.sec.gov/ixviewer/ix.html?doc=/Archives/edgar/data/0001592057/000110465923028007/tm238321d1_8k.htm.

(a)      The Company Enlists the Aid of Committees and Advisors

102.    In May 2023, the board of directors of Enviva formed a sub-committee (the "***Finance Committee***") to examine the Company's performance issues and to develop solutions.  I understand that the Finance Committee initially relied on internal resources and later retained advisors.  To that end, the Company retained Alvarez & Marsal ("***A&M***") as financial advisor in June 2023 to initially assess and enhance the Company's existing financial planning and reporting tools.  Consequently, A&M assisted the Company with the development of a detailed 13-week cash flow forecast, business-planning model, and KPI-reporting dashboard.  Subsequently, A&M's role continued to evolve to include assistance with tracking and assessing historical and projected financial performance, development of a long-term business plan and scenario analysis.  As part of the overall business planning process, A&M worked together with the Company to evaluate plant performance and operational initiatives and assisted in ongoing customer contract negotiations.  Additionally, A&M's role has evolved to include, among other roles and responsibilities, assistance with liquidity forecasting, vendor management, facilitation of counterparty diligence, and contingency planning.

103.    I was hired as CFO in August of 2023.  In August 2023, the Company expanded its engagement with Vinson & Elkins LLP ("***V&E***"), who has been the Company's historic counsel, to serve as restructuring counsel, and the Company later hired Lazard Frères & Co. LLC ("***Lazard***" and, collectively with A&M and V&E, the "***Advisors***") as investment banker in early October 2023.  Lazard, along with A&M, began working with the Company on forecasting cash flow, analyzing and preserving liquidity, exploring out-of-court restructuring solutions, and implementing contingency planning for a potential in-court process in the event the Company was unsuccessful in finding a comprehensive out-of-court solution.  During this time, the Company and the Advisors explored a number of potential out-of-court alternatives.

(b)    <u>Draw Down of Senior Secured Credit Facility and Cash Move</u>

104.    In the face of continued uncertainty in the wood-pellet market, on September 28, 2023, the Company drew down all available Revolving Loans, an amount equal to approximately $246.5 million, (the "***September Draw***") as a proactive measure to shore up liquidity as, among other things, the Company sought to engage with contract counterparties, implement a business plan, and prepare to pursue a recapitalization process.

105.    On October 30, 2023—in response to, among other things, the loss of automated clearing house ("***ACH***") capabilities with Enviva's principal operating account—the Company moved substantially all the remaining proceeds of the September Draw, roughly $230 million (the "***Cash Management Transaction***"), to a bank account held by Debtor Enviva MLP International Holdings, LLC ("***MLP***"). The Company believes the Cash Management Transaction was conducted in full compliance with the terms of the Senior Secured Credit Facility. The Cash Management Transaction allowed the Company to preserve valuable liquidity, increased funds available to finance operations and other strategic alternatives, preserved optionality, and enhanced the Company's cash-management functionality.

106.    The Company memorialized the mechanical terms of the Cash Management Transaction in the "***Intercompany Arrangements***," which are comprised of a *Letter Agreement Regarding Cash Management Arrangement*, dated October 27, 2023 (the "***Letter Agreement***"), and an *Intercompany Credit Agreement*, dated as of October 27, 2023, between MLP, as Lender and Enviva, LP, as Borrower (the "***Intercompany Credit Agreement***").

(c)    <u>RWEST Negotiations</u>

107.    In an attempt to address or mitigate the negative impact of the Q4 2022 Transactions, the Company began negotiating with RWEST in the fall of 2023 to restructure its obligations. Those negotiations culminated in a series of standstill agreements (the "***Standstill***

*Agreements*") beginning in September 2023, under which the parties agreed not to exercise any rights or remedies under the Master Agreements in order to facilitate further negotiations focused on reaching a successful restructuring of the parties' obligations to one another.

108.    On January 16, 2024, RWEST issued two Termination Notices which terminated the Master Agreements and triggered a ten-business-day notice period following which early termination payments totaling approximately $348.7 million (the "***Early Termination Payments***") became due under the Master Agreements.  Although RWEST provided a brief extension, the Early Termination Payments became due on February 15, 2024.  The Company did not pay the Early Termination Payments and, on February 16, 2024, RWEST issued a letter demanding the overdue amounts.   Under the Standstill Agreements, the obligations with respect to Enviva Waycross under the 2010 Master Agreement are approximately $11 million, and the obligations with respect to Enviva, LP under the 2011 Master Agreement are approximately $338 million. The Company does not believe any amounts are owed to or from the Company or RWEST under the 2012 Master Agreement.

### 2.    *The Company Implements Strategic Solutions*

109.    In its Quarterly Report (Form 10-Q) for the period ending September 30, 2023 (the **"*Q3 2023 Report*"**), Enviva's management reported substantial doubt about the Company's ability to continue as a going concern if certain events transpired and conditions persisted.  It was clear that the Company needed to immediately implement emergency, targeted efforts to address the factors that were hindering its performance.

110.    By this time, the Advisors' ongoing efforts to review and evaluate the Company had yielded a clearer picture regarding certain financial-health metrics that the Company would need to improve, and to what degree, in order to stabilize in the near term.  Of these metrics, the chief considerations became the Company's EBITDA and gross margins.  If these metrics were

sufficiently improved in the near-term, the Company believed that it could lay the foundation for a future capital raise that would provide it with further capability to address its capital structure and return to financial health.

111.    Based on these analyses, the Company and its Advisors identified renegotiation of certain pricing, volume, and adjustment terms within its portfolio of long-term fixed-price contracts to be the key revenue-side area it could leverage towards increasing its projected gross margins and EBITDA.  With that goal identified, the Company and its Advisors settled on a two-pronged solution:  (1) engage with key customers to renegotiate the terms of the long-term fixed-price agreements to include additional pricing adjustments and mechanisms sufficient to rebound the profitability of the sales thereunder; and (2) solicit a broad array of lending parties for bridge financing to give the contract renegotiation efforts enough time to successfully run their course.  As noted above, the Company also focused heavily on cost optimization at its plants and elsewhere.

(a)    "Raise the Bridge" Efforts (Contract Renegotiations)

112.    Beginning in fall 2023, a subset of the Company and the Advisors (the "***RTB Team***") set out to aggressively re-negotiate, or "raise the bridge" ("***RTB***") on, the terms of the existing long-term contracts to make the profitability metrics sufficiently sustainable for the Company.  The RTB Team has devoted significant time and energy over the course of the past six months to implement the initiative.

113.    First, the RTB Team conducted a systematic review of existing contracts with key customers in Europe and Asia to highlight and identify terms and features that could feasibly be renegotiated and boost the profitability of the arrangement.  Based on that review, the RTB Team then developed customized strategies to guide its engagement and deliverables to negotiations with each individual counterparty and contract.  Beginning in early November 2023, with a strategy in

hand, the RTB Team then proceeded to initiate contract negotiations with customers it had identified.  The negotiations have involved multiple rounds of proposals and counterproposals, countless remote discussions, and multiple trips from the United States to various destinations in Asia and Europe to engage with customer representatives in person.  As of the Petition Date, the RTB Team's renegotiation efforts remain ongoing.

114.    The RTB Team was able to make substantial headway; its efforts yielded numerous working proposals and counterproposals, approximately 25% of which have materialized into firm commitments to long-term price increases across a large portion of the Company's portfolio.  To accomplish this, a significant amount of stakeholder involvement has been required to overcome inherent delays and obstacles baked into the negotiating process.  For example, several contracts with Japanese project finance counterparties required that the counterparty obtain consent to changes in the counterparty's secured debt documents with banks (*e.g.*, payment terms). Additionally, many of the modifications involve more than just price increases; other material terms have been adjusted as well.  For instance, in certain cases, the RTB Team was able to create value by decreasing the overall volume sold but increasing the price per metric ton.  In other scenarios, the counterparties have agreed to alter certain wood-pellet source restrictions or quality levels, sometimes driven by the type of boiler such counterparty uses, to the benefit of the Company's profit margin.  The Company believes that the RTB Team's continued efforts during the chapter 11 cases may result in further successful commitments, as the RTB Team and the counterparties to the remaining contracts continue to work together to find a solution.

115.    In some cases where the negotiations were not productive, or where significant uplift was unlikely to be realized, the Company and such customers agreed to mutual termination of certain contracts, often on a "no-fault" basis, allowing the Company to walk away from

out-of-the-money contracts without incurring additional costs or claims.  The RTB Team's efforts to date resulted in several such "no-fault" terminations—which should independently serve to further stem the Company's contractual losses over time.

116.    As of the Petition Date, the RTB Team's efforts are expected to create meaningful uplift over the course of approximately two-and-a-half months.  Although documentation is not yet final, the RTB Team is working with the relevant counterparties' stakeholders to finalize terms in agreed form with the Company.

(b)      Bridge Financing Efforts

117.    Following the Q3 2023 Report, beginning in November 2023, the Company and its Advisors also began actively engaging with and soliciting various creditors, equity holders, strategic partners, and other third parties regarding their interest in participating in a prospective bridge financing, as well as long-term financing, to support the Company's efforts to successfully complete a comprehensive restructuring of its existing indebtedness on an out-of-court basis. Lazard marketed the potential financing, soliciting numerous counterparties, including both traditional financing sources and strategics, over the course of more than three months for potential participation in a financing transaction.

118.    These efforts were fruitful—the Company and the Advisors were able to engage in preliminary discussions with many parties (including, as noted below, the Ad Hoc Group), which included involvement in countless formal and informal conversations and execution of non-disclosure agreements ("***NDAs***"), which themselves required several rounds of drafting and negotiation to secure and finalize.  Once under NDA, Lazard facilitated an extensive due diligence process with these counterparties that encompassed numerous diligence requests, the responses to which were either posted to a virtual data room or distributed directly to counterparties.

3. *Stakeholder Engagement*

119.    Also following the Q3 2023 Report, various stakeholders hired advisors and initiated correspondence with the Company regarding the issues facing the Company and potential pathways to resolution.  The Company and its Advisors actively engaged in negotiations with these stakeholders.

120.    In November 2023, certain holders of claims formed the Ad Hoc Group and retained Davis Polk & Wardwell LLP and Evercore Group L.L.C. as advisors (the "***Ad Hoc Group Advisors***").  The Ad Hoc Group Advisors initially contacted the Company and its Advisors, noting that the Ad Hoc Group represented a substantial portion of the 2026 Notes and other claims, and that the Ad Hoc Group was interested in engaging in constructive talks with the Company regarding a financing or other strategic transaction.  Shortly thereafter, the Ad Hoc Group Advisors and the members of the Ad Hoc Group entered into NDAs, and the Company began providing certain diligence materials to and engaging in discussions with the Ad Hoc Group regarding potential out-of-court bridge financing efforts.

121.    An ad hoc group of Epes Bondholders (the "***Ad Hoc Epes Bondholder Group***") and an ad hoc group of Bond Bondholders (the "***Ad Hoc Bond Bondholder Group***," and, with the Ad Hoc Epes Bondholder Group, the "***Ad Hoc Green Bondholder Groups***") also formed, negotiating through Kramer Levin Naftalis & Frankel LLP and Perella Weinberg Partners LLP as advisors to the Epes Green Bonds Trustee and the Bond Green Bonds Trustee.  The Ad Hoc Green Bondholder Groups engaged in written correspondence with the Company's Advisors regarding the existence of alleged potential defaults under the Bond MS Loan Agreement.    This correspondence never materialized into a notice of default.    After these initial rounds of correspondence, the Ad Hoc Green Bondholder Groups proceeded to further engage with the

Company's Advisors in discussions regarding potential bridge financing and consensual resolution of treatment of their claims in a potential restructuring.

122.    RWEST retained Skadden, Arps, Slate, Meagher & Flom (UK) LLP and Houlihan Lokey Capital, Inc. as advisors.  As noted above, the Company's Advisors continued to negotiate diligently with RWEST during this time period on a workable structure for the parties obligations and relationship going forward, and reached agreement on certain amendments to the Standstill Agreements.

123.    Additionally, the Company engaged in negotiations with MGT on contract price uplift and also engaged in discussions with John Hancock as relevant to its rights in EWH.

### C.    The Company Finds a Path Forward

124.    Despite the extensive marketing activity and negotiations with key stakeholders and other third parties, additional factors, including the Company's deteriorating liquidity profile, put substantial pressure on the process.  The Company continued to face operational challenges and encountered additional developments in January and February 2024 that accelerated the Company's decline in liquidity faster than previously anticipated.  As a result, the emphasis in negotiations with potential financing parties shifted from bridge financing towards potential transactions that would provide holistic in-court and out-of-court solutions.

125.    On January 15, 2024, the Company's Board of Directors voted to forgo making a required semi-annual interest payment under the 2026 Notes.  That decision preserved approximately $24.4 million in immediate additional liquidity to support the Company's efforts to renegotiate and satisfy its near-term obligations out of court.  The skipped payment also signaled to key stakeholders that the Company was seriously evaluating all restructuring options available. And, because the 2026 Indenture provides for a 30-day grace period before a failure to make an interest payment results in an "Event of Default," the Company maintained the option to cure the

missed payment before such default could trigger an event of default under the 2026 Notes and the Company's other debt facilities.

126.     During the grace period, the Company worked to advance the various proposals it had received, both from stakeholders inside the capital structure and from third parties outside the capital structure.  The Company and the Advisors considered each proposal in turn and focused additional efforts into strategically leveraging competitive tension between the proposing parties to achieve the maximum value available to the Company and all stakeholders in light of the circumstances.  The Company and the Advisors continued to negotiate extensively with each counterparty and engaged in multiple rounds of negotiations across all proposed transactions.

127.     The Ad Hoc Group was among the parties negotiating financing proposals with the Company.  These negotiations included discussion of out-of-court and in-court transaction structures (and, at times, both in parallel).  As part of this process, and as the Company continued to evaluate its strategic objectives and the feasibility of bridge financing, the Ad Hoc Group conveyed a desire to work constructively with the Company on a holistic deleveraging transaction. Moreover, as it came to hold majority positions in the Company's secured as well as unsecured funded debt, the Ad Hoc Group was uniquely positioned as a negotiating counterparty to provide the requisite consents and support necessary to implement various transaction structures.

128.     While engaging with the Ad Hoc Group, the Company continued to pursue alternatives for a financing, including out-of-court financing; however, the Company refocused its out-of-court efforts on a refinancing of the Senior Secured Facility in parallel to negotiating with the Ad Hoc Group.  As part of that work, the Company and its Advisors found significant interest from a group of certain third-party investors and a strategic partner who did not have a position in the capital structure, most of whom had been extensively engaged in the bridge-financing process.

129.    Through this multi-party process, the in-court transaction proposed by the Ad Hoc Group (the "***Ad Hoc Group Proposal***") ultimately emerged as the most value-maximizing proposal and, in my view, the best path forward for the Company and its stakeholders.  The Ad Hoc Group Proposal stands to provide the Company with a $500 million debtor-in-possession credit facility (the "***DIP Facility***") consisting of (i) a secured Tranche A facility (the "***Tranche A Facility***") in an aggregate principal amount equal to $250 million and (ii) a secured Tranche B facility (the "***Tranche B Facility***") in an aggregate principal amount equal to $250 million.  The DIP Facility would be administered in up to five draws—an initial draw of $150 million and up to four subsequent draws in amounts between $50 million and $100 million.  The Ad Hoc Group Proposal also allows the Company to syndicate up to $100 million of the total $500 million DIP Facility, with the Ad Hoc Group providing any ultimately unsubscribed amounts from that syndication process.

130.    The Ad Hoc Group Proposal presented notable advantages to the Company and key stakeholders compared to the other proposals received.  For example, in addition to first liens on the Company's relative handful of unencumbered assets, the proposed DIP Facility would be secured by a second-priority junior lien on the collateral package securing the Senior Secured Credit Facility.  Compared to other proposals, the Ad Hoc Group's proposed DIP Facility stood to provide the greatest liquidity to the Company with the least execution risk and at the lowest cost.  Additionally, the Ad Hoc Group's substantial holdings throughout the Company's capital structure has given the Company assurance of a smoother execution than with other proposals received by the Company, and the Company enters chapter 11 with a strong consensus among its funded debt holders.

131.    On February 15, 2024, the Company entered into forbearance agreements (the "***Forbearance Agreements***") with certain of the Senior Secured Credit Facility Lenders, 2026 Noteholders, Epes Bondholders, and Bond Bondholders (collectively, the "***Forbearing Counterparties***") holding the requisite amount of the aggregate principal amount outstanding or committed under the applicable facilities, wherein the Forbearing Counterparties agreed to forbear from exercising any of their rights and remedies with respect to potential defaults and events of default under the applicable agreements until the end of a Forbearance Period, ultimately terminating on March 12, 2024 at 11:59 p.m. New York time.   The Forbearance Agreements provided the Company and key stakeholders with additional time and flexibility to continue critical negotiations with respect to an in-court-restructuring solution.[23]

132.    On March 12, 2024, the Company and the Ad Hoc Group entered into the Restructuring Support Agreement ("***RSA***") which is attached hereto as **Exhibit C**.[24] to document the agreement that had been reached among the parties on an in-court restructuring transaction.

### D.    The Future of Enviva

#### 1.    The RSA[25]

133.    The RSA documents the parties' commitment to the restructuring transactions described above.   Accordingly, it is an essential part of the Debtors' restructuring efforts and provides the Debtors with significant assurances regarding the ultimate success of the chapter 11 cases.   In particular, by signing the RSA, the members of the Ad Hoc Group (the "***RSA Parties***")

---

[23]    The Board also formed a transaction committee which ultimately recommended entry into the Forbearance Agreements, as well as the RSA (as defined herein) and the DIP Facility (as defined herein).

[24]    The summaries contained in this Declaration are qualified in their entirety by the provisions of the documents referenced. To the extent anything in this Declaration is inconsistent with such documents, the terms of the applicable documents shall control.

[25]    Capitalized terms used in this section that are not otherwise defined shall have the meanings ascribed to them in the RSA.

have agreed to support the restructuring process on the terms set forth in the RSA and the Term

Sheet (as defined in the RSA).  This includes an agreement by the Debtors and the RSA Parties to

take all actions that are reasonably necessary to implement the Restructuring (as defined in the

RSA) through a chapter 11 plan of reorganization.

134.   Under the RSA, the Debtors and the RSA Parties have agreed to a comprehensive

restructuring process, which includes certain key elements such as:

- agreement by the RSA Parties to vote in favor of the Plan (as defined in the RSA);

- support and facilitation of the Debtors' contract renegotiation process, including by imposing deadlines by which the Debtors and Customers (as defined in the RSA) must execute definitive documents reflecting the renegotiated contracts, as well as deadlines by which the Debtors must file motions to reject certain contracts with Customers;

- agreement by the Debtors to negotiate and pursue a settlement with the Consenting Epes Green Bondholders to provide for the release of cash from trust accounts in respect of the Epes Green Bonds on substantially similar terms to the MS Bond Settlement (the terms of which are detailed further below);

- comprehensive restructuring of the Company's capital structure, described further below;

- provision of a $750 million exit facility (the "*IL Exit Facility*") secured by first liens on substantially all assets of the Company;

- provision of a new $250 million revolving credit facility to provide the reorganized Company additional liquidity; and

- an equity rights offering of $250 million, plus amounts of the Tranche A DIP Facility not already converted (the "***ERO***"), used to repay the Tranche B DIP Facility and any Tranche A DIP Facility amounts not converted at emergence.[26]

---

[26] For the avoidance of doubt, all debt and equity financing contemplated by the RSA is subject to definitive documentation, final terms, and formal commitments.

135.   Additionally, the RSA contemplates a chapter 11 plan providing the following treatment of claims:

| Class | Treatment |
|-------|-----------|
| DIP Facility | The Tranche A Facility has the option to equitize into reorganized Enviva equity subject to certain conditions in the DIP Facility term sheet.  The Tranche B Facility to be repaid in cash at emergence. |
| Senior Secured Credit Facility | The outstanding Revolving Loans and Term Loans to be paid in full with cash proceeds from the 1L Exit Facility. Holders of Revolving Loans and Term Loans may also participate in the exit financing process and have the ability to voluntarily roll existing debt into the 1L Exit Facility on the terms thereof. |
| 2026 Notes | To be treated as general unsecured creditors and receive a pro rata share of reorganized Enviva equity and ERO participation in connection therewith. |
| Epes Note and Bond MS Note | To receive: (1) partial repayment with any remaining restricted cash held in the applicable trust accounts in respect of the related applicable Green Bonds; and (2) for remaining principal, to be treated as general unsecured creditors and receive a pro rata share of reorganized Enviva equity and ERO participation in connection therewith. |
| NMTC Loans | To be reinstated or refinanced. |
| Subsidiary General Unsecured Creditors[27] | To receive: (1) pro rata share of reorganized equity (in amounts to be determined in connection with the Plan) subject to dilution from certain fees, premiums, and other sources, including the conversion of Tranche A Facility claims and the ERO, and (2) the potential right to participate in the ERO. In addition, a cash-out option may be provided for non-financial unsecured claims. |

---

[27]   May consist of any general unsecured creditors of Enviva Development Finance Company, LLC, Enviva Pellets, LLC, Enviva Pellets Lucedale, LLC, Enviva Pellets Waycross, LLC, Enviva Port of Pascagoula, LLC, Enviva Energy Services, LLC, Enviva Pellets Greenwood, LLC, Enviva Pellets Bond, LLC, Enviva Pellets Epes Holdings, LLC, Enviva Pellets Epes Finance Company, LLC, Enviva Pellets Epes, LLC, and Enviva MLP International Holdings, LLC.

| Class | Treatment |
|---|---|
| HoldCo General Unsecured Creditors[28] | To receive: pro rata share of reorganized equity (in amounts to be determined in connection with the Plan) and subject to dilution from certain fees, premiums, and other sources, including the conversion of Tranche A Facility claims and the ERO. In addition, a cash-out option may be provided for non-financial unsecured claims. |
| Existing Equity Holders | To receive: (1) 5% of the reorganized Enviva equity, subject to dilution from certain premiums and sources, including the conversion of Tranche A Facility claims and the ERO; and (2) warrants with a 5 year term exercisable for 5.0% of reorganized equity, prior to any to dilution from the ERO, the conversion of Tranche A Facility claims and the MIP (as defined in the RSA), exercisable on a cashless basis, with Black-Scholes protection. |

136.     The RSA further contemplates, among others, the following case timeline and milestones:

- no later than one calendar day after the Petition Date, the Debtors shall file a motion seeking entry of the DIP Order;

- no later than seven calendar days after the Petition Date, the Debtors shall have obtained entry by the Bankruptcy Court of the Interim DIP Order;

- no later than 14 calendar days after the Petition Date, the Debtors shall file a motion seeking entry of an order setting a deadline for submitting any claim;

- no later than 35 calendar days after the Petition Date, the Debtors shall have obtained entry by the Bankruptcy Court of the Final DIP Order.

- no later than 45 calendar days after the Petition Date, the Debtors shall file with the Bankruptcy Court a motion seeking rejection of the Rejected Customer Contracts;

- no later than 90 calendar days after the Petition Date, the Debtors shall deliver to the Ad Hoc Group an initial draft of their revised long-term business plan;

---

[28]    May consist of any general unsecured creditors of Enviva, LP, Enviva Holdings GP, LLC, Enviva GP, LLC, Enviva Partners Finance Corp., Enviva Aircraft Holdings Corp., Enviva Holdings GP, LLC, Enviva Holdings, LP, Enviva Shipping Holdings, LLC, and Enviva Management Company, LLC.

- no later than 100 calendar days after the Petition Date, the Debtors shall have entered into definitive documentation in respect of all renegotiated Customer Contracts, subject to certain caveats;

- no later than 115 calendar days after the Petition Date, the Debtors shall deliver to the Ad Hoc Group their revised long-term business plan;

- no later than 120 calendar days after the Petition Date, the Debtors shall file with the Bankruptcy Court: (i) the Plan; (ii) the Disclosure Statement; (iii) a motion (the "***Disclosure Statement and Solicitation Motion***") seeking, among other things, (A) approval of the Disclosure Statement, (B) approval of procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan, (C) approval of the Solicitation Materials, and (D) to schedule the hearing to consider final approval of the Disclosure Statement and confirmation of the Plan; (iv) a motion seeking approval of the Backstop Agreement; and (v) a motion seeking approval of the Rights Offering Procedures;

- no later than 150 calendar days after the Petition Date, the Bankruptcy Court shall have entered (i) the Disclosure Statement Order and (ii) the Backstop Approval Order;

- no later than five (5) calendar days after entry of the Disclosure Statement Order, the Debtors shall have commenced a solicitation of votes to accept or reject the Plan in accordance with the order approving the Disclosure Statement and Solicitation Motion;

- no later than 185 calendar days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and

- no later than 205 calendar days after the Petition Date, the Debtors shall have consummated the transactions contemplated by the Plan.

*2.     The Bond Green Bond RSA*

137.    On March 12, 2024, the Company separately entered into the Bond Green Bond RSA with certain holders representing more than 50% of the Company's outstanding bonds related to the Bond Plant. The Bond Green Bond RSA provides for a forbearance in respect of potential alleged defaults under the Bond MS Loan Agreement in exchange for a return of the funds now held in the Construction Fund (as defined in the Bond Green Bond RSA) being transferred to a separate fund for partial redemption of the then-outstanding Bond Green Bonds upon entry of the Rule 9019 Order (as defined in the Bond Green Bond RSA).

138.    The Bond Green Bond RSA contemplates the following timeline and milestones:

- no later than 30 days after the Petition Date, the Debtors shall file with the Bankruptcy Court a Rule 9019 Motion;

- no later than 60 days after the Petition Date, the Debtors shall have scheduled a hearing to consider approval of the Rule 9019 Motion; and

- no later than 90 days after the Petition Date, the relevant Debtors shall have obtained entry by the Bankruptcy Court of the Rule 9019 Order.

### 3. Enviva's Restructuring Goals

139. I believe the Company is built upon a sound product, infrastructure, customer base, and operational vision. However, Enviva's fixed-price sales-contract portfolio—which was entered into primarily during a period of historically low costs—has proven too inflexible to remain competitive in a new reality of rising costs and lower spot prices. As a result, absent a reworking of the sales contracts and restructuring of its debt obligations, the Company's profitability is inadequate to satisfy those obligations and continue to grow in the future. The Company believes that an in-court restructuring process, and the support and capital provided by the Ad Hoc Group through the DIP Facility, the consensual use of cash collateral and the RSA, will allow it to address its contract portfolio (including but not limited to finishing the RTB initiative), deleverage its capital structure, and formulate a new business plan so that Enviva can emerge from chapter 11 with a right-sized structure and strategic focus fit for long-term growth.

**E.     The Debtors' Need for the DIP Facility to Operate on a Postpetition Basis in the Ordinary Course**

140. As also discussed in the *Declaration of Mark Rajcevich in Support of the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief*, filed contemporaneously herewith (the "***Rajcevich DIP Declaration***"), the Debtors' postpetition

operations in the near term will not generate sufficient cash to continue operations in the ordinary course while funding the expenses associated with these chapter 11 cases.  Access to sufficient cash is essential to ensuring the viability of the Company as a going concern.  The harm caused by a failure to meet liquidity needs could destabilize the Company's business operations and lead to additional declines in the Company's revenues.  Accordingly, the Debtors require immediate access to debtor-in-possession financing and authority to use cash collateral to maintain sufficient liquidity to continue to operate, effectively reorganize to maximize value for their stakeholders, and avoid immediate and irreparable harm to their businesses.

141.    To that end, prior to the Petition Date, the Debtors, with the assistance of Lazard, engaged in a marketing process to determine whether other parties were willing to provide debtor-in-possession financing, as described in more detail in the *Declaration of Christian Tempke in Support of the Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief*, filed contemporaneously herewith (the "***Tempke Declaration***").

142.    I believe that the amount the Debtors are requesting to draw under the DIP Facility on an interim basis ($150 million), addresses the Debtors' immediate liquidity needs during the first three weeks of these chapter 11 cases and prior to the Court approving the DIP Facility on a final basis.  Additionally, without this postpetition financing, the Debtors would be unable to meet their liquidity needs, including paying employees and vendors, all of which are essential to the Debtors' ongoing operations.  Additionally, access to cash collateral will allow the Debtors to continue operating their businesses which will, in turn, allow the Debtors to pursue a restructuring

that will maximize the value of the Debtors' estates to the benefit of all stakeholders.  I believe that the DIP Facility, in addition to access to cash collateral, will be sufficient to address the Debtors' liquidity needs for the anticipated duration of these chapter 11 cases.

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Executed on March 13, 2024

*/s/ Glenn Nunziata*

Glenn Nunziata
Interim Chief Executive Officer & Chief Financial Officer
Enviva Inc.

**EXHIBIT A**

**Organizational Chart of the Company**



## <u>EXHIBIT B</u>

**Bond Green Bond RSA**

*EXECUTION VERSION*

**THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT CONSTITUTE, AND SHALL NOT BE DEEMED TO BE, AN OFFER OF SECURITIES OR A SOLICITATION OF THE ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE RSA EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

**THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTATION INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTATION AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTATION.**

---

## ENVIVA INC.

## RESTRUCTURING SUPPORT AGREEMENT

## MARCH 12, 2024

---

This Restructuring Support Agreement (together with the exhibits attached hereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "***Agreement***"),[1] dated as of March 12, 2024, is entered into by and among the following parties:

(i)      Enviva Inc. and those certain subsidiaries of Enviva Inc. listed on **Schedule 1** hereto (such subsidiaries and Enviva Inc. each a "***Debtor***" and, collectively, the "***Debtors***");

(ii)     the undersigned holders of Exempt Facilities Revenue Bonds, (Enviva Inc. Project), Series 2022 (Green Bonds) (the "***Bond Green Bonds***," and the claims against the Debtors on account thereof, the "***Bond Green Bonds Claims***") issued by the Mississippi Business Finance Corporation (the "***Bond Green Bonds Issuer***") pursuant to that certain *Indenture of Trust*, dated as of November 1, 2022 (the "***Bond Green Bonds Indenture***"), between the Bond Green Bonds Issuer and Wilmington Trust, N.A., as trustee under the Bond Green Bonds Indenture

---

[1] Except where otherwise so stated, capitalized terms used but not immediately defined herein shall, as applicable, have the meanings ascribed to them at a later point in this Agreement or the Term Sheet.

(solely in such capacity, the "***Bond Green Bonds Trustee***") (such holders, together with their respective successors and permitted assigns and any subsequent holder of Bond Green Bonds that may become in accordance with <u>Section 14</u> and/or <u>Section 15</u> hereof signatory hereto, collectively, and solely in their capacity as holders of Bond Green Bonds, the "***Consenting Bond Green Bondholders***"); and

(iii)    the Bond Green Bonds Trustee (collectively with the Consenting Bond Green Bondholders, the "***Restructuring Support Parties***").

This Agreement collectively refers to the Debtors and the Restructuring Support Parties as the "***Parties***" and each individually as a "***Party***."

## <u>RECITALS</u>

**WHEREAS**, as of the date hereof, the Consenting Bond Green Bondholders, in the aggregate, hold approximately 92% of the aggregate outstanding principal amount of the Bond Green Bonds;

**WHEREAS**, Section 1004 of the Bond Green Bonds Indenture permits holders of at least a majority in aggregate principal amount of the Bond Green Bonds then outstanding to direct the Bond Green Bonds Trustee to direct the method and place of conducting all proceedings to be taken in connection with the enforcement of the terms and conditions of the Bond Green Bonds Indenture;

**WHEREAS**, Section 8.4 of the Bond Green Bonds Loan Agreement[2] confers upon the Bond Green Bonds Trustee all rights and remedies set forth therein and otherwise available to the Bond Green Bonds Issuer at law and in equity;

**WHEREAS**, the Debtors and the Consenting Bond Green Bondholders have, in good faith and at arm's length, negotiated certain restructuring transactions premised on consummation of the MS Bond Settlement (collectively, the "***Restructuring***") with respect to the Debtors on the terms set forth in this Agreement and as specified in the restructuring term sheet attached hereto as **<u>Exhibit A</u>** (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance herewith, the "***Term Sheet***"), which shall be implemented through jointly administered voluntary cases commenced by the Debtors (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the Eastern District of Virginia (the "***Bankruptcy Court***").

**NOW, THEREFORE**, in consideration of the promises, mutual covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

---

[2]    "***Bond Green Bonds Loan Agreement***" means that certain *Loan and Guaranty Agreement* between the Bond Green Bonds Issuer and the Debtors, dated as of November 1, 2022.

2

## AGREEMENT

1.  **RSA Effective Date**.  This Agreement shall become effective, and the obligations contained herein shall become binding upon the Parties, upon the first date (such date, the "***RSA Effective Date***") that this Agreement has been executed by all of the following: (i) each Debtor; (ii) the holders of at least a majority of the aggregate outstanding principal amount of Bond Green Bonds Claims (as of the relevant date, the "***Required Consenting Bond Green Bondholders***"); and (iii) the Bond Green Bonds Trustee; *provided, however*, that the Debtors shall have paid or reimbursed all outstanding, reasonable, invoiced, and documented fees and expenses of the Green Bonds Advisors and the Bond Green Bonds Trustee incurred as of March 8, 2024; *provided, further*, that, notwithstanding anything set forth in the Term Sheet, the Debtors shall have no obligation to pay any fees or expenses of the Green Bonds Advisors and the Bond Green Bonds Trustee under this Agreement on account of the Bond Green Bonds Claims in excess of the amounts specified in the Letter Agreement,[3] taking into account all such payments primarily made to such persons, whether before or after the Petition Date; *provided further*, that the Letter Agreement shall not constitute an amendment, waiver, or other modification of any rights of the Bond Green Bonds Trustee to recover its fees and expenses pursuant to the Bond Green Bonds Indenture, Bond Green Bonds Loan Agreement, or any related document (other than this Agreement) or prevent Wilmington Trust, N.A. from seeking reimbursement of its fees and expenses relating to any appointment as a member of any official committee of unsecured creditors appointed in the Chapter 11 Cases.

2.  **Exhibits Incorporated by Reference**.  Each of the exhibits and schedules attached hereto and any schedules or annexes to such exhibits and schedules (collectively, the "***Exhibits***") is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the Exhibits.  In the event of any inconsistency between this Agreement (without reference to the Exhibits) and the Exhibits, this Agreement (without reference to the Exhibits) shall govern.

3.  **The MS Bond Settlement**.  Subject to the terms and conditions of this Agreement, the MS Bond Settlement shall occur in the manner set forth in the Term Sheet.

4.  **Definitive MS Bond Settlement Documentation**.

(a)  The definitive documents and agreements governing the Restructuring (collectively, the "***Definitive MS Bond Settlement Documentation***") shall be:

(i)  the motion filed by the relevant Debtors pursuant to Federal Rule of Bankruptcy Procedure Rule 9019 (the "***Rule 9019 Motion***") seeking judicial authorization to effect the MS Bond Construction Fund Distribution and enter into the MS Bond Settlement and the proposed order filed in connection thereto, substantially in the form of the Rule 9019 Order;

---

[3]   The "***Letter Agreement***" is that certain agreement in respect of payment of fees and expenses of the Green Bonds Advisors and the Bond Green Bonds Trustee by, between, and among Vinson & Elkins, LLP, Kramer, Levin, Naftalis & Frankel LLP, and Perella Weinberg Partners L.P., dated March 12, 2024.

(ii)    the order entered by the Bankruptcy Court granting the Rule 9019 Motion and in addition, if different than such order, the Final Order[4] entered by the Bankruptcy Court granting the Rule 9019 Motion, which order and Final Order shall include findings and mutual releases to the effect that the Debtors, the Bond Greens Bonds Trustee, and the Consenting Bond Green Bondholders shall, as applicable, have no liability to one another for entering into and implementing the Restructuring, and providing directions to do the same (collectively, the "***Rule 9019 Order***");

(iii)    to the extent applicable, any replies, responses, or other documents filed by the Debtors in connection with the Rule 9019 Motion;

(iv)    to the extent applicable, and solely for the purpose of assuring consistency with the MS Bond Settlement, any other document, agreement or pleading entered into or filed by the Debtors that would reasonably be expected to affect the consummation of the MS Bond Settlement under the agreed terms of this Agreement and the Term Sheet; and

(v)    solely for purposes of assuring that the Debtors' treatment of the Deficiency Claim is consistent with MS Bond Settlement under the agreed terms of this Agreement and the Term Sheet, the Plan, the Disclosure Statement, any proposed order and proposed findings of fact and conclusions of law relating to the Plan, any order entered by the Bankruptcy Court that confirms the Plan, and (if different than such order), any Final Order entered by the Bankruptcy Court that confirms the Plan (collectively, the "***Confirmation Order***").

(b)    The Definitive MS Bond Settlement Documentation identified in <u>Section 4(a)</u> will, subject to the requirements herein governing when such documentation must be completed, after the RSA Effective Date remain subject to negotiation and completion.  Upon completion, the Definitive MS Bond Settlement Documentation described in <u>Sub-Clauses (i)</u> through <u>(iv)</u> of <u>Section 4(a)</u> shall be in form and substance reasonably acceptable to (i) the Debtors and (ii) the Consenting Bond Green Bondholders holding at least one-half in dollar amount of the aggregate outstanding principal amount of the Bond Green Bond Claims held by all Consenting Bond Green Bondholders at the time of such consent (the "***Majority Consenting***

---

[4]  "***Final Order***" means an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the subject matter, that has not been reversed, stayed, modified, or amended, and as to which the time to appeal, seek *certiorari*, or move, under Rule 9023 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") or Rule 59 of the Federal Rules of Civil Procedure, for a new trial, reargument, or rehearing has expired and no appeal or petition for *certiorari* or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for *certiorari* that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which *certiorari* was sought or the new trial, reargument, or rehearing shall have been denied, resulted in no stay pending appeal or modification of such order or has otherwise been dismissed with prejudice; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order shall not preclude such order from being a Final Order.

*Bond Green Bondholders*").  Notwithstanding anything to the contrary herein, no Consenting Bond Green Bondholder shall, acting in its capacity as a Consenting Bond Green Bondholder, have any right of consent over (A) any feature of the Plan, Disclosure Statement, or Confirmation Order, other than the rights identified in Section 4(a)(v) or (B) any documents or pleadings in the Chapter 11 Cases other than the Definitive MS Bond Settlement Documentation.

5.    **Milestones**.  As provided in and subject to Section 7, the Debtors shall implement the Restructuring on the following timeline (each deadline, a "*Milestone*"):[5]

   (a)    no later than 30 days after the date that the Debtors commence the Chapter 11 Cases by filing petitions for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court (such filing date, the "*Petition Date*"), the relevant Debtors shall file the Rule 9019 Motion;

   (b)    no later than 60 days after the Petition Date, the relevant Debtors shall have scheduled a hearing to consider approval of the Rule 9019 Motion;

   (c)    no later than 90 days after the Petition Date, the relevant Debtors shall have obtained entry by the Bankruptcy Court of the Rule 9019 Order; and

   (d)    no later than 120 days after the Petition Date, except to the extent such delay was caused by the actions (or failure to act) of any of the Restructuring Support Parties, the MS Bond Construction Fund Distribution shall have occurred.

Each of the Milestones may be extended or waived with the express prior written consent of the Majority Consenting Bond Green Bondholders and the Bond Green Bonds Trustee.

6.    **Commitment of Restructuring Support Parties.**  Each Restructuring Support Party shall (severally and not jointly), solely as it remains the legal owner and/or beneficial owner with power and/or authority to bind any claims held by it, from the RSA Effective Date until the occurrence of a Termination Date (as defined in Section 12) applicable to such Restructuring Support Party or in the case of a Consenting Bond Green Bondholder until it has made a Transfer of all Bond Green Bonds and Bond Green Bond Claims in accordance with Section 14, in each case subject to Sections 3 and 4 of this Agreement and without limiting consent, approval, or termination rights provided in this Agreement:

   (a)    support and use commercially reasonable efforts to cooperate with the Debtors to take all actions reasonably necessary to consummate the Restructuring in accordance with the terms and conditions of this Agreement and the Term Sheet;

   (b)    as applicable, vote all of its claims against, or interests in, the Debtors now or hereafter owned by such Restructuring Support Party (or for which such Restructuring Support Party now or hereafter has voting control over) to accept any operative chapter 11 plan proposed by the Debtors (each, a "*Plan*") in accordance

---

[5]    In computing any period of time prescribed or allowed under this Agreement, the provisions of Bankruptcy Rule 9006(a) shall apply.

with the applicable procedures set forth in the disclosure statement for such Plan (the "***Disclosure Statement***") and accompanying solicitation materials (together, the "***Solicitation Materials***"), each as approved by the Bankruptcy Court, and timely return a duly executed ballot in connection therewith;

(c)     as and to the extent applicable, or affirmatively "opt into" or not "opt out" of any releases to be provided under the Plan; *provided*, that such releases and the ability to "opt into" or "opt out" of any such releases is, in each case, identical in respect of the Bond Green Bond Claims as applicable to any other holder of a "***Claim***" as defined in the Bankruptcy Code that is entitled to vote to accept or reject the Plan;

(d)     at any time prior to entry of the Rule 9019 Order, timely file a formal objection to any motion or objection (or joinder to the Debtors' objection), as applicable, filed with the Bankruptcy Court by a third party seeking entry of an order:

    (i)     directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code);

    (ii)    converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code;

    (iii)   dismissing the Chapter 11 Cases;

    (iv)    modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable; or

    (v)     objecting to the Rule 9019 Motion;

(e)     (i) not object to, contest, or otherwise seek to limit, modify, or terminate the Debtors' use of cash collateral as provided in the operative documentation in respect of the Debtors' postpetition debtor-in-possession financing and cash collateral (such documents collectively, the "***DIP Financing Documents***"), (ii) not seek or support any relief from the automatic stay or any other relief that would interfere with the use of cash collateral as provided in the DIP Financing Documents, and (iii) not take any action or support any other party in taking any action that would be inconsistent with or contrary to the Restructuring or terms of this Agreement, the Term Sheet, or the DIP Financing Documents; *provided, however*, that nothing in this <u>Section 6(e)</u> shall limit the exercise of rights of the Majority Consenting Bond Green Bondholders, as applicable and consistent with <u>Section 4</u> of this Agreement to review or consent to the Definitive MS Bond Settlement Documentation;

(f)     provide any applicable consents as may be necessary or required, and within its capability to provide, to effectuate the MS Bond Settlement and the Restructuring as set forth herein, in the Term Sheet, and in the Definitive MS Bond Settlement Documentation, so long providing such consent is lawful;

(g)    not withdraw, amend, or revoke (or cause to be withdrawn, amended, or revoked) its tender, consent, or vote with respect to the Plan, except as otherwise in accordance with the terms hereof; *provided, however*, that no Restructuring Support Party shall have the right to withdraw, amend, or revoke (or cause to be withdrawn, amended, or revoked) its tender, consent, or vote with respect to the Plan upon entry of the Rule 9019 Order;

(h)    solely in respect of the Consenting Bond Green Bondholders, give any notice, order, instruction, or direction to the Bond Green Bonds Trustee reasonably necessary to give effect to the Restructuring, and not give any notice, order, instruction, or direction to the Bond Green Bonds Trustee to take any action inconsistent with such Consenting Bond Green Bondholder's obligations under this Agreement;

(i)    not take any action, directly or indirectly, to initiate, solicit, encourage, or participate in any discussions, negotiations, inquiries, proposals, or offers with or from any customer of any Debtor regarding the financial condition, operations, contracts, prospects, liabilities, obligations, or restructuring of any Debtor, without the prior written consent of the Debtors;

(j)    not take any action that is inconsistent with, or is intended to interfere with, consummation of the Restructuring and confirmation of the Plan, including any releases included therein; *provided, however*, that nothing in this Section 6(j) shall limit the exercise of rights of the Majority Consenting Bond Green Bondholders, as applicable and consistent with Section 4 of this Agreement to review or consent to the Definitive MS Bond Settlement Documentation;

(k)    negotiate in good faith and use commercially reasonable efforts to execute (as applicable) and implement the Definitive MS Bond Settlement Documentation, the Restructuring, and confirmation of the Plan;

(l)    support and not object to, delay, impede, or take any other action, whether direct or indirect, inconsistent with the Restructuring, or propose, file, support, or vote for, encourage, seek, solicit, pursue, initiative, assist, join in, participate in the formulation of, or enter into negotiations or discussion with any entity regarding any restructuring, workout, or chapter 11 plan for any of the Debtors other than the Restructuring and the Plan; *provided, however*, that nothing in this Section 6(l) shall limit the exercise of rights of the Majority Consenting Bond Green Bondholders, as applicable and consistent with Section 4 of this Agreement to review or consent to the Definitive MS Bond Settlement Documentation; and

(m)    not object to or otherwise seek to hinder the Debtors' payment to Lazard Frères & Co. LLC ("***Lazard***") of the fees and expenses set forth in the engagement letter, dated as of January 25, 2024, among Lazard, Vinson & Elkins LLP, and Enviva Inc.

Nothing in this Agreement and neither a vote to accept the Plan by any Restructuring Support Party (as applicable) nor the acceptance of the Plan by any Restructuring Support Party shall

(w) limit, impact, or restrict Wilmington Trust, N.A., from performing any duties, exercising any rights, and satisfying any obligations in its capacity as trustee in respect of the Epes Green Bonds[6] to which the Debtors are obligors or from serving on an official committee of unsecured creditors in the Chapter 11 Cases and exercising its fiduciary duties as a committee member thereunder, (x) be construed to prohibit any Restructuring Support Party from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement, or exercising rights or remedies specifically reserved herein, (y) be construed to limit any Restructuring Support Party's rights under the Bond Green Bonds Indenture, any related document, and/or applicable law, or to prohibit any Restructuring Support Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, from the RSA Effective Date until the occurrence of a Termination Date, such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring, or (z) impair or waive the rights of any Restructuring Support Party to assert or raise any objection permitted under this Agreement, including, without limitation, in connection with any hearing on confirmation of the Plan or in the Bankruptcy Court.

7.    **Commitment of the Debtors**.

(a)    Each of the Debtors:

    (i)    (A) agrees to (1) support and use its commercially reasonable efforts to complete the Restructuring set forth in this Agreement, (2) negotiate in good faith all Definitive MS Bond Settlement Documentation that is subject to negotiation as of the RSA Effective Date, and (3) use commercially reasonable efforts to complete the Restructuring in accordance with each Milestone set forth in <u>Section 5</u> of this Agreement, and (B) shall not undertake any action inconsistent with the implementation of the Restructuring;

    (ii)    agrees to timely file a formal objection to any motion or objection, as applicable, filed with the Bankruptcy Court by a third party seeking the entry of an order (A) directing the appointment of a trustee, (B) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (C) dismissing the Chapter 11 Cases, or (D) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable, or (E) objecting to the Rule 9019 Motion;

    (iii)    agrees to provide written notice to counsel for the Restructuring Support Parties promptly (and no less than five (5) business days following) of (A) the occurrence of any event of which the Debtors have actual knowledge which occurrence or failure would cause any condition precedent contained in this Agreement impossible to satisfy, (B) the receipt

---

[6]    The "***Epes Green Bonds***" are the Exempt Facilities Revenue Bonds (Enviva Inc. Project), Series 2022 (Green Bonds) issued by the Industrial Development Authority of Sumter County, Alabama pursuant to that certain *Indenture of Trust*, dated as of July 1, 2022, between Epes Green Bonds Issuer and Wilmington Trust, N.A., as trustee.

of any written notice from any governmental authority or third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring, (C) the receipt of any written notice of any proceeding commenced or, to the actual knowledge of the Debtors, threatened against the Debtors relating to or involving or otherwise affecting in any material respect the transactions contemplated by this Agreement or the Restructuring, or (D) a failure of the Debtors to comply in any material respect with a covenant or agreement to be complied with or by it hereunder;

(iv)    agrees to not take any action that is inconsistent with, or is intended to interfere with, consummation of the Restructuring;

(v)     to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, agrees to negotiate in good faith with respect to appropriate additional or alternative provisions to address any such impediment; and

(vi)    subject to the limitations set forth in the Letter Agreement and, to the extent not pre-empted by the Letter Agreement, on the terms set forth in the Term Sheet, pay all reasonable and documented fees and expenses of the Bond Green Bonds Trustee and advisors to the Initial Consenting Bond Green Bondholders and the Bond Green Bonds Trustee, whether arising before or after the Petition Date, after taking into account all such payments primarily made to such persons, whether before or after the Petition Date.

For the avoidance of doubt, nothing in this <u>Section 7</u> shall be construed to limit or affect in any way (y) any Restructuring Support Party's rights under this Agreement, including upon occurrence of any Termination Event, or (z) the Debtors' ability to engage in marketing efforts, discussions, and/or negotiations with any party regarding financing in the Chapter 11 Cases or exit financing consistent with the Term Sheet. Notwithstanding anything to the contrary herein, any board of directors, board of managers, director, officer, member, or manager of any Debtor (in its capacity as such, each a "***Debtor Agent***") shall be permitted to take or refrain from taking any action to the extent such Debtor Agent determines, in good faith and based upon advice of outside legal counsel, that taking such action, or refraining from taking such action, as applicable, is reasonably required to comply with its fiduciary duties, and may take (or refrain from taking) such action; *provided*, that this provision shall not impede any Party's right to terminate this Agreement pursuant to the terms hereof, including on account of any determination made or inaction taken pursuant to this provision.

8.    **Tax Matters**.  To the extent practicable, the Restructuring and the consideration received in the Restructuring shall be structured in a manner that (a) minimizes any current taxes payable as a result of the consummation of the Restructuring, and (b) optimizes the tax efficiency (including, but not limited to, by way of the preservation or enhancement of favorable tax attributes, or moving certain businesses to new entities incorporated in tax-favorable jurisdictions) of the Restructuring to the Debtors, and the Consenting Bond Green Bondholders going forward, in each case, as determined by the Debtors and the Consenting Bond Green Bondholders.

9.     <u>**Consenting Bond Green Bondholders Termination Events**</u>.    The Required Consenting Bond Green Bondholders shall have the right, but not the obligation, upon five (5) business days' written notice to the Debtors, to terminate the obligations of the Consenting Bond Green Bondholders under this Agreement (and to direct the Bond Green Bonds Trustee to terminate its obligations upon the same notice period) upon the occurrence of any of the following events, unless waived, in writing, by the Majority Consenting Bond Green Bondholders (each, a "***Consenting Bond Green Bondholder Termination Event***"):

(a)     the failure of the Debtors to meet any of the Milestones in <u>Section 5</u> unless (i) such failure is the direct result of any act, omission, or delay on the part of any Restructuring Support Party in violation of its obligations under this Agreement, or (ii) such Milestone is extended by the Majority Consenting Bond Green Bondholders in accordance with <u>Section 5</u>;

(b)     any Debtor (i) files, amends or modifies, or files a pleading seeking authority to amend or modify, or any relief that would have the effect of amending or modifying, the Definitive MS Bond Settlement Documentation in a manner that is materially inconsistent with this Agreement or the Term Sheet, or (ii) announces that it will no longer support the Restructuring, in each case without the prior consent of the Majority Consenting Bond Green Bondholders;

(c)     the issuance of any ruling or order by any governmental authority, including the Bankruptcy Court, or any other court of competent jurisdiction, or other regulatory authority, enjoining or otherwise making impractical the substantial consummation of the Restructuring on the terms and conditions set forth in this Agreement, or the commencement of any action by any governmental authority or other regulatory authority that could reasonably be expected to enjoin or otherwise make impracticable the substantial consummation of the Restructuring on the terms and conditions set forth in this Agreement or the Term Sheet; *provided*, *however*, that the Debtors shall have five (5) business days after issuance of such ruling, order, or action to obtain relief that would allow consummation of the Restructuring in a manner that does not prevent or diminish in a material way compliance with the terms of this Agreement or the Term Sheet;

(d)     a material breach by any Debtor of any covenant of such Debtor set forth in this Agreement;

(e)     any Debtor terminates its obligations under and in accordance with this Agreement;

(f)     if any court of competent jurisdiction has entered a final, non-appealable order or judgment declaring this Agreement to be unenforceable;

(g)     any relevant Debtor (i) solicits votes upon a Plan that separately classifies the Deficiency Claim in a manner that treats the Deficiency Claim in a manner inconsistent with the terms of this Agreement or the Term Sheet, or (ii) seeks any relief that treats the Deficiency Claim in a manner inconsistent with the terms of this Agreement or the Term Sheet;

10

(h)     a breach by any Debtor of any representation or warranty of such Debtor set forth in this Agreement that would reasonably be expected to have a material or adverse impact on the Restructuring or the confirmation of the Plan that (to the extent curable) remains uncured for a period of five (5) business days after the receipt by the Debtors of notice and description of such breach;

(i)     any creditor of a Debtor that is party to a restructuring support agreement with any Debtor should file a motion or pleading with the Bankruptcy Court that opposes the Rule 9019 Motion, entry of the Rule 9019 Order, or could be reasonably expected to have the effect of hindering, delaying, or preventing the consummation of, any material aspect of the Restructuring; or

(j)     solely to the extent that the Debtors are not subject to a voluntary or involuntary bankruptcy proceeding on or after March 31, 2024, the Debtors and the Consenting Bond Green Bondholders have failed to reach an agreement on an out-of-court resolution in respect of the Bond Green Bond Claims by June 30, 2024.

10.     **The Debtors' Termination Events**.  Each Debtor may, upon written notice to the Restructuring Support Parties, terminate its obligations under this Agreement upon the occurrence of any of the following events (each a "***Debtor Termination Event***," and together with the Consenting Bond Green Bondholder Termination Events, the "***Termination Events***"), in which case this Agreement shall terminate with respect to all Parties, subject to the rights of the Debtors to fully or conditionally waive, in writing, the occurrence of a Debtor Termination Event:

(a)     a breach by the Restructuring Support Parties of any representation, warranty, or covenant of such Restructuring Support Party set forth in this Agreement that would reasonably be expected to have a material or adverse impact on the Restructuring or the confirmation of the Plan that (to the extent curable) remains uncured for a period of five (5) business days after the receipt by the Restructuring Support Parties of notice and description of such breach;

(b)     if the board of directors or board of managers, as applicable, of any Debtor determines, in good faith based upon advice of outside legal counsel, that proceeding with the Restructuring or taking any action (or refraining from taking any action) in relation thereto, would be inconsistent with the exercise of their fiduciary duties under applicable law;

(c)     the Majority Consenting Bond Green Bondholders terminate their obligations under and in accordance with this Agreement;

(d)     a material breach by any Restructuring Support Party of any covenant of such Restructuring Support Party set forth in this Agreement;

(e)     the issuance of any ruling or order by any governmental authority, including the Bankruptcy Court, or any other court, agency, commission, or other entity exercising executive, legislative, judicial, regulatory, or administrative functions, enjoining or otherwise making impractical the substantial consummation of the Restructuring on the terms and conditions set forth in the Term Sheet or the Plan,

or the commencement of any action by any such governmental or regulatory authority that could reasonably be expected to enjoin or otherwise make impractical the substantial consummation of the Restructuring on the terms and conditions set forth in the Term Sheet or the Plan; *provided*, *however*, that the Debtors have made commercially reasonable, good faith efforts to cure, vacate, or have overruled such ruling or order prior to terminating this Agreement;

(f)    if any court of competent jurisdiction has entered a final, non-appealable order or judgment declaring this Agreement to be unenforceable; or

(g)    solely to the extent that the Debtors are not subject to a voluntary or involuntary bankruptcy proceeding on or after March 31, 2024, the Debtors and the Consenting Bond Green Bondholders have failed to reach an agreement on an out-of-court resolution in respect of the Bond Green Bond Claims by June 30, 2024.

11.    **Mutual Termination; Automatic Termination**.    This Agreement and the obligations of all Parties hereunder may be terminated by mutual written agreement by and among (a) each of the Debtors and (b) each of the Restructuring Support Parties.    This Agreement shall otherwise terminate automatically upon the occurrence of the effective date under the Plan (the "***Plan Effective Date***").

12.    **Effect of Termination**.    The earliest date on which termination of this Agreement as to a Party is effective in accordance with Sections 9, 10, or 11 of this Agreement shall be referred to, with respect to such Party, as a "***Termination Date*.**"    Upon the occurrence of a Termination Date, the terminating Party's and, solely in the case of a Termination Date in accordance with Section 11, all Parties' obligations under this Agreement shall be terminated effective immediately, and such Party or Parties hereto shall be released from all commitments, undertakings, and agreements hereunder; *provided*, *however*, that each of the following shall survive any such termination: (a) any claim for breach of this Agreement that arises prior to such Termination Date, and all rights and remedies with respect to such claims shall remain in full force and effect and not be prejudiced in any way by such termination; (b) the Debtors' obligations in Section 17 of this Agreement accrued up to and including such Termination Date; and (c) Sections 2, 12, 18, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 32, 34, 35, and 36 hereof.    The automatic stay applicable under section 362 of the Bankruptcy Code shall not prohibit a Party from taking any action necessary to effectuate the termination of this Agreement pursuant to and in accordance with the terms hereof.

13.    **Cooperation and Support**.    The relevant Debtors shall use their commercially reasonable efforts to provide draft copies of all Definitive MS Bond Settlement Documentation that any Debtor intends to file with the Bankruptcy Court to the counsel to the Bond Green Bonds Trustee and Consenting Bond Green Bondholders, respectively, at least four (4) days prior to the date when such Debtor intends to file such document or as soon as reasonably practicable and shall provide a draft of the 9019 Motion and related proposed order at least five (5) business days prior to the date when such Debtor intends to file such document or as soon as reasonably practicable. The Bond Green Bonds Trustee and Consenting Bondholders, respectively, shall use their commercially reasonable efforts to provide all comments to all such documents by no later than two (2) days prior to the date when the Debtors intend to file such documents, and counsel to the

12

Bond Green Bonds Trustee and the Consenting Bond Green Bondholders, respectively, shall consult with the Debtors in good faith regarding the form and substance of any such proposed filing with the Bankruptcy Court.  For the avoidance of doubt, the Bond Green Bonds Trustee, the Consenting Bond Green Bondholders, and the Debtors agree to negotiate in good faith the Definitive MS Bond Settlement Documentation that is subject to negotiation and completion, consistent with Sub-Clause (b) of Section 4 hereof, and the Definitive MS Bond Settlement Documentation, including any motions or orders related thereto, shall be consistent with this Agreement.

14. **Transfers of Claims and Interests**.

(a) No Consenting Bond Green Bondholder shall (i) sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Consenting Bond Green Bondholder's Bond Green Bond Claims, including, without limitation, the Bond Green Bonds themselves, in whole or in part, or (ii) deposit any of such Consenting Bond Green Bondholder's claims or interests, as applicable, into a voting trust, or grant any proxies, or enter into a voting agreement with respect to any such claims or interests (the actions described in Sub-Clauses (i) and (ii) are collectively referred to herein as a "***Transfer***" and the Consenting Bond Green Bondholder making such Transfer is referred to herein as the "***Transferor***"), unless such Transfer is to (y) another Consenting Bond Green Bondholder or (z) any other entity that first agrees in writing to be bound by the terms of this Agreement by executing and delivering to the Debtors a Joinder Agreement substantially in the form attached hereto as **Exhibit B** (the "***Joinder Agreement***").  With respect to any right, title, or interest in Bond Green Bond Claims, including, without limitation, the Bond Green Bonds themselves, held by the relevant transferee, upon consummation of a Transfer in accordance herewith, such transferee is deemed to make all of the representations, warranties, and covenants of a Consenting Bond Green Bondholder set forth in this Agreement. Upon compliance with the foregoing, the Transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Agreement that occurs prior to such Transfer) under this Agreement to the extent of such transferred rights and obligations.  Any Transfer made in violation of this Sub-Clause (a) of this Section 14 shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the Debtors and/or Bond Green Bonds Trustee, and shall not create any obligation or liability of any Debtor or any other Bond Green Bonds Trustee to the purported transferee.

(b) Notwithstanding Sub-Clause (a) of this Section 14, (i) an entity that is acting in its capacity as a Qualified Marketmaker shall not be required to be or become a Consenting Bond Green Bondholder to effect any transfer (by purchase, sale, assignment, participation, or otherwise) of any claim against, or interest in, any Debtor, as applicable, by a Consenting Bond Green Bondholder to a transferee; *provided, that*, such transfer by a Restructuring Support Party to a transferee shall be in all other respects in accordance with and subject to Sub-Clause (a) of this Section 14; and (ii) to the extent that a Consenting Bond Green Bondholder, acting in its capacity as a Qualified Marketmaker, acquires any claim against, or interest in,

13

any Debtor from a holder of such claim or interest who is not a Consenting Bond Green Bondholder, it may transfer (by purchase, sale, assignment, participation, or otherwise) such claim or interest without the requirement that the transferee be or become a Restructuring Support Party in accordance with this <u>Section 14</u>. For purposes of this <u>Sub-Clause (b)</u>, a "***Qualified Marketmaker***" means an entity that (y) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against, or interests in, any of the Debtors (including debt securities or other debt) or enter with customers into long and short positions in claims against the Debtors (including debt securities or other debt), in its capacity as a dealer or market maker in such claims or interests against the Debtors, and (z) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

(c)     Any holder of Bond Green Bonds may, at any time after the date hereof, become a party to this Agreement as a Consenting Bond Green Bondholder by executing a Joinder Agreement, pursuant to which such party shall be bound by the terms of this Agreement as a Consenting Bond Green Bondholder hereunder.

15.     **Further Acquisition of Claims or Interests**. Except as set forth in <u>Section 14</u>, nothing in this Agreement shall be construed as precluding any Consenting Bond Green Bondholder or any of its affiliates from acquiring, as applicable, additional Bond Green Bond Claims or interests in the instruments underlying the Bond Green Bonds; *provided*, *however*, that any additional Bond Green Bond Claims or interests in the underlying instruments acquired by any Consenting Bond Green Bondholder and with respect to which such Consenting Bond Green Bondholder is the legal owner, beneficial owner, and/or investment advisor or manager of or with power and/or authority to bind any claims or interests held by it shall automatically be subject to the terms and conditions of this Agreement, other than <u>Section 14</u> hereof, without any further action by such Consenting Bond Green Bondholder or the Debtors.  Upon any such further acquisition, and not later than three (3) business days following such acquisition, such Consenting Bond Green Bondholder shall notify Enviva Inc., its counsel, and counsel to the Bond Green Bonds Trustee.

16.     **Waivers and Forbearances**.   The MS Bond Settlement and Restructuring contemplate certain waivers and forbearances that the Parties agree and acknowledge are integral to their decision to enter into this Agreement, and without which they would not have done so. The Parties acknowledge that nothing in this <u>Section 16</u> constitutes an admission of any kind with respect to the existence of any "***Default***" or "***Event of Default***" under the Bond Green Bonds Indenture, the Bond Green Bonds Loan Agreement, any related documents, or any applicable law. The Parties acknowledge, moreover, that the illustrative list of potential Defaults or Events of Default included in this <u>Section 16</u> was developed through the course of settlement negotiations and in the context of an offer of settlement subject to Federal Rule of Evidence 408 and any relevant state-law equivalents, such that no part of this <u>Section 16</u> would be admissible in any subsequent judicial proceeding for purposes of proving the existence of a Default or Event of Default under the Bond Green Bonds Indenture, Bond Green Bonds Loan Agreement, or any related document.

(a)     Subject to <u>Sub-Clause (b)</u> the Consenting Bond Green Bondholders hereby agree to forbear, and will direct the Bond Green Bonds Trustee to forbear from, the

exercise of any rights (including any right of setoff) or remedies it may have under the Bond Green Bonds Indenture and/or the Bond Green Bonds Loan Agreement, as applicable, and under applicable United States or foreign law or otherwise in the manner set forth in this Sub-Clause (a) with respect to the following potential Defaults or Events of Default under the Bond Green Bonds Indenture, the Bond Green Bonds Loan Agreement, and any related documents, in each case for so long as this Agreement remains in effect:

(i)     any potential Defaults arising from any Debtor's alleged or potential failure to diligently pursue construction of the "**_Project_**" (under and as defined in the Bond Green Bonds Loan Agreement), including, without limitation, under Section 3.2 of the Bond Green Bonds Loan Agreement;

(ii)    any potential Defaults arising from any alleged or potentially inaccurate or non-compliant certification by any Debtor in connection with a written requisition under Section 3.5(a) of the Bond Green Bonds Loan Agreement, including, without limitation, through Section 8.1(b) and 8.1(g) of the Bond Green Bonds Loan Agreement;

(iii)   any potential Defaults or Events of Default alleged on account of any Debtor's voluntary bankruptcy under Section 8.1(d) of the Bond Green Bonds Loan Agreement and/or any Defaults or Events of Default alleged on account of any Debtor's failure to have such bankruptcy dismissed within 60 days under Section 8.1(f) of the Bond Green Bonds Loan Agreement; and

(iv)    any potential Defaults or Events of Default alleged on account of any Debtor's failure to make a required payment in respect of that certain _Indenture_, dated as of December 9, 2019, among Enviva Partners, LP and Enviva Partners Finance Corp., as issuers, each of the guarantors party thereto, and Wilmington Trust, National Association, as trustee, prior to March 4, 2024, including, without limitation, under Section 8.1(c) of the Bond Green Bonds Loan Agreement.

The Consenting Bond Green Bondholders agree that, if the Bond Green Bonds Trustee takes any action inconsistent with such Consenting Bond Green Bondholders' obligations under this Sub-Clause (a), that the Consenting Bond Green Bondholders shall direct the Bond Green Bonds Trustee to cease and refrain from taking any such action.

(b)     The forbearances in Sub-Clause (a) shall immediately, irrevocably, and without further action by any Party, convert into a permanent waiver upon satisfaction of the following conditions precedent:

(i)     Subject to the Letter Agreement, the Debtors have made all required payments under Section 17 of this Agreement;

(ii)    The Rule 9019 Order shall have become a Final Order;

15

(iii)    The MS Bond Construction Fund Distribution shall have occurred;

(iv)    All required opinions, governmental, regulatory, and third-party approvals and consents to implement the Restructuring in a manner consistent with this Agreement have been obtained; and

(v)    This Agreement remains in full force and effect with respect to all Parties.

(c)    Nothing in this <u>Section 16</u> shall constitute an extension of any of the relevant Debtors' repayment obligations under the Bond Green Bonds.

(d)    Except where otherwise expressly provided by this Agreement (including, without limitation, in this <u>Section 16</u>), nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Restructuring Support Party or the ability of each Restructuring Support Party to protect and preserve its rights, remedies, and interests, including its claims against the Debtors, and the Debtors acknowledge and confirm that nothing in this Agreement amends, modifies, waives, or expands in any respect any obligation of the Debtors to pay interest or other amounts in accordance with the Bond Green Bonds Indenture, the Bond Green Bonds Loan Agreement, or any related documents.

17.    **<u>Fees and Expenses</u>**.  Subject to both the Letter Agreement and <u>Section 12</u> of this Agreement, the Debtors shall pay and reimburse, or shall have paid, as applicable, all reasonable and documented fees and expenses of (a) Kramer Levin Naftalis & Frankel LLP, as counsel to the Bond Green Bonds Trustee ("***Kramer Levin***"), (b) Greenberg Traurig, P.A., as counsel to the Bond Green Bonds Trustee ("***Greenberg Traurig***"), (c) one local counsel retained by the Bond Green Bonds Trustee in connection with the Chapter 11 Cases ("***Local Counsel***"), and (d) Perella Weinberg Partners L.P., as investment banker to the Bond Green Bonds Trustee ("***PWP***" and, together with Kramer Levin, Greenberg Traurig, and one Local Counsel, the "***Green Bonds Advisors***"), in each case, as follows:

(a)    After the Petition Date, and subject to both the Letter Agreement and any budget imposed by the DIP Financing Documents, including, without limitation, the attendant 13-week cashflow reports (the "***DIP Budget***"), the Debtors shall pay all reasonable and documented fees and expenses of the Bond Green Bonds Trustee and the Green Bonds Advisors after the RSA Effective Date within 10 business days of receiving an invoice therefor; and

(b)    As adequate protection for the interests of the Bond Green Bonds Trustee and the Consenting Bond Green Bondholders during the pendency of the Chapter 11 Cases, the Debtors shall, subject to the DIP Budget, pay all reasonable and documented expenses of the Bond Green Bonds Trustee and Green Bonds Advisors incurred through five (5) days after the Rule 9019 Order becomes a Final Order within 10 business days of receiving an invoice therefor; *provided, however*, that the Bond Green Bonds Trustee and the Consenting Bond Green Bondholders agree to seek no further adequate protection for so long as (A) this Agreement remains in effect, (B) no Debtor takes any action to alter the Bond Green Bonds Trustee's post-petition

16

control of the Construction Fund, and (C) the amounts identified in the Letter Agreement have been paid.

18. **Consents and Acknowledgments**. Each Party irrevocably acknowledges and agrees that this Agreement is not and shall not be deemed to be a solicitation for acceptances to the Plan. The acceptance of the Plan by the holders of Bond Green Bonds Claims will not be solicited until such persons have received the Disclosure Statement and related ballots approved by the Bankruptcy Court and in accordance with applicable law, and will be subject to sections 1125, 1126 and 1127 of the Bankruptcy Code.

19. **Representations and Warranties**.

(a)     Each Restructuring Support Party hereby represents and warrants on a several and not joint basis for itself and not any other person or entity that the following statements are true, correct, and complete, as of the date hereof (or, with respect to a Restructuring Support Party that is joining this Agreement pursuant to Section 14, as of the date of such joinder):

   (i)     it has the requisite organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

   (ii)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

   (iii)   the execution, delivery, and performance by it of this Agreement does not violate any provision of law, rule, or regulation applicable to it, or its certificate of incorporation, bylaws, or other organizational documents in any material respect;

   (iv)    subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code, this Agreement is the legally valid and binding obligation of it, enforceable against it in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability;

   (v)     solely as to the Consenting Bond Green Bondholders, it is an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act of 1933, as amended, with sufficient knowledge and experience to evaluate properly the terms and conditions of this Agreement and to consult with its legal and financial advisors with respect to its investment decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement;

   (vi)    it has reviewed, or has had the opportunity to review, with the assistance of professional and legal advisors of its choosing, all information it deems

17

necessary and appropriate for it to evaluate the financial risks inherent in the Restructuring and to accept the terms of the Plan;

(vii)    the Bond Green Bond Claims held by such Restructuring Support Party are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would materially and adversely affect in any way such Restructuring Support Party's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed; and

(viii)    it (A) either (1) is the sole owner of the claims and interests identified below its name on its signature page hereof and in the amounts set forth therein, or (2) has all necessary investment or voting discretion with respect to the principal amount of claims and interests identified below its name on its signature page hereof, and has the power and authority to bind the owner(s) of such claims and interests to the terms of this Agreement; (B) is entitled (for its own accounts or for the accounts of such other owners) to all of the rights and economic benefits of such claims and interests; and (C) does not directly or indirectly own any claims against any Debtor other than as identified below its name on its signature page hereof.

(b)    Each Debtor hereby represents and warrants on a joint and several basis (and not any other person or entity other than the Debtors) that the following statements are true, correct, and complete as of the date hereof:

(i)    it has the requisite corporate or other organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

(iii)    the execution and delivery by it of this Agreement does not (A) violate its certificates of incorporation, or bylaws, or other organizational documents, or (B) result in a breach of, or constitute (with due notice or lapse of time or both) a default (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases or any Debtor's undertaking to implement the Restructuring through the Chapter 11 Cases) under any material contractual obligation to which it is a party;

(iv)    the execution and delivery by it of this Agreement does not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state, or other governmental authority or regulatory body, other than, for the avoidance of doubt, the actions with governmental authorities or regulatory bodies required in connection with implementation

of the Restructuring and filings pursuant to the Securities Exchange Act of 1934, as amended (the "***Exchange Act***");

(v)     subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code and, to the extent applicable, approval by the Bankruptcy Court, this Agreement is a legally valid and binding obligation of each Debtor that is enforceable against each Debtor in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability;

(vi)    it has sufficient knowledge and experience to evaluate properly the terms and conditions of the Restructuring and this Agreement, and has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction; and

(vii)   the execution and delivery by it of this Agreement and consummation of the Restructuring contemplated hereby are consistent with applicable law and, as applicable, the exercise of its fiduciary duties as of the RSA Effective Date.

20.     **Survival of Agreement**. Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning the Restructuring and in contemplation of possible chapter 11 filings by the Debtors and the rights granted in this Agreement are enforceable by each signatory hereto without approval of any court, including the Bankruptcy Court.

21.     **Rights and Settlement Discussions**. If the transactions contemplated herein are not consummated, or following the occurrence of a Termination Date, if applicable, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, other than as provided in Section 16, and the Parties expressly reserve any and all of their respective rights. The Parties acknowledge that this Agreement, the MS Bond Settlement, the Restructuring, and all negotiations relating hereto are part of a proposed settlement of matters that could otherwise be the subject of litigation.  The Parties agree that this Agreement, the Term Sheet, any related documents, and all negotiations relating thereto, constitute settlement discussions for purposes of Rule 408 of the Federal Rules of Evidence, any applicable or equivalent state rules of evidence, and any other similar applicable law, foreign or domestic.

22.     **Waiver and Amendments**.

(a)     Other than as set forth in Section 22(b), this Agreement, including the Exhibits, may not be waived, modified, amended, or supplemented except with the prior written consent of the Debtors, the Bond Green Bonds Trustee and the Majority Consenting Bond Green Bondholders.

(b)      Notwithstanding <u>Section 22(a)</u>:

    (i)      any waiver, modification, amendment, or supplement to this <u>Section 22</u> shall require the prior written consent of all of the Parties; and

    (ii)     any modification, amendment, or change to the definition of "Majority Consenting Bond Green Bondholders" or "Required Consenting Bond Green Bondholders" shall require the prior written consent of all of the Parties.

23.      **Relationship Among Parties**.  The duties and obligations of the Restructuring Support Parties under this Agreement shall be several, not joint.  No Party shall have any responsibility by virtue of this Agreement for any trading by any other entity.  No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement.  The Parties acknowledge that this Agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Debtors, and neither the Parties nor any group thereof shall constitute a "group" within the meaning of Rule 13d-5 under the Exchange Act.  No action taken by any Restructuring Support Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Restructuring Support Parties are in any way acting in concert or as such a "group."

24.      **Specific Performance**.  It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach of this Agreement, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.  Each Party also agrees that it will not (a) seek, and will waive any requirement for, the securing or posting of a bond in connection with any Party seeking or obtaining such relief or (b) raise as a defense thereto the necessity of proving the inadequacy of money damages as a remedy.

25.      **Governing Law & Jurisdiction**.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice-of-law provisions that would require or permit the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each Party irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, shall be brought in the federal or state courts located in the City of New York, Borough of Manhattan, and by executing and delivering this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding.  Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.  By executing and delivering this Agreement, and upon commencement of the Chapter 11 Cases, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of the

Bankruptcy Court solely for purposes of any action, suit, proceeding, or other contested matter arising out of or relating to this Agreement, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding, or other contested matter.

26.    **Waiver of Right to Trial by Jury**.  EACH OF THE PARTIES WAIVES ANY RIGHT TO HAVE A JURY PARTICIPATE IN RESOLVING ANY DISPUTE, WHETHER SOUNDING IN CONTRACT, TORT, OR OTHERWISE, BETWEEN ANY OF THE PARTIES ARISING OUT OF, CONNECTED WITH, RELATING TO, OR INCIDENTAL TO THE RELATIONSHIP ESTABLISHED BETWEEN ANY OF THEM IN CONNECTION WITH THIS AGREEMENT.  INSTEAD, ANY DISPUTES RESOLVED IN COURT SHALL BE RESOLVED IN A BENCH TRIAL WITHOUT A JURY.

27.    **Successors and Assigns**.  Except as otherwise provided herein, this Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective permitted successors, assigns, heirs, executors, administrators, and representatives.

28.    **No Third-Party Beneficiaries**.  Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement.

29.    **Notices**.  All notices (including, without limitation, any notice of termination or breach) and other communications from any Party hereunder shall be in writing and shall be deemed to have been duly given if personally delivered by courier service, messenger, email, or facsimile to the other Parties at the applicable addresses below, or such other addresses as may be furnished hereafter by notice in writing.  Any notice of termination or breach shall be delivered to all other Parties.

(a)    If to any Debtor:

Enviva Inc.
Attn:   Jason E. Paral
7272 Wisconsin Ave., Suite 1800
Bethesda, MD 20814
Tel:    (301) 657-5560
Email: jason.paral@enviva.com

*With a copy to:*

Vinson & Elkins LLP
Attn:   David S. Meyer
        Jessica C. Peet
1114 Avenue of the Americas, 32nd Floor
New York, NY 10036
Tel:    (212) 237-0000
Email: dmeyer@velaw.com
        jpeet@velaw.com

- and -

21

> Vinson & Elkins LLP
> Attn:   Matthew J. Pyeatt
>         Trevor G. Spears
> 2001 Ross Avenue, Suite 3900
> Dallas, TX 75201
> Tel:    (214) 220-7700
> Email: mpyeatt@velaw.com
>         tspears@velaw.com

(b)     If to the Green Bonds Trustee:

To the address set forth on its signature page hereto

*with a copy to*

> Kramer Levin Naftalis & Frankel LLP
> Attn:   Amy Caton
>         Douglas Buckley
> 1177 Sixth Avenue
> New York, NY 10036
> Tel:    (212) 715-9100
> Email: acaton@kramerlevin.com
>         dbuckley@kramerlevin.com

(c)     If to a Consenting Bond Green Bondholder:

To the address set forth on its signature page hereto

*with a copy to*

> Kramer Levin Naftalis & Frankel LLP
> Attn:   Amy Caton
>         Douglas Buckley
> 1177 Sixth Avenue
> New York, NY 10036
> Tel:    (212) 715-9100
> Email: acaton@kramerlevin.com
>         dbuckley@kramerlevin.com

30.     **Email Consents**.  Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

22

31.     **Entire Agreement**.  This Agreement (including the Exhibits) constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.

32.     **Reservation of Rights**.  Except as expressly provided in this Agreement or the Term Sheet, including, without limitation, Section 6(a) of this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including, without limitation, its claims against any of the other Parties.

33.     **Counterparts**.  This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument, and the counterparts may be delivered by electronic mail in portable document format (.pdf).

34.     **Public Disclosure**.  This Agreement, as well as its terms, its existence, and the existence of the negotiation of its terms are expressly subject to any existing confidentiality agreements executed by and among any of the Parties as of the date hereof; *provided, however*, that, (a) on or after the RSA Effective Date, the Debtors may make any public disclosure or filing of, or with respect to the subject matter of, this Agreement, including the existence of, or the terms of, this Agreement or any other material term of the transaction contemplated herein, that, based upon the advice of counsel, is required to be made (i) by applicable law or regulation or (ii) pursuant to any rules or regulations of the New York Stock Exchange, without the express written consent of the other Parties, and (b) after the Petition Date, the Parties may disclose the existence of, or the terms of, this Agreement without the express written consent of the other Parties; *provided, further*, that where permitted by applicable law or regulation, the identities of the Consenting Bond Green Bondholders and their respective holdings of Bond Green Bonds be redacted from any such public disclosure or filing.

35.     **Headings**.  The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

36.     **Interpretation**.  This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof, shall not be effective in regard to the interpretation hereof.

*[Signatures and exhibits follow.]*

23

**ENVIVA INC.**

By: _____

Name:  Glenn T. Nunziata
Title:   Interim Chief Executive Officer and
         Chief Financial Officer


**ENVIVA PELLETS, LLC**

By: _____

Name:  Glenn T. Nunziata
Title:   Interim Chief Executive Officer and
         Chief Financial Officer


**ENVIVA PELLETS LUCEDALE, LLC**

By: _____

Name:  Glenn T. Nunziata
Title:   Interim Chief Executive Officer and
         Chief Financial Officer


**ENVIVA, LP**

**By Enviva GP, LLC,**
**as its sole general partner**

By: _____

Name:  Glenn T. Nunziata
Title:   Interim Chief Executive Officer and
         Chief Financial Officer

**ENVIVA PELLETS WAYCROSS, LLC**

By: _____

Name:  Glenn T. Nunziata
Title:   Interim Chief Executive Officer and
          Chief Financial Officer


**ENVIVA PELLETS GREENWOOD, LLC**

By: _____

Name:  Glenn T. Nunziata
Title:   Interim Chief Executive Officer and
          Chief Financial Officer


**ENVIVA PORT OF PASCAGOULA, LLC**

By: _____

Name:  Glenn T. Nunziata
Title:   Interim Chief Executive Officer and
          Chief Financial Officer


**ENVIVA PELLETS BOND, LLC**

By: _____

Name:  Glenn T. Nunziata
Title:   Interim Chief Executive Officer and
          Chief Financial Officer


*[Enviva Signature Pages to RSA]*

**ENVIVA HOLDINGS, LP**

**By Enviva Holdings GP, LLC,**
**as its sole general partner**

By: _____

Name:  Glenn T. Nunziata
Title:   Interim Chief Executive Officer and
          Chief Financial Officer

**ENVIVA GP, LLC**

By: _____

Name:  Glenn T. Nunziata
Title:   Interim Chief Executive Officer and
          Chief Financial Officer

**ENVIVA MANAGEMENT COMPANY, LLC**

By: _____

Name:  Glenn T. Nunziata
Title:   Interim Chief Executive Officer and
          Chief Financial Officer

**ENVIVA AIRCRAFT HOLDINGS CORP.**

By: _____

Name:  Glenn T. Nunziata
Title:   Interim Chief Executive Officer and
          Chief Financial Officer

*[Enviva Signature Pages to RSA]*

**ENVIVA SHIPPING HOLDINGS, LLC**

By: _____

Name: Glenn T. Nunziata
Title:　Interim Chief Executive Officer and
　　　　Chief Financial Officer


**ENVIVA PARTNERS FINANCE CORP.**

By: _____

Name: Glenn T. Nunziata
Title:　Interim Chief Executive Officer and
　　　　Chief Financial Officer


**ENVIVA ENERGY SERVICES, LLC**

By: _____

Name: Glenn T. Nunziata
Title:　Interim Chief Executive Officer and
　　　　Chief Financial Officer


**ENVIVA HOLDINGS GP, LLC**

By: _____

Name: Glenn T. Nunziata
Title:　Interim Chief Executive Officer and
　　　　Chief Financial Officer


*[Enviva Signature Pages to RSA]*

**ENVIVA DEVELOPMENT
FINANCE COMPANY, LLC**

By: _____

Name: Glenn T. Nunziata
Title:   Interim Chief Executive Officer and
Chief Financial Officer


**ENVIVA PELLETS EPES, LLC**

By: _____

Name: Glenn T. Nunziata
Title:   Interim Chief Executive Officer and
Chief Financial Officer


**ENVIVA PELLETS EPES
FINANCE COMPANY, LLC**

By: _____

Name: James P. Geraghty
Title:   Manager


**ENVIVA PELLETS EPES HOLDINGS, LLC**

By: _____

Name: Glenn T. Nunziata
Title:   Interim Chief Executive Officer and
Chief Financial Officer

**ENVIVA MLP INTERNATIONAL
HOLDINGS, LLC**

By: _____

Name:  Glenn T. Nunziata
Title:    Interim Chief Executive Officer and
           Chief Financial Officer

**WILMINGTON TRUST, N.A., AS TRUSTEE**

By: _____

Name:    Barry Ihrke

Title:    Vice President

<u>Address for Notices:</u>

Wilmington Trust, N.A.
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Attention: Barry Ihrke
Email: BIHRKE@WilmingtonTrust.com

With copies by electronic mail (which shall not constitute notice) to:

Greenberg Traurig, P.A.
450 So. Orange Avenue
Suite 650
Orlando, FL 32801
Attn: Warren Bloom, Esq.
Email: bloomw@gtlaw.com

and

Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, NY 10036
Attn: Amy Caton, Esq. and Douglas Buckley, Esq.
Email: acaton@kramerlevin.com and dbuckley@kramerlevin.com

*[Trustee Signature Page to RSA]*

## Schedule 1 to Restructuring Support Agreement

### Subsidiaries

1. Enviva Inc.
2. Enviva Pellets, LLC
3. Enviva Pellets Lucedale, LLC
4. Enviva, LP
5. Enviva Pellets Waycross, LLC
6. Enviva Pellets Greenwood, LLC
7. Enviva Port of Pascagoula, LLC
8. Enviva Pellets Bond, LLC
9. Enviva Holdings, LP
10. Enviva GP, LLC
11. Enviva Management Company, LLC
12. Enviva Aircraft Holdings Corp.
13. Enviva Shipping Holdings, LLC
14. Enviva Partners Finance Corp.
15. Enviva Energy Services, LLC
16. Enviva Holdings GP, LLC
17. Enviva Development Finance Company, LLC
18. Enviva Pellets Epes, LLC
19. Enviva Pellets Epes Finance Company, LLC
20. Enviva Pellets Epes Holdings, LLC
21. Enviva MLP International Holdings, LLC

**Exhibit A** to the Restructuring Support Agreement

**Term Sheet**

*Confidential; Subject to FRE 408 and Similar Rules*

**Mississippi Business Finance Corporation – Exempt Facility Revenue Bonds
Enviva Inc. Project, Series 2022 (Green Bonds)**

<u>Term Sheet</u>

THIS TERM SHEET IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE OR ANY OTHER PLAN OF REORGANIZATION OR SIMILAR PROCESS UNDER ANY OTHER APPLICABLE LAW.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS, PROVISIONS OF THE BANKRUPTCY CODE AND/OR OTHER APPLICABLE LAWS.  NOTHING CONTAINED IN THIS TERM SHEET SHALL BE AN ADMISSION OF FACT OR LIABILITY OR BE DEEMED BINDING ON ANY OF THE PARTIES HERETO.  THIS TERM SHEET IS FOR SETTLEMENT DISCUSSION PURPOSES ONLY, IS SUBJECT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE, AND CANNOT BE DISCLOSED TO ANY OTHER PERSON OR ENTITY WITHOUT THE CONSENT OF THE PARTIES. THIS TERM SHEET DOES NOT ADDRESS ALL TERMS THAT WOULD BE REQUIRED IN CONNECTION WITH THE RESTRUCTURING, AND ENTRY INTO ANY BINDING AGREEMENT IS SUBJECT TO, AMONG OTHER THINGS, THE COMPLETION OF DUE DILIGENCE SATISFACTORY TO THE PARTIES AND THE EXECUTION OF DEFINITIVE DOCUMENTS.

| Term | Description |
|---|---|
| **I.    OVERVIEW** ||
| **Overview of the Restructuring** | This term sheet (the "<u>Term Sheet</u>") sets forth certain elements of a restructuring, as set forth herein, (the "<u>Restructuring</u>") to be implemented through a restructuring support agreement (the "<u>RSA</u>") for the Company and the other Debtors.[1]<br><br>The Restructuring is structured to be accomplished through the MS Bond Settlement in the "<u>Chapter 11 Cases</u>," each as further described and defined herein. |
| **Bond Green Bonds Issuer** | Mississippi Business Finance Corporation |
| **Bond Green Bonds Trustee** | Wilmington Trust, N.A. |
| **Company** | Enviva Inc. |

---

[1]    Capitalized terms not initially defined herein shall share the meanings ascribed to them later in this Term Sheet. Capitalized terms not defined in this Term Sheet shall share the meanings ascribed to them in the Bond Green Bonds Loan Agreement or the Bond Green Bonds Indenture, as applicable.  The "<u>Bond Green Bonds Indenture</u>" refers to that certain Indenture of Trust, dated as of November 1, 2022, between the Bond Green Bonds Issuer and the Bond Green Bonds Trustee, as amended, restated, supplemented, or otherwise modified from time to time.  The "<u>Bond Green Bonds Loan Agreement</u>" refers to the Loan Agreement, dated as of November 1, 2022, between the Bond Green Bonds Issuer and certain Debtors, as amended, restated, supplemented, or otherwise modified from time to time.

| Term | Description |
|---|---|
| **Debtors** | The Company, together with all the Company's "Subsidiaries" listed on Schedule 1 of the RSA (collectively, the "Debtors" and each, a "Debtor"). |
| **Initial Consenting Bond Green Bondholders** | Consenting Bond Green Bondholders that have signed the RSA as of the "RSA Effective Date" (as defined in the RSA), and their successors and assigns. |
| **Consenting Bond Green Bondholders** | The Initial Consenting Bond Green Bondholders, together with any additional Consenting Bond Green Bondholders that have acceded to the RSA by delivering a joinder pursuant to the procedures set forth in Section 13(c) of the RSA.[2] |
| **Waiver of Defaults; Forbearance** | Subject to Section 16 of the RSA and for so long as the RSA remains in effect, the RSA will provide for a forbearance (and to withdraw any notice of alleged default that has been delivered) in respect of the following potential defaults prior to the effectiveness of the Permanent Waiver: <br><br>(i)   any potential defaults arising from any Debtor's alleged or potential failure to diligently pursue construction of the Project, including, without limitation, under Section 3.2 of the Bond Green Bonds Loan Agreement; <br><br>(ii)   any potential defaults arising from any alleged or potentially inaccurate, or non-compliant certification by any Debtor in connection with a written requisition under Section 3.5(a) of the Bond Green Bonds Loan Agreement, including, without limitation, through Sections 8.1(b) and 8.1(g) of the Bond Green Bonds Loan Agreement; <br><br>(iii)   any potential defaults alleged on account of any Debtor's voluntary bankruptcy under Section 8.1(d) of the Bond Green Bonds Loan Agreement and/or any potential defaults alleged on account of any Debtor's failure to have such a bankruptcy dismissed within 60 days under Section 8.1(f) of the Bond Green Bonds Loan Agreement; and <br><br>(iv)   any potential defaults alleged on account of any Debtor's failure to make a required payment in respect of the 2026 Notes[3] in January 2024, including, without limitation, through Section 8.1(c) of the Bond Green Bonds Loan Agreement. <br><br>The foregoing forbearances shall immediately, irrevocably, and without further action by any Party, convert into a permanent waiver (the "Permanent Waiver") upon satisfaction of the conditions precedent set forth below under "Conditions Precedent." |

---

[2]   The "Parties" are comprised of the Debtors and the Consenting Bond Green Bondholders.

[3]   The "2026 Notes" comprise any "Notes" issued pursuant to that certain 6.500% Senior Notes Due 2026 Indenture, dated as of December 9, 2019, by, between, and among Enviva Partners, LP, Enviva Partners Finance Corp., as Issuers, and Wilmington Trust, N.A., as Trustee.  The 2026 Notes are held by the "2026 Noteholders."

| Term | Description |
|------|-------------|
| | The Parties acknowledge that nothing herein constitutes, nor shall it be argued by any Party to constitute, an admission of any kind with respect to the existence of any potential default. The Parties acknowledge, moreover, that the illustrative list of potential defaults contained herein is conveyed pursuant to an offer of settlement subject to Federal Rule of Evidence 408 and any relevant state-law equivalents. |
| **II.    TERMS RELATED TO MS BOND SETTLEMENT IN CHAPTER 11 CASES** | |
| **MS Bond Settlement** | In exchange for resolving the controversy between the Parties regarding rights to withdraw from or have any right, title, or interest in the Construction Fund, as well as any and all claims that the Bond Green Bonds Trustee or the Bond Green Bondholders, in each case, may have with respect to whether or not prior withdrawals from the Construction Fund were made in accordance with the requirements of the Bond Green Bonds Loan Agreement—and for so long as the RSA remains in effect—the Parties agree that all monies in the Construction Fund shall be held by the Trustee for the benefit of the holders of the Bonds until entry of the Rule 9019 Order and shall, upon entry of the Rule 9019 Order, be transferred to a separate fund held by the Bond Green Bonds Trustee (the "New Fund"), for redemption of the then-outstanding Bond Green Bonds (and equivalent reduction of any and all claims related to the Bond Green Bonds), rebate payments (if any), and payment of Bond Green Bonds Trustee fees (pursuant to the Bond Green Bonds Trustee's charging lien) not otherwise reimbursed by the Company (such distribution, the "MS Bond Construction Fund Distribution"). For so long as the RSA is in effect, the Debtors shall not submit any written requisitions or otherwise seek the withdrawal of monies in the Construction Fund. |
| | The principal amount of any Bond Green Bonds not redeemed or purchased through the MS Bond Construction Fund Distribution shall, together with any accrued and unpaid interest through the "Petition Date" (as defined in the RSA), and any and all fees, expenses, indemnities, and similar charges of the Bond Green Bonds Trustee payable by any Debtor under the Bond Green Bonds Indenture or Bond Green Bonds Loan Agreement (but which have not been paid by any Debtor), shall collectively constitute an allowed claim (the "Deficiency Claim") against each Debtor in the Chapter 11 Cases and shall not, pursuant to and upon entry of the Rule 9019 Order, be subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether contractual, equitable, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, or any other challenges under any applicable law or regulation by any Debtor. |
| | Subject to each Party's rights and obligations under the RSA and this Term Sheet, the RSA will provide that the Consenting Bond Green Bondholders shall, to the extent so entitled, vote all their respective Bond Green Bond Claims, including, without limitation, all their respective Deficiency Claims that exist against any Debtors as of the voting record date in the Chapter 11 Cases to accept any operative plan of reorganization proposed by any Debtor (*provided*, that such plan |

3

| Term | Description |
|---|---|
| | treats the Deficiency Claim no worse than any other general unsecured claims (including the claims arising from the 2026 Notes) against the applicable Debtors) and, as applicable, to affirmatively "opt into" any releases applicable to all general unsecured creditors contained therein or to not "opt out" of the same (the transactions described in the preceding three paragraphs, the "<u>MS Bond Settlement</u>"). |
| **Rule 9019 Motion** | Within 30 days after the Petition Date, the Debtors shall file a motion pursuant to Federal Rule of Bankruptcy Procedure 9019 (the "<u>Rule 9019 Motion</u>") seeking the bankruptcy court's entry of an order (the "<u>Rule 9019 Order</u>") approving the MS Bond Settlement on terms consistent with this Term Sheet and the RSA. Each of the Rule 9019 Motion and the Rule 9019 Order shall be reasonably acceptable to the Bond Green Bonds Trustee and the Initial Consenting Bond Green Bondholders. |
| **Chapter 11 Case Milestones** | <ul><li>30 days after Petition Date: Rule 9019 Motion to be filed with bankruptcy court</li><li>60 days after Petition Date: Hearing on Rule 9019 Motion</li><li>90 days after Petition Date: Entry of Rule 9019 Order</li></ul> |
| **Adequate Protection** | As adequate protection for the interests of the Bond Green Bonds Trustee and Bond Green Bondholders in the Construction Fund, during the Chapter 11 Cases, the Debtors agree to pay all Creditor Support Fees incurred through five (5) days after the Rule 9019 Order becoming a final, non-appealable order. Such fees shall be paid within 10 business days of receiving an invoice therefor and procedures for review and payment of such fees shall be consistent with procedures applied to fees of any lenders of any debtor-in-possession financing. The Bond Green Bonds Trustee and the Consenting Bond Green Bondholders agree not to seek any additional adequate protection of the interests of the Bond Green Bonds Trustee and the Bond Green Bondholders in the Construction Fund for so long as the RSA is in effect and no Debtor takes any action to alter the Bond Green Bonds Trustee's post-petition control of the Construction Fund. |
| **III. ADDITIONAL MATERIAL TERMS TO RESTRUCTURING** | |
| **Covenant to Negotiate Out-Of-Court Restructuring** | The Debtors shall negotiate in good faith with the Initial Consenting Bond Green Bondholders and the Bond Green Bonds Trustee the terms of an out-of-court restructuring if, on or after March 31, 2024, the Debtors are not subject to a voluntary or involuntary bankruptcy proceeding. Solely to the extent the Debtors are not subject to a voluntary or involuntary bankruptcy proceeding on or after March 31, 2024, failure to reach an agreement on an out-of-court resolution with Bond Green Bondholders then holding majority in principal amount of the Bond Green Bonds on or before June 30, 2024 shall result in a termination right for each of the Debtors and the "<u>Majority Consenting Bond Green Bondholders</u>" under and as defined in the RSA. |

4

| Term | Description |
|------|-------------|
| **Reasonable Assistance** | The Debtors and the Consenting Bond Green Bondholders shall, subject to and consistent with their obligations under the RSA, use commercially reasonable efforts to provide assistance to each other with respect to the matters contained in this Term Sheet. |
| **Tax Structure** | To the extent practicable, the Restructuring and the consideration received in the Restructuring shall be structured in a manner that (i) minimizes any current taxes payable as a result of the consummation of the Restructuring, and (ii) optimizes the tax efficiency (including, but not limited to, by way of the preservation or enhancement of favorable tax attributes, or moving certain businesses to new entities incorporated in tax-favorable jurisdictions) of the Restructuring to the Debtors, and the Consenting Bond Green Bondholders going forward, in each case, as determined by the Debtors and the Initial Consenting Bond Green Bondholders. |
| **Creditor Support Fees** | Subject to the Creditor Support Fee Cap (as defined below), the Debtors shall pay (and to the extent already paid by means other than the Company's payment, reimburse), as a condition precedent to the effectiveness of the RSA, all reasonable and documented fees and expenses of the Bond Green Bonds Trustee and advisors to the Initial Consenting Bond Green Bondholders and the Bond Green Bonds Trustee (all such fees, collectively the "<u>Creditor Support Fees</u>") by no later than [February [●], 2024][4].  Subject to any budget imposed and adopted by the Debtors' debtor-in-possession financing—as well as any attendant 13-week cashflow reports— the Debtors shall pay all Creditor Support Fees related to the negotiation and implementation of the Restructuring incurred after the RSA Effective Date within 10 business days of receiving an invoice therefor; *provided*, that the Debtors shall have no obligation to pay any Creditor Support Fees or make any payments of any kind to the Bond Green Bonds Trustee, its advisors, or any advisors to the Initial Consenting Bond Green Bondholders once the Debtors have collectively made aggregate payments of $1.8 million in Creditor Support Fees (such limitation, the "<u>Creditor Support Fee Cap</u>"). |
| **Conditions Precedent to Permanent Waiver** | The effectiveness of the Permanent Waiver in respect of all alleged defaults under the Bond Green Bonds Loan Agreement and any related documents shall be subject to the following additional Conditions Precedent:<br><br>• The RSA shall not have been terminated and remains in full force and effect with respect to all Parties;<br><br>• The Company shall have paid, or caused to be paid, in cash all Creditor Support Fees;<br><br>• Any and all other requisite opinions, governmental, regulatory, and third-party approvals and consents to implement the Restructuring shall have been obtained; |

---

[4]   NTD: To be fixed at same date RSA is signed.

| Term | Description |
|---|---|
| | • The Rule 9019 Order shall have been entered by the Bankruptcy Court and become a final, non-appealable order; and<br><br>• All monies in the Construction Fund shall been transferred to the New Fund. |
| **Governing Law** | This Term Sheet and the RSA shall be governed by New York law. |
| **Documentation** | The Parties shall, consistent with and subject to their fiduciary duties, if any, negotiate documents in connection with this Restructuring in good faith.  The Rule 9019 Motion, Rule 9019 Order, and any objections, replies, or other responsive pleadings to the Rule 9019 Motion filed by the Debtors or any Consenting Bond Green Bondholder (such pleadings, together with the Rule 9019 Motion and Rule 9019 Order, the "<u>Definitive MS Bond Settlement Documents</u>") shall be in form and substance consistent with this Term Sheet and the RSA and reasonably acceptable to the Company and the Initial Consenting Bond Green Bondholders holding a majority in principal amount of the Bond Green Bonds held by the Initial Consenting Bond Green Bondholders.  For the avoidance of doubt, no Consenting Bond Green Bondholder shall, acting in its capacity as a Consenting Bond Green Bondholder, have any consent right of any sort over documents other than the Definitive MS Bond Settlement Documents pursuant to this Term Sheet. |
| **Extension of Disclosure Time Under NDA** | Notwithstanding any other provision of any confidentiality agreement that a Consenting Bond Green Bondholder has executed with the Company and the Debtors, all of the Consenting Bond Green Bondholders that have executed such confidentiality agreements agree that any "<u>Disclosure Time</u>" under and as defined therein (or any like concept) shall be extended for so long as such Disclosure Time (or any like concept) in the confidentiality agreements that the Company and the Debtors have executed with the 2026 Noteholders is extended in the discretion of the Company, the Debtors, and the 2026 Noteholders; *provided*, that the Disclosure Time shall in no event take place later than March 15, 2024. |
| **Reservation of Rights** | The execution of the RSA and the exhibits thereto is without prejudice to the Parties' rights to negotiate the Definitive MS Bond Settlement Documents required to reflect the terms hereto.<br><br>Nothing herein constitutes, or shall be argued by any Party to constitute, an admission of any kind.  If the Restructuring is not consummated for any reason, all Parties reserve any and all of their respective rights. |

**Exhibit B** to the Restructuring Support Agreement

**Form of Joinder Agreement**

**Form of Joinder Agreement**

This joinder (this "*Joinder*") to the Restructuring Support Agreement (the "*Agreement*"),[1] dated as of March 12, 2024, by and among (i) Enviva Inc. and each of the subsidiaries set forth in **Schedule 1** to the Agreement, and (ii) the Restructuring Support Parties, is executed and delivered by [_____] (the "*Joining Party*") as of [_____].

1.     <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder as <u>Annex 1</u> (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof).  The Joining Party shall hereafter be deemed to be a Party for all purposes under the Agreement and one or more of the entities comprising the Restructuring Support Parties, as applicable.

2.     <u>Representations and Warranties</u>.  The Joining Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joining Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the claims identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations and warranties set forth in <u>Section 19</u> of the Agreement to each other Party.

3.     <u>Governing Law</u>.  This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts-of-law provisions that would require or permit the application of the law of any other jurisdiction.

4.     <u>Notice</u>.  All notices and other communications given or made pursuant to the Agreement shall be sent to:

> To the Joining Party at:
>
> [JOINING PARTY]
> [ADDRESS]
> Attn: [_____]
> Facsimile: [FAX]
> EMAIL: [_____]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

---

[1]     Capitalized term used but not otherwise defined herein shall have the meaning ascribed to it in the Agreement.

**[JOINING PARTY]**


By: _____

Name:

Title:


Holdings: $_____ in principal amount of
Bond Green Bonds

*[Joinder Signature Page to RSA]*

**<u>Annex 1</u> to the Form of Joinder Agreement**

**Restructuring Support Agreement**

## **EXHIBIT C**

**RSA**

*EXECUTION VERSION*

**THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT CONSTITUTE, AND SHALL NOT BE DEEMED TO BE, AN OFFER OF SECURITIES OR A SOLICITATION OF THE ACCEPTANCE OR REJECTION OF A CHAPTER 11 PLAN FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE RSA EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

**THIS RESTRUCTURING SUPPORT AGREEMENT DOES NOT PURPORT TO SUMMARIZE ALL OF THE TERMS, CONDITIONS, REPRESENTATIONS, WARRANTIES, AND OTHER PROVISIONS WITH RESPECT TO THE TRANSACTIONS DESCRIBED HEREIN, WHICH TRANSACTIONS WILL BE SUBJECT TO THE COMPLETION OF DEFINITIVE DOCUMENTATION INCORPORATING THE TERMS SET FORTH HEREIN, AND THE CLOSING OF ANY TRANSACTION SHALL BE SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SUCH DEFINITIVE DOCUMENTATION AND THE APPROVAL RIGHTS OF THE PARTIES SET FORTH HEREIN AND IN SUCH DEFINITIVE DOCUMENTATION.**

---

**ENVIVA INC.**

**RESTRUCTURING SUPPORT AGREEMENT**

**March 12, 2024**

---

This Restructuring Support Agreement (together with the exhibits and schedules attached hereto, as each may be amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof, this "***Agreement***"),[1] dated as of March 12, 2024, is entered into by and among the following parties:

(i)      Enviva Inc. and those certain subsidiaries of Enviva Inc. listed on **Schedule 1** hereto (such subsidiaries and Enviva Inc. each a "***Debtor***" and, collectively, the "***Debtors***");

(ii)     the undersigned holders or beneficial holders, investment advisors, sub-advisors, or managers of funds and/or accounts that are holders or beneficial holders, of the senior notes issued pursuant to that certain *Indenture*, dated as of December 9, 2019, among Enviva Partners, LP and Enviva Partners Finance Corp., as issuers, each of the guarantors party thereto, and Wilmington Savings Fund Society, FSB, as trustee (in such capacity, the "***2026 Notes Indenture Trustee***") (as amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date, the "***2026 Notes***

---

[1]    Unless otherwise noted, capitalized terms used but not immediately defined herein shall have the meanings ascribed to them at a later point in this Agreement or in the Term Sheet (as defined herein), as applicable.

*Indenture*"), for the 6.500% senior notes due 2026 (the "***2026 Notes***," and the claims against the Debtors on account thereof, the "***2026 Notes Claims***") (such holders, together with their respective successors and permitted assigns and any subsequent holder of 2026 Notes that may become in accordance with <u>Section 12</u> and/or <u>Section 13</u> hereof signatory hereto, collectively, the "***Consenting 2026 Noteholders***");

(iii)    the undersigned holders or beneficial holders, investment advisors, sub-advisors, or managers of funds and/or accounts that are holders or beneficial holders, whether as record holders or participants, of loans or commitments (the "***Senior Secured Credit Facility Loans***") under that certain *Amended and Restated Credit Agreement* dated as of October 18, 2018 (as amended, restated, modified, supplemented, or replaced from time to time prior to the Petition Date, the "***Senior Secured Credit Agreement***," and the claims arising thereunder, the "***Senior Secured Credit Facility Claims***") among Enviva Inc., as administrative borrower, Enviva LP, as subsidiary borrower, Ankura Trust Company, LLC, as administrative agent and collateral agent (in such capacity, the "***Senior Secured Credit Facility Agent***"), and the lenders party thereto from time to time (such lenders, together with their respective successors and permitted assigns and any subsequent lender that may become in accordance with <u>Section 12</u> and/or <u>Section 13</u> hereof signatory hereto, collectively, the "***Consenting Senior Secured Credit Facility Lenders***");

(iv)    (A) the undersigned holders or beneficial holders, investment advisors, sub-advisors, or managers of funds and/or accounts that are holders or beneficial holders, of Exempt Facilities Revenue Bonds (Enviva Inc. Project), Series 2022 (Green Bonds) (the "***Epes Green Bonds***," and the claims against the Debtors on account thereof, the "***Epes Green Bonds Claims***") issued by the Industrial Development Authority of Sumter County, Alabama (the "***Epes Green Bonds Issuer***") pursuant to that certain *Indenture of Trust*, dated as of July 1, 2022, between Epes Green Bonds Issuer and Wilmington Trust, N.A., as trustee (the "***Epes Green Bonds Trustee***") (such holders, together with their respective successors and permitted assigns and any subsequent holder of Epes Green Bonds that may become in accordance with <u>Section 12</u> and/or <u>Section 13</u> hereof signatory hereto, collectively, the "***Consenting Epes Green Bondholders***"); and

(v)    (A) the undersigned holders or beneficial holders, investment advisors, sub-advisors, or managers of funds and/or accounts that are holders or beneficial holders, of Exempt Facilities Revenue Bonds, (Enviva Inc.), Series 2022 (Green Bonds) (the "***Bond Green Bonds***," and, the claims against the Debtors on account of the Bond Green Bonds, the "***Bond Green Bonds Claims***" and, the Bond Green Bonds Claims together with the Epes Green Bonds Claims, the "***Green Bonds Claims***"[2] and, the Green Bonds Claims together with the 2026 Notes Claims and the Senior Secured Credit Facility Claims, the "***Company Claims/Interests***") issued by Mississippi Business Finance Corporation (the "***Bond Green Bonds Issuer***") pursuant to that

---

[2]    For the avoidance of doubt, any reference herein to the principal amount of Green Bonds Claims as of the RSA Effective Date shall, upon the consummation of either the Epes Bond Settlement or the MS Bond Settlement (each as defined herein), as applicable, refer to the adjusted principal amount of the applicable Green Bonds Claims after the consummation of the applicable Settlement.

certain *Indenture of Trust*, dated as of November 1, 2022, between Bond Green Bonds Issuer and Wilmington Trust, N.A., as trustee (the "***Bond Green Bonds Trustee***") (such holders, together with their respective successors and permitted assigns and any subsequent holder of Bond Green Bonds that may become in accordance with <u>Section 12</u> and/or <u>Section 13</u> hereof signatory hereto, collectively, the "***Consenting Bond Green Bondholders***," and collectively with the Consenting Epes Green Bondholders, the "***Consenting Green Bondholders***" and, together with the Consenting 2026 Noteholders and the Consenting Senior Secured Credit Facility Lenders, the "***Restructuring Support Parties***").

This Agreement collectively refers to the Debtors and the Restructuring Support Parties as the "***Parties***" and each individually as a "***Party***."

## <u>RECITALS</u>

**WHEREAS**, as of the date hereof, the Consenting 2026 Noteholders, in the aggregate, hold, or are investment advisors, sub-advisors, or managers of discretionary accounts or funds acting on behalf of beneficial owner(s) that hold, approximately 95% of the aggregate outstanding principal amount of the 2026 Notes;

**WHEREAS**, as of the date hereof, the Consenting Senior Secured Credit Facility Lenders, in the aggregate, hold, or are investment advisors, sub-advisors, or managers of discretionary accounts or funds acting on behalf of beneficial owner(s) that hold, approximately 72% of the aggregate outstanding principal amount of Senior Secured Credit Facility Loans;

**WHEREAS**, as of the date hereof, the Consenting Epes Green Bondholders, in the aggregate, hold, or are investment advisors, sub-advisors, or managers of discretionary accounts or funds acting on behalf of beneficial owner(s) that hold, approximately 78% of the aggregate outstanding principal amount of the Epes Green Bonds;

**WHEREAS**, as of the date hereof, the Consenting Bond Green Bondholders, in the aggregate, hold, or are investment advisors, sub-advisors, or managers of discretionary accounts or funds acting on behalf of beneficial owner(s) that hold, approximately 45% of the aggregate outstanding principal amount of the Bond Green Bonds; and

**WHEREAS**, the Debtors and the Restructuring Support Parties have, in good faith and at arms' length, negotiated certain restructuring transactions (the "***Restructuring***") with respect to the Debtors on the terms set forth in this Agreement and as specified in the restructuring term sheet attached hereto as <u>**Exhibit A**</u> (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance herewith, the "***Term Sheet***") and incorporated herein by reference pursuant to <u>Section 2</u> hereof, which will be implemented through jointly administered voluntary cases commenced by the Debtors (the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "***Bankruptcy Code***"), in the United States Bankruptcy Court for the Eastern District of Virginia (the "***Bankruptcy Court***"), pursuant

to the Plan[3], which will be filed by the Debtors in the Chapter 11 Cases in accordance with the Milestones set forth in <u>Section 4</u> of this Agreement.

      **NOW, THEREFORE**, in consideration of the promises, mutual covenants, and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, each of the Parties, intending to be legally bound, hereby agrees as follows:

<u>**AGREEMENT**</u>

      1.    <u>**RSA Effective Date**</u>. This Agreement shall become effective, and the obligations contained herein shall become binding upon the Parties, upon the first date (such date, the "***RSA Effective Date***") that this Agreement has been executed by all of the following: (i) each Debtor; (ii) the holders[4] of at least one-half of the aggregate outstanding principal amount of Senior Secured Credit Facility Claims; (iii) the holders of at least two-thirds of the aggregate outstanding principal amount of 2026 Notes Claims; (iv) the holders of at least 45% of the aggregate outstanding principal amount of Bond Green Bonds Claims; (v) the holders of at least two-thirds of the aggregate outstanding principal amount of Epes Green Bonds Claims; *provided* that the RSA Effective Date with respect to any Joining Party shall be the date that such Joining Party executes a Joinder Agreement; and (vi) the Forbearance Agreements[5] shall be in full force and effect and the Debtors shall be in full compliance therewith.

      2.    <u>**Exhibits and Schedules Incorporated by Reference**</u>. Each of the exhibits attached hereto and any schedules to such exhibits (collectively, the "***Exhibits and Schedules***") is expressly incorporated herein and made a part of this Agreement, and all references to this

---

[3]   "***Plan***" means the joint plans of reorganization for each of the Debtors under chapter 11 of the Bankruptcy Code on the terms and subject to the conditions set forth herein, including in the Term Sheet.

[4]   References to "holder" or "lender" herein shall include holders or lenders or beneficial holders (including participants) or lenders, investment advisors, sub-advisors, or managers of funds and/or accounts that are holders or lenders, or beneficial holders (including participants) or lenders, as applicable.  For purposes of this Agreement, including in connection with determining requisite consent thresholds, termination thresholds, the occurrence of the RSA Effective Date, covenants, and representations and warranties with respect to holdings of Company Claims/Interests, holdings of Company Claims/Interests shall include any executed but unsettled trades and any Company Claims/Interests beneficially held by the applicable party.  Any covenants or representations and warranties with respect to voting shall be satisfied with respect to any unsettled trades by using commercially reasonable efforts to exercise all rights such Restructuring Support Party has to cause and direct the applicable holder of such Company Claims/Interests to vote.

[5]   "***Forbearance Agreements***" means, collectively, (i) the forbearance agreement dated as of February 16, 2024, between Enviva Inc. and certain of its subsidiaries more particularly detailed therein, as debtors and the holders or investment advisors, sub-advisors, or managers of discretionary accounts or funds acting on behalf of holders, of the senior notes issued pursuant to that certain Indenture dated as of December 9, 2019, as requisite creditors, (ii) the forbearance agreement dated as of February 16, 2024, between Enviva Inc. and certain of its subsidiaries more particularly detailed therein, as debtors and the holders, or investment advisors, sub-advisors, or managers of discretionary accounts or funds acting on behalf of holders, of loans or commitments under that certain Amended and Restated Credit Agreement, dated as of October 18, 2018, as requisite creditors, and (iii) the forbearance agreement dated as of February 16, 2024, between Enviva Inc. and certain of its subsidiaries more particularly detailed therein, as debtors and the holders or investment advisors, sub-advisors, or managers of discretionary accounts or funds acting on behalf of holders, of Exempt Facilities Revenue Bonds (Enviva Inc. Project), Series 2022 (Green Bonds) issued by the Industrial Development Authority of Sumter County, as requisite creditors.

4892-5401-1299

Agreement shall include the Exhibits and Schedules. In the event of any inconsistency between this Agreement (without reference to the Exhibits and Schedules) and the Exhibits and Schedules, this Agreement (without reference to the Exhibits and Schedules) shall govern.

3.  **Definitive Documentation**.

(a)  The definitive documents and agreements governing the Restructuring (each, including all amendments, modifications and supplements thereto, a "***Definitive Document***" and collectively, the "***Definitive Documentation***") shall include:

(i)  the Plan and all exhibits thereto (including the compilation of documents and forms of documents, schedules, and exhibits to the Plan that will be filed by the Debtors with the Bankruptcy Court in accordance with this Agreement (the "***Plan Supplement***"), including the exhibit to the Plan Supplement that will set forth the material components of the transactions that are required to effectuate the Restructuring contemplated by this Agreement and the Plan Supplement, including any "restructuring steps memo," "tax steps memo" or other document describing steps to be taken and the related tax considerations in connection with the Restructuring (the "***Restructuring Transactions Exhibit***"));

(ii)  the confirmation order with respect to the Plan (the "***Confirmation Order***") and any pleadings in support of entry thereof;

(iii)  the order with respect to the Disclosure Statement (the "***Disclosure Statement Order***") (including the Disclosure Statement and Solicitation Motion (as defined herein));

(iv)  the solicitation materials with respect to the Plan, including the disclosure statement (and all exhibits thereto) with respect to the Plan (the "***Disclosure Statement***") (collectively, the "***Solicitation Materials***");

(v)  (A) the interim order authorizing, among other things, the Debtors to use cash collateral and obtain debtor-in-possession financing (the "***Interim DIP Order***"), (B) the final order authorizing, among other things, the Debtors to use cash collateral and obtain debtor-in-possession financing (the "***Final DIP Order***" and, together with the Interim DIP Order, the "***DIP Orders***"), and (C) the debtor-in-possession credit agreement and note purchase agreement (the "***DIP Facility Agreement***") and all related documentation, including any budget (the "***DIP Budget***") or term sheet (the "***DIP Term Sheet***") related thereto, regarding the debtor-in-possession financing including any equity conversion processes or mechanisms relating thereto (collectively, the "***DIP Financing Documents***" and, such financing, the "***DIP Financing***");

(vi)  all documentation related to any exit financing for the Restructuring (collectively, the "***Exit Financing Documents***");

5

(vii)  all documentation related to the new money rights offering, which will be offered pursuant to section 1145 of the Bankruptcy Code and/or any other applicable law, including, without limitation, under section 4(a)(2) of the Securities Act (the "***Rights Offering***"), including the order authorizing the Debtors to enter into the Backstop Agreement (the "***Backstop Approval Order***") and the procedures for the implementation of the Rights Offering (the "***Rights Offering Procedures***") (collectively with the Backstop Agreement, the "***Rights Offering Documents***");

(viii)  the backstop agreement with respect to the Rights Offering (the "***Backstop Agreement***");

(ix)  any "key employee" retention or incentive plan and any motion, declaration or order related thereto;

(x)  all "first day" motions, applications, and other documents that any Debtor intends to file with the Bankruptcy Court and seeks to have heard on an expedited basis at the "first-day hearing" in the Chapter 11 Cases and any proposed orders related thereto;

(xi)  all documentation addressing or relating to the MS Bond Settlement (as defined herein) (the "***MS Bond Settlement Documents***") and/or the Epes Bond Settlement (as defined herein) (the "***Epes Bond Settlement Documents***");

(xii)  any other material documents, agreements, motions, pleadings, supplements, briefs, applications, orders, and other filings with the Bankruptcy Court, including any term sheets in respect thereof related to any of the foregoing or as may be reasonably necessary or advisable to implement the Restructuring; and

(xiii)  to the extent not included, any motions and related proposed orders, or amendment or modification of any order, related to each of the above.

(b)  The Definitive Documentation identified in Section 3(a) not executed or in a form attached to this Agreement will, after the RSA Effective Date, remain subject to negotiation and completion.   The Definitive Documentation, including all amendments and modifications thereto and including all forms thereof filed with the Bankruptcy Court, shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement and shall be at all times in form and substance reasonably acceptable to (i) the Debtors and (ii) the Consenting 2026 Noteholders holding at least one-half in dollar amount of the aggregate outstanding principal amount of the 2026 Notes Claims held by all Consenting 2026 Noteholders at the time of such consent (the "***Majority Consenting 2026 Noteholders***"); *provided*, that, without limiting the foregoing, (A) the Plan, the Plan Supplement, the DIP Orders, the DIP Facility Agreement, the Backstop Agreement, the Backstop Approval Order and the Confirmation Order shall be in form and

substance acceptable to the Debtors and the Majority Consenting 2026 Noteholders; (B) (x) the MS Bond Settlement Documents and (y) any other Definitive Document to the extent related to or concerning the Plan treatment of the Bond Green Bonds to the extent materially and adversely inconsistent with this Agreement (including as may be amended), shall, in each case, be reasonably acceptable to the Debtors and the Consenting Bond Green Bondholders holding at least one-half in dollar amount of the aggregate outstanding principal amount of the Bond Green Bonds Claims held by all Consenting Bond Green Bondholders at the time of such consent (the "***Majority Consenting Bond Green Bondholders***"); (C) (x) the Epes Bond Settlement Documents and (y) any other Definitive Document to the extent related to or concerning the Plan treatment of the Epes Green Bonds to the extent materially and adversely inconsistent with this Agreement (including as may be amended), shall, in each case, be reasonably acceptable to the Debtors and the Consenting Epes Green Bondholders holding at least one-half in dollar amount of the aggregate outstanding principal amount of the Epes Green Bonds Claims held by all Consenting Epes Green Bondholders at the time of such consent (the "***Majority Consenting Epes Green Bondholders***"); and (D) any Definitive Document, to the extent related to or concerning (x) the use of prepetition cash collateral, adequate protection or stipulations and findings relating to the Senior Secured Credit Facility Claims, (y) the Plan treatment of the Senior Secured Credit Facility Claims to the extent materially and adversely inconsistent with this Agreement (including as may be amended) and (z) the Exit Financing Documents (solely to the extent the Senior Secured Credit Facility Claims convert to obligations under such Exit Financing) shall be reasonably acceptable to the Debtors and the Consenting Senior Secured Credit Facility Lenders holding at least one-half in dollar amount of the aggregate outstanding principal amount of the Senior Secured Credit Facility Claims held by all Consenting Senior Secured Credit Facility Lenders at the time of such consent (the "***Majority Consenting Senior Secured Credit Facility Lenders***"); *provided further*, that any provision of any Definitive Document setting out allocations of the DIP Financing or any backstop of the Rights Offering or Exit Financing shall be acceptable to the Debtors and the ad hoc group of those holders of Company Claims/Interests, including the 2026 Notes Claims (the "***Ad Hoc Group***") represented by Davis Polk & Wardwell LLP ("***Davis Polk***"), as legal counsel, and Evercore Group L.L.C. ("***Evercore***"), as financial advisor, in connection with the Restructuring (collectively, the "***Ad Hoc Group Advisors***").

(c)      For the avoidance of doubt, any reference in this Agreement to a Definitive Document or other instrument shall be construed to include the attendant consent rights set forth herein, and failure to explicitly refer to such consent rights when referencing or defining a Definitive Document or instrument shall not impair such rights.

4.    **Milestones**.  As provided in and subject to Section 6, the Debtors shall implement the Restructuring on the following timeline (each deadline, a "*Milestone*"):[6]

    (a)    no later than March 12, 2024 at 11:59 p.m. (prevailing Eastern Time), the Debtors shall commence the Chapter 11 Cases by filing petitions for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court (such filing date, the "*Petition Date*");

    (b)    no later than one calendar day after the Petition Date, the Debtors shall file with the Bankruptcy Court a motion seeking entry of the DIP Orders;

    (c)    no later than seven calendar days after the Petition Date, the Debtors shall have obtained entry by the Bankruptcy Court of the Interim DIP Order;

    (d)    no later than 14 calendar days after the Petition Date, the Debtors shall file with the Bankruptcy Court a motion seeking entry of an order setting a date as the deadline for submitting any claim (as defined in section 101(5) of the Bankruptcy Code, a "*Claim*") against the Debtors (other than administrative and government Claims) (such order, the "*Bar Date Order*");

    (e)    no later than 35 calendar days after the Petition Date, the Debtors shall have obtained entry by the Bankruptcy Court of the Final DIP Order;

    (f)    no later than 45 calendar days after the Petition Date, the Debtors shall file with the Bankruptcy Court a motion seeking rejection of the Rejected Customer Contracts[7];

    (g)    no later than 90 calendar days after the Petition Date, the Debtors shall deliver to the Ad Hoc Group an initial draft of their revised long-term business plan;

    (h)    no later than 100 calendar days after the Petition Date, the Debtors shall have entered into definitive documentation in respect of all renegotiated Customer Contracts[8]; *provided* that the Milestone in this Section 4(h) may be extended if the Debtors, in their sole discretion, and in consultation with the Ad Hoc Group, determine that continuing good faith negotiations in respective of any Customer Contract is in the best interest of the Debtors and their Estates[9];

    (i)    no later than 115 calendar days after the Petition Date, the Debtors shall deliver to the Ad Hoc Group their revised long-term business plan;

---

[6]    In computing any period of time prescribed or allowed under this Agreement, the provisions of Federal Rule of Bankruptcy Procedure 9006(a) shall apply.

[7]    "*Rejected Customer Contracts*" means the initial Customer Contracts (as defined below) that the Debtors will file a motion seeking to reject in the Chapter 11 Cases.

[8]    "*Customer Contracts*" means the contracts for the sale of wood pellets between a Debtor and a Customer.

[9]    "*Estates*" means the estates of the Debtors created under section 541 of the Bankruptcy Code upon the commencement of each Debtor's Chapter 11 Case and all property acquired by each Debtor after the Petition Date and before the Effective Date.

4892-5401-1299

(j)       no later than 120 calendar days after the Petition Date, the Debtors shall file with the Bankruptcy Court: (i) the Plan; (ii) the Disclosure Statement; (iii) a motion (the "***Disclosure Statement and Solicitation Motion***") seeking, among other things, (A) approval of the Disclosure Statement, (B) approval of procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan, (C) approval of the Solicitation Materials, and (D) to schedule the hearing to consider final approval of the Disclosure Statement and confirmation of the Plan; (iv) a motion seeking approval of the Backstop Agreement; and (v) a motion seeking approval of the Rights Offering Procedures;

(k)      no later than 150 calendar days after the Petition Date, the Bankruptcy Court shall have entered (i) the Disclosure Statement Order and (ii) the Backstop Approval Order;

(l)      no later than five calendar days after entry of the Disclosure Statement Order, the Debtors shall have commenced a solicitation of votes to accept or reject the Plan in accordance with the order approving the Disclosure Statement and Solicitation Motion;

(m)     no later than 185 calendar days after the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order; and

(n)      no later than 205 calendar days after the Petition Date, the Debtors shall have consummated the transactions contemplated by the Plan (the date of such consummation, the "***Effective Date***"), it being understood that the satisfaction or waiver of the conditions precedent to the Effective Date (as set forth in the Plan) are conditions precedent to the occurrence of the Effective Date.

Each of the Milestones may be extended or waived with the express prior written consent of the Majority Consenting 2026 Noteholders.

5.      **<u>Commitment of Restructuring Support Parties</u>**. Each Restructuring Support Party shall (severally and not jointly), solely so long as it remains the holder of or with power and/or authority to bind any of its applicable Company Claims/Interests, from the RSA Effective Date until the occurrence of a Termination Date (as defined in <u>Section 10</u>) applicable to such Restructuring Support Party:

(a)      support and use commercially reasonable efforts to cooperate with the Debtors to take all actions reasonably necessary to obtain approval of the DIP Financing and consummate the Restructuring in accordance with the Plan, in each case on the terms and conditions of this Agreement and the Term Sheet;

(b)      vote (or, to the extent of any applicable legal entitlements, instruct its proxy or other relevant person to vote) each of its Company Claims/Interests now or hereafter acquired by such Restructuring Support Party (or for which such Restructuring Support Party now or hereafter has voting control over), for so long as it remains the holder thereof, to accept the Plan in accordance with the applicable procedures set forth in the Disclosure Statement and the Solicitation Materials, as approved by the Bankruptcy Court, and timely return a duly-executed ballot in connection therewith;

(c)      to the extent that it is permitted to elect whether to opt out of (or opt in to) any releases to be provided under the Plan, elect not to opt out of (or elect to opt in to) such releases;

(d)      not withdraw, amend, or revoke (or cause to be withdrawn, amended, or revoked) its consent, waiver, subscription, or vote with respect to the Restructuring or the Plan; provided, however, that the consent, waiver, subscription, or vote of a Restructuring Support Party shall be immediately deemed void ab initio upon the occurrence of a Termination Date with respect to such Restructuring Support Party in accordance with the terms hereof and such Restructuring Support Party shall have a reasonable opportunity to cast a vote;

(e)      use commercially reasonable efforts to provide any applicable consents as may be necessary or required to effectuate the Restructuring as set forth herein, in the Term Sheet and in the Definitive Documentation (in each case without limiting or superseding any consent rights herein or in any such documents);

(f)      (i) in the case of the Consenting Senior Secured Credit Facility Lenders, give any reasonable notice, order, instruction, or direction to the Senior Secured Credit Facility Agent necessary to give effect to the Restructuring (including the DIP Financing), and not give any notice, order, instruction, or direction to the Senior Secured Credit Facility Agent to take any action inconsistent with such Consenting Senior Secured Credit Facility Lender's obligations under this Agreement; (ii) in the case of the Consenting 2026 Noteholders, give any reasonable notice, order, instruction, or direction to the 2026 Notes Indenture Trustee necessary to give effect to the Restructuring (including the DIP Financing), and not give any notice, order, instruction, or direction to the 2026 Notes Indenture Trustee to take any action inconsistent with such Consenting 2026 Noteholder's obligations under this Agreement; and (iii) in the case of the Consenting Green Bondholders, give any reasonable notice, order, instruction, or direction to the Epes Green Bonds Trustee and/or the Bond Green Bonds Trustee, as applicable, necessary to give effect to the Restructuring (including the DIP Financing), and not give any notice, order, instruction, or direction to the Epes Green Bonds Trustee and/or the Bond Green Bonds Trustee, as applicable, to take any action inconsistent with such Consenting Green Bondholders' obligations under this Agreement; *provided* that nothing herein shall abrogate or reduce any consent rights of any Restructuring Support Party under the DIP Orders or other DIP Financing Documents or the ability of any Restructuring Support Party to enforce any rights or remedies under the DIP Orders or DIP Financing Documents or cause or direct enforcement of such rights, including in connection with any termination or default by the Debtors thereunder;

(g)      (i) provide reasonable support and cooperation to the Debtors in connection with the Debtors' process of negotiating modifications to certain Customer Contracts with key customers of the Debtors (the "***Customers***"), it being understood that (x) the Debtors' efforts shall be undertaken in consultation with the Ad Hoc Group and Ad Hoc Group Advisors and in a manner consistent with the terms and conditions of the Restructuring and (y) any agreements and/or modifications to agreements involving the Debtors and the Customers shall be subject to the applicable consent rights set

10

forth herein and in the Definitive Documents; and (ii) not engage with the Customers regarding the Restructuring or the negotiations described in the foregoing clause (i) without the prior written consent of the Debtors (such consent not to be unreasonably withheld), so long as nothing herein shall prohibit the Ad Hoc Group from engaging with any party in interest that has appeared or otherwise engaged in the Chapter 11 Cases or restrict any communications by the Ad Hoc Group Advisors, in each case, with respect to the Restructuring; *provided further* that, in connection with the foregoing, the Ad Hoc Group and Ad Hoc Group Advisors shall, as reasonably practicable, consult with the Debtors and their advisors and provide advance notice in connection with initiating any such discussions with Customers;

(h)     support and not oppose, delay or impede the Debtors' negotiation, prosecution and implementation of the MS Bond Settlement and the Epes Bond Settlement; *provided, however*, that nothing set forth in this sub-clause 5(h) is intended to impose any cost on any Party other than as may be set forth in the MS Bond Settlement or the Epes Bond Settlement;

(i)     not object to, delay, impede, or take any action that is inconsistent with, or is intended to interfere with, the acceptance, implementation, or consummation of the Restructuring (including the DIP Financing);

(j)     engage in good faith negotiations with the Debtors regarding potential modifications or alternatives that do not negatively impact the economic or legal terms, rights or recoveries of the Restructuring Support Parties (relative to the terms and conditions set forth in the Term Sheet) in the event that the DIP Financing is not approved on the terms set forth in the Term Sheet and upon the Debtors' reasonable request;

(k)     negotiate in good faith upon reasonable request of the Debtors any modifications to the Restructuring that improve the tax efficiency of the Restructuring or are otherwise necessary to address any legal, financial, or structural impediment that may prevent the consummation of the Restructuring (in each case to the extent such modifications can be implemented without any material adverse effect on any members of the Ad Hoc Group or the Restructuring);

(l)     negotiate in good faith and, to the extent agreed in accordance with the terms of this Agreement, use commercially reasonable efforts to execute (as applicable) and implement the Definitive Documentation to which it is required to be a party;

(m)     support and not object to, delay, impede, or take any other action, whether direct or indirect, inconsistent with the Restructuring (including the entry by the Bankruptcy Court of the DIP Orders and the execution and implementation thereof), or propose, file, support, or vote for, seek, solicit, pursue, initiate, assist, join in, participate in the formulation of, or enter into negotiations with any entity regarding any restructuring, workout, Alternative Transaction, Alternative Transaction Proposal, or chapter 11 plan for any of the Debtors other than the Restructuring and the Plan

4892-5401-1299

(but without limiting consent, approval, or termination rights provided in this Agreement and the Definitive Documentation); and

(n)     not object to or otherwise seek to hinder the Debtors' retention of and payment to Lazard Frères & Co. LLC ("*Lazard*") of the fees and expenses set forth in the engagement letter, dated as of January 25, 2024, and amended as of February 27, 2024, among Lazard, Vinson & Elkins LLP, and Enviva Inc., as modified and supplemented pursuant to that certain agreement communicated by email among Lazard, Vinson & Elkins LLP, Enviva Inc., and the Ad Hoc Group Advisors on March 12, 2024, and, in each case, any application seeking approval of or court order approving the same.

Notwithstanding anything contained in this Agreement, nothing in this Agreement and neither a vote to accept the Plan by any Restructuring Support Party nor the acceptance of the Plan by any Restructuring Support Party shall (i) be construed to prohibit any Restructuring Support Party from contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the Definitive Documentation, or exercising rights or remedies reserved herein or therein, (ii) be construed to limit any Restructuring Support Party's rights under any applicable indenture, credit agreement, other loan document, and/or applicable law or to prohibit any Restructuring Support Party from appearing as a party-in-interest in any matter to be adjudicated in the Chapter 11 Cases, so long as, from the RSA Effective Date until the occurrence of a Termination Date, such appearance and the positions advocated in connection therewith are not materially inconsistent with this Agreement and are not for the purpose of hindering, delaying, or preventing the consummation of the Restructuring, (iii) impair or waive the rights of any Restructuring Support Party to assert or raise any objection permitted under (A) this Agreement in connection with any hearing on confirmation of the Plan or in the Bankruptcy Court or (B) under the DIP Orders or DIP Financing Documents, (iv) prevent any Restructuring Support Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement, (v) be construed to prohibit any Restructuring Support Party from, either itself or through any representatives or agents, soliciting, initiating, negotiating, facilitating, proposing, continuing or responding to any proposal to purchase or sell Company Claims/Interests, so long as such Restructuring Support Party complies with Section 13 hereof; (vi) obligate a Restructuring Support Party to deliver a vote to support the Plan or prohibit a Restructuring Support Party from changing such vote, in each case from and after the Termination Date as to such Restructuring Support Party (other than pursuant to Section 10); (vii) affect the ability of any Restructuring Support Party to consult with any other Restructuring Support Party, the Debtors, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), subject to sub-paragraph (g) of this Section 5; (viii) be construed to prohibit or limit any Restructuring Support Party from taking or directing any action relating to maintenance, protection or preservation of any collateral, provided that such action is not materially inconsistent with this Agreement; (ix) prohibit any Restructuring Support Party from taking any other action that is not inconsistent with this Agreement, the Restructuring or any Definitive Document; (x) require any Consenting Senior Secured Credit Facility Lender to breach or potentially breach any participation agreement relating to the Senior Secured Credit Facility Loans to which such Consenting Senior Secured Credit Facility Lender is a party; (xi) require any Restructuring Support Party to incur any costs or provide any entity with any indemnity in connection with this Agreement and/or the Restructuring except as may be agreed in the Definitive Documentation; or (xii) be construed to be a binding commitment on the part of any Restructuring

12

Support Party to provide any financing, funding or any other similar funding commitments relating to the Restructuring, including with respect to the DIP Financing, the Exit Financing, the Rights Offering, or any backstop to the foregoing, except to the extent such Restructuring Support Party agrees, pursuant to a Definitive Document, to provide such financing, funding or other funding commitment.

6.    **<u>Commitment of the Debtors</u>**. Each of the Debtors agrees to, and agrees to cause each of its direct and indirect subsidiaries to:

(a)    (i) (A) support and use commercially reasonable efforts to take all steps reasonably necessary and desirable to complete the Restructuring set forth in the Plan and this Agreement, (B) negotiate in good faith, and, to the extent agreed in accordance with the terms of this Agreement, execute and implement (to the extent the Debtors are required to be a party) all Definitive Documentation that is subject to negotiation as of the RSA Effective Date, (C) use commercially reasonable efforts to complete the Restructuring set forth in the Plan in accordance with each Milestone set forth in <u>Section 4</u> of this Agreement, and (D) obtain, file, submit, or register any and all required governmental, regulatory, and third-party approvals that are necessary or required for the implementation or consummation of the Restructuring or approval by the Bankruptcy Court of the Definitive Documentation, and (ii) shall not undertake any action inconsistent with the adoption and implementation of the Plan and the confirmation thereof;

(b)    timely file a formal objection to any motion, pleading, application, adversary proceeding or cause of action filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing the Chapter 11 Cases, (iv) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable or (v) for relief that (y) is inconsistent with this Agreement or any Definitive Document in any material respect or (z) would or would reasonably be expected to frustrate the purposes of this Agreement or any Definitive Document, including by preventing consummation of the Restructuring;

(c)    oppose, object to and timely file a formal written response in opposition to any objection filed with the Bankruptcy Court by any person with respect to the Restructuring, the DIP Financing or any Definitive Document (provided that the Debtors and the Ad Hoc Group Advisors may agree that no written response is required with respect to certain objections);

(d)    not solicit proposals or offers for any chapter 11 plan or restructuring transaction (including, for the avoidance of doubt, a transaction premised on an asset sale under section 363 of the Bankruptcy Code) other than the Restructuring (an "***Alternative Transaction***" and any inquiry, proposal, offer, bid, indication of interest, or term sheet with respect to an Alternative Transaction, whether written or oral, an "***Alternative Transaction Proposal***") received from a party other than the

13

Restructuring Support Parties; *provided*, *however*, that, notwithstanding the foregoing, the Debtors and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives, and in the case of any Debtor that is a wholly owned direct or indirect subsidiary of Enviva Inc., any manager or member of such Debtor, shall have the right, consistent with their fiduciary duties, to (i) consider, respond to, and discuss unsolicited Alternative Transaction Proposals received by any Debtor; (ii) provide access to nonpublic information concerning the Debtors to any person or entity that: (A) provides an unsolicited Alternative Transaction Proposal; (B) executes and delivers to the Debtors a customary confidentiality agreement, which shall be in form and substance no less restrictive than the confidentiality agreement between the Debtors and the Ad Hoc Group, and otherwise acceptable to the Debtors; and (C) requests such information; (iii) maintain or continue discussions or negotiations with respect to any unsolicited Alternative Transaction Proposals (including, for the avoidance of doubt, any unsolicited Alternative Transaction Proposal that was proposed to the Debtors prior to the RSA Effective Date); and (iv) enter into or continue discussions or preliminary negotiations with holders of Company Claims/Interests (including any Restructuring Support Party), any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other entity regarding an Alternative Transaction or an Alternative Transaction Proposal; *provided*, *further*, that if any Debtor receives an Alternative Transaction Proposal or an update thereto, then such Debtor shall, within one (1) business day of receiving such Alternative Transaction Proposal, provide the Ad Hoc Group Advisors with all documentation (with redactions as reasonably necessary) received in connection with such Alternative Transaction Proposal (or, if such Alternative Transaction Proposal was not made in writing, a reasonably detailed summary of such Alternative Transaction Proposal), including, as permitted, the identity of the person or group of persons involved and reasonable updates as to the status and progress of such Alternative Transaction Proposal, and such Debtor shall respond promptly to reasonable information requests and questions from the Ad Hoc Group Advisors relating to such Alternative Transaction Proposal; *provided*, *further*, that if the board of directors or board of managers, as applicable, of any Debtor determines, in the exercise of its fiduciary duties, to pursue an Alternative Transaction Proposal that is not acceptable to the Majority Consenting 2026 Noteholders, including by making any written or oral proposal or counterproposal (other than discussions contemplated by the foregoing sub-clause (d)(iv) with respect thereto, the Debtors shall provide written notice (with email being sufficient) to counsel to the Ad Hoc Group within two (2) business days following such determination and prior to make any such proposal or counterproposal (an "***Alternative Transaction Proposal Notice***"), and the Required Consenting 2026 Noteholders (as defined herein) shall have the right to terminate this Agreement pursuant to the terms hereof upon receipt of such Alternative Transaction Proposal Notice;

(e)     promptly (but in any event within two (2) business days) provide written notice to counsel to the Ad Hoc Group of (i) the occurrence of any event of which the Debtors have actual knowledge, or believe is likely, which occurrence or failure

14

would, or would be likely to cause (A) any condition precedent or covenant contained in this Agreement or in any Definitive Document not to occur or become impossible to satisfy, or (B) a material breach by any Debtor of any undertaking, commitment or covenant of such Debtor set forth in this Agreement or the existence of an inaccuracy in any material respect in a representation or warranty of any Debtor as of the RSA Effective Date that would trigger, including with the delivery of notice and/or the passage of time, a right hereunder to cause a Consenting 2026 Noteholder Termination Event, (ii) the receipt of any written notice from any governmental authority or third party alleging that the consent of such party is or may be required in connection with the transactions contemplated by the Restructuring, (iii) receipt of any written notice of any proceeding commenced or, to the actual knowledge of the Debtors, threatened against the Debtors relating to or involving or otherwise affecting in any material respect the transactions contemplated by this Agreement or the Restructuring, or (iv) a failure of the Debtors to comply in any material respect with a covenant or agreement to be complied with or by it hereunder or under any Definitive Document;

(f)     unless the Debtors have received prior written consent from the Majority Consenting 2026 Noteholders, operate the business of each of the Debtors in the ordinary course (other than changes in the operations resulting from or relating to the Restructuring or the filing of the Chapter 11 Cases) and consistent with past practice, the DIP Budget, and in a manner that is materially consistent with this Agreement and the business plan of the Debtors;

(g)     as reasonably requested with reasonable notice by the Majority Consenting 2026 Noteholders (which, in each case, may be through the Ad Hoc Group Advisors), (i) cause management and advisors of the Debtors to inform and/or confer with the Ad Hoc Group Advisors as to: (A) the status and progress of the Restructuring, including, without limitation, progress in relation to the negotiations of the Definitive Documentation, (B) the status of obtaining any necessary or desirable authorizations (including any consents) with respect to the Restructuring from each Restructuring Support Party, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange and (C) operational and financial performance matters (including liquidity), collateral matters, contract negotiation and lease matters, and the general status of ongoing operations, (ii) shall provide the Ad Hoc Group Advisors with all information related to the Debtors, its properties and business, or any transaction; *provided*, *however*, that to the extent such diligence information is designated as professional eyes only, such diligence information shall be provided to the Ad Hoc Group Advisors, and the Debtors and their advisors shall act reasonably and in good faith to ensure that the maximal amount of such information that can be provided to the Ad Hoc Group pursuant to the terms of any non-disclosure agreements then in effect between Enviva and such Restructuring Support Parties is so provided (and the Debtors shall work in good faith to enter into or renew non-disclosure agreements with members of the Ad Hoc Group and/or the Ad Hoc Group Advisors as reasonably necessary or appropriate); and (iii) hold calls on a weekly basis (or with such other frequency as may be reasonably agreed) for the Chief Executive

15

Officer of Enviva Inc. to provide updates to members of the Ad Hoc Group regarding the business operations and finances of the Debtors and the progress of the Chapter 11 Cases and the Restructuring, *provided* that any financial advisor and/or investment banker of the Debtors and the Ad Hoc Group may also participate in such update calls;

(h)     pay all fees and expenses in accordance with <u>Section 15</u> of this Agreement as and when due;

(i)     not file or seek authority to file any motion, pleading, or Definitive Documentation with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not consistent with this Agreement or the Plan;

(j)     comply with each Milestone;

(k)     not consummate or enter into a definitive agreement evidencing any merger, consolidation, disposition of material assets, acquisition of material assets, or similar transaction, pay any dividend, or incur any indebtedness for borrowed money, in each case outside the ordinary course of business, in each case other than: (i) the Restructuring or (ii) with the prior consent of the Majority Consenting 2026 Noteholders;

(l)     timely (i) pursue Bankruptcy Court approval and implementation of the MS Bond Settlement[10] and (ii) negotiate, document and pursue Bankruptcy Court approval of a settlement with the Consenting Epes Green Bondholders providing for the release of cash from trust accounts in respect of the Epes Green Bonds on substantially similar terms to the MS Bond Settlement (inclusive of process milestones providing for such settlement to be prosecuted and implemented on the same timeline as the MS Bond Settlement, or such other timeline as has been agreed to by the Consenting Epes Green Bondholders) (the "***Epes Bond Settlement***"); *provided* that, in connection with the MS Bond Settlement, the Epes Bond Settlement and the other Definitive Documents, the amounts paid from the Debtors' Estates to the advisors acting on behalf of trustees and/or holders of Green Bonds Claims (including, without limitation, Perella Weinberg Partners L.P. as financial advisor and Kramer Levin Naftalis & Frankel LLP as legal advisor) shall not at any time during and/or at emergence of the Chapter 11 Cases exceed the aggregate professional fees cap agreed as communicated by email among the Debtors and the Ad Hoc Group Advisors on March 12, 2024 (and the amounts paid may be less than such limits);

---

[10]     "***MS Bond Settlement***" means that certain settlement by and among the Debtors and certain holders of Bond Green Bonds Claims concerning the return of funds held by the trustee for the Bond Green Bonds to the holders of the Bond Green Bonds Claims, as set forth in that certain MS Bond term sheet, dated as of February 15, 2024, by and among the Debtors and certain holders of Bond Green Bonds Claims.

(m)    provide all consents within each Debtors' power that are necessary or appropriate to elevate any participation interests in any Senior Secured Credit Facility Loans held by any Restructuring Support Party to record positions held by assignment;

(n)    not object to, delay, impede, or take any other action that is inconsistent with, or is intended to interfere with, consummation of the Restructuring or is barred by this Agreement;

(o)    negotiate in good faith upon reasonable request of the Ad Hoc Group any supplements or modifications to the Restructuring that (i) improve the tax efficiency of the Restructuring or are otherwise necessary to address any legal, financial, or structural impediment that may prevent the consummation of the Restructuring (in each case to the extent such modifications can be implemented without any material adverse effect on such Debtor or the Restructuring) and/or (ii) are intended to minimize go-forward costs for the reorganized Debtors with respect to any potential litigation cost exposure that may survive the consummation of the Restructuring;

(p)    except to the extent required by this Agreement or otherwise required to consummate the Restructuring or with the consent of the Ad Hoc Group, not take any action or inaction that would cause a change to the tax classification, for United States federal income tax purposes, of any Debtor; and

(q)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, agrees to take all steps reasonably necessary and desirable, including to negotiate in good faith with respect to appropriate additional or alternative provisions, to address any such impediment, in each case, in a manner reasonably acceptable to the Majority Consenting 2026 Noteholders.

For the avoidance of doubt, nothing in this <u>Section 6</u> shall be construed to limit or affect in any way (y) any Restructuring Support Party's rights under this Agreement, including upon the occurrence of any Termination Event, or (z) the Debtors' ability to engage in marketing efforts, discussions, and/or negotiations with any party regarding exit debt financing consistent with the Term Sheet and the terms hereof.

Notwithstanding anything to the contrary herein, any board of directors, board of managers, director or officer of any Debtor and, in the case of any Debtor that is a wholly owned direct or indirect subsidiary of Enviva Inc., any manager or member of such Debtor (in its capacity as such, each a "***Debtor Agent***") shall be permitted to take or refrain from taking any action to the extent such Debtor Agent determines, in good faith and based upon advice of outside legal counsel, that taking such action, or refraining from taking such action, as applicable, is reasonably required to comply with its fiduciary duties, and may take (or refrain from taking) such action; *provided* that this provision shall not limit (x) any other obligation herein to provide notice to any other Party or (y) any Party's right to terminate this Agreement pursuant to the terms hereof, including, without limitation, as a result of any breach of this Agreement resulting from a determination of the type made in this paragraph.

7.      **Restructuring Support Party Termination Events**

(a)     <u>Individual Restructuring Support Party Termination Events</u>. Any Restructuring Support Party shall have the right, but not the obligation, upon written notice to the Debtors and counsel to the Consenting 2026 Noteholders, to terminate the obligations of such Restructuring Support Party under this Agreement upon the occurrence of any of the following events (each, an "***Individual Restructuring Support Party Termination Events***"), in which case this Agreement shall terminate solely with respect to such terminating Restructuring Support Party; *provided* that such right to terminate shall be deemed waived if not exercised by the applicable Restructuring Support Party within five (5) business days of such Restructuring Support Party becoming aware of the underlying facts or circumstances giving rise to such Individual Restructuring Support Party Termination Event:

(i)     With respect to any Consenting Senior Secured Credit Facility Lender, (A) any change, modification, or amendment to this Agreement or the approval hereunder of any Definitive Document setting out the material terms of the Restructuring, in each case to the extent affecting the class treatment of the Senior Secured Credit Facility Claims in a manner that is materially adverse relative to the manner in which such Claims are contemplated to be treated under the Term Sheet as in effect on the RSA Effective Date, and on a basis that is disproportionate to any corresponding change (or absence thereof) to the treatment of any other class of Claims held by the Restructuring Support Parties, and (B) the Majority Consenting Senior Secured Credit Facility Lenders determine in writing that individual Consenting Senior Secured Credit Facility Lenders shall be permitted to terminate in accordance with this <u>Section 7(a)(i)</u>;

(ii)    With respect to any Consenting Senior Secured Credit Facility Lender, any change, modification or amendment to this Agreement, or the approval hereunder of any Definitive Document setting out the material terms of the Restructuring, in each case, in a manner that is materially and adversely disproportionate, on an economic or non-economic basis, to the manner in which the Claim of any other Consenting Senior Secured Credit Facility Lender is contemplated to be treated under the Term Sheet as in effect on the RSA Effective Date;

(iii)   With respect to any Consenting Bond Green Bondholder, (A) any change, modification, or amendment to this Agreement or the approval hereunder of any Definitive Document setting out the material terms of the Restructuring, in each case to the extent affecting the class treatment of the Bond Green Bonds Claims in a manner that is materially adverse relative to the manner in which such Claims are contemplated to be treated under the Term Sheet as in effect on the RSA Effective Date, and on a basis that is disproportionate to any corresponding change (or absence thereof) to the treatment of any other class of Claims held by the Restructuring Support Parties, and (B) the Majority Consenting Bond Green Bondholders

18

determine in writing that individual Consenting Bond Green Bondholders shall be permitted to terminate in accordance with this <u>Section 7(a)(iii)</u>;

(iv)  With respect to any Consenting Bond Green Bondholder, any change, modification or amendment to this Agreement, or the approval hereunder of any Definitive Document setting out the material terms of the Restructuring, in each case, in a manner that is materially and adversely disproportionate, on an economic or non-economic basis, to the manner in which the Claim of any other Consenting Bond Green Bondholder is contemplated to be treated under the Term Sheet as in effect on the RSA Effective Date;

(v)  With respect to any Consenting Epes Green Bondholder, (A) any change, modification, or amendment to this Agreement or the approval hereunder of any Definitive Document (x) setting out the material terms of the Restructuring, in each case to the extent affecting the class treatment of the Epes Green Bonds Claims in a manner that is materially adverse relative to the manner in which such Claims are contemplated to be treated under the Term Sheet as in effect on the RSA Effective Date, and on a basis that is disproportionate to any corresponding change (or absence thereof) to the treatment of any other class of Claims held by the Restructuring Support Parties or (y) implementing, modifying or waiving the terms of the Epes Bond Settlement in a manner materially inconsistent with this Agreement and adverse to the holders of Epes Green Bonds Claims (except with the express written consent of the Majority Consenting Epes Green Bondholders), (B) the Debtors shall fail to meet any milestone contained in the Epes Bond Settlement Documents and such failure shall not have been waived, extended or otherwise consented to by the Majority Consenting Epes Green Bondholders and (C) in the case of the foregoing (A) or (B), the Majority Consenting Epes Green Bondholders determine in writing that individual Consenting Epes Green Bondholders shall be permitted to terminate in accordance with this <u>Section 7(a)(v)</u>;

(vi)  With respect to any Consenting Epes Green Bondholder, any change, modification or amendment to this Agreement, or the approval hereunder of any Definitive Document setting out the material terms of the Restructuring, in each case, in a manner that is materially and adversely disproportionate, on an economic or non-economic basis, to the manner in which the Claim of any other Consenting Epes Green Bondholder is contemplated to be treated under the Term Sheet as in effect on the RSA Effective Date;

(vii)  With respect to any Consenting 2026 Noteholder, any change, modification or amendment to this Agreement, or the approval hereunder of any Definitive Document setting out the material terms of the Restructuring, in each case, in a manner that is materially and adversely disproportionate, on an economic or non-economic basis, to the manner in which the Claim of

any other Consenting 2026 Noteholder is contemplated to be treated under the Term Sheet as in effect on the RSA Effective Date;

(viii)   the occurrence of the date that is 330 calendar days after the Petition Date.

(b)   <u>Consenting 2026 Noteholder Termination Events</u>. The holders of at least two-thirds in dollar amount of the aggregate outstanding principal amount of the 2026 Notes Claims held by all Consenting 2026 Noteholders (the "***Required Consenting 2026 Noteholders***") shall have the right, but not the obligation, upon two (2) business days' written notice to the Debtors, to terminate the obligations of the Restructuring Support Parties under this Agreement upon the occurrence of any of the following events, unless waived, in writing, by the Required Consenting 2026 Noteholders (each, a "***Consenting 2026 Noteholder Termination Event***" and together with the Individual Restructuring Support Party Termination Events, the "***Restructuring Support Party Termination Events***"):

(i)   the failure of the Debtors to meet any of the Milestones in <u>Section 4</u> unless (A) such failure is the direct result of any act, omission, or delay on the part of any Restructuring Support Party in violation of its obligations under this Agreement, or (B) such Milestone is extended by the Majority Consenting 2026 Noteholders in accordance with <u>Section 4</u>;

(ii)   the conversion of one or more of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code;

(iii)   the appointment of a receiver, trustee or examiner with expanded powers beyond those set forth in section 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases;

(iv)   the dismissal of the Chapter 11 Cases;

(v)   any Debtor (A) files any Definitive Document, motion or pleading with the Bankruptcy Court that is materially inconsistent with this Agreement, including any filing or pleading that amends or modifies, or files a pleading seeking authority to amend or modify the Definitive Documentation in a manner that does not comply with the consent rights set forth in <u>Section 3</u> of this Agreement, and such filing is not withdrawn (or, in the case of a motion that has already been approved by an order of the Bankruptcy Court at the time the Debtors are provided with such notice, such order is not stayed, reversed, or vacated) within five (5) business days following written notice thereof to the Debtors by the Majority Consenting 2026 Noteholders or publicly announces its intention to take any such action set forth in this clause (A); (B) withdraws or revokes the Plan, or (C) announces that it will no longer support the Restructuring, in each case without the prior consent of the Majority Consenting 2026 Noteholders;

4892-5401-1299

(vi)     any Debtor joins in or affirmatively supports any Alternative Transaction in any pleading filed or other public written statement without the prior written consent of the Majority Consenting 2026 Noteholders;

(vii)    the issuance of any ruling or order by any governmental authority, including the Bankruptcy Court, or any other court of competent jurisdiction, or other regulatory authority, enjoining or otherwise making impractical the substantial consummation of the Restructuring on the terms and conditions set forth in the Term Sheet or the Plan, or the commencement of any action by any governmental authority or other regulatory authority that could reasonably be expected to enjoin or otherwise make impracticable the substantial consummation of the Restructuring on the terms and conditions set forth in the Term Sheet or the Plan; *provided*, *however*, that the Debtors shall have five (5) business days after the issuance of such ruling, order or action to obtain relief that would allow consummation of the Restructuring in a manner that does not prevent or diminish in any material way compliance with the terms of the Plan and this Agreement;

(viii)   a material breach by any Debtor of any undertaking, commitment or covenant of such Debtor set forth in this Agreement or the existence of an inaccuracy in any material respect in a representation or warranty of any Debtor as of the RSA Effective Date, in each case that remains uncured for five (5) business days after the Majority Consenting 2026 Noteholders provide written notice to the Debtors in accordance with Section 27(a) detailing such breach or inaccuracy;

(ix)     any Debtor terminates its obligations under and in accordance with this Agreement;

(x)      the Bankruptcy Court enters any order (1) authorizing post-petition financing that is inconsistent in any material respect with this Agreement, the DIP Orders, or the DIP Term Sheet and such inconsistency could reasonably be expected to have a material adverse effect on the Consenting 2026 Noteholders; (2) approving any plan, disclosure statement, or Definitive Document, in any such case, that is inconsistent in any material respect with this Agreement, including the consent rights set forth in Section 3; (3) reversing or vacating the Confirmation Order, Interim DIP Order, Final DIP Order or Backstop Approval Order without entering a revised applicable order acceptable to the Majority Consenting 2026 Noteholders within five (5) business days of such reversal or vacation; (4) denying (I) confirmation of the Plan, or (II) approval of the DIP Financing or entry of the Backstop Approval Order or (5) finding or stating on the record, on a conclusive basis, that any material term of the DIP Financing or the Restructuring is unlawful or unenforceable or cannot be approved;

(xi)    the failure of the Debtors to promptly pay all fees and expenses in accordance with <u>Section 14</u> of this Agreement, and such fees and expenses remain unpaid for two (2) business days after the Debtors receive notice that such fees are past due;

(xii)   any of the Debtors enters into a material executory contract, lease, any key employee incentive plan or key employee retention plan, any new or amended agreement regarding executive compensation, or other compensation arrangement, in each case, outside of the ordinary course of business, in each case other than with the prior consent of the Majority Consenting 2026 Noteholders;

(xiii)  any Debtor (A) files any motion seeking to avoid, disallow, subordinate, or recharacterize any Company Claims/Interests or any lien in respect thereof held by any Restructuring Support Party in respect thereof, (B) supports any application, adversary proceeding, or cause of action referred to in the immediately preceding clause (A) filed by a third party, or (C) consents to the standing of any such third party to bring such application, adversary proceeding, or cause of action;

(xiv)   any (A) Debtor provides an Alternative Transaction Proposal Notice (or fails to provide such notice when required) to counsel to the Ad Hoc Group, (B) Debtor solicits, publicly announces or executes a definitive agreement with respect to an Alternative Transaction, including any commitment with respect to debt or equity financing to be provided by any party or entity other than the Consenting 2026 Noteholders other than with respect to exit debt financing as expressly contemplated by this Agreement (including the Term Sheet) without the consent of the Majority Consenting 2026 Noteholders, or (C) board of directors, board of managers, or such similar governing body of any Debtor determines, after consulting with outside counsel, that proceeding with the Restructuring would be inconsistent with the exercise of its fiduciary duties or applicable law (in which case the Debtors shall also be required under this Agreement to promptly, and in no event later than two (2) calendar days after making such determination, provide written notice to counsel to the Restructuring Support Parties (email being sufficient) that such determination has been made);

(xv)    the Bankruptcy Court enters an order in the Chapter 11 Cases terminating any of the Debtors' exclusive right to file a plan or plans of reorganization pursuant to section 1121 of the Bankruptcy Code;

(xvi)   any Debtor files any motion or application seeking authority to sell any material asset or right used in the business of the Debtors to any entity outside the ordinary course of business without the prior written consent of the Majority Consenting 2026 Noteholders, and such motion is either (A) filed with a request for emergency consideration or shortened notice or

(B) if filed on regular notice, not withdrawn within five (5) days following notice from the Majority Consenting 2026 Noteholders;

(xvii)   if any court of competent jurisdiction has entered a final, non-appealable order or judgment declaring this Agreement to be unenforceable;

(xviii)   the Debtors take any action or inaction to receive or obtain debtor-in-possession financing, cash collateral usage, exit financing and/or financing arrangements, other than as expressly contemplated in this Agreement (including the Term Sheet) or with the consent of the Majority Consenting 2026 Noteholders;

(xix)   except as otherwise provided for herein, the Bankruptcy Court enters an order granting relief from the automatic stay imposed by section 362 of the Bankruptcy Code authorizing any party to proceed against any material asset of the Debtors or that would materially and adversely affect the Debtors' ability to operate the Debtors' businesses in the ordinary course;

(xx)   as a result of the exercise of Individual Restructuring Support Party Termination Events, the Restructuring Support Parties cease to hold at least a majority of the aggregate outstanding principal amount held by all Restructuring Support Parties as of the RSA Effective Date of (A) the Senior Secured Credit Facility Claims, (B) the Bond Green Bonds Claims, (C) the Epes Green Bonds Claims or (D) the 2026 Notes Claims;

(xxi)   the occurrence of an Event of Default (as defined in the DIP Financing Documents) under the DIP Financing, the Backstop Agreement or the Rights Offering Documents; or

(xxii)   other than the Chapter 11 Cases, and in each case without the prior consent of the Majority Consenting 2026 Noteholders, if any Debtor (A) voluntarily commences any case or files any petition seeking bankruptcy, winding up, dissolution, liquidation, administration, moratorium, receivership, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency, administrative receivership or similar law now or hereafter in effect, except as contemplated by this Agreement, (B) consents to the institution of, or fails to contest in a timely and appropriate manner, any involuntary proceeding or petition described in the preceding subsection (A), (C) applies for or consents to the appointment of a receiver, administrator, administrative receiver, trustee, custodian, sequestrator, conservator or similar official with respect to any Debtor or for a substantial part of such Debtor's assets, (D) makes a general assignment or arrangement for the benefit of creditors, or (E) takes any corporate action for the purpose of authorizing any of the foregoing.

8.    **The Debtors' Termination Events**. Each Debtor may, upon notice to the Restructuring Support Parties, terminate its obligations under this Agreement upon the occurrence

4892-5401-1299

of any of the following events (each a "***Debtor Termination Event***," and together with the Restructuring Support Party Termination Events, the "***Termination Events***"), in which case this Agreement shall terminate with respect to all Parties, subject to the rights of the Debtors to fully or conditionally waive, in writing, the occurrence of a Debtor Termination Event:

(a)     a material breach by a Restructuring Support Party of any representation, warranty, or covenant of such Restructuring Support Party set forth in this Agreement that would have a material or adverse impact on the Restructuring or the consummation of the Restructuring (i) that (to the extent curable) remains uncured for a period of five (5) business days after the receipt by the Restructuring Support Parties of notice and description of such breach and (ii) the non-breaching Restructuring Support Parties do not hold or beneficially own at least 66⅔% of a class of Company Claims/Interests that would be able to serve as an impaired accepting class in connection with, and pursuant to, a Plan governing the Restructuring, as determined by the Debtors in good faith after consultation with outside counsel;

(b)     if the board of directors or board of managers, as applicable, of any Debtor determines, in good faith based upon advice of outside legal counsel, that proceeding with the Restructuring or taking any action (or refraining from taking any action) in relation thereto, would be inconsistent with the exercise of its fiduciary duties under applicable law;

(c)     the Backstop Agreement is terminated due to the material breach thereunder by backstop parties that are, or are affiliates of, Restructuring Support Parties;

(d)     the Majority Consenting 2026 Noteholders terminate their obligations under and in accordance with this Agreement; or

(e)     the issuance of any ruling or order by any governmental authority, including the Bankruptcy Court, or any other court, agency, commission, or other entity exercising executive, legislative, judicial, regulatory, or administrative functions in the United States, the European Union, the United Kingdom, and/or Japan, enjoining or otherwise making impractical the substantial consummation of the Restructuring on the terms and conditions set forth in the Term Sheet or the Plan, or the commencement of any action by any such governmental or regulatory authority that would reasonably be expected to enjoin the substantial consummation of the Restructuring on the terms and conditions set forth in the Term Sheet or the Plan; *provided*, *however*, that the Debtors have made commercially reasonable, good faith efforts to cure, vacate, or have overruled such ruling or order prior to terminating this Agreement.

9.     **Mutual Termination; Automatic Termination**. This Agreement and the obligations of all Parties hereunder may be terminated by mutual written agreement by and among (a) each of the Debtors and (b) each of the Restructuring Support Parties. This Agreement shall terminate automatically upon the occurrence of the Effective Date.

4892-5401-1299

10.     **Effect of Termination**. The earliest date on which termination of this Agreement as to a Party is effective in accordance with Sections 7, 8, or 9 of this Agreement shall be referred to, with respect to such Party, as a "***Termination Date***." Upon the occurrence of a Termination Date, the terminating Party's and, solely in the case of a Termination Date in accordance with Section 9, all Parties' obligations under this Agreement shall be terminated effective immediately, and such Party or Parties hereto shall be released from all commitments, undertakings, and agreements hereunder; *provided*, *however*, that each of the following shall survive any such termination: (a) any claim for breach of this Agreement that occurs prior to such Termination Date, and all rights and remedies with respect to such claims shall remain in full force and effect and not be prejudiced in any way by such termination; (b) the Debtors' obligations in Section 15 of this Agreement accrued up to and including such Termination Date; and (c) Sections 10, 16, 18–26, 30, 32, 34, and 35 hereof.  The automatic stay applicable under section 362 of the Bankruptcy Code shall not prohibit a Party from taking any action necessary to effectuate the termination of this Agreement pursuant to and in accordance with the terms hereof. Nothing in this Agreement shall be construed as prohibiting any Party from contesting whether any such termination is in accordance with the terms of this Agreement or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Date. Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any Party or the ability of any Party to protect and reserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any other Party.

11.     **Cooperation and Support**. The Debtors shall use commercially reasonable efforts to provide draft copies of all "first day" motions, material pleadings, applications, and other documents that any Debtor intends to file with the Bankruptcy Court, as applicable, and draft copies of all press releases that any Debtor intends to issue regarding this Agreement or the Restructuring, to the counsel to the Ad Hoc Group at least three (3) business days prior to the date when such Debtor intends to file, submit or issue such document (or if exigent circumstances make such delivery impossible, as soon as reasonably practicable prior to such filing).  Counsel to the Ad Hoc Group shall be entitled to consult with the Debtors in good faith regarding the form and substance of any such proposed filing with or submission to the Bankruptcy Court, but any such proposed filing or submission shall comply with the Milestones set forth in Section 4, the consent rights in Section 3, and all other provisions of this Agreement.  For the avoidance of doubt, the Ad Hoc Group and the Debtors agree to negotiate in good faith the Definitive Documentation that is subject to negotiation and completion, consistent with sub-clause (b) of Section 3 hereof, and the Definitive Documentation, including any motions or orders related thereto, shall be consistent with this Agreement. The Debtors shall comply with their obligations herein and in any Definitive Documents to provide access and information to the Restructuring Support Parties, the Ad Hoc Group and the Ad Hoc Group Advisors, as applicable, including the obligations set forth in Section 6(g).

12.     **Transfers of Claims and Interests**.

(a)     No Restructuring Support Party shall (i) sell, transfer, assign, pledge, grant a participation interest in, or otherwise dispose of, directly or indirectly, its right, title, or interest in respect of any of such Restructuring Support Party's Company Claims/Interests subject to this Agreement, as applicable, in whole or in part, or (ii) deposit any of such Restructuring Support Party's Company Claims/Interests, as

applicable, into a voting trust, or grant any proxies, or enter into a voting agreement with respect to any such claims or interests (the actions described in clauses (i) and (ii) are collectively referred to herein as a "***Transfer***" and the Restructuring Support Party making such Transfer is referred to herein as the "***Transferor***"), unless such Transfer is to (y) another Restructuring Support Party or (z) any other entity that first agrees in writing to be bound by the terms of this Agreement (any such party, a "***Joining Party***") by executing and delivering to the Debtors and counsel to each of the other Parties a Joinder Agreement substantially in the form attached hereto as **Exhibit B** (the "***Joinder Agreement***"). With respect to Company Claims/Interests held by the relevant Joining Party, upon consummation of a Transfer in accordance herewith, such Joining Party is deemed to make all of the representations, warranties, and covenants of a Restructuring Support Party, as applicable, set forth in this Agreement.  Upon compliance with the foregoing, the Transferor shall be deemed to relinquish its rights (and be released from its obligations, except for any claim for breach of this Agreement that occurs prior to such Transfer) under this Agreement to the extent of such transferred rights and obligations.  Any Transfer made in violation of this sub-clause (a) of this Section 12 shall be deemed null and void *ab initio* and of no force or effect, regardless of any prior notice provided to the Debtors and/or any Restructuring Support Party, and shall not create any obligation or liability of any Debtor or any other Restructuring Support Party to the Joining Party.

(b)     Notwithstanding sub-clause (a) of this Section 12, (i) an entity that is acting in its capacity as a Qualified Marketmaker shall not be required to be or become a Restructuring Support Party to effect any transfer (by purchase, sale, assignment, participation, or otherwise) of any Company Claims/Interests by a Restructuring Support Party to such Qualified Marketmaker if such Qualified Marketmaker acquired such Company Claims/Interests with the purpose and intent of acting as a Qualified Marketmaker; and (ii) to the extent that a Restructuring Support Party, acting in its capacity as a Qualified Marketmaker, acquires any Company Claims/Interests from a holder of such Company Claims/Interests who is not a Restructuring Support Party, it may transfer (by purchase, sale, assignment, participation, or otherwise) such Company Claims/Interests without the requirement that the transferee be or become a Restructuring Support Party in accordance with this Section 12.  For purposes of this sub-clause (b), a "***Qualified Marketmaker***" means an entity that (y) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers claims against, or interests in, any of the Debtors (including debt securities or other debt) or enter with customers into long and short positions in claims against the Debtors (including debt securities or other debt), in its capacity as a dealer or market maker in such claims or interests against the Debtors, and (z) is in fact regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

(c)     Any holder of 2026 Notes, Epes Green Bonds, or Bond Green Bonds may, at any time after the date hereof, become a party to this Agreement as a Consenting 2026 Noteholder or Consenting Green Bondholder, as applicable, by executing a Joinder Agreement, pursuant to which such party shall be bound by the terms of this

Agreement as a Consenting 2026 Noteholder or Consenting Green Bondholders, as applicable, hereunder. Any holder of Senior Secured Credit Facility Loans may, at any time after the date hereof, become a party to this Agreement as a Consenting Senior Secured Credit Facility Lender by executing a Joinder Agreement, pursuant to which such person shall be bound by the terms of this Agreement as a Consenting Senior Secured Credit Facility Lender hereunder. Any party that executes a Joinder Agreement shall be bound by the terms of this Agreement with respect to all Company Claims/Interests held thereby for so long as it remains the holder thereof.

13. **Further Acquisition of Claims or Interests**. Except as set forth in <u>Section 12</u>, nothing in this Agreement shall be construed as precluding any Restructuring Support Party or any of its affiliates from acquiring, as applicable, additional Senior Secured Credit Facility Claims, 2026 Notes Claims, Epes Green Bonds Claims, Bond Green Bonds Claims, existing equity interests, or interests in the instruments underlying the Senior Secured Credit Facility Loans, the 2026 Notes, Epes Green Bonds, Bond Green Bonds, or existing equity interests (as applicable); *provided*, *however*, that any additional Senior Secured Credit Facility Claims, 2026 Notes Claims, Epes Green Bonds Claims, Bond Green Bonds Claims, existing equity interests, or interests in the underlying instruments acquired by any Restructuring Support Party and with respect to which such Restructuring Support Party is the holder of or with power and/or authority to bind (including through instructing its proxy or other relevant person, to the extent it is legally entitled to instruct that person) any claims or interests held by it shall automatically be subject to the terms and conditions of this Agreement, other than <u>Section 12</u> hereof, without any further action by such Restructuring Support Party or the Debtors. Upon any such further acquisition, and not later than three (3) business days following such acquisition, such Restructuring Support Party shall notify, on a confidential basis, counsel to the Debtors and counsel to the Restructuring Support Parties.

14. **Payment of Default Interest**. The Debtors hereby acknowledge and shall not oppose any assertion that (i) interest on all principal and interest (including, for the avoidance of doubt, default interest payable pursuant to Section 2.07 of the Senior Secured Credit Agreement, which, without limitation to any earlier accrual, shall accrue on all obligations from and after the Petition Date) with regard to the Senior Secured Credit Facility Loans and all amounts payable under the Loan Documents (as defined in the Senior Secured Credit Agreement) shall continue to accrue and be payable in each case (subject to any DIP Order and the application of the automatic stay under section 362 of the Bankruptcy Code, as may be modified by any other order during the Chapter 11 Cases), and (ii) interest on all outstanding Senior Secured Credit Facility Loans (other than, as of the RSA Effective Date, the $20,000,000 of existing Term SOFR Loans (as defined in the Senior Secured Credit Agreement) (the "***Existing SOFR Loans***")) shall accrue based on ABR and no Senior Secured Credit Facility Loans (including the Existing SOFR Loans) may be made, converted into, or continued as, Term SOFR Loans in accordance with Section 2.10(viii) of the Senior Secured Credit Agreement and the Debtors acknowledge that notice to that effect has been given pursuant to Section 2.10(viii) of the Senior Secured Credit Agreement.

15. **Fees and Expenses**. Without limiting any rights to payment contained in the DIP Orders, DIP Financing Documents, any Plan, Backstop Approval Order or other Definitive Document, from the RSA Effective Date until the occurrence of a Termination Date, the Debtors shall pay or reimburse all reasonable and documented fees and expenses of: (a) Davis Polk, as counsel to Ad Hoc Group; (b) Evercore, as financial advisor to the Ad Hoc Group; (c) McCurdy

Consulting Inc., as technical advisor to the Ad Hoc Group; and (d) any local, regulatory or other special counsel and any advisors or consultants engaged by or on behalf of the Ad Hoc Group in connection with the Restructuring, it being understood that any such counsel, advisor or consultant shall use reasonable efforts to enter into an engagement or fee reimbursement agreement with the Debtors governing the payment by the Debtors of fees and expenses; *provided* that, to the extent the Debtors and any of the Parties set forth in the foregoing clauses (a) through (d) are party to an engagement or fee letter then in effect that governs the payment by the Debtors of fees and expenses, payment shall be in accordance with the terms and conditions set forth in such letter.

16.    **Consents and Acknowledgments**. Each Party irrevocably acknowledges and agrees that this Agreement is not and shall not be deemed to be a solicitation for acceptances to the Plan. The acceptance of the Plan by each of the Restructuring Support Parties will not be solicited until such Parties have received the Disclosure Statement and related ballots approved by the Bankruptcy Court and in accordance with applicable law, and will be subject to sections 1125, 1126 and 1127 of the Bankruptcy Code.

17.    **Representations and Warranties**.

(a)    Each Restructuring Support Party hereby represents and warrants on a several and not joint basis for itself and not any other person or entity that the following statements are true, correct, and complete, as of the date hereof (or, with respect to a Restructuring Support Party that is joining this Agreement pursuant to Section 12, as of the date of such joinder):

(i)    it has the requisite organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

(iii)    the execution, delivery, and performance by it of this Agreement does not violate any provision of law, rule, or regulation applicable to it, or its certificate of incorporation, bylaws, or other organizational documents in any material respect;

(iv)    it is either (A) a qualified institutional buyer as defined in Rule 144A of the Securities Act of 1933 (the "***Securities Act***"), (B) not a U.S. person (as defined in Regulation S of the Securities Act), or (C) an "accredited investor" within the meaning of Rule 501 of Regulation D promulgated under the Securities Act, as amended, with sufficient knowledge and experience to evaluate properly the terms and conditions of this Agreement and to consult with its legal and financial advisors with respect to its investment decision to execute this Agreement, and it has made its own analysis and decision to enter into this Agreement;

28

(v)  it understands that the securities contemplated by this Agreement and the Restructuring have not been, and are not contemplated to be, registered under the Securities Act and may not be resold without registration under the Securities Act except pursuant to a specific exemption from the registration provisions of the Securities Act;

(vi)  it is acquiring any securities of the Debtors in connection with the Restructuring for investment and not with a view to distribution or resale in violation of the Securities Act;

(vii)  the 2026 Notes Claims, Senior Secured Credit Facility Claims, Epes Green Bonds Claims, or Bond Green Bonds Claims, as applicable, held by such Restructuring Support Party are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would materially and adversely affect in any way such Restructuring Support Party's ability to perform any of its obligations under this Agreement at the time such obligations are required to be performed; and

(viii)  it (A) either (1) is the sole owner (including through participation) of the Company Claims/Interests identified below its name on its signature page hereof and in the amounts set forth therein, or (2) has all necessary investment or voting discretion with respect to the principal amount of the Company Claims/Interests identified below its name on its signature page hereof, and has the power and authority to bind the owner(s) of such Company Claims/Interests to the terms of this Agreement (including through, to the extent permitted thereby, any participation agreement); (B) is entitled (for its own accounts or for the accounts of such other owners) to all of the rights and economic benefits of such Company Claims/Interests (other than any Company Claims/Interests that are subject to any executed but unsettled trades); and (C) does not directly or indirectly own any claims against any Debtor other than as identified below its name on its signature page hereof.  Notwithstanding anything to the contrary herein, the Parties acknowledge that the ability of any Consenting Senior Secured Credit Facility Lender to vote or cause the vote of its Senior Secured Credit Facility Claims held on participation may be limited to what is provided for in the applicable participation documents.

(b)  All representations, warranties, covenants and other agreements made by each Restructuring Support Party herein shall apply solely to the business unit of each Restructuring Support Party that has become a party to this Agreement (as may specified on its signature page hereto), in its capacity as a holder of Company Claims/Interests and this Agreement shall not apply to such Restructuring Support Party or any of its business units acting in any other capacity.

(c)    Each Debtor hereby represents and warrants on a joint and several basis (and not any other person or entity other than the Debtors) that the following statements are true, correct, and complete as of the date hereof:

(i)    it has the requisite corporate or other organizational power and authority to enter into this Agreement and to carry out the transactions contemplated by, and perform its respective obligations under, this Agreement;

(ii)    the execution and delivery of this Agreement and the performance of its obligations hereunder have been duly authorized by all necessary corporate or other organizational action on its part;

(iii)    the execution and delivery by it of this Agreement does not (A) violate its certificates of incorporation, or bylaws, or other organizational documents, or (B) result in a breach of, or constitute (with due notice or lapse of time or both) a default (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases or any Debtor's undertaking to implement the Restructuring through the Chapter 11 Cases) under any material contractual obligation to which it is a party;

(iv)    the execution and delivery by it of this Agreement does not require any registration or filing with, the consent or approval of, notice to, or any other action with any federal, state, or other governmental authority or regulatory body, other than, for the avoidance of doubt, the actions with governmental authorities or regulatory bodies required in connection with implementation of the Restructuring and filings pursuant to the Securities Exchange Act of 1934, as amended (the "***Exchange Act***");

(v)    since November 9, 2023, no Debtor has entered into any non-ordinary course transactions other than (A) this Agreement, (B) any other transactions or agreements related to the Restructuring and disclosed in writing to the Ad Hoc Group or the Ad Hoc Group Advisors or (C) any transaction that has otherwise been publicly disclosed in SEC filings;

(vi)    subject to the provisions of sections 1125 and 1126 of the Bankruptcy Code and, to the extent applicable, approval by the Bankruptcy Court, this Agreement is a legally valid and binding obligation of each Debtor that is enforceable against each Debtor in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws relating to or limiting creditors' rights generally, or by equitable principles relating to enforceability; and

(vii)    it has sufficient knowledge and experience to evaluate properly the terms and conditions of the Plan and this Agreement, and has been afforded the opportunity to consult with its legal and financial advisors with respect to its decision to execute this Agreement, and it has made its own analysis and

decision to enter into this Agreement and otherwise investigated this matter to its full satisfaction.

18. **Survival of Agreement**. Each of the Parties acknowledges and agrees that this Agreement is being executed in connection with negotiations concerning the Restructuring and in contemplation of possible chapter 11 filings by the Debtors and the rights granted in this Agreement are enforceable by each signatory hereto without approval of any court, including the Bankruptcy Court.

19. **Rights and Settlement Discussions**. If the transactions contemplated herein are not consummated, or following the occurrence of a Termination Date, if applicable, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, other than as provided in Section 16, and the Parties expressly reserve any and all of their respective rights. The Parties acknowledge that this Agreement, the Plan, and all negotiations relating hereto are part of a proposed settlement of matters that could otherwise be the subject of litigation. Pursuant to Rule 408 of the Federal Rules of Evidence, any applicable state rules of evidence and any other applicable law, foreign or domestic, the Term Sheet, this Agreement, the Plan, any related documents, and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms.

20. **Waiver and Amendments**.

(a)     Other than as set forth in Section 20(b), this Agreement, including the Exhibits and Schedules, may not be waived, modified, amended, or supplemented except with the prior written consent of the Debtors and the Majority Consenting 2026 Noteholders.

(b)     Notwithstanding Section 20(a):

(i)     any waiver, modification, amendment, or supplement to this Section 20 shall require the prior written consent of all of the Parties;

(ii)    any modification, amendment, or change to the definition of "Majority Consenting 2026 Noteholders" or to Section 7(a) of this Agreement shall require the prior written consent of all of the Parties;

(iii)   any change, modification, or amendment to this Agreement (including, for the avoidance of doubt, the Term Sheet) that treats or affects any Consenting 2026 Noteholders' Claim in a manner that is materially and adversely disproportionate, on an economic or non-economic basis, to the manner in which the Claim of any other Consenting 2026 Noteholder is treated shall require the prior written consent of such materially adversely and disproportionately affected Consenting 2026 Noteholder;

(iv)    any change, modification, or amendment to this Agreement (including, for the avoidance of doubt, the Term Sheet) that treats or affects any Consenting Green Bondholder's Claim in a manner that is materially and adversely disproportionate, on an economic or non-economic basis, to the manner in which the Claim of any other Consenting Green Bondholder is treated shall

require the prior written consent of such materially adversely and disproportionately affected Consenting Green Bondholders;

(v) any change, modification, or amendment to this Agreement (including, for the avoidance of doubt, the Term Sheet) that treats or affects any Consenting Senior Secured Credit Facility Lender in a manner that is materially and adversely disproportionate, on an economic or non-economic basis, to the manner in which the claim of any other Consenting Senior Secured Credit Facility Lender is treated shall require the prior written consent of such materially adversely and disproportionately affected Consenting Senior Secured Credit Facility Lender;

(vi) any change, modification, or amendment to this Agreement (including, for the avoidance of doubt, the Term Sheet) that affects the class treatment of holders of Senior Secured Credit Facility Claims, Bond Green Bonds Claims or Epes Green Bonds Claims in a manner that is materially adverse relative to the manner in which such Claims are contemplated to be treated under the Term Sheet as in effect on the RSA Effective Date, and on a basis that is disproportionate to any corresponding change (or absence thereof) to the treatment of other classes of Claims held by the Restructuring Support Parties, shall require the prior written consent, as applicable, of the Majority Consenting Senior Secured Credit Facility Lenders, the Majority Consenting Bond Green Bondholders or the Majority Consenting Epes Green Bondholders, as applicable; and

(vii) any modification or amendment that requires any Restructuring Support Party to incur any expenses, liabilities, or other obligations, or agree to any commitments, undertakings, concessions, indemnities, or other arrangements that could result in expenses, liabilities, or other obligations, shall require the written consent of each such affected Restructuring Support Party.

  21. **Relationship Among Parties**. The duties and obligations of the Restructuring Support Parties under this Agreement shall be several, not joint. No Party shall have any responsibility by virtue of this Agreement for any trading by any other entity. No prior history, pattern, or practice of sharing confidences among or between the Parties shall in any way affect or negate this Agreement. The Parties acknowledge that this Agreement does not constitute an agreement, arrangement, or understanding with respect to acting together for the purpose of acquiring, holding, voting, or disposing of any equity securities of the Debtors, and neither the Parties nor any group thereof shall constitute a "group" within the meaning of Rule 13d-5 under the Exchange Act. No action taken by any Restructuring Support Party pursuant to this Agreement shall be deemed to constitute or to create a presumption by any of the Parties that the Restructuring Support Parties are in any way acting in concert or as such a "group."

  22. **Specific Performance**. It is understood and agreed by the Parties that money damages would be an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable

4892-5401-1299

relief as a remedy of any such breach of this Agreement, including an order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply promptly with any of its obligations hereunder.  Each Party also agrees that it will not seek, and will waive any requirement for, the securing or posting of a bond in connection with any Party seeking or obtaining such relief. Notwithstanding anything to the contrary in this Agreement, none of the Parties will be liable for, and none of the Parties shall claim or seek to recover, any punitive, special, indirect, or consequential damages or damages for lost profits related to breach of this Agreement, except, in each case, to the extent such damages are the reasonably foreseeable consequence of the relevant breach of this Agreement.

23. **Governing Law & Jurisdiction**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to such state's choice of law provisions which would require or permit the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each Party irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter arising under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, shall be brought in the federal or state courts located in the City of New York, Borough of Manhattan, and by executing and delivering this Agreement, each of the Parties irrevocably accepts and submits itself to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to New York jurisdiction, if the Chapter 11 Cases are commenced, each Party agrees that the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement. By executing and delivering this Agreement, and upon commencement of the Chapter 11 Cases, each of the Parties irrevocably and unconditionally submits to the personal jurisdiction of the Bankruptcy Court solely for purposes of any action, suit, proceeding, or other contested matter arising out of or relating to this Agreement, or for recognition or enforcement of any judgment rendered or order entered in any such action, suit, proceeding, or other contested matter.

24. **Waiver of Right to Trial by Jury**. Each of the Parties waives any right to have a jury participate in resolving any dispute, whether sounding in contract, tort, or otherwise, between any of the Parties arising out of, connected with, relating to, or incidental to the relationship established between any of them in connection with this Agreement. Instead, any disputes resolved in court shall be resolved in a bench trial without a jury.

25. **Successors and Assigns**. Except as otherwise provided herein, this Agreement is intended to bind and inure to the benefit of each of the Parties and each of their respective permitted successors, assigns, heirs, executors, administrators, and representatives.

26. **No Third-Party Beneficiaries**. Unless expressly stated herein, this Agreement shall be solely for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement.

27. **Notices**. All notices (including, without limitation, any notice of termination or breach) and other communications from any Party hereunder shall be in writing and shall be deemed to have been duly given if personally delivered by courier service, messenger, email, or facsimile to the other Parties at the applicable addresses below, or such other addresses as may be

furnished hereafter by notice in writing. Any notice of termination or breach shall be delivered to all other Parties.

(a)    If to any Debtor:

        Enviva Inc.
        Attn:   Jason E. Paral
        7272 Wisconsin Ave., Suite 1800
        Bethesda, MD 20814
        Tel:     (301) 657-5560
        Email: jason.paral@envivabiomass.com

        *With a copy to:*

        Vinson & Elkins L.L.P.
        Attn:   David S. Meyer
                Jessica C. Peet
        1114 Avenue of the Americas, 32nd Floor
        New York, NY 10036
        Tel:     (212) 237-0000
        Email: dmeyer@velaw.com
                jpeet@velaw.com

        - and -

        Vinson & Elkins L.L.P.
        Attn:   Matthew J. Pyeatt
                Trevor G. Spears
        2001 Ross Avenue, Suite 3900
        Dallas, TX 75201
        Tel:     (214) 220-7700
        Email: mpyeatt@velaw.com
                tspears@velaw.com

(b)    If to a Consenting 2026 Noteholder:

        To the address set forth on its signature page hereto

        *with a copy to*

        Davis Polk & Wardwell LLP
        Attn:   Damian S. Schaible
                David Schiff
                Hailey W. Klabo
        450 Lexington Avenue
        New York, NY 10017
        Tel:     (212) 450-4000
        Email: damian.schaible@davispolk.com
                david.schiff@davispolk.com
                hailey.klabo@davispolk.com

4892-5401-1299

28.    **Email Consents**. Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the Parties submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

29.    **Entire Agreement**. This Agreement (including the Exhibits and Schedules) constitutes the entire agreement of the Parties with respect to the subject matter of this Agreement, and supersedes all prior negotiations, agreements, and understandings, whether written or oral, among the Parties with respect to the subject matter of this Agreement.

30.    **Reservation of Rights**.

(a)    Except as expressly provided in this Agreement or the Term Sheet, including Section 5(a) of this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including without limitation, its claims against any of the other Parties.

(b)    Without limiting Sub-Clause (a) of this Section 30 in any way, if the Plan is not consummated in the manner set forth, and on the timeline set forth, in this Agreement and the Term Sheet (taking into account any extension of applicable Milestones pursuant to the terms hereof), or if this Agreement is terminated for any reason in accordance herewith, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, remedies, claims, and defenses and the Parties expressly reserve any and all of their respective rights, remedies, claims and defenses, subject to Section 18 of this Agreement.  The Term Sheet, this Agreement, the Plan, any Definitive Document, and any related document shall in no event be construed as or be deemed to be evidence of an admission or concession on the part of any Party of any claim or fault or liability or damages whatsoever. Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

31.    **Counterparts**. This Agreement may be executed in one or more counterparts, each of which, when so executed, shall constitute the same instrument, and the counterparts may be delivered by electronic mail in portable document format (.pdf).

32.    **Public Disclosure**. Except as required by law, no Party or its advisors shall (a) use the name of any Restructuring Support Party in any public manner (including in any press release) with respect to this Agreement, the Restructuring, or any Definitive Document or (b) disclose to any entity (including, for the avoidance of doubt, any other Restructuring Support Party), other than advisors to the Debtors, the holdings information of any Restructuring Support Party without such Restructuring Support Party's prior written consent (it being understood and agreed that each Restructuring Support Party's signature page to this Agreement shall be redacted to remove the

name of such Restructuring Support Party and the amount and/or percentage of Company Claims/Interests held by such Restructuring Support Party to the extent this Agreement is filed on the docket maintained in the Chapter 11 Cases or otherwise made publicly available); *provided further*, *however*, that (x) if such disclosure is required by law, and to the extent reasonably practicable and not otherwise prohibited by law, the disclosing Party shall afford the relevant Restructuring Support Party a reasonable opportunity to review and comment in advance of such disclosure and such Party shall take all reasonable measures to limit such disclosure and (y) the foregoing shall not prohibit the disclosure of the aggregate percentage or aggregate principal amount of Company Claims/Interests held by Restructuring Support Parties of the same class, collectively. This Agreement, as well as its terms, its existence, and the existence of the negotiation of its terms are expressly subject to any existing confidentiality agreements executed by and among any of the Parties as of the date hereof; *provided*, *however*, that, (a) on or after the RSA Effective Date, the Debtors may make any public disclosure or filing of, or with respect to the subject matter of, this Agreement, including the existence of, or the terms of, this Agreement or any other material term of the transaction contemplated herein, that, based upon the advice of counsel, is required to be made (i) by applicable law or regulation or (ii) pursuant to any rules or regulations of the New York Stock Exchange, without the express written consent of the other Parties, and (b) after the Petition Date, the Parties may disclose the existence of, or the terms of, this Agreement without the express written consent of the other Parties.

33.     **Enforceability of Agreement**. Each of the Parties waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

34.     **Headings**. The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

35.     **Interpretation**. This Agreement is the product of negotiations among the Parties, and the enforcement or interpretation hereof, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement or any portion hereof, shall not be effective in regard to the interpretation hereof.

*[Signatures and exhibits follow.]*

### Schedule 1 to Restructuring Support Agreement

### Subsidiaries

1. Enviva Inc.
2. Enviva Pellets, LLC
3. Enviva Pellets Lucedale, LLC
4. Enviva, LP
5. Enviva Pellets Waycross, LLC
6. Enviva Pellets Greenwood, LLC
7. Enviva Port of Pascagoula, LLC
8. Enviva Pellets Bond, LLC
9. Enviva Holdings, LP
10. Enviva GP, LLC
11. Enviva Management Company, LLC
12. Enviva Aircraft Holdings Corp.
13. Enviva Shipping Holdings, LLC
14. Enviva Partners Finance Corp.
15. Enviva Energy Services, LLC
16. Enviva Holdings GP, LLC
17. Enviva Development Finance Company, LLC
18. Enviva Pellets Epes, LLC
19. Enviva Pellets Epes Finance Company, LLC
20. Enviva Pellets Epes Holdings, LLC
21. Enviva MLP International Holdings, LLC

**Exhibit A** to the Restructuring Support Agreement

**Term Sheet**

Confidential
Subject to FRE 408 and Equivalents
For Discussion Purposes Only
Subject to Material Revision and Ongoing Diligence



**Restructuring and DIP Proposals**

**February 15, 2024**



Confidential
Subject to FRE 408 and Equivalents
For Discussion Purposes Only
Subject to Material Revision and Ongoing Diligence

# Restructuring Proposal

| | | |
|---|---|---|
| **Implementation** | | ■ Prearranged Ch. 11 restructuring with a Restructuring Support Agreement ("RSA") executed by holders representing > 67%, in aggregate, of the 2026 Notes, >50% of Epes Green Bonds, and > 50%, in aggregate, of the Existing RCF and the Incremental Term Loan (the "Term Loan")<br>■ 2026 Noteholders to sign in all capacities (i.e., as holders of Senior Notes, Green Bonds, and 1L Debt) |
| **DIP Financing** | | ■ Refer to DIP Term Sheet[1] |
| **Treatment of Claims** | **DIP Financing** | ■ Tranche A has option to equitize subject to conditions in the DIP Term Sheet; Tranche B is repaid in cash at maturity |
| **Treatment of Claims** | **Existing RCF / TL / NMTC Loan** | ■ Paid in full in cash with proceeds from the 1L Exit Facility; holders of 1L TL / RCF can participate in exit financing process and, if a third party provides best terms for the 1L Exit Facility, roll existing debt into same terms as the 1L Exit Facility<br>■ NMTC Loan reinstated or refinanced, subject to diligence<br>■ Default interest rate on RCF / TL to be paid as adequate protection during chapter 11 cases |
| | **Epes / Bond GBs** | ■ Repaid with remaining Restricted Cash from Construction Fund based on amounts at chapter 11 filing<br>■ Claim to be limited to the face amount outstanding, plus interest accrued prepetition, less any restricted cash that is returned to holders prior to the Plan effective date, regardless of timing of when such cash is returned; in an RSA, the Company and the other RSA parties will agree to support the return of cash as promptly as reasonably possible after the Petition Date<br>■ Remaining principal receives pro rata share (together with 2026 Notes and GUCs) of reorganized equity (subject to dilution from ERO, ERO Backstop Fee, DIP conversion, warrants, and MIP)<br>■ Right to participate in ERO<br>■ The Company shall work in good faith and to finalize the mechanics on the return of cash by February 26, 2024, and it is anticipated that such terms will be consistent with any restructuring support agreement entered into as of such date |
| | **2026 Notes[2]** | ■ Receives pro rata share (together with Epes / Bond Green Bonds and GUCs) of reorganized equity (subject to dilution from ERO, ERO Backstop Fee, DIP conversion, warrants, and MIP)<br>■ Right to participate in ERO |
| | **Subsidiary GUCs[3]** | ■ [•]% of reorganized equity[4] (subject to dilution from ERO, ERO Backstop Fee, DIP Conversion, warrants, and MIP)<br>■ Right to participate in ERO if classified with unsecured financial debt<br>■ Cash-out option for non-financial GUCs to be discussed by Company / AHG in connection with contract negotiation strategy |
| | **HoldCo Unsecured Claims** | ■ [•]% of reorganized equity (subject to dilution from ERO, ERO Backstop Fee, DIP Conversion, warrants, and MIP) and/or warrants at terms TBD<br>■ No right to participate in ERO<br>■ Enviva entities and related claims included in "HoldCo" class subject to diligence<br>■ Cash-out option for non-financial GUCs / non-Q4'22 Transaction GUCs to be discussed by Company / AHG in connection with contract negotiation strategy |
| | **Existing Equity** | ■ Receive<br>▶ (i) 5% of the reorganized equity, subject to dilution from ERO, ERO Backstop Fee, Warrants, MIP and DIP conversion, and<br>▶ (ii) Warrants with a 5 year term exercisable for 5.0% of reorganized equity (prior to dilution from ERO, DIP conversion, and MIP)<br>• Exercisable at a strike price per share calculated as a) the sum of par + accrued claims of the 2026 Notes, net Green Bonds, and Subsidiary GUCs (with no double counting of claims), divided by b) the number of shares issued at emergence prior to the DIP Conversion, ERO, and the MIP<br>• Exercisable on a cashless basis<br>• Black-Scholes protections<br>■ No right to participate in ERO |

 
1. All general unsecured claims may be classified together, subject to diligence
2. Any reference to DIP loans (including corollary terms such as "Tranche A loans" or "aggregate loans") without concurrent mention of DIP notes shall encompass both DIP loans and DIP notes
3. Subsidiary GUCs include 2026 Notes, Green Bond claims (net of cash) and non-financial claims at subsidiary debtors
4. NTD: Subject to contract rejection damage analysis and GUC analysis

Confidential
Subject to FRE 408 and Equivalents
For Discussion Purposes Only
Subject to Material Revision and Ongoing Diligence

# Restructuring Proposal (Cont'd)

| Post-Emergence Capital Structure | New 1L RCF | ■ Commitment: $[250] million; to be provided by parties acceptable to Company and AHG ahead of Plan confirmation<br>■ Security / Priority: Terms to be subject to AHG consent rights<br>■ Terms TBD based on results of exit financing process but acceptable to the AHG |
|---|---|---|
| | 1L Exit Facility | ■ Amount: $[750] million; to be provided by parties acceptable to Company and AHG ahead of Plan Confirmation<br>■ Security / Priority: First lien on substantially all assets of the Company<br>■ Company to work in good faith with the AHG to negotiate a committed financing acceptable to AHG and the Company by Disclosure Statement hearing or such later date to be agreed. Company to work with third parties on a "best-efforts" basis thereafter to determine if superior exit financing is available<br>■ Additional terms TBD based on results of exit financing process but acceptable to the AHG |
| | Equity Rights Offering ("ERO") | ■ ERO of $[250] million plus amounts of Tranche A DIP not converted pursuant to Conversion Option, backstopped by AHG, at a discount to be agreed relative to plan equity value, provided that plan equity value does not exceed the Valuation Ceiling, subject to dilution by MIP<br>▶ Use of proceeds: Repay Tranche B DIP and any Tranche A DIP amounts not converted at emergence<br>▶ Backstop terms to be agreed and court-approved by no later than Disclosure Statement hearing<br>▶ "Valuation Ceiling" shall mean Equity Value based on a TEV equal to the sum of prepetition secured debt claims plus DIP loans anticipated to be outstanding at emergence, plus the 2026 Notes and net Green Bonds claims |
| Management Incentive Plan ("MIP") | | ■ 3.5% of reorganized equity in the form of RSUs granted at emergence; Up to 6.5% of reorganized equity to be granted at discretion of new board (structure of such equity awards (e.g. options, RSUs) to be agreed); for the avoidance of doubt, MIP is not subject to dilution by the ERO |
| Governance | | ■ Initial post-emergence board of directors to be selected pursuant to RSA consent rights, and commensurate with equity ownership<br>■ Special committee on a basis to be agreed[1] |
| Other | | ■ Post-emergence governance structure acceptable to AHG and Company<br>▶ Customary minority investor protections and information rights to be agreed<br>■ AHG to work with company to ensure appropriate critical vendor relief and support for ongoing trade relationships<br>■ Customary RSA rights, consent rights, and reporting requirements<br>■ Customary releases and exculpation provisions, including insider releases subject to investigation and diligence; parties will work in good faith with respect to diligence (and reporting on investigation findings) prior to anticipated filing of Plan<br>■ Tax structuring and definitive documentation to be acceptable to the AHG and the Company<br>■ Payment of AHG reasonable and documented fees and expenses (including AHG advisors)<br>■ Assumption of employment agreements and indemnification agreements subject to diligence and RSA consent rights; parties will work in good faith to address diligence of such agreements on a timeline reasonably practicable<br>■ Linkage between RSA/DIP to be addressed through definitive documentation<br>■ RSA to include customary fiduciary out and customary provisions regarding response to inbound proposals, and to permit Company to conduct a 1L exit financing process consistent with this Term Sheet |

  

1.   Company to provide detail on current/proposed governance structure

Confidential
Subject to FRE 408 and Equivalents
For Discussion Purposes Only
Subject to Material Revision and Ongoing Diligence

# DIP Proposal

| | |
|---|---|
| **Description** | ■ Delayed-draw term loan or delayed-draw notes or a combination thereof, at option of AHG members, as long as no economic difference to Company (i.e., both are delayed from interest cost perspective) |
| **Facility Size** | ■ $500 million[1]<br>  ▶ Tranche A ($250mm): at each holder's election, (i) repaid in cash or (ii) convertible into reorganized equity at the same discount to Plan Equity Value as the ERO, subject to dilution from MIP; election to convert into reorganized equity must be made prior to Disclosure Statement hearing<br>  ▶ Tranche B ($250mm): to be repaid at emergence in cash<br>■ Maximum of five draws; initial draw $[150]mm; size of subsequent draws minimum $[50]mm, max $[100]mm,<br>  ▶ Draws to be subject to customary borrowing conditions, including, without limitation, no default or event of default existing (which includes ongoing compliance with budget and variance requirements)<br>  ▶ To discuss requirement that Tranche A be fully drawn prior to Tranche B |
| **Guarantors** | ■ All subsidiaries, both wholly owned and non-wholly owned, excluding any non-debtor joint ventures, foreign subsidiaries, or domestic subsidiaries that are FSHCOs or owned directly or indirectly by a CFC; subject to tax diligence<br>  ▶ For avoidance of doubt, domestic subs that are FSHCOs or are directly or indirectly owned by CFC to provide guarantees; subject to diligence |
| **Claims / Collateral** | ■ Superpriority administrative expense claim<br>■ Second priority lien on the prepetition RCF/TL Collateral/Hamlet JV[2]; superpriority lien on all unencumbered assets<br>  ▶ To discuss equity pledge of interest in EWH<br>■ Superpriority lien on Epes subject only to NMTC Loan, subject to ongoing diligence<br>■ Guarantors' pledges of 100% equity in all subsidiaries unless there are actual and demonstrated adverse consequences |
| **Lenders / Allocation** | ■ AHG to backstop full amount of the DIP at the time of filing<br>■ The Company may syndicate up to 20% of the Tranche A commitments and up to 20% of the Tranche B commitments at their discretion during a two week syndication period after commencement of the Chapter 11 Case; any amounts not syndicated will be backstopped by the AHG<br>■ Company allocation is separate between Tranche A and Tranche B (i.e., Company-allocated parties can participate in one tranche and not the other); the Company must allocate at least $1 of Tranche B for each $1 of Tranche A; for the avoidance of doubt, Company may allocate to Tranche B without allocating to Tranche A<br>■ Existing equity holders will have the ability to participate in the Company-allocated portion of the DIP commitments[3] |
| **Borrower** | ■ Enviva Inc. |
| **Roll-up** | ■ None |
| **Maturity** | ■ [9] months after the petition date |
| **Interest Rate** | ■ S + [800] (50% undrawn spread) |
| **Fees** | ■ 3% Backstop Fee to Backstop Parties (members of AHG); 4% OID upfront fee payable at interim on all commitments to all participating lenders (including Company-allocated lenders participating in the DIP during the first two weeks following commencement of chapter 11 cases; [any unallocated portion from the Company DIP syndication will be funded by the Backstop Parties with the 4% OID upfront fee])<br>■ Exit Fee: [3]% of aggregate loans payable in cash to Tranche B lenders; provided [3]% Exit Fee applies to Tranche A loans repaid in cash at emergence<br>■ Early Repayment / Break Fee of [5]% on account of Tranche A and Tranche B in the event of any refinancing that occurs prior to emergence / maturity |

**Evercore   Davis Polk**

  

1. The terms in this section are subject to tax diligence
2. Lien priority on Hamlet JV assets subject to diligence
3. To the extent other debtholders in capital structure participate in DIP, the allocations between AHG and Company would be pared back pro rata

Confidential
Subject to FRE 408 and Equivalents
For Discussion Purposes Only
Subject to Material Revision and Ongoing Diligence

# DIP Proposal (Cont'd)

| | |
|---|---|
| **Cash Collateral** | ■ Customary permitted cash collateral use and adequate protection to be agreed (note: adequate protection terms herein are inextricably tied to this transaction and the AHG DIP; should not be taken to reflect AHG position with respect to any other financing or proposed collateral use) |
| **Exit Financing** | ■ DIP to be paid in full in cash (including Exit Fee) at emergence unless equitized pursuant to the Conversion Option |
| **Conversion Option** | ■ Tranche A DIP loans to include option to be repaid in cash in full or converted into equity at a discount equivalent to the ERO discount, subject to dilution from the MIP, conversion shall be solely at each lender's option[1]<br>▶ Repaid at par + 3% Exit Fee if repaid in cash because holder declined to exercise Conversion Option; if repaid in cash for any other reason, 5% Exit Fee to apply |
| **Adequate Protection** | ■ Customary adequate protection claims and liens and AHG expense reimbursement<br>■ Adequate protection for non-participating 1L lenders to be discussed |
| **Covenants** | ■ Maximum variance of $2 million or 15%, whichever is greater (excluding professional fees and expenses); permitted variance for (i) shortfall in MGT receipts due to MGT plant shutdown or contract termination and (ii) losing access to Non-Debtor funding as relates to the flow of MGT receipts from the EWH JV (Non-Debtor) to the Debtors<br>▶ Tested weekly on rolling 4-week basis (with first test occurring after conclusion of the 4-week period)<br>▶ New budgets issued once every 4 weeks; to extent new budget is not approved, then Company retains ability to carryforward favorable variances from prior period(s)<br>■ $[30]mm minimum liquidity covenant, tested daily<br>■ Customary DIP covenants and consents, including consent right over contract rejection / assumption<br>■ Subsequent draws subject to customary borrowing conditions as described above<br>■ No voting by affiliated lenders other than limited sacred rights protections to be addressed in definitive documentation |
| **Reporting** | ■ Monthly financial reporting (bi-weekly variance reporting, to include professional fees, and updated 13-WCF budget due every four weeks), on a non-cleansed basis<br>▶ DIP Lenders to have opportunity to get restricted<br>■ Critical vendor and contract negotiation report on a weekly basis; but on a non-cleansed basis, i.e., available to DIP lenders willing to access private side datasite<br>■ Customary information rights and access, incl. twice-monthly calls with management, weekly call with Company financial advisors to discuss cash flows and operations on a non-cleansed basis, i.e., available to DIP lenders willing to access private side datasite |
| **Other** | ■ Payment of DIP Lender fees & expenses (including DIP Lender advisors); indemnification of DIP Lenders<br>■ Other customary DIP terms to be agreed (including events of default, representations & warranties, etc.); also to include releases of DIP lenders in their capacity as such; any releases of insiders subject to court approvals and customary carve-outs<br>■ Company, AHG and other stakeholders TBD to enter into acceptable RSA prior to filing<br>■ DIP lenders willing to access private side datasite allowed to review professional fee estimates (including estimates for banker success fees, financing fees and crediting), by advisor and month, in the DIP budget<br>■ Customary professional fee carveout to be agreed |
| **Milestones** | ■ Entry of Interim DIP Order: T + 7<br>■ Filing of Bar Date Motion: T + 14<br>■ Entry of Final DIP Order: T + 35<br>■ Filing of rejection motion: T + 45<br>■ Filing of an Acceptable Plan of Reorganization and Acceptable Disclosure Statement by the Debtors: T + 120<br>■ Entry of order approving the Disclosure Statement for an Acceptable Plan of Reorganization by the Bankruptcy Court: T + 150<br>■ Entry of Confirmation Order for an Acceptable Plan of Reorganization by the Bankruptcy Court: T + 185<br>■ Occurrence of effective date for an Acceptable Plan of Reorganization: T + 205 |



1.    DIP conversion mechanics and documentation subject to legal structuring





Confidential
Subject to FRE 408 and Equivalents
For Discussion Purposes Only
Subject to Material Revision and Ongoing Diligence

This non-binding presentation is provided for discussion purposes only, and is not intended to be and should not be construed as an offer, a commitment, nor an agreement to provide any financing, enter into any transaction or otherwise, nor should it be construed as an attempt to establish all of the requirements, terms, conditions, representations, warranties and other provisions relating to any transaction described herein. It is intended only to broadly outline at a high level certain illustrative terms of a potential transaction. This presentation does not constitute, nor shall it be construed as, an offer with respect to any securities, it being understood that any such offer will only be made in compliance with applicable securities laws and/or other applicable laws. Any transaction is subject to, among other things, completion of due diligence and the negotiation, execution and delivery of definitive, binding documentation satisfactory to the parties thereto and satisfaction of all applicable terms and conditions therein. No person or entity shall have any obligation to commence or thereafter continue any negotiations to enter into any such definitive, binding agreement with respect to any transaction involving the matters described herein, and no person or entity should rely on an eventual formation of any agreement. This presentation is provided on a confidential basis, and may not be used or disclosed to any person, including, without limitation, based on the protection provided pursuant to Rule 408 of the Federal Rules of Evidence and any other rule of similar import. Any potential debt or equity recovery levels, valuations, or other related measures provided or implied herein are for purely illustrative purposes only and should not be used or construed for any other purpose. Nothing contained herein shall be an admission of fact or liability or deemed binding on any person or entity.

Evercore    **Davis Polk**

Vinson&Elkins    LAZARD        

**Exhibit B** to the Restructuring Support Agreement

**Form of Joinder Agreement**

4892-5401-1299

## Form of Joinder Agreement

This joinder (this "*Joinder*") to the Restructuring Support Agreement (the "*Agreement*"),[1] dated as of [●], 2024, by and among (i) Enviva Inc. and each of the subsidiaries set forth in **<u>Schedule 1</u>** to the Agreement, and (ii) the Restructuring Support Parties, is executed and delivered by [_____] (the "*Joining Party*") as of [_____].

      1.    <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder as <u>Annex 1</u> (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof).  The Joining Party shall hereafter be deemed to be a Party for all purposes under the Agreement and one or more of the entities comprising the Restructuring Support Parties, as applicable.

      2.    <u>Representations and Warranties</u>.  The Joining Party hereby represents and warrants to each other Party to the Agreement that, as of the date hereof, such Joining Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the claims identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations and warranties set forth in <u>Section 17</u> of the Agreement to each other Party.

      3.    <u>Governing Law</u>.  This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require or permit the application of the law of any other jurisdiction.

      4.    <u>Notice</u>.  All notices and other communications given or made pursuant to the Agreement shall be sent to:

      To the Joining Party at:

      [JOINING PARTY]
      [ADDRESS]
      Attn:
      Facsimile: [FAX]
      EMAIL:

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

---

[1]    Capitalized term used but not otherwise defined herein shall have the meaning ascribed to it in the Agreement.

4892-5401-1299

**[JOINING PARTY]**


By: _____

Name:

Title:


Holdings: $_____ of Debt
       Under the Senior Secured Credit Agreement


Holdings: $_____ of Debt
       Under the 2026 Notes


Holdings: $_____ of Debt
       Under the Epes Green Bonds


Holdings: $_____ of Debt
       Under the Bond Green Bonds

**<u>Annex 1</u> to the Form of Joinder Agreement**

**Restructuring Support Agreement**