David S. Meyer (*pro hac vice* pending)
Jessica C. Peet (*pro hac vice* pending)
**VINSON & ELKINS LLP**
The Grace Building
1114 Avenue of the Americas, 32nd Floor
New York, New York 10036-7708
Telephone:        (212) 237-0000
Facsimile:        (212) 237-0100

Matthew J. Pyeatt (*pro hac vice* pending)
Trevor G. Spears (*pro hac vice* pending)
**VINSON & ELKINS LLP**
Trammell Crow Center
2001 Ross Avenue, Suite 3900
Dallas, TX 75201
Telephone:        (214) 220-7700
Facsimile:        (214) 220-7716

Michael A. Condyles (VA 27807)
Peter J. Barrett (VA 46179)
Jeremy S. Williams (VA 77469)
**KUTAK ROCK LLP**
901 East Byrd Street, Suite 1000
Richmond, Virginia 23219-4071
Telephone:        (804) 644-1700
Facsimile:        (804) 783-6192

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENVIVA INC., *et al.*, | ) | Case No. 24–10453 (BFK) |
| | ) | |
| Debtors.[1] | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF MARK RAJCEVICH
## IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST-DAY MOTIONS

I, Mark Rajcevich, declare the following under 28 U.S.C. § 1746:

1.        I am a Managing Director based in the Chicago office of Alvarez & Marsal North America, LLC ("**A&M**").  I am over the age of twenty-one years, and if called upon to testify, I would testify competently to the facts and opinions set forth in this declaration (the "***Declaration***").

---

[1]        Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been requested, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/enviva.  The location of the Debtors' corporate headquarters is:  7272 Wisconsin Avenue, Suite 1800, Bethesda, MD 20814.

2.      A&M is the proposed financial advisor for the debtors and debtors in possession (collectively, the "*Debtors*") in the above-captioned chapter 11 cases.  A&M and its affiliates comprise a leading international advisory services firm with approximately 9,000 employees in locations around the world.

3.      A&M has significant experience assisting distressed companies with (a) restructurings and turnaround management, (b) litigation support, (c) mergers and acquisitions, (d) interim management, (e) regulatory and risk advisory, (f) capital markets advisory, (g) tax advisory, (h) financial management and financial and strategic guidance, and (i) performance improvement services and solutions.  A&M provides a wide range of debtor advisory services targeted at stabilizing and improving a company's financial position, including: developing or validating forecasts, business plans, and related assessments of strategic position; monitoring and managing cash, cash flow, and supplier relationships; assessing and recommending cost reduction strategies; and designing and negotiating financial restructuring transactions.  Additionally, A&M provides advice on specific aspects of the turnaround process and helps manage complex constituency relations and communications.  A&M often works alongside company management and key constituents during chapter 11 restructurings to develop a feasible and executable plan of reorganization.

4.      I have more than 20 years of experience in advising companies throughout the United States in distressed and bankruptcy-related situations, including public companies. Prior to joining A&M in 2006, I worked for four years in FTI Consulting's restructuring practice and for two years in PricewaterhouseCoopers' Business Recovery Services practice.  I hold a bachelor's degree (with high honors) in Finance from the University of Illinois.

5.      My primary focus at A&M includes: (a) assessing and modeling financial and operational restructuring strategies; (b) cash-flow forecasting; (c) formulating business plans and related financial projections; (d) implementing cost-cutting and liquidity management measures; and (e) assisting and advising companies through the chapter 11 process, asset dispositions, and wind-downs.  I have advised both public and private companies across various industries, including energy, manufacturing, consumer retail, automotive, homebuilding, and real estate development, among others.  I have led or otherwise been actively involved in large and complex matters involving the restructuring or reorganization of a multitude of companies, including the following proceedings:  *In re Gulfport Energy Corp.*, Case No. 20-35562 (DRJ) (Bankr. S.D. Tex. Nov. 13, 2020); *In re California Resources Corp.*, Case No. 20-33568 (DRJ) (Bankr. S.D. Tex. July 15, 2020); *In re Revlon Inc.*, Case No. 22-10760 (DSJ) (Bankr. S.D.N.Y. June 16, 2022); *In re iHeartMedia Inc.*, Case No. 18-31274 (MI) (Bankr. S.D. Tex. Mar. 15, 2018); *In re Chisholm Oil & Gas Operating, LLC*, Case No. 20-11593 (BLS) (Bankr. D. Del. June 17, 2020); *In re Legacy Reserves Inc.*, Case No. 19-33395 (MI) (Bankr. S.D. Tex. June 18, 2019); *In re Stone Energy Corp.*, Case No. 16-36390 (MI) (Bankr. S.D. Tex. Dec. 14, 2016); *In re Penn Virginia Corp.*, Case No. 16-32395 (KLP) (Bankr. E.D. Va. May 12, 2016); and *In re Vantage Drilling Int'l*, Case No. 15-12422 (BLS) (Bankr. D. Del. Dec. 3, 2015).  My company-side experience includes the provision of a broad range of financial advisory services, including the preparation and review of financial projections and liquidity and liquidation analyses. I also have represented creditor constituencies in various restructuring transactions.

6.      In June 2023, Enviva Inc. and its Debtor (as defined below) and non-Debtor affiliates (collectively, the "**Company**") engaged A&M to provide financial advisory services to the Company.  In August 2023, the scope of A&M's engagement was expanded to include

3

restructuring advisory services, including, among other things, assisting the Company in developing a long-term business plan and evaluating and exploring solutions for its balance-sheet and liquidity challenges. Through this engagement, I have become familiar with the Company's day-to-day operations, business and financial affairs, capital structure, liquidity needs, and books and records.

7.      A&M has worked closely with the Company's management and board of directors to provide a variety of services, including, among other things: (a) reviewing and analyzing the Company's business, operations, and financial projections; (b) assessing the Company's liquidity situation and potential financing needs; (c) evaluating potential in- and out-of-court financing alternatives; (d) negotiating a restructuring support agreement; (e) assisting the Company in preparing for the chapter 11 filing; and (f) as part of preparing for the chapter 11 cases, analyzing and advising on various terms of debtor-in-possession financing for the Company to assist it in obtaining the most competitive terms and conditions available to the Company.

8.      On the date hereof (the "***Petition Date***"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Eastern District of Virginia (the "***Court***").

9.      I am authorized on behalf of the Debtors and A&M to make this Declaration.  All statements set forth in this Declaration are based upon: (a) my personal knowledge, belief, or opinion; (b) information learned from my review of the Company's records; (c) information supplied to me or verified by the Company's employees or advisors and/or employees of A&M working directly with me or under my supervision, direction, or control; and/or (d) my knowledge, skill, education, experience, and/or training concerning financial matters including restructuring. Unless otherwise indicated, any financial information contained in this Declaration is unaudited

and subject to change, but is accurate to the best of my knowledge.  Such financial information is presented on a consolidated basis for the Company, except where specifically noted.

## I.    FIRST-DAY MOTIONS

10.    On the date hereof (the "***Petition Date***"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Eastern District of Virginia (the "***Court***").

11.    The Debtors have filed certain substantially contemporaneous motions seeking "first day" relief (collectively, the "***First-Day Motions***") seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and minimize possible adverse effects of the chapter 11 filings on the Debtors' businesses.

12.    I have reviewed the First-Day Motions, and as set forth herein and described in greater detail in the First-Day Motions, I believe that emergency relief is necessary to avoid immediate and irreparable harm to the Debtors' businesses, estates, and stakeholders from the filing of these chapter 11 cases, and is necessary to allow the Debtors to operate with minimal disruption during the pendency of the chapter 11 cases.  I believe that without immediate access to cash collateral and debtor-in-possession financing, and authority to make certain essential prepetition payments and otherwise continue conducting ordinary course business operations, the Debtors would suffer immediate and irreparable harm to the detriment of their businesses, estates, and stakeholders.

13.    A description of the relief requested and the facts and opinions supporting each of the First-Day Motions is detailed in **Exhibit A.**

*[Remainder of page intentionally left blank.]*

5

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Executed on March 13, 2024

*/s/ Mark Rajcevich*
Mark Rajcevich
Managing Director
Alvarez & Marsal North America, LLC

## EXHIBIT A
### Evidentiary Support for First-Day Motions[1]

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the *Declaration of Glenn Nunziata in Support of Chapter 11 Petitions and First-Day Motions* and/or the applicable First-Day Motions.

## ADMINISTRATIVE MOTIONS

**A.     Motion of Debtors for Entry of an Order Directing Joint Administration of the Debtors' Chapter 11 Cases (the "*Joint Administration Motion*")**

1.      In the Joint Administration Motion, the Debtors seek entry of an order consolidating the administration of these chapter 11 cases for procedural purposes only.  Specifically, the Debtors request that the Court maintain one file and one docket for all of the Debtors' chapter 11 cases under the case of Enviva Inc. and that these chapter 11 cases be administered under a consolidated caption, as follows:

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ENVIVA INC., *et al.*, | ) | Case No. 24 – 10453 (BFK) |
| | ) | |
| Debtors.[1] | ) | (Jointly Administered) |
| | ) | |

2.      The lead case docket, as well as the dockets for each of the other chapter 11 cases, will be available on the website of the Debtors' proposed claims, noticing, and solicitation agent at www.kccllc.net/enviva.

3.      The Debtors also respectfully request that a notation be entered on each of the Debtors' respective dockets (other than Debtor Enviva Inc.) to reflect the joint administration of these chapter 11 cases.

4.      Notices, applications, motions, other pleadings, hearings, and orders in these chapter 11 cases may affect all of the Debtors.  I believe that if each Debtor's case were administered independently, there would be a number of duplicative filings and overlapping

---

[1]     Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been requested, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein.  A complete list may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/enviva.  The location of the Debtors' corporate headquarters is:  7272 Wisconsin Avenue, Suite 1800, Bethesda, MD 20814.

service, which would be an unnecessary duplication of identical documents that would be wasteful of the resources of the Debtors' estates, as well as the resources of the Court and of other parties in interest.

5.      Joint administration will permit the Clerk of the Court to use a single general docket for all of the Debtors' chapter 11 cases and to combine notices to creditors and other parties in interest by ensuring that all parties in interest will be able to review one docket to stay apprised of the various matters before the Court regarding all of the Debtors' chapter 11 cases.  Moreover, supervision of the administrative aspects of the Debtors' chapter 11 cases by the U.S. Trustee will be simplified.   Therefore, joint administration will promote the economical and efficient administration of the Debtors' estates to the benefit of the Debtors, their creditors, the U.S. Trustee, and the Court.

6.      I do not believe joint administration will give rise to any conflict of interest among the Debtors' estates, and I believe that the rights of the Debtors' respective creditors will not be adversely affected by the proposed joint administration because each of the Debtors will continue as separate and distinct legal entities, will continue to maintain separate books and records, and will provide information as required in the consolidated monthly operating reports on a debtor-by-debtor basis.  I further understand that each creditor may file a proof of claim against the applicable estate in which it allegedly has a claim or interest and will retain whatever claims or interests it has against the particular estate.  As such, I believe the recoveries of all creditors will be enhanced by the reduction in costs resulting from joint administration of the Debtors' chapter 11 cases.  I also believe that the Court will be relieved of the burden of scheduling duplicative hearings, entering duplicative orders, and maintaining redundant files.

7.      Based on the foregoing, I believe any delay in granting the relief requested in the Joint Administration Motion would hinder the Debtors' operations and cause immediate and irreparable harm.  Accordingly, on behalf of the Debtors, I respectfully request that the relief sought in the Joint Administration Motion be approved.

**B.      Motion of Debtors for Entry of an Order (I) Authorizing Debtors to (A) File a Consolidated Creditor Matrix, (B) File a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, and (C) Redact Certain Personal Identification Information, (II) Waiving the Requirement to File a List of Equity Security Holders of Enviva Inc., (III) Approving the Form and Manner of Notice of Commencement, and (IV) Granting Related Relief (the "*Consolidated Creditor Matrix Motion*")**

8.      By the Consolidated Creditor Matrix Motion, the Debtors seek an order from the Court (i) authorizing the Debtors to (a) file a consolidated creditor matrix in lieu of submitting a separate mailing matrix for each Debtor, (b) file a consolidated list of the Debtors' 30 largest unsecured creditors in lieu of filing lists for each Debtor, and (c) redact certain personal identification information; (ii) waiving the requirement to file a list of, and provide notice directly to, the equity security holders of Enviva Inc., (iii) approving the form and manner of the Notice of Commencement (as defined below), and (iv) granting related relief.

9.      I believe that preparing separate lists and creditor matrices for each Debtor would be an unnecessarily burdensome task and could result in duplicate mailings.  Moreover, the Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive notice, as applicable, and other documents in these chapter 11 cases.  I submit that the information, as maintained in the Debtors' computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested parties with requisite notice and other documents filed in these chapter 11 cases.

10.     Lists of the top 30 creditors of each of the Debtors (each a "***Top 30 List***") could overlap and certain Debtors may have fewer than 30 significant unsecured creditors.  I believe that

filing separate Top 30 Lists for each Debtor would be of limited utility and would be less reflective of the body of unsecured creditors that have the greatest stake in these cases than filing a consolidated list for all Debtors.  In addition, the exercise of compiling a separate Top 30 List for each individual Debtor could consume an excessive amount of the Debtors' limited time and resources.  A single Top 30 List will also help alleviate administrative burden, costs, and the possibility of duplicative service. Accordingly, I believe that filing a consolidated Top 30 List would support the efficient and orderly administration of these chapter 11 cases, is appropriate under the facts and circumstances, and is in the best interests of the Debtors' estates.

11.     The Debtors also request that certain personal identification information (*i.e.*, addresses) ("***Personal Data***") be redacted with respect to the Debtors' employees and individual creditors of the Debtors from the Creditor Matrix because such information could be used to perpetrate identity theft or to harm such individuals. Further, I understand that some creditors listed on the Creditor Matrix are subject to certain privacy and data protection regulations, including the United Kingdom Data Protection Act of 2018 and the United Kingdom General Data Protection Regulation (together, the "***U.K. GDPR***"), the European General Data Protection Regulation (the "***E.U. GDPR***") and that those regulations impose certain requirements before Personal Data may be disclosed.

12.     I believe that disclosing the unredacted names and home addresses (or other Personal Data) of individual creditors on the public docket is not necessary for the purpose of reviewing the claim amounts of individual creditors in connection with drafting a plan of reorganization or administering these chapter 11 cases, and the proposed redaction would be a less intrusive way of achieving this purpose.  I further believe that the privacy interests of individual creditors outweigh any interest in disclosing such information in these chapter 11 cases.

4

13.     I believe the requirements to file a list of, and to provide notice directly to, equity security holders, should be modified as to Enviva Inc. Enviva Inc.'s common stock is publicly traded on the New York Stock Exchange, with approximately 74,673,972 outstanding shares of common stock as of February 27, 2024, that cannot be readily traced to specific individual holders. Enviva Inc. only maintains a list of its registered equity security holders and therefore must obtain the names and addresses of its beneficial shareholders from a securities agent. I believe that preparing and submitting such a list with last known addresses for each equity security holder and sending notices to all such parties will create undue expense and administrative burden with limited corresponding benefit to the estates or parties in interest, while raising significant privacy concerns similar to those described above.

14.     I understand that Enviva Inc. has taken or will take several actions to inform its equity security holders of the commencement of these chapter 11 cases, which are as follows: (a) as soon as is practicable after commencement of the chapter 11 cases, the Debtors will serve the notices I understand are required under the Bankruptcy Code on the registered holders of Enviva Inc.'s equity securities and all banks, brokers, intermediaries, Depository Trust Company participants and other nominees or their mailing agents that hold Enviva Inc. equity securities in "street name" for the beneficial holders (with instructions to serve down to beneficial holders, as applicable); (b) on or about the date hereof, the Debtors will publish the notice of commencement on the Debtors' case website located at www.kccllc.net/enviva; (c) as soon as is practicable after the date hereof, the Debtors will issue a press release announcing the bankruptcy filing and cause certain notices that I understand are required under the Bankruptcy Code to be published in full in USA Today and the specific regional publication required under the Local Rules; and (d) the

Debtors will file a form 8-K with the SEC within four business days following the Petition Date, notifying their investors and other parties of the commencement of these chapter 11 cases.

15.     Based on the foregoing, I believe any delay in granting the relief requested in the Consolidated Creditor Matrix Motion would hinder the Debtors' operations and cause immediate and irreparable harm.  Accordingly, I believe that the relief sought in the Consolidated Creditor Matrix Motion should be approved.

**C.      Motion of Debtors for Entry of an Order Extending the Debtors' Deadline to File (I) (A) Schedules of Assets and Liabilities, (B) Schedules of Executory Contracts and Unexpired Leases, (C) Schedules of Income and Expenditures, and (D) Statements of Financial Affairs and (II) Rule 2015.3 Financial Reports (the "*Extension Motion*")**

16.     Pursuant to the Extension Motion, the Debtors seek a Court order extending the time within which the Debtors must file their (i) (a) schedules of assets and liabilities, (b) schedules of executory contracts and unexpired leases, (c) schedules of income and expenditures, and (d) statements of financial affairs (together, the "*Schedules and Statements*") to 60 days after the Petition Date, through and including May 11, 2024, and (ii) their initial financial information reports under Rule 2015.3(a) (the "*2015.3 Reports*") to the later of (i) 15 days after the meeting of creditors pursuant to section 341 of the Bankruptcy Code (the "*341 Meeting*") and 60 days after the Petition Date (the "*2015.3 Filing Deadline*"), without prejudice to the Debtors' ability to request additional extensions for cause shown.

17.     Given the size and complexity of the Debtors' business and financial affairs and the critical matters that the Debtors' management and professionals were required to address prior to the commencement of these chapter 11 cases, I understand that the Debtors were not in a position to complete the Schedules and Statements by the Petition Date, even with the assistance of professionals.  I further estimate that, given the critical matters to be addressed in the early days of these cases, the Debtors will require more than 14 days after the Petition Date to complete this

substantial task.  Nevertheless, I understand that the Debtors intend to complete the Schedules and

Statements as quickly as practicable under the circumstance.

18.    I believe that the number of Debtor entities, the substantial size, scope, and

complexity of their businesses, and the volume of material that must be compiled and reviewed by

the Debtors' staff and professionals to complete the Schedules and Statements for each of the 21

Debtors during the early days of these cases provides ample reason for an extension. The ordinary

operation of the Debtors' businesses requires the Debtors to maintain voluminous books, records,

and complex accounting systems. To prepare the Schedules and Statements, the Debtors must

compile information from those books and records and from documents relating to the claims of

approximately 12,100 creditors and the Debtors' many assets and contracts. Collecting the

necessary information requires an enormous expenditure of time and effort on the part of the

Debtors, their employees, and their professional advisors in the near term. The additional time

requested should help ensure that the Schedules and Statements are as accurate as possible. Given

the volume of information provided in these documents and the fact that the information is required

to be accurate as of the Petition Date, providing the Debtors with additional time will help ensure

that the relevant information is fully processed through the Debtors' various information systems

and can be incorporated into the relevant schedules. I believe that rushing to complete the

Schedules and Statements soon after the Petition Date likely would compromise the completeness

and accuracy of the Schedules and Statements.

19.    Prior to the Petition Date, the Debtors focused on preparing for the chapter 11 filing,

preparing the businesses to transition into chapter 11, and negotiating with their significant creditor

constituencies.  Although the Debtors have commenced the process that will enable them to

prepare and finalize what will be voluminous Schedules and Statements and are working diligently

to move the process forward, I anticipate that they may require up to 46 additional days to complete the Schedules and Statements beyond the Initial Deadline. I believe that the extensive amount of information that must be assembled and compiled and the hundreds of employee and professional hours required to complete the Schedules and Statements provides a reason for the Debtors to need the extra time requested.  Accordingly, I understand that the Debtors have respectfully requested that the Court extend the Initial Deadline by an additional 46 days, for a filing deadline of 60 days after the Petition Date, or May 11, 2024, without prejudice to the Debtors' right to seek a further extension through a subsequent motion and showing of cause for such extension.

20.    The Debtors have a substantial interest in several entities that are not debtors in these chapter 11 cases or publicly traded corporations, which I understand requires them to file the reports pursuant to Bankruptcy Rule 2015.3.  However, I believe the Debtors cannot complete the initial 2015.3 Reports in the time set forth under Bankruptcy Rule 2015.3 without significant hardship.  Additionally, I believe that extending the deadline to file the 2015.3 Reports will enable the Debtors to coordinate with the U.S. Trustee and their financial advisors to establish the scope of the 2015.3 Reports and discuss any necessary modifications.  Accordingly, I understand that the Debtors have requested that the Court extend the deadline to file the initial 2015.3 Reports until the 2015.3 Filing Deadline (i.e., the later of (i) 15 days after the 341 Meeting and (ii) 60 days after the Petition Date), without prejudice to the Debtors' right to seek a further extension through a subsequent motion and showing of cause for such extension.

21.    Based on the foregoing, I believe that the relief requested in the Extension Motion is necessary and appropriate, is in the best interests of their estates and creditors and should be granted in all respects.

8

**D.**   **Motion of Debtors for Entry of an Order (A) Restating and Enforcing the Worldwide Automatic Stay, Anti-Discrimination Provisions, and *Ipso Facto* Protections of the Bankruptcy Code; (B) Approving the Form and Manner of Notice; and (C) Granting Related Relief (the "*Automatic Stay Motion*")**

22.     Pursuant to the Automatic Stay Motion, I understand that the Debtors seek entry of an order (a) restating and enforcing the worldwide automatic stay, anti-discrimination provisions, and *ipso facto* protections of the Bankruptcy Code; (b) approving the form and manner of notice related thereto; and (c) granting related relief.  Further, I understand that the Debtors seek the authority, but not the direction, to translate the Automatic Stay Motion, the related notice, and related order to better inform non-U.S. creditors, governmental units, and interested parties of the relief requested in the Automatic Stay Motion to help ensure that the Debtors' global business operations are not disrupted and to deter adverse action.

23.     I understand that the Debtors seek the relief requested in the Automatic Stay Motion out of an abundance of caution and to assist them in most effectively informing non-U.S. creditors of the broad protections offered by the Bankruptcy Code.

24.     It is my understanding that the Debtors sell most of their wood-pellet volumes through long-term, take-or-pay offtake contracts with non-U.S. customers, and have dozens of offtake contracts serving customers, including major utility providers and operators of some of the highest capacity biomass power plants in the world, across a variety of jurisdictions, such as the United Kingdom, the European Union, and Japan.  I further understand that not all parties affected, or potentially affected, by the commencement of these chapter 11 cases, including the Debtors' non-U.S. customers, are aware of the fact that the Debtors are now protected by the automatic stay, or of the significance and impact of this fact.  Therefore, I believe that some of the Debtors' foreign creditors, vendors and/or contract counterparties may, absent an unambiguous order of the Court, take precipitous action against the Debtors or their property, including attempting to seize assets

9

located outside of the United States, or may attempt to terminate or refuse to perform under contracts upon the commencement of these chapter 11 cases pursuant to *ipso facto* provisions in their respective contracts.  I further believe that any such unilateral self-help action would adversely affect the Debtors' operations and potentially jeopardize the Debtors' reorganization efforts, resulting in irreparable harm to the Debtors' estates and parties in interest.  Accordingly, I believe the relief requested is necessary and appropriate to ensure the continuation of the Debtors' contracts and creditor compliance with the automatic stay.

25.     It is my understanding that the Debtors also contract or otherwise do business with a number of non-U.S. vendors, including dry bulk oceangoing cargo vessel chartering services, to facilitate the shipment of wood pellets manufactured in the United States to overseas ports for delivery to its non-U.S. customers.  As such, I understand that the Debtors rely on certain non-U.S. vendors to continue the uninterrupted flow of merchandise through their supply and distribution network.  Without continued support from their non-U.S. vendors, I believe that the Debtors would face severe interruptions to their supply chain.  Importantly, I believe that any disruption to the Debtors' supply chain could result in a significant loss of operational efficiency, decreasing the value of the Debtors' businesses and impairing stakeholder value at the outset of these chapter 11 cases.

26.     Moreover, I understand that the Debtors' wood pellets enable major power, heat, or combined heat-and-power generators to profitably generate electricity and heat in a manner that reduces the overall cost of compliance with certain mandatory greenhouse gas emissions limits and renewable energy targets.  I further understand that many of the Debtors' customers, particularly their non-U.S. customers, use the Debtors' wood pellets in an increasing variety of applications around the world, including as a substitute for coal, to help reduce the life-

cycle greenhouse gas emissions generated by customers in energy generation and industrial processes and other sectors where reducing carbon emissions has historically been either cost prohibitive or technologically impossible to reduce with the currently available abatement technology—colloquially known as "hard-to-abate sectors." To that end, I understand that many of the Debtors' shipments must adhere to strict sustainability requirements established by organizations or government bodies in the home countries of the Debtors' customers. I further understand that the Debtors do business in the U.K., the E.U., and Japan and are dependent on their respective government agencies for licenses and permits that allow the Debtors to operate therein. I believe that governmental units outside the United States may attempt to deny, suspend, terminate, or otherwise place conditions upon certain licenses, permits, charters, or other similar grants required for the Debtors' ongoing business operations, which I believe would adversely affect the Debtors' operations and efforts to maximize value through these chapter 11 cases. Accordingly, I believe the relief requested is necessary and appropriate to ensure that foreign governmental units unfamiliar with the Bankruptcy Code do not discriminate against the Debtors.

27.     Because the Debtors' operations are dependent upon, among other things, uninterrupted performance by non-U.S. contract counterparties (including contractual relationships with foreign entities operating in foreign jurisdictions), I believe the relief requested in the Automatic Stay Motion is necessary and appropriate and should be granted.

**E.     Debtors' Application for Entry of an Order Authorizing the Retention and Appointment of Kurtzman Carson Consultants LLC as Claims and Noticing Agent (the "*KCC Application*")** [2]

28.     I understand that, pursuant to the KCC Application, the Debtors seek a Court order authorizing the retention and appointment of Kurtzman Carson Consultants LLC ("*KCC*") as

---

[2]     Subject to review by local counsel.

claims and noticing agent in accordance with the terms and conditions set forth in the engagement

agreement dated February 5, 2024 attached as Exhibit B to the KCC Application (the

"**_Engagement Agreement_**"), which is also supported by the _Declaration of Evan Gershbein in_

_Support of Debtors' Application for Entry of an Order Authorizing the Retention and Appointment_

_of Kurtzman Carson Consultants LLC as Claims and Noticing Agent_, attached to the KCC

Application as Exhibit C (the "**_Gershbein Declaration_**") in order to assume full responsibility for

the distribution of notices and the maintenance, processing and docketing of proofs of claim filed

in the Debtors' cases.  In view of the number of anticipated claimants and the complexity of the

Debtors' businesses, I believe that the appointment of an Agent is both necessary and in the best

interests of both the Debtors' estates and their creditors.

29.     I understand that KCC has agreed to maintain records of all services showing dates,

categories of services, fees charged and expenses incurred, and to serve monthly invoices on the

Debtors, the office of the United States Trustee, counsel for the Debtors, counsel for any official

committee, if any, monitoring the expenses of the Debtors and any party-in-interest who

specifically requests service of the monthly invoices.  I further understand that if any dispute arises

relating to the Engagement Agreement or monthly invoices, the KCC and the Debtors shall meet

and confer in an attempt to resolve the dispute, and that, if resolution is not achieved, the parties

may seek resolution of the matter from the Court. Prior to the Petition Date, the Debtors provided

KCC a retainer in the amount of $50,000, which I understand that KCC will apply in accordance

with the Engagement Agreement.

30.     I understand that the Debtors have agreed to indemnify KCC as set forth in the

Engagement Agreement; however, notwithstanding anything to the contrary, I understand that

KCC will not be indemnified for matters resulting from KCC's bad faith, gross negligence, willful misconduct, or as otherwise provided in the proposed order.

31.      Finally, I understand that KCC has reviewed its electronic database to determine whether it has any relationships with the Debtors, creditors, and other parties in interest.  Except as disclosed in the Declaration, KCC has represented that it neither holds nor represents any interest materially adverse to the Debtors' estates in connection with any matter on which it would be employed.  To the best of my knowledge, KCC (a) is not a creditor, an equity security holder, or an insider; (b) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and (c) does not have an interest materially adverse to the interest of the Debtors' estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtors, or for any other reason.  I also understand that KCC agrees that it will supplement its disclosure to the Court if any facts or circumstances are discovered that would require such additional disclosure.

32.      I understand that, in addition to the tasks KCC will perform as Agent, pursuant to the Engagement Agreement, KCC will also act as the Debtors' balloting and solicitation agent.

33.      I further believe that KCC's services are necessary to effectuate the Debtors' transition into bankruptcy and to immediately begin providing effective notice of pleadings and orders to interested parties.  Accordingly, on behalf of the Debtors, I respectfully request that the relief sought in the KCC Application be approved.

## OPERATIONAL MOTIONS REQUESTING IMMEDIATE RELIEF

**A.      Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief (the "*Wages Motion*")**

34.      I understand that, to avoid the immediate and irreparable harm to the Debtors' business operations and restructuring efforts that I believe would occur if the Debtors' employee obligations are not paid when due and the Debtors' compensation and benefit programs are not continued in the ordinary course of business, and to minimize personal hardship on the Debtors' employees, the Debtors seek, through the Wages Motion, entry of an interim order and subsequently a final order authorizing the Debtors to (a) pay prepetition wages, salaries, other compensation, and reimbursable expenses on account of the Compensation and Benefit Programs (as defined below) and (b) continue to administer the Compensation and Benefit Programs in the ordinary course of business, including payment of prepetition obligations related thereto.

35.      As of the Petition Date, the Debtors employ approximately 1,207 individuals on a full-time basis and approximately 3 individuals on a part-time basis.  Approximately 819 employees are paid on an hourly basis (the "***Hourly Employees***") and approximately 391 employees receive a salary (the "***Salaried Employees***," and together with the Hourly Employees, the "***Employees***").  None of the Employees are represented by a union or collective bargaining unit.   Additionally, the Debtors utilize approximately 37 independent contractors (the "***Independent Contractors***" and together with the Employees, the "***Workforce***").[3]

---

[3]      The Debtors also retain temporary workers (the "***Temporary Employees***") from time to time from several staffing agencies (collectively, the "***Staffing Agencies***") to fulfill certain duties on a short-term basis.  The Debtors currently retain approximately 77 Temporary Employees, although this number fluctuates based on the Debtors' specific needs at any given time.  The Temporary Employees are a critical supplement to the efforts of the Debtors' Workforce.

14

36.     The Workforce performs a wide variety of functions critical to the Debtors' operations, the administration of these chapter 11 cases, and the Debtors' successful reorganization.  Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability, safety, and efficiency.  In many instances, these Employees and the Independent Contractors are highly trained personnel with specialized skills who are not easily replaced.  Without the continued, uninterrupted services of the Workforce, I believe that the Debtors' business operations and restructuring efforts will suffer immediate and irreparable harm.

37.     I understand that the vast majority of the Workforce relies exclusively on their compensation and benefits from the Debtors to pay their daily living expenses and support their families.  Thus, my understanding is that the Workforce will be exposed to significant financial constraints if the Debtors are not permitted to continue paying their compensation and providing benefits in the ordinary course.  I believe that, consequently, the relief requested in the Wages Motion is necessary and appropriate.

38.     I understand that the Debtors are seeking authority to pay and honor certain prepetition claims relating to compensation and benefit programs to avoid immediate and irreparable harm to the Debtors' business operations and restructuring efforts and to minimize the personal hardship the Workforce would suffer if the Debtors' employee obligations are not paid when due or as expected.  I further understand that, specifically, the Debtors are seeking authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, expense reimbursements, other compensation, federal and state withholding taxes and other amounts withheld (including Employees' share of insurance premiums, taxes, health savings accounts and flexible spending accounts contributions, and 401(k) contributions), health

15

insurance, life and accidental death and dismemberment insurance, disability coverage, retirement benefits, workers' compensation benefits, paid time off, and other benefits that the Debtors have historically directly or indirectly provided to the Workforce in the ordinary course of business (collectively, the "***Compensation and Benefit Programs***," and such obligations arising therefrom, the "***Compensation and Benefit Obligations***"), as well as all incidental costs thereof.

39.     Subject to the Court's approval of the relief requested in the Wages Motion, I understand that the Debtors intend to continue their prepetition Compensation and Benefit Programs in the ordinary course of business and consistent with past practice.

40.     I estimate that the prepetition amounts owed on account of the Compensation and Benefit Programs are as follows:[4]

| Estimated Prepetition Liabilities | | |
|---|---|---|
| Category | Interim Amount | Final Amount |
| **Compensation & Related Obligations** | | |
| Employee Wages | $1,356,800 | $1,356,800 |
| Independent Contractors | $338,600 | $338,600 |
| Temporary Employees | $1,394,900 | $1,394,900 |
| Withholding Obligations | $375,500 | $375,500 |
| Expense Reimbursements | $396,600 | $431,400 |
| Human Resources Systems | $7,400 | $7,400 |
| Non-Insider Bonus | $0 | $2,495,500 |
| **Benefit Programs** | | |
| Health Insurance | $982,100 | $3,145,200 |
| Life, Disability, and Related Insurance | $74,400 | $74,400 |
| Workers' Compensation | $30,000 | $709,900 |
| 401(k) Plan | $149,900 | $149,900 |
| Additional Benefit Programs | $43,200 | $43,200 |

a.   **<u>Employee Wages</u>**:  In the ordinary course of business, the Debtors incur and pay the Employees' wages, salaries, and other compensation on a bi-weekly basis (collectively, the "***Employee Compensation***").[5]  The Debtors pay their Employees' wage and salary obligations (collectively, the "***Wages***") on either a salaried or hourly basis.  On average, the Debtors pay approximately $3,949,000 per bi-weekly pay period on account of Wages.  The Debtors' most recent bi-weekly pay cycle ended on March 8, 2024.  The

---

[4]   This table is for illustrative purposes only and is qualified by the Wages Motion and the Interim and Final Orders.

[5]   The Debtors also pay the wages, salaries, and other compensation of employees of certain non-Debtor affiliates in the ordinary course of business.  Additional details regarding such payment structure are provided in the Cash Management Motion (defined and discussed below), which seeks further relief regarding such payments to such non-Debtor affiliates.

Debtors use a third-party payroll processor, UKG Inc. (d/b/a Ultimate Software Group Inc.) ("***UKG***"), by which all Employee disbursements and withholdings (as set forth in the Wages Motion) are processed. Because the Employees are paid in arrears, it is my understanding that Employees are owed accrued but unpaid Wages as of the Petition Date. I understand that Wages also may be due and owing as of the Petition Date because of, among other things, potential discrepancies between the amounts paid and the amounts that Employees believe should have been paid, which, upon resolution, may reveal that additional amounts are owed to such Employees. As of the Petition Date, I estimate that the amount of accrued but unpaid Wages is approximately $1,356,800 (the "***Unpaid Wages***"), all of which I believe will become due and owing in the first 21 days of these chapter 11 cases. I do not believe there are prepetition amounts owed to any individual on account of the Unpaid Wages that exceed $15,150, and I understand that the Debtors are not seeking authority to pay Unpaid Wages to any Employee in excess of such amount.

b. **Independent Contractor Obligations**: In the ordinary course of business, the Debtors incur and pay the Independent Contractors compensation based on an hourly rate (the "***Independent Contractor Obligations***"). Amounts owed on behalf of Independent Contractor Obligations may be paid by the Debtors on a weekly, bi-weekly, or monthly basis, depending on the applicable Independent Contractor. In 2023, the Debtors paid approximately $2,779,800 on account of Independent Contractor Obligations. As of the Petition Date, I estimate that the amount of accrued but unpaid Independent Contractor Obligations is approximately $338,600 (the "***Unpaid Independent Contractor Obligations***"), all of which I believe will become due and owing in the first 21 days of these chapter 11 cases.

c. **Temporary Employee Obligations**: From time to time, the Debtors rely on Temporary Employees in the ordinary course of business to perform services critical to the Debtors' operations, including, among other things, providing administrative support functions and additional day-to-day labor support as needed. The Debtors rely on the support of the Temporary Employees to complete discrete projects in furtherance of the Debtors' business and to fill short-term positions that are not economically feasible to employ on a full-time or part-time basis. The Debtors engage the Staffing Agencies that provide the Temporary Employees to the Debtors, as needed. The Debtors either (a) pay the Temporary Employees directly or (b) pay a fee to the Staffing Agencies for certain Temporary Employees, and the Staffing Agencies in turn pay such Temporary Employees (collectively, the "***Temporary Employee Obligations***"). In 2023, the Debtors paid an aggregate of approximately $7,463,100 on account of the Temporary Employee Obligations. As of the Petition Date, I estimate that the amount of accrued but unpaid Temporary Employee Obligations is approximately $1,394,900 (the "***Unpaid Temporary Employee Obligations***"), all of which will become due and owing in the first 21 days of these chapter 11 cases.

d. **Withholding Obligations**: During each applicable pay period, the Debtors, through UKG, routinely deduct and withhold certain amounts from Employees' paychecks for, among other things, garnishments, child support, and pre- or post-tax deductions payable pursuant to certain of the benefit programs (collectively, the "***Deductions***").

17

Certain of the Deductions are processed and forwarded to various third-party recipients. The Debtors also are required by U.S. law to withhold from Employee Compensation amounts related to, among other things, federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "***Employee Payroll Taxes***") for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then match the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (together with the Employee Payroll Taxes, the "***Payroll Taxes***"). The Payroll Taxes generally are processed and forwarded to the appropriate taxing authority at the same time the Employees' payroll checks are disbursed. As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid Deductions and Payroll Taxes is approximately $375,500 (the "***Unpaid Deductions and Payroll Taxes***"), all of which will become due and owing in the first 21 days of these chapter 11 cases.

e. **Expense Reimbursements**:  In the ordinary course of business, the Debtors reimburse the Employees for reasonable and customary expenses that such Employees, as applicable, personally incur in the scope of their employment. Expense reimbursements typically include expenses associated with travel, lodging, ground transportation, meals and other business-related expenses incurred in the course of an Employee's duties (the "***Expense Reimbursements***").[6] Eligible travel expenses may be (a) personally incurred by an Employee and reimbursed by the Debtors or (b) incurred on a company-issued corporate credit card for which such Employee pays the monthly statements and is reimbursed by the Debtors.[7] The Debtors contract with Concur Technologies Inc. ("***Concur***") to process and administer the Expense Reimbursements. Employees may be held personally liable for any unpaid obligations even though the obligations were incurred for the Debtors' benefit. Thus, I believe that the Debtors' inability to reimburse their Employees with respect to any Expense Reimbursements likely would impose significant hardships on those Employees, as applicable. Because of the irregular nature of requests for Expense Reimbursements, it is difficult to determine the amount of unpaid Expense Reimbursements at any given time, but historically, the Expense Reimbursements are approximately $412,500 per month. As of the Petition Date, based on historical practice, I estimate that the amount of accrued but unpaid Expense Reimbursements, including Wellness Reimbursements, Educational Reimbursements, and Construction Relocation Benefits, is less than $431,400 (the "***Unpaid Expense Reimbursements***"), a portion of which will become due and owing in the first 21 days of these chapter 11 cases.

f. **Corporate Credit Card Program**:   The Debtors also provide certain eligible Employees with company paid corporate credit cards (the "***Corporate Credit Cards***")

---

[6] Unless stated otherwise in the Wages Motion, Expense Reimbursements are inclusive of any obligations owed on account of the Wellness Reimbursement Program, the Educational Reimbursement Program, and the Construction Relocation Benefits (each as defined below).

[7] As of February 1, 2024, the Debtors have discontinued this company-issued corporate credit card; however, Employees may continue to seek reimbursement for payment of the monthly statements on account thereof.

that are primarily utilized to pay for certain non-travel, work-related expenses, including goods and services for business-related expenses or in emergency situations.

g. **Human Resources Systems**:  The Debtors utilize certain human resources information systems to manage the Workforce and provide human resources-related functions (collectively, the "***HR Systems***").  The HR Systems are in place to ensure the efficiency of various human resources-related functions and allow the Debtors to realize substantial cost savings with respect to the administration of the Compensation and Benefits Programs by not having to employ additional human resources professionals. The Debtors' third-party payroll processor, UKG, processes the Debtors' payroll and federal W-2 tax forms and completes payroll tax filings, including federal, state, and local filings.  UKG also provides timekeeping and attendance tracking solutions and leave management services, among other services.    The Debtors pay UKG approximately $172,000 in subscription fees on a quarterly basis.  Concur provides the Debtors with total spend management solutions, including processing the Expense Reimbursements.  The Debtors pay Concur approximately $14,800 in subscription fees on a monthly basis.  Docebo NA, Inc. ("***Docebo***") provides the Debtors with a range of training solutions geared toward the development of the Debtors' Workforce, including, among other things, onboarding, talent development, and compliance training.  The Debtors pay Docebo approximately $84,000 in subscription fees on an annual basis.  As of the Petition Date, I estimate that the total accrued but unpaid subscription fees arising in connection with the HR Systems is approximately $7,400 (the "***Unpaid HR Systems Fees***"), all of which I believe will become due and owing in the first 21 days of these chapter 11 cases.

h. **Severance Program**:    In the ordinary course of business, the Debtors provide severance benefits to certain Employees (the "***Severance Program***").  Pursuant to the Severance Program, I understand that, upon termination of employment by the Debtors without cause, Employees are entitled to a cash payment generally determined by a combination of the Employee's salary, job title, and length of time employed by the Debtors (the "***Severance Benefits***").  I believe that the maintenance of the Severance Program and satisfaction of the Severance Benefits are critical to maintaining Employee morale and loyalty.  I further believe that failure to maintain the Severance Program will result in increased instability in the Debtors' operations.  I do not believe there are prepetition amounts owed to any Employees on account of the Severance Benefits.[8]

i. **Incentive and Bonus Programs**:  The Debtors maintain programs to incentivize and reward their Employees (collectively, the "***Incentive and Bonus Programs***").[9]    I

---

[8]    In the interest of full disclosure, I understand that the Debtors' former General Counsel continues to receive compensation for part-time services performed in the capacity of a senior advisor pursuant to a consulting agreement, which expires on May 1, 2024.  I understand that the compensation received pursuant to such consulting agreement is separate and distinct from such individual's Severance Benefits.

[9]    In the interest of full disclosure, the Debtors paid retention bonuses—which I understand must be repaid if the recipient does not continue working for the Debtors for the specified retention period—to certain Insider and non-

19

believe the Incentive and Bonus Programs are an integral part of the Compensation and Benefit Programs. I understand that certain Employees eligible for the Incentive and Bonus Programs may be considered Insiders, and that the Debtors are not seeking to honor the Incentive and Bonus Programs that are applicable to Insiders or make any payments to Insiders on account of such Incentive and Bonus Programs. Rather, I understand that the Debtors are seeking authority, in the Debtors' discretion, to continue the Incentive and Bonus Programs only with respect to non-Insider Employees.

j.  **Quarterly Incentive Compensation Program**: In the ordinary course of business, the Debtors provide a quarterly incentive compensation program (the "***Incentive Compensation Program***") to eligible Employees. The Incentive Compensation Program is designed to reward approximately 399 exempt, corporate and non-corporate Employees for the achievement of certain company and personal performance targets. Under the Incentive Compensation Program, each eligible Employee has the potential to earn a quarterly cash incentive award based upon a percentage of the Employee's salary (the "***Incentive Bonus***").[10] The Incentive Bonus is paid two payroll cycles in arrears following the last day of each quarter. The Debtors paid an aggregate amount of approximately $2,194,600 in Incentive Bonuses earned in the fourth quarter of 2023. As of the Petition Date, I estimate that the amount of accrued but unpaid Incentive Bonus is up to approximately $1,439,700 (the "***Unpaid Incentive Bonus***"), none of which I believe will become due and owing in the first 21 days of these chapter 11 cases.

k.  **Quarterly Production Bonus Program**: In the ordinary course of business, the Debtors provide a quarterly production bonus program (the "***Production Bonus Program***") to eligible Employees. The Production Bonus Program is designed to reward approximately 801 non-exempt, non-corporate Employees for achieving specified production, quality, safety, and similar goals at the Debtors' various operating plant facilities and provides such Employees with the opportunity to earn a quarterly bonus (the "***Production Bonus***") in the amount of up to $1,300 per Employee.[11] The Production Bonus is paid two payroll cycles in arrears following the last day of each quarter. The Debtors paid an aggregate of approximately $1,728,400 in Production Bonuses earned in 2023. As of the Petition Date, I estimate that the amount of accrued but unpaid Production Bonus is up to approximately $1,055,800 (the "***Unpaid***

---

Insider Employees prior to the Petition Date. I understand that, by the Wages Motion, the Debtors do not seek approval or authorization from the Court or any other relief with respect to such payments.

[10] Historically, the Incentive Compensation Program awards were paid to eligible Employees on an annual basis in the beginning of the calendar year for services provided during the previous calendar year. However, in 2023, the Debtors amended the Incentive Compensation Program so awards are instead paid on a quarterly basis in order to better align the Incentive Compensation Program with goals of the Debtors in the months leading up to, and through the pendency of, these chapter 11 cases.

[11] Historically, eligible Employees could earn a Production Bonus in the amount of $2,000. However, in January 2024, the Debtors reduced the Production Bonus to the amount of $1,000 with the potential to increase to $1,300 for Employees who achieve a new quarterly production record.

***Production Bonus***"), none of which I believe will become due and owing in the first 21 days of these chapter 11 cases.

l. **Long-Term Incentive Plan**:  In the ordinary course of business, the Debtors provide a long-term incentive plan (the "***LTIP***") to select exempt, corporate and non-corporate Employees.  The LTIP is designed to create incentives and rewards to motivate the eligible Employees to put forth maximum effort toward the success and growth of the Debtors and to enable the Debtors to attract and retain experienced individuals who by their position, ability, and diligence are able to make important contributions to the Debtors' success.  Each eligible Employee's award under the LTIP is based on a target percentage of their annual salary, with such percentage varying depending on the Employee's role and level within the Debtors' business.  The Debtors have historically maintained an equity-based LTIP; however, after reviewing the prior LTIP, market data, and historical compensation, I understand that the Debtors determined that it was appropriate to modify the existing, equity-based LTIP, including converting the equity-based payments to discounted cash payments for the approximately 201 non-Insider participants and changing the payment schedule from annual to quarterly installments.  I do not believe there are prepetition amounts owed to any Employees on account of the LTIP.

41.    I understand that Employees working at least 30 hours per week are eligible to receive the various benefits described below.

a. **Health Insurance Programs**:  The Debtors offer their Employees the opportunity to participate in a number of health benefit plans, including the Medical Plans and associated Stop-Loss Insurance, the HSA and FSA, the Dental Plan, and the Vision Plan (each, as defined below and collectively, including their respective administrative costs, the "***Health Insurance Programs***").

b. **The Medical Plans**:  The Debtors offer medical coverage (the "***Medical Plans***") to their benefit-eligible Employees.  The Medical Plan is a self-insured program administered by Care First, which utilizes the national BlueCross BlueShield network.  Under the Medical Plans, the Debtors assume liability for, and initially pay, certain medical claims, rather than paying premiums for independent insurance coverage.  Employees are provided with three plan options that each have various required premiums.  I understand that Employees, as well as their spouses, children, and/or eligible dependents may be covered under the Medical Plans.  As part of the Medical Plans, the Debtors offer a prescription drug coverage plan, which is administered by CVS Caremark in collaboration with PrudentRx LLC.  As of the Petition Date, approximately 1,100 Employees participate in the Medical Plans.  After taking applicable Deductions, the Debtors pay approximately $1,454,300 per month with respect to the Medical Plans, including associated administrative fees.  Employees may also purchase supplemental health insurance (the "***Supplemental Health Insurance***") through Voya Financial Inc.

21

("***Voya***").[12]  The Debtors do not make any contributions on account of the Supplemental Health Insurance.  As of the Petition Date, approximately 898 Employees maintain Supplemental Health Insurance.  In connection with the Medical Plans, the Debtors maintain stop-loss insurance (the "***Stop-Loss Insurance***") through Stealth Partner Group.  The Debtors pay approximately $101,100 per month on account of Stop-Loss Insurance premiums.

c.  **Health Savings and Flexible Spending Accounts**:  Employees who participate in the high deductible health plan may contribute a portion of their compensation into an optional health savings account (the "***HSA***"), administered by WEX Health Inc. ("***WEX***").  Participating Employees can make contributions to the HSA through payroll deductions on a pre-tax basis to cover reimbursements under the program up to the maximum amount permitted by the Internal Revenue Service.  The Debtors match up to $500 of each Employee's contribution to an HSA.  The Debtors pay such matching contribution on the first payroll cycle in January of each calendar year or, in the case of new hires, on the first payroll cycle following the applicable hire date.  As of the Petition Date, approximately 443 Employees maintain an HSA.  The Debtors contributed approximately $191,700 on account of the HSA prior to the Petition Date.  The Debtors also provide Employees with access to an optional dependent care flexible spending account (the "***FSA***"), administered by WEX.  Participating Employees can make contributions to the FSA to cover certain eligible out-of-pocket dependent child and elderly care expenses.  As of the Petition Date, approximately 27 Employees maintain an FSA.  The Debtors contribute approximately $12,900 per month on account of the FSA.  After giving effect to the applicable Deductions, the Debtors pay approximately $5,900 in administrative fees to WEX on a monthly basis for administrative services with respect to the HSA, FSA, and Cobra Rights (as defined below).

d.  **Dental Plans**:  The Debtors offer self-insured dental coverage (the "***Dental Plan***") to their Employees through Guardian Life Insurance Co.  Employees are provided with one plan option.  I understand that Employees, as well as their spouses, children, and/or eligible dependents may be covered under the Dental Plan.  As of the Petition Date, approximately 1,033 Employees participate in the Dental Plan.  After taking applicable Deductions, the Debtors pay approximately $60,000 per month with respect to the Dental Plans, including associated administrative fees.

e.  **Vision Plan**:  The Debtors offer fully insured vision coverage (the "***Vision Plan***") to their Employees through Eye Med.  The Vision Plan provides coverage or discounts for exams, prescription eyeglasses, and contact lenses.  I understand that Employees, as well as their spouses, children, and/or eligible dependents may be covered under the Vision Plan.  As of the Petition Date, approximately 922 Employees participate in the Vision Plan.  After taking applicable Deductions, the Debtors pay approximately $7,800 per month with respect to the Vision Plan, including associated administrative fees.

---

[12]  Voya features a number of add-on benefits available to Employees at no extra cost to the Debtors, including an employee assistance program, college tuition benefit, travel assistance program, ID theft assistance, and Enviva associate discount program.

f.   **COBRA Rights**:  The Debtors provide their former Employees coverage (the "***COBRA Rights***") under the Consolidated Omnibus Budget Reconciliation Act ("***COBRA***").  The COBRA Rights are administered by WEX.  As of the Petition Date, 25 former Employees participate in the COBRA Rights.  As of the Petition Date, I estimate that the amount of total accrued but unpaid obligations arising under the Health Insurance Programs, including associated administrative fees, is approximately $3,145,200 (the "***Unpaid Health Insurance Program Obligations***"), a portion of which I believe will become due and owing in the first 21 days of these chapter 11 cases.

g.   **Life, Disability, and Related Insurance Programs**:   The Debtors offer their Employees the opportunity to participate in a number of life, AD&D, disability, and related benefit programs, including the Basic Life and AD&D Insurance, the Supplemental Life and AD&D Insurance, the Executive Life Insurance, the Short-Term Disability Benefits, the Long-Term Disability Benefits, and the Related Insurance Programs (each, as defined below and collectively, including their respective administrative costs, the "***Life, Disability, and Related Insurance Programs***").

h.   **Life and AD&D Insurance Programs**:  The Debtors offer fully insured life and accidental death and dismemberment insurance coverage (the "***Basic Life and AD&D Insurance***") to their Employees through Voya, which I understand provides maximum coverage of up to 100 percent to 200 percent of the applicable Employee's annual earnings (not to exceed $500,000) in the event of an Employee's death, accidental death, or dismemberment.  Employees do not make any contributions on account of the Basic Life and AD&D Insurance.  The Debtors pay approximately $6,800 per month with respect to the Basic Life and AD&D Insurance, including associated administrative fees. Employees may also purchase supplemental life and accidental death and dismemberment insurance (the "***Supplemental Life and AD&D Insurance***") through Voya.  As of the Petition Date, approximately 596 Employees maintain Supplemental Life and AD&D Insurance.  The Debtors pay approximately $22,700 per month with respect to the Supplemental Life and AD&D Insurance, including associated administrative fees.   I understand that Executive Employees may also purchase additional whole-life insurance (the "***Executive Life Insurance***") through Ameritas Life Insurance Corp. ("***Ameritas***").  While the Executive Life Insurance is in the name of the applicable executive, the Debtors pay the policy premium annually and subsequently record such payment on the following payroll cycle for the applicable executive.  As of the Petition Date, approximately one executive Employee maintains Executive Life Insurance.  In 2023, the Debtors paid the aggregate amount of approximately $12,900 on account of the Executive Life Insurance for three executive Employees.

i.   **Disability Benefit Programs**:  The Debtors provide certain Employees with fully insured short- and long-term disability benefits (the "***Disability Benefits***") through Voya.  I understand that Employees are eligible for the Disability Benefits as of their date of hire.  I understand that, under the short-term disability benefits program, in the event of a qualified non-work related illness or injury, Employees are entitled to continuation of 66.67 percent of their salary (up to a weekly limit of $3,500) for up to 90 days (the "***Short-Term Disability Benefits***").  Employees do not make any contributions on account of Short-Term Disability Benefits.  The Debtors pay

approximately $41,700 per month for the Short-Term Disability Benefits, including associated administrative fees. I further understand that, under the long-term disability benefits program, Employees are entitled to continuation of 60 percent of their salary (up to a monthly limit of $10,000) for a period of time dependent on the Employee's ability to perform their duties and when the disability begins (the "***Long-Term Disability Benefits***"). Employees do not make any contributions on account of Long-Term Disability Benefits. The Debtors pay approximately $24,700 per month for the Long-Term Disability Benefits, including associated administrative fees.

j.    **Related Insurance Program**: The Debtors offer Employees accident insurance, critical illness insurance, and absence insurance (collectively, the "***Related Insurance Programs***"). The Related Insurance Programs are administered by Voya. The Debtors pay approximately $20,800 per month with respect to the Related Insurance Programs, including associated administrative fees. As of the Petition Date, over 898 Employees participate in the Related Insurance Programs. As of the Petition Date, I estimate that the amount of total accrued but unpaid obligations arising under the Life, Disability, and Related Insurance Programs, including associated administrative fees, is approximately $74,400 (the "***Unpaid Life, Disability, and Related Insurance Program Obligations***"), all of which I believe will become due and owing in the first 21 days of these chapter 11 cases.

k.    **Workers' Compensation Program**: It is my understanding that the Debtors maintain workers' compensation insurance (the "***Workers' Compensation Program***") for Employees at the level required by law in the states in which the Debtors operate, both to address claims arising from or related to their employment with the Debtors, and for the purpose of satisfying the Debtors' obligations arising under or related to the Workers' Compensation Program (the "***Workers' Compensation Obligations***"). The Debtors maintain third-party insurance for Workers' Compensation Obligations through Hartford Financial Services. It is my understanding that all Employees are entitled to participate in the Workers' Compensation Program. The Debtors pay an annual premium of approximately $407,200. As of the Petition Date, approximately 22 individuals are receiving benefits on account of the Workers' Compensation Obligations and there are 12 open claims. As of the Petition Date, I estimate that the amount of total accrued but unpaid Workers' Compensation Obligations is approximately $709,900 (the "***Unpaid Workers' Compensation Obligations***"), a portion of which will become due and owing in the first 21 days of these chapter 11 cases.

l.    **Paid Leave**: The Debtors maintain certain paid leave benefit programs for Employees, providing paid leave for PTO and Other Leave (each as defined below, and collectively, the "***Leave Benefits***"). In the ordinary course of business, the Debtors provide paid time off ("***PTO***") to Employees. PTO accrues at a specified rate based on the Employee's length of employment and employment status. Non-exempt, non-corporate Employees accrue between 80 and 160 hours of PTO each year and, provided they use at least 40 hours of PTO in such year, may carry over up to 40 hours of accrued but unused PTO into the next calendar year at the end of any calendar year. It is my understanding that, upon termination or following the end of each calendar year, taking into account the used and/or carry-over PTO hours, non-exempt, non-corporate Employees may receive

24

cash payments for up to 80 hours of accrued but unused PTO (the "***PTO Cash-Out Obligations***").  Exempt, corporate Employees accrue between 120 and 160 hours of minimum PTO each year and, as I understand it, are not entitled to carry over any accrued but unused PTO into the next calendar year at the end of any calendar year. Likewise, it is my understanding that such Employees are not entitled to receive cash payments for accrued but unused PTO.  As of the Petition Date, I do not believe that any unpaid PTO Cash-Out Obligations are outstanding.  In the ordinary course of business, the Debtors provide certain other paid and unpaid leave, including holidays, bereavement, civic duty leave, military leave, leave provided for under the Family Medical Leave Act, and all legally required leaves (collectively, the "***Other Leave***").  It is my understanding that Employees are not entitled to any cash payments in connection with the Other Leave.  I believe that the continuation of the Leave Benefits in the ordinary course of business and consistent with past practice is essential to maintaining Employee morale during these chapter 11 cases.  Further, I believe the policies are broad-based programs upon which all Employees have come to depend.

m. **401(k) Plan**:  The Debtors provide all Employees with the ability to participate in a defined contribution 401(k) plan (the "***401(k) Plan***"), which is administered by Fidelity Investments.  It is my understanding that Employees are eligible to participate in a 401(k) Plan immediately upon their date of hire.  The 401(k) Plan generally provides for pre-tax deductions[13] of compensation up to limits set by the Internal Revenue Code, as well as for certain post-tax deductions.  Employee contributions to the 401(k) Plan are deducted automatically from each paycheck and transferred to a trust established under the 401(k) Plan (collectively, the "***401(k) Deductions***").  The Debtors match Employees' 401(k) Plan contributions up to three percent of each participating Employee's annual salary (collectively, the "***401(k) Contributions***").  The Debtors pay approximately $97,700 on account of the 401(k) Contributions per bi-weekly pay period. As of the Petition Date, approximately 1,195 Employees contribute to the 401(k) Plan.  As of the Petition Date, I estimate that the amount of accrued but unpaid obligations due on account of the 401(k) Plan is approximately $149,900 (the "***Unpaid 401(k) Obligations***"), all of which will become due and owing in the first 21 days of these chapter 11 cases.

n. **Wellness Reimbursement Program**:  The Debtors provide eligible Employees the ability to participate in the wellness reimbursement program (the "***Wellness Reimbursement Program***"), which is designed to encourage and support a well-rounded healthy lifestyle for Employees by reimbursing expenses for a variety of eligible wellness activities, including gym memberships, fitness classes, and nutritional counseling.  The Debtors reimburse up to $25 per month per Employee, to a maximum of $300 annually (the "***Wellness Reimbursements***"). The Wellness Reimbursement Program is administered by WEX and the Wellness Reimbursements are processed through Concur as Expense Reimbursements.  Because of the irregular nature of requests for Wellness Reimbursements, it is difficult to determine the amount of unpaid Wellness Reimbursements at any given time; however, I believe the amount of unpaid

---

[13]   The Debtors withhold approximately $350,000 per bi-weekly pay period on account of 401(k) related deductions from Employee Wages.

Wellness Reimbursements may be up to $37,700 per month.  As of January 1, 2024, the Debtors have discontinued the Wellness Reimbursement Program; however, I understand that Employees have continued to seek Wellness Reimbursements incurred in 2023 after January 1, 2024.

o.  **Educational Reimbursement Program**:  The Debtors offer eligible Employees an education reimbursement program (the "***Educational Reimbursement Program***").  To be eligible for the Education Reimbursement Program, among other requirements, the Employee must be pursuing a degree, seeking licensure or certification, or advancing professional development, in each case related to the Employee's job or a probable future assignment in the Debtors' business.  The Educational Reimbursement Program provides Employees with annual reimbursement of up to $5,250 per calendar year for qualifying tuition and related expenses, provided that certain criteria are met (the "***Educational Reimbursements***").  The Educational Reimbursements are processed through Concur as Expense Reimbursements.  In 2023, the Debtors paid approximately $240,600 of Educational Reimbursements.  Because of the irregular nature of requests for Educational Reimbursements, it is difficult to determine the amount of unpaid Educational Reimbursements at any given time.

p.  **Fleet Vehicle Program**:  The Debtors assign company-leased vehicles to (i) certain Employees to meet transportation needs while conducting business and (ii) specific plant or port sites for the performance of business operations (collectively, the "***Fleet Vehicle Program***").  The Fleet Vehicle Program is offered through Enterprise Fleet Management ("***EFM***").   As of the Petition Date, approximately 85 Employees participate in the Fleet Vehicle Program.  The Debtors pay approximately $86,300 per month to EFM on account of the Fleet Vehicle Program (the "***Fleet Vehicle Obligations***"), which includes the cost to lease, repair, and maintain the vehicles.  The Debtors provide Fleet Vehicle Program participants with company-paid corporate credit cards (the "***Gas Cards***") that are exclusively used to purchase fuel for the company-leased vehicles.  As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid Fleet Vehicle Obligations is approximately $43,200 (the "***Unpaid Fleet Vehicle Obligations***"), all of which will become due and owing in the first 21 days of these chapter 11 cases.

q.  **Construction Relocation Policy**:  In the ordinary course of business, the Debtors pay or reimburse certain Employees for relocation expenses incurred at the Debtors' request or for the Debtors' benefit pursuant to established written policies (the "***Construction Relocation Benefits***").  Employees who are asked to deploy to a construction site for a defined period of time are eligible to receive Construction Relocation Benefits.  The Construction Relocation Benefits generally include amounts incurred for temporary lodging and housing, moving expenses, per diem allowance, in addition to other expenses incurred during construction deployment.  The Construction Relocation Benefits are processed through Concur as Expense Reimbursements.   In 2023, the Debtors paid approximately $20,400 on account of the Construction Relocation Benefits.  Because of the irregular nature of requests for Construction Relocation Benefits, it is difficult to determine the amount of unpaid Construction Relocation Benefits at any given time.

26

42.     I believe that payment of the Compensation and Benefits Obligations is warranted on the facts of these chapter 11 cases.  I believe the Workforce will be exposed to significant financial difficulties if the Debtors are not permitted to honor unpaid Compensation and Benefits Obligations.  Additionally, I believe that continuing ordinary course benefits will help maintain morale and minimize the adverse effect of the commencement of these chapter 11 cases on the Debtors' ongoing business operations.

43.     Moreover, I believe the Workforce provides the Debtors with services necessary to conduct the Debtors' businesses, and I believe that absent the payment of the obligations owed to the Workforce, the Debtors may experience turnover and instability at this critical time in these chapter 11 cases.  I believe that without these payments, the Workforce may become demoralized and unproductive because of the potential significant financial strain and other hardships the Workforce may face.  I believe the Workforce may then elect to seek alternative employment opportunities.  Additionally, a significant portion of the value of the Debtors' businesses is tied to the skills of the Workforce, which I believe cannot be replaced without significant efforts, and which I further believe may not be successful given the overhang of these chapter 11 cases.  I believe that enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario.  I therefore believe that (i) payment of the prepetition Compensation and Benefits Obligations and (ii) continuation of payment of the same on a postpetition basis is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retaining their Workforce throughout these chapter 11 cases.

44.     It is my understanding that the Debtors have sufficient liquidity (after approval of the requested debtor-in-possession financing) to pay the amounts described in the Wages Motion in the ordinary course of business, and that, under the Debtors' existing cash management system,

the Debtors can readily identify checks, wire transfers, or electronic fund transfer requests as relating to an authorized payment in respect of the Compensation and Benefits Obligations. Accordingly, on behalf of the Debtors, I respectfully request that the relief sought in the Wages Motion be approved.

**B.    Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Maintain the Cash Management System, (B) Continue Using Existing Business Forms, and (C) Continue Intercompany Transfers, (II) Providing Administrative Expense Priority Status for Postpetition Intercompany Claims, and (III) Granting Related Relief (the "*Cash Management Motion*")**

45.    It is my understanding that the Debtors seek entry of interim and final orders, substantially in the forms attached to the Cash Management Motion, (a) authorizing the Debtors to:  (i) maintain their existing Bank Accounts and Cash Management System (each as defined below) in accordance with the DIP Order; (ii) continue using their existing Business Forms (as defined below); (iii) pay any undisputed prepetition Bank Fees (as defined below) and continue to pay the Bank Fees in the ordinary course of business; and (iv) continue to engage in Intercompany Transfers (as defined below) in the ordinary course of business and consistent with past practices; (b) providing administrative expense priority for postpetition payments made on account of Intercompany Transfers, which priority shall rank junior to the DIP Claims, including, for the avoidance of doubt, the DIP Superpriority Claims, the 507(b) Claims, and any other DIP Claims established pursuant to the DIP Order; and (c) granting related relief.

46.    In the ordinary course of business, the Debtors manage their cash, receivables, and payables through a centralized cash management system (the "*Cash Management System*"). The Debtors use the Cash Management System to efficiently collect, transfer, concentrate, invest, and disburse funds generated from their operations.  The Cash Management System also enables the Debtors and their non-Debtor affiliates to monitor the collection and disbursement of funds and the administration of the Bank Accounts.  The Debtors maintain accounting controls with

respect to each of the Bank Accounts and are able to accurately trace the funds through the Cash Management System to ensure that all transactions are adequately documented and readily ascertainable, including in connection with the Intercompany Transfers, all as more fully described below.

47.    It is my understanding that the Debtors will maintain their books and records relating to the Cash Management System to the same extent such books and records were maintained prior to the Petition Date.  Accordingly, I believe the Debtors will be able to accurately document, record, and track the transactions occurring within the Cash Management System for the benefit of their bankruptcy estates and all parties in interest.

48.    The Debtors' Cash Management System currently consists of a total of 22 bank accounts (collectively, the "***Bank Accounts***"), [14] each maintained at one of five different Banks.[15] The primary Bank Accounts used by the Debtors are held by Debtor Enviva MLP International Holdings, LLC ("***MLP***") with Capital One (such account, the "***MLP Main Operating Account***") and Debtor Enviva with Citibank (such account, the "***Enviva Inc. Main Operating Account***" and together with the MLP Main Operating Account, the "***Main Operating Accounts***").  Prior to the Cash Management Transaction (as defined below), the Debtors primarily used the Enviva Inc. Main Operating Account to collect receivables intended for all Debtor entities and certain non-Debtor entities, as well as to make disbursements to third parties on behalf of all Debtor entities

---

[14]    For the avoidance of doubt, the Cash Management Motion applies to all of the Debtors' Bank Accounts, irrespective of whether or not such Bank Account is specifically identified therein.  Certain non-Debtor affiliates of the Debtors likewise maintain bank accounts that are part of the overall Cash Management System.  The Debtors also maintain a residual interest in approximately $122.9 million in cash held among 12 bank accounts maintained by the Epes Green Bonds Trustee and the Bond Green Bonds Trustee.

[15]    The "***Banks***" are Capital One Financial Corporation ("***Capital One***"), Citibank, N.A. ("***Citibank***"), HSBC Bank USA, N.A. ("***HSBC***"), United Bank ("***United Bank***"), and Webster Bank, N.A. ("***Webster Bank***").

and certain non-Debtor entities. The Main Operating Accounts now serve these functions in tandem, as more fully described below.

49. In October 2023, Citibank restricted the ability of the Enviva Inc. Main Operating Account (and other Bank Accounts held by Debtors, as well as bank accounts by certain non-Debtor affiliates) to engage in transfers via automatic clearinghouse ("**ACH**"). On October 30, 2023, the Debtors moved approximately $230 million in cash from the Enviva Inc. Main Operating Account to the MLP Main Operating Account (the "***Cash Management Transaction***"). The Debtors memorialized the mechanical terms of the Cash Management Transaction in the Intercompany Arrangements.[16] I believe the Cash Management Transaction allowed the Debtors to preserve valuable liquidity, increased funds available to finance operations and other strategic alternatives, preserved optionality, and enhanced functionality within the Cash Management System.

50. A list identifying each of the Bank Accounts, along with the type of account, the Bank at which such account is held, and the last four digits of each account number, is attached to the Cash Management Motion as **Exhibit C**, and a diagram depicting the Cash Management System, the relationship between the Bank Accounts, and the general flow of funds is attached to the Cash Management Motion as **Exhibit D**. A general description of the Debtors' Bank Accounts is provided in the table directly below:

---

[16] The "***Intercompany Arrangements***" are comprised of that certain *Letter Agreement Regarding Cash Management Arrangement*, dated October 27, 2023 (the "***Letter Agreement***") and that certain *Intercompany Credit Agreement*, dated as of October 27, 2023, between MLP, as Lender and Enviva, LP, as Borrower (the "***Intercompany Credit Agreement***").

| Accounts | Description of Accounts |
|---|---|
| **MLP** | |
| **MLP Main Operating Account (Capital One)**<br><br>Account No. 6503 | Since October 2023, the MLP Main Operating Account has served as one of the two primary Bank Accounts used by the Debtors, including for disbursements to third parties.  Pursuant to the Intercompany Arrangements, MLP collects accounts receivable intended for all Debtor entities, as well as certain non-Debtor entities, and distributes cash to the relevant Debtors and non-Debtors, as applicable, as often as daily.  The MLP Main Operating Account is not subject to any depository agreement.<br><br>As of the Petition Date, and the date the Cash Management Motion was filed, the MLP Main Operating Account had a balance of approximately $13,854,218. |
| **MLP Secondary Operating Account (Capital One)**<br><br>Account No. 3960 | The "***MLP Secondary Operating Account***" was opened in December 2023, but had seen minimal activity since.  The MLP Secondary Operating Account shall be funded, maintained, and used by the Debtors as the DIP Funding Account (as defined in the DIP Order), in accordance with the terms of the DIP Order and the DIP Documents.<br><br>As of the Petition Date, and the date the Cash Management Motion was filed, the MLP Secondary Operating Account had a balance of approximately $0. |
| **MLP Deposit Account (Webster Bank)**<br><br>Account No. 0262 | The "***MLP Deposit Account***" was opened in March 2024 to potentially facilitate the transfer of proceeds from the Debtors' postpetition financing upon approval by the Court.<br><br>As of the Petition Date, and the date the Cash Management Motion was filed, the MLP Deposit Account had a balance of approximately $0. |
| **MLP Deposit Account (Webster Bank)**<br><br>Account No. 0268 | The "***MLP Savings Account***" was opened in March 2024 to potentially facilitate the transfer of proceeds from the Debtors' postpetition financing upon approval by the Court.<br><br>As of the Petition Date, and the date the Cash Management Motion was filed, the MLP Savings Account had a balance of approximately $0. |

| Accounts | Description of Accounts |
|---|---|
| *Enviva* | |
| **Enviva Inc. Main Operating Account (Citibank)** Account No. 4139 | Prior to October 2023, the Enviva Inc. Main Operating Account served as the primary Bank Account used by the Debtors, including for disbursements to third parties.  Enviva collected accounts receivable intended for all Debtor entities, as well as certain non-Debtor entities, and distributed cash to the relevant Debtors and non-Debtors, as applicable, on a daily basis.  Significant numbers of customers and counterparties continue to direct accounts receivable and other payments intended for all Debtor entities and certain non-Debtor entities to Enviva, which distributes cash to MLP, as necessary and applicable, for further distribution as often as daily.  Enviva also continues to make certain disbursements to third-party vendors through the Enviva Main Operating Account.

As of the Petition Date, and the date the Cash Management Motion was filed, the Enviva Inc. Main Operating Account had a balance of approximately $9,654,362. |
| **Enviva Inc. GBP Operating Account (Citibank)** Account No. 0757 | The "***Enviva Inc. GBP Operating Account***" is used to supplement the Enviva Inc. Main Operating Account by collecting certain accounts receivable paid by customers and counterparties in GBP (£).  When the Enviva Inc. GBP Operating Account has maintained more than a nominal cash balance, Enviva historically has paid disbursements quoted in GBP (£) in local currency to avoid currency-exchange costs or transferred these amounts to the Enviva Inc. Main Operating Account via WorldLink Payment Services.   Since the Cash Management Transaction, the Enviva Inc. GBP Operating Account has seen minimal activity.

As of the Petition Date, and the date the Cash Management Motion was filed, the Enviva Inc. GBP Operating Account had a balance of approximately £8,187. |
| **Enviva Inc. EUR Operating Account (Citibank)** Account No. 0749 | The "***Enviva Inc. EUR Operating Account***" is used to supplement the Enviva Inc. Main Operating Account by collecting certain accounts receivable paid by customers and counterparties in EUR (€).  When the Enviva Inc. EUR Operating Account has maintained more than a nominal cash balance, Enviva historically has paid disbursements quoted in EUR (€) in local currency to avoid currency-exchange costs or transferred these amounts to the Enviva Inc. Main Operating Account via WorldLink Payment Services.   Since the Cash Management Transaction, the Enviva Inc. EUR Operating Account has seen minimal activity.

As of the Petition Date, and the date the Cash Management Motion was filed, the Enviva Inc. EUR Operating Account had a balance of approximately €1,585. |

| Accounts | Description of Accounts |
|---|---|
| ***Enviva Pellets, LLC*** | |
| **TPI Engineered Systems Disbursement Account (Citibank)**<br><br>Account No. 2525 | The "***TPI Engineered Systems Disbursement Account***" is used to fund certain disbursements to third-party vendors and supplement the MLP Main Operating Account by collecting certain accounts receivable paid by customers, primarily both Debtor and non-Debtor entities, for services rendered.<br><br>As of the Petition Date, and the date the Cash Management Motion was filed, the TPI Engineered Systems Disbursement Account had a balance of approximately $65,940. |
| ***Enviva Holdings, LP*** | |
| **Enviva Holdings, LP Operating Account (Citibank)**<br><br>Account No. 2541 | The "***Enviva Holdings, LP Operating Account***" was used prior to the series of transactions in 2021 that resulted in the conversion of Enviva Partners, LP (a master limited partnership) to Enviva (a so-called "C" corporation), but for a period of years thereafter did not maintain a material balance or otherwise see meaningful activity.  Pursuant to the Utilities Motion (defined below), however, the Debtors propose to use the Enviva Holdings, LP Operating Account to provide adequate assurance of payment to utility companies pursuant to section 366 of the Bankruptcy Code.  The Enviva Holdings, LP Operating Account will be funded in accordance with the terms of the Utilities Motion and any of the Court's order(s) with respect thereto.<br><br>As of the Petition Date, and the date the Cash Management Motion was filed, the Enviva Holdings, LP Operating Account had a balance of approximately $736. |
| ***Enviva, LP*** | |
| **Enviva, LP Operating Account (Citibank)**<br><br>Account No. 2592 | The "***Enviva, LP Operating Account***" served as the primary Bank Account used by the Debtors before the Enviva Inc. Main Operating Account took over the same functions.  In addition to making disbursements to third parties, Enviva, LP collected accounts receivable intended for other Debtor and certain non-Debtor entities and distributed cash to the relevant Debtors and non-Debtors, as applicable, as often as daily.  Certain customers and counterparties continue to direct accounts receivable and other payments intended for various Debtor and non-Debtor entities to Enviva, LP, which distributes cash to MLP, as necessary and applicable, for further distribution. Prior to the creation of the MLP Main Operating Account, the Enviva, LP Operating Account swept cash as often as daily to the Enviva Inc. Main Operating Account.<br><br>As of the Petition Date, and the date the Cash Management Motion was filed, the Enviva, LP Operating Account had a balance of approximately $0. |
| **Enviva, LP Savings Account (HSBC)**<br><br>Account No. 2345 | The "***Enviva, LP Savings Account***" was used previously as a savings account, but no longer maintains a material balance.<br><br>As of the Petition Date, and the date the Cash Management Motion was filed, the Enviva, LP Savings Account had a balance of approximately $52. |

| Accounts | Description of Accounts |
|---|---|
| *Enviva Management Company, LLC* | |
| **Enviva Management Company, LLC Payroll Account (Citibank)** Account No. 7035 | The "***Enviva Management Company, LLC Payroll Account***" serves as the primary payroll account for employees of the Debtors and certain non-Debtor entities. The Debtors pay employees located in the United States every two weeks, although payroll taxes and benefits are now paid primarily from the MLP Main Operating Account. The Enviva Management Company, LLC Payroll Account is funded via Intercompany Transfers from multiple accounts held by both Debtor and non-Debtor entities, including the MLP Main Operating Account.<br><br>As of the Petition Date, and the date the Cash Management Motion was filed, the Enviva Management Company, LLC Payroll Account had a balance of approximately $522,569. |
| *Enviva Development Finance Company, LLC* | |
| **Enviva Development Finance Company, LLC Operating Account (Citibank)** Account No. 7358 | The "***Enviva Development Finance Company, LLC Operating Account***" was opened to support the procurement of an exemption from sales & use tax for a marine terminal located in Pascagoula, Mississippi, but has since seen minimal activity.<br><br>As of the Petition Date, and the date the Cash Management Motion was filed, the Enviva Development Finance Company, LLC Operating Account had a balance of approximately $0. |
| *Enviva Pellets Waycross, LLC* | |
| **Enviva Pellets Waycross, LLC Deposit Account (Citibank)** Account No. 5498 | The "***Enviva Pellets Waycross, LLC Deposit Account***" collects accounts receivable intended for Enviva Pellets Waycross, LLC under certain legacy customer contracts that pre-dated Enviva's acquisition of a biomass production facility located in Waycross, Georgia (the "***Waycross Plant***") in August 2020. The Enviva Pellets Waycross, LLC Deposit Account presently sees minimal activity.<br><br>As of the Petition Date, and the date the Cash Management Motion was filed, the Enviva Pellets Waycross, LLC Deposit Account had a balance of approximately $0. |
| *Enviva Pellets Bond, LLC* | |
| **Enviva Pellets Bond, LLC Operating Account (Citibank)** Account No. 1655 | The "***Enviva Pellets Bond, LLC Operating Account***" was opened to support the construction of a biomass production facility located near Bond, Mississippi (the "***Bond Plant***"). While it was originally expected that the Enviva Pellets Bond, LLC Operating Account would primarily support construction of the Bond Plant, Enviva obtained tax-exempt financing, the proceeds of which are instead routed from accounts held by a third-party trustee to the Enviva Inc. Main Operating Account upon requests for disbursement. Throughout the last calendar year, the Enviva Pellets Bond, LLC Operating Account has not maintained a material balance.<br><br>As of the Petition Date, and the date the Cash Management Motion was filed, the Enviva Pellets Bond, LLC Operating Account had a balance of approximately $61. |

| Accounts | Description of Accounts |
|---|---|
| **Enviva Pellets Epes Finance Company, LLC** | |
| **Enviva Pellets Epes Finance Company, LLC Operating Account (Capital One)** Account No. 7154 | The "***Enviva Pellets Epes Finance Company, LLC Operating Account***" was opened to support the flow of funds in respect of a loan that certain Debtors received via the New Market Tax Credit Program (such program, the "***NMTC Program***" and such loan, the "***NMTC Loan***") to support construction of a biomass production facility located near Epes, Alabama (the "***Epes Plant***") the Enviva Pellets Epes Finance Company, LLC Operating Account presently sees minimal or no activity.<br><br>As of the Petition Date, and the date the Cash Management Motion was filed, the Enviva Pellets Epes Finance Company, LLC Operating Account had a balance of approximately $185,924. |
| **Enviva Pellets Epes Finance Company, LLC Debt Service Account (United Bank)** Account No. 5591 | The "***Enviva Pellets Epes Finance Company, LLC Debt Service Account***" facilitates the payment of interest and principal in respect of the NMTC Loan.  The Enviva Pellets Epes Finance Company, LLC Debt Service Account is funded by the Main Operating Accounts in advance of scheduled payments.  None of the Debtor entities maintains disbursement control over the Enviva Pellets Epes Finance Company, LLC Debt Service Account.<br><br>As of the Petition Date, and the date the Cash Management Motion was filed, the Enviva Pellets Epes Finance Company, LLC Debt Service Account had a balance of approximately $0. |
| **Enviva Pellets Epes, LLC** | |
| **Enviva Pellets Epes, LLC Operating Accounts (Capital One)** Account No. 7148 Account No. 7151 Account No. 7160 | The "***Enviva Pellets Epes, LLC Operating Accounts***" facilitate the payment of recurring costs associated with the NMTC Loan.  In connection with the NMTC Loan, the relevant Debtors are required to pay fees incurred by the lenders party to the NMTC Loan.  None of the Debtor entities maintains disbursement control over the Enviva Pellets Epes, LLC Operating Accounts, one of which is funded as necessary from the Main Operating Accounts in advance of quarterly payments to the lenders party to the NMTC Loan, and two of which contain pre-funded reserves that are deducted quarterly.<br><br>As of the Petition Date, and the date the Cash Management Motion was filed, the Enviva Pellets Epes, LLC Operating Accounts had an aggregate balance of approximately $735,606. |
| **Enviva Pellets Epes, LLC Operating Account (Citibank)** Account No. 5642 | The "***Enviva Pellets Epes, LLC Operating Account***" was opened to support the construction of the Epes Plant.  While it was originally expected that the Enviva Pellets Epes, LLC Operating Account would primarily support construction of the Epes Plant, Enviva obtained tax-exempt financing, the proceeds of which are instead routed from accounts held by a third-party trustee to the Enviva Inc. Main Operating Account upon requests for disbursement.  Throughout the last calendar year, the Enviva Pellets Epes, LLC Operating Account has seen minimal activity.<br><br>As of the Petition Date, and the date the Cash Management Motion was filed, the Enviva Pellets Epes, LLC Operating Account had a balance of approximately $41,497. |

| Accounts | Description of Accounts |
|---|---|
| **Enviva Pellets Epes, LLC Disbursement Account (United Bank)**<br><br>Account No. 7764 | The "***Enviva Pellets Epes, LLC Disbursement Account***" facilitates draws by the relevant Debtor entities in respect of the NMTC Loan. Prior to September 2023—when the relevant Debtors drew down on the Enviva Pellets Epes, LLC Disbursement Account in its entirety—this Bank Account carried a roughly $18 million balance.<br><br>As of the Petition Date, and the date the Cash Management Motion was filed, the Enviva Pellets Epes, LLC Disbursement Account had a balance of approximately $0. |

51.     The Debtors regularly receive payments from customers on account of the sale of wood pellets and other revenue sources.  Such payments are received in the form of checks, cash, ACH transfer, electronic funds transfer, and wire transfer.  Receipts primarily flow through the Main Operating Accounts, and the relevant Debtors then distribute proceeds as necessary to other Debtors and certain non-Debtor affiliates.  As set forth in greater detail below, the Debtors use the Cash Management System to facilitate the flow of funds collected by the Main Operating Accounts.

52.     The Debtors maintain a number of other Bank Accounts, including the Enviva Inc. GBP Operating Account and the Enviva Inc. EUR Operating Account, each of which supports the Enviva Inc. Main Operating Account and serves the same function for the small number of receivables and disbursements that are denominated in GBP (£) and EUR (€), respectively. The Debtors likewise maintain the Enviva, LP Operating Account, which previously served the same function as the Enviva Inc. Main Operating Account, and which certain legacy counterparty payors continue to use in place of the Main Operating Accounts.

53.     The Debtors also maintain a number of Bank Accounts associated with the construction of, and financing for the Epes Plant and the Bond Plant, respectively.  Several of these accounts facilitate the administration of the NMTC Loan, and most do not carry material balances, except in advance of payments or disbursements.  The Debtors likewise maintain the Enviva

Pellets Waycross, LLC Deposit Account to receive payments under certain legacy contracts with the Waycross Plant.  Receipts in respect of the Enviva Pellets Waycross, LLC Deposit Account are distributed to the MLP Main Operating Account, as necessary and applicable.  The Debtors additionally maintain the TPI Engineered Systems Disbursement Account, which makes disbursements to third-party vendors and collects certain accounts receivable paid by customers, primarily both Debtor and non-Debtor entities, for services rendered in connection with the construction and servicing of conveyors.

54.    Debtor Enviva Pellets, LLC ("***Enviva Pellets***") is party to a corporate credit card program with Cross River Bank, whereby the latter provides credit to approximately 47 eligible employees of Debtor Enviva Management Company, LLC (**"*Enviva Management*"**) for business-related expenses or emergency situations (the "***Corporate Credit Card Program***"). All but six of these cards are restricted to business purposes that do not include travel or entertainment; the remaining six are used primarily for corporate travel.  Each card is subject to a $10,000 spending limit, and the Corporate Credit Card Program is subject to an aggregate spending limit of $150,000, which is secured by the same amount of the Debtors' cash collateral.  Payment in respect of the Corporate Credit Card Program is due monthly.

55.    The Corporate Credit Card Program very recently replaced a prior arrangement with HSBC that I understand was the subject of a dispute over late fees (the "***HSBC Card***").  While data in respect of actual spending under the Corporate Credit Card Program accordingly is not yet available, aggregate monthly spending under the HSBC Card averaged roughly $180,000 over the course of the past 12 months.  It is my understanding that the Debtors expect that obligations under the Corporate Credit Card Program, as reconstituted through Cross River Bank, will track prior

monthly spending under the HSBC Card, and that they accordingly request authority to continue the Corporate Credit Card Program in the ordinary course of business.

56.     Debtor Enviva Management is likewise party to a corporate credit card program with WEX Bank, whereby the latter provides credit to approximately 85 eligible employees of Enviva Management exclusively for fuel purchase for enterprise-owned fleet vehicles (the "*Gas Card Program*"). Each card is subject to a $300 daily spending limit, and the Gas Card Program is subject to an aggregate monthly spending limit of $123,500. Aggregate monthly spending in respect of the Gas Card Program has averaged roughly $40,000 over the course of the past 12 months. Enviva Management receives monthly statements for purchases made via the Gas Card Program during the preceding month. Payment on these statements is due at the end of each calendar month. Enviva Management typically pays amounts due on a monthly basis in the ordinary course of business. As of the Petition Date, payment obligations in the amount of $40,000 are accrued and outstanding in respect of the Gas Card Program.

57.     As described in the Wages Motion, in the ordinary course of business, Debtor Enviva Management reimburses employees for the reasonable and customary expenses that such employees, as applicable, personally incur in the scope of their employment (the "*Expense Reimbursement Program*"). Expense reimbursements typically include expenses associated with travel, lodging, ground transportation, meals, and other business-related expenses incurred in the course of an employee's duties. Eligible travel expenses may be (a) personally incurred by an employee and reimbursed by Enviva Management or (b) incurred on a company-issued corporate credit card that is not a part of the Corporate Credit Card Program for which such employee pays the monthly statements and is subsequently reimbursed. Enviva Management contracts with Concur Technologies Inc. to administer the Expense Reimbursement Program. It is my

38

understanding that, if Enviva Management is not permitted to maintain the Expense Reimbursement Program, then employees may be held personally liable for any unpaid obligations, notwithstanding the fact that these obligations were incurred for the ultimate benefit of their employer. Because of the irregular nature of requests administered via the Expense Reimbursement Program, I understand that it is difficult for the Debtors to determine the quantum of unpaid amounts that will become due under the Expense Reimbursement Program at any given time. Historically, however, monthly disbursements have averaged approximately $412,500.

58.     I understand that to the best of the Debtors' knowledge, each Bank Account is maintained at a Bank that is insured by the Federal Deposit Insurance Corporation, and the vast majority of the Debtors' Bank Accounts are maintained at banks that have executed a Uniform Depository Agreement ("*UDA*") with, and are designated as authorized depositories by, the U.S. Trustee, pursuant to the U.S. Trustee Guidelines. The Debtors' Bank Accounts with HSBC and United Bank are the exceptions, as, to my understanding, neither is designated as an authorized depository by the U.S. Trustee pursuant to the U.S. Trustee Guidelines. Nevertheless, I believe that both HSBC and United Bank are stable institutions and, therefore, that the Bank Accounts can be maintained at HSBC and United Bank without jeopardizing the rights of any parties in interest. These Bank Accounts do not carry material balances, and I understand that the Debtors do not anticipate any activity for these accounts beyond the payment of ordinary debt-service obligations and Bank Fees for the duration of these chapter 11 cases.

59.     As part of the Cash Management System, the Debtors use numerous pre-printed business forms (including, without limitation, letterhead, purchase orders, invoices, and pre-printed and future checks, collectively, the "*Business Forms*") in the ordinary course of business. To minimize expenses to the Debtors' estates and to avoid confusion on the part of

employees, customers, and vendors during the pendency of these chapter 11 cases, I understand that the Debtors are requesting that the Court waive such requirements and authorize the Debtors' continued use of all correspondence and Business Forms as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new Business Forms as, to my understanding, would otherwise be required under the U.S. Trustee Guidelines.  To the extent the Debtors exhaust their existing supply of Business Forms during these chapter 11 cases, I understand that the Debtors will transition to using checks and other Business Forms with the designation "Debtor in Possession" and the corresponding bankruptcy case number on all such checks and other Business Forms.  Additionally, I understand that the Debtors will continue to maintain records of all transfers within the Cash Management System and use the Debtors' accounting team to administer the Bank Accounts.  To guard against improper transfers resulting from the postpetition honoring of prepetition checks, the Debtors have issued "stop payment" orders to the Banks instructing the Banks not to honor any checks drawn on the Debtors' Bank Accounts prior to the Petition Date, again subject to any exceptions approved by this Court.

60.    I understand that the Debtors have prepared communication materials to distribute to various parties with which they conduct business, which will, among other things, inform such parties of the commencement of these chapter 11 cases.  I believe that these direct communications will provide adequate notice to such parties of their status as debtors in possession.

61.    In the ordinary course of business, the Debtors incur and pay, or allow to be deducted from the appropriate Bank Accounts, a number of fees, charges, and expenses related to the cost of administering the Bank Accounts, including among other things, wire transfer and other

40

fees, costs, and expenses that are standard for a typical corporate bank account and any other items the Banks give provisional credit for which (including during the prepetition period) (collectively, the "***Bank Fees***"). The Bank Fees for the vast majority of the Debtors' unrestricted Bank Accounts are debited directly from the Bank Accounts and typically are due and payable at the end of each month for that preceding month.  The Debtors paid the Banks approximately $10,000 per month in Bank Fees on average for the last six months.  I understand that the Debtors estimate that $10,000 on account of Bank Fees will become due and payable during the interim period, of which $4,500 will be attributable to the prepetition period.

62.     As is often customary for an enterprise of Enviva's size and complexity, the Debtor entities maintain business relationships with each other and certain of their non-Debtor affiliates, conducting intercompany financial transactions (such transactions, the "***Intercompany Transfers***") from time to time that result in intercompany receivables and payables (such payables, the "***Intercompany Balances***") in the ordinary course of business.  The Debtors manage their disbursements and receipts through the centralized Cash Management System.  The Debtors and their non-Debtor affiliates track all fund transfers in their respective accounting systems and can ascertain, trace, and account for all Intercompany Transfers and will continue to do so on a postpetition basis.  At any given time—and in addition to the Intercompany Arrangements—there may be Intercompany Balances owing from one Debtor to another Debtor.  Intercompany Transfers are made to reimburse certain Debtors for various expenditures associated with their businesses, to fund certain Debtors' Bank Accounts in anticipation of such expenditures, as needed, and to transfer excess funds to the MLP Main Operating Account.

63.     By way of example, the Debtors transfer funds out of the Main Operating Accounts into various disbursement accounts, including the Enviva Management Company, LLC Payroll

Account.  By way of additional example, Enviva Pellets, LLC (d/b/a TPI Engineered Systems) builds and services conveyors for use at biomass production facilities owned and operated by certain Debtor and non-Debtor entities and seeks payment from such entities in the ordinary course of business.

64.     The Debtors also engage in Intercompany Transfers with certain non-Debtor affiliates in the ordinary course of business as part of the Cash Management System. Certain transfers in the aggregate of approximately $405,000 per month on average support operations and expenditures (including costs attributable to a limited number of employees) for non-Debtor affiliates located in the United Kingdom, Japan, and Germany, specifically Enviva Management UK, Limited, Enviva Management Japan K.K., and Enviva Management Germany GmbH (such Intercompany Transfers, the "*Foreign Subsidiary Transfers*"). The Foreign Subsidiary Transfers benefit Debtor Enviva as the ultimate parent, in each case, and are necessary to ensure smooth operations in light of the fact that Enviva's customers are based in these foreign jurisdictions.  The Debtors also engage in Intercompany Transfers with certain non-Debtor affiliates that are joint ventures with third parties in the ordinary course of business. One such non-Debtor affiliate is Enviva Tooling Services Company, LLC ("*Enviva Tooling Services*"), a joint venture with Amandus Kahl USA Corporation that provides bespoke tooling services for numerous Debtor entities in exchange for payment therefrom.  It is my understanding that Enviva Tooling Services provides tangible benefits to Enviva as the ultimate parent by meeting the unique needs of its biomass production facilities and other projects.

65.     In a similar vein, the Debtors likewise engage in material Intercompany Transfers with non-Debtor affiliate Enviva Wilmington Holdings, LLC ("*Enviva Wilmington Holdings*"), a joint venture with John Hancock Life Insurance Company, U.S.A., and certain of its affiliates,

42

in the ordinary course of business.  Debtor Enviva, LP serves as managing member of Enviva Wilmington Holdings, which in turn is counterparty to a long-term offtake agreement (the "***EWH Fuel Supply Agreement***") with MGT Teesside Limited ("***MGT***").  Enviva Wilmington Holdings is also the sole member of non-Debtor affiliate Enviva Pellets Hamlet, LLC, which owns a biomass production facility in Hamlet, North Carolina (the "***Hamlet Plant***").

66.     In the ordinary course of business, Enviva, Enviva, LP, and Enviva Wilmington Holdings, as applicable, engage in Intercompany Transfers between one another in respect of Intercompany Balances arising from, among other things, investment in operational expenditures, reimbursement of attributed costs, or the purchase and sale of biomass between such parties.

67.     I believe the Intercompany Transfers are necessary due to the complex corporate structure of the Debtors and their non-Debtor affiliates.  I believe this system not only maximizes efficiency but also simplifies third-party interactions with the Debtors as an enterprise.  If the Intercompany Transfers were to be discontinued, I believe the Cash Management System and the Debtors' operations would be unnecessarily disrupted to the detriment of the Debtors, their creditors, and other stakeholders.  The Intercompany Transfers are the type of transactions that are common among many complex business enterprises that operate through multiple affiliates.  I believe the Intercompany Transfers are integral to the Debtors' ability to operate their businesses. I believe that requiring the Debtors to modify their current practices would impose a costly and time-consuming undertaking, distracting the Debtors and their employees from the important tasks of continuing to operate the Debtors' businesses in the ordinary course and proceeding towards a timely exit from chapter 11.

68.     I believe that the Cash Management System is an ordinary course and essential business practice providing significant benefits to the Debtors, including the ability to control

corporate funds, ensure the maximum availability of funds when and where necessary, reduce

borrowing costs and administrative expenses by facilitating the movement of funds, and ensure

the availability of timely and accurate account balance information consistent with prepetition

practices.  The Cash Management System reduces operating expenses by enabling the Debtors to

use funds in the optimal and most efficient manner.  Accordingly, I believe that ongoing use of the

Cash Management System without interruption is vital to the Debtors' business operations and the

success of these chapter 11 cases.  As such, on behalf of the Debtors, I respectfully request that

the Cash Management Motion be approved.

C.      **Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Critical Vendors, Foreign Vendors, Lien Claimants, and 503(B)(9) Claimants, and (B) Honor Prepetition Payment Arrangements; (II) Confirming Administrative Expense Priority of Outstanding Orders; and (III) Granting Related Relief (the "*Vendors Motion*")**

69.      I understand that, in the Vendors Motion, the Debtors seek entry of interim and

final orders, (a) authorizing the Debtors, in the ordinary course of business and based on their

sound business judgment, to (i) pay prepetition amounts owed to Critical Vendors, Foreign

Vendors, Lien Claimants, and 503(b)(9) Claimants (together with the Critical Vendors, Foreign

Vendors, and the Lien Claimants, the "*Vendors*" and the Vendors' prepetition claims sought for

payment by the Vendors Motion, collectively, the "*Vendor Claims*"), and (ii) honor Prepetition

Payment Arrangements; (b) confirming the administrative expense priority status and treatment of

certain of the Debtors' outstanding orders described herein; and (c) granting related relief.  I

understand that the Debtors respectfully request authority to pay Vendor Claims in an amount not

to exceed $63.3 million on an interim basis and in an amount not to exceed $115.0 million on a

final basis, and honor Prepetition Payment Arrangements in an amount not to exceed $3.7 million

on an interim basis and in an amount not to exceed $13.1 million on a final basis, in each case as

they become due in the ordinary course of business and only on such terms and conditions the

44

Debtors deem appropriate, in their business judgment, to minimize any disruptions to the Debtors' businesses.

70.     The Debtors rely on continuing access to, and relationships with, the Vendors and customers, who provide supplies, services, and revenue that are essential to the Debtors' pellet-manufacturing operations and their ability to maintain uninterrupted production and delivery of their products on a postpetition basis. The Debtors' pellet-manufacturing process involves a complex and interdependent chain of equipment, materials, and services, including chippers, various types of wood hammermills, dryers, and pellet mills, all of which require regular maintenance, repair, replacement, and/or replenishment. Additionally, to deliver the pellets to their customers, the Debtors rely on various freight and shipping services, including rail, freight trucks, barges, and ocean-going vessels. The Vendors provide the Debtors with these vital goods and services, without which I believe the Debtors would face significant operational disruptions, increased costs, and lost revenues. The Debtors have exercised their business judgment in identifying the Vendors based on various factors, such as the availability and quality of alternative sources, the impact of non-payment on the Debtors' operations and relationships, and the likelihood of vendor holdbacks or liens, as described in greater detail below. I believe that any disruption in the Debtors' access to the goods and services provided by the Vendors would have significant and detrimental economic and operational impacts on the Debtors' businesses. As such, I believe that paying the Vendors is necessary and appropriate to preserve the value of their estates and facilitate their successful reorganization. Accordingly, I understand that the Debtors are requesting authority to pay Vendor Claims and Honor Prepetition Payment Arrangements in the amounts summarized below.

| Vendors[17] | Estimated Interim Amount | Estimated Final Amount[18] |
|---|---|---|
| Critical Vendors | $8.0 million | $16.4 million |
| Foreign Vendors | $5.0 million | $7.2 million |
| Lien Claimants | $43.1 million | $84.2 million |
| 503(b)(9) Claimants | $7.2 million | $7.2 million |
| Prepetition Payment Arrangements | $3.7 million | $13.1 million |
| | **$67.0 million** | **$128.1 million** |

a. **Critical Vendors**: In connection with the normal operation of their businesses, the Debtors purchase goods and/or services from certain vendors, suppliers, and service providers (the "*Critical Vendors*") that are unaffiliated with the Debtors and whose continued provision of such goods and/or services I believe to be crucial to maintaining the Debtors' ongoing business operations.  The Critical Vendors are generally sole source or limited source suppliers or vendors which provide a material economic or operational advantage when compared to other available suppliers and vendors (to the extent any exist).  Many of the Critical Vendors provide goods and/or services related to maintaining the specialized equipment used in the Debtors' operating plants.  Additionally, certain Critical Vendors provide corporate resources, such as cloud-based storage.  Moreover, in many cases, the specialty equipment at the operating plants, such as hammermills and pellet mills, are manufactured by certain Critical Vendors.  As such, only the relevant Critical Vendor has the necessary expertise, knowledge, and specialty tooling to promptly service the equipment or provide any replacement parts.  Additionally, certain Critical Vendors provide specialized chemicals and/or lubricants that are designed specifically for the Debtors' production process (*e.g.*, the chemicals used in the drying process) and are, in my opinion, therefore necessary to ensure the Debtors' uninterrupted production on a postpetition basis. I believe uninterrupted production is essential to preserving the Debtors' operational stability and their overall viability due to the lack of storage options for produced pellets in the Debtors' industry.  The Debtors' operations (like others in the industry) require real-time deliveries—the Debtors must quickly ship their product off to customers; they cannot store it in material quantities.  Pellet storage is costly and

---

[17]   For the avoidance of doubt, the amounts proposed to be paid to each Vendor on account of its prepetition claims are only captured once.  For example, if a Critical Vendor Claim (defined below) is subject to a valid lien or entitled to administrative expense priority status under section 503(b)(9) of the Bankruptcy Code, that claim will instead be categorized as a Lien Claim (defined below) or 503(b)(9) Claim (defined below), as appropriate. Additionally, amounts proposed to be paid to the Vendors do not include claims of creditors whose prepetition claims are addressed in any other first-day motion filed substantially contemporaneously herewith.

[18]   For the avoidance of doubt, estimated amounts of Critical Vendor Claims, Foreign Claims, Lien Claims, 503(b)(9) Claims, and Prepetition Payment Arrangements the Debtors seek authority to pay or honor on a final basis are inclusive of estimated interim amounts for Critical Vendor Claims, Foreign Vendor Claims, Lien Claims, 503(b)(9) Claims, and Prepetition Payment Arrangements, respectively.

burdensome due to several factors, including the exacting temperature and humidity control levels required to safely store them, which is compounded by the significant amount of physical space necessary to store commercial volumes. The corollary is that the Debtors' plants have insufficient stored pellets to service their customer requirements, and I understand that any interruption to production may render the Debtors unable to service their customers and, accordingly, in breach of their customer contracts.  If such production interruption were to occur and cause a plant shutdown, I understand that the Debtors' wood and fiber suppliers also would have to divert their deliveries, which I believe would be costly for the Debtors to address and may cause long-lasting damage to operations.  Due to their familiarity with the Debtors' operating equipment and infrastructure, I believe that the Critical Vendors are essential to the Debtors' ability to operate in the ordinary course on a postpetition basis, and that the preservation of relationships with such Critical Vendors is necessary to prevent interruptions in the Debtors' production process.  I believe that disruption in the provision of goods and services from the Critical Vendors, even for a short duration, could significantly impact the Debtors' operations and cause immediate and irreparable harm to the Debtors' businesses and their ability to operate during the course of these chapter 11 cases.  Accordingly, the Debtors, with the assistance of their advisors, have identified the universe and type of vendors they deem to be critical to their ongoing operations. Through this process, the Debtors and their advisors spent significant time reviewing and analyzing the Debtors' books and records, consulting operations management and purchasing personnel, reviewing contracts and supply agreements, and analyzing applicable laws, and historical practices to identify certain critical business relationships and/or suppliers of goods and services, the loss of which could materially harm their businesses, reduce their enterprise value, and/or impair their going-concern viability.  I understand that the Debtors considered a variety of factors, including, among other things:

- whether a vendor is a sole- or limited-source or high-volume supplier for goods or services critical to the Debtors' business operations;

- whether alternative vendors are available that can provide requisite volumes of similar goods or services on equal or better terms and, if so, whether the Debtors would be able to continue operating while transitioning business thereto;

- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales of future revenue) exceed the amount of a vendor's prepetition claim;

- whether an agreement exists by which the Debtors could compel a vendor to continue performing on prepetition terms without paying such vendor's prepetition claim at the outset of these chapter 11 cases;

- whether certain specification or contract requirements prevent, directly or indirectly, the Debtors from obtaining goods or services from alternative sources;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to ship inventory or to provide critical services on a postpetition basis;

- whether failure to pay all or part of a particular vendor's claim would significantly harm such vendor's ability to remain in business, leading to fewer options in the market for the Debtors to choose from;

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation; and

- whether authorization for payment of a particular vendor is being sought under another motion of the Debtors for first day relief.

Following this analysis, I understand that the Debtors identified certain categories of Critical Vendors utilized in the ordinary course that would be difficult or impossible to replace or could only be replaced at substantially higher costs for the Debtors as they transition into chapter 11. The categories of Critical Vendors that the Debtors request authority to pay on an interim and final basis are described below (all such amounts, "***Critical Vendor Claims***").

    i.   Specialized Parts Suppliers: The Debtors have longstanding business relationships with certain suppliers (the "***Specialized Parts Suppliers***") of highly specialized equipment, parts, and supplies related to producing wood pellets—such as chippers, various types of hammermills, dryers, and pellet mills—that are essential to the Debtors' operations. Most of these items are available only from single-source or limited-source suppliers and are supplied to the Debtors on one-off purchase orders. Many of these items are not only industry-specific, but are also uniquely designed by the specific supplier for the Debtors' specific needs. The Debtors' suppliers customize certain equipment to meet the requirements of the Debtors' operating plants. In many cases, the Debtors have worked with their suppliers of equipment, parts, and supplies for a number of years, and such suppliers have developed detailed knowledge of the Debtors' operating plants and infrastructure. If the Debtors are unable to pay these suppliers of specialized equipment and providers of specialized services, I believe that they will face significant difficulty locating adequate replacement vendors (if at all possible), and that it would take such replacement providers a significant amount of time to provide the same level of service the Debtors currently receive. This is especially true because the Debtors obtain a portion of such equipment on a one-off, purchase-order basis, for which no adequate replacements exist in the marketplace. The Debtors' only alternative—fabricating custom tooling—is equally unviable as it would take the Debtors a significant amount of time and resources to complete, and the Debtors' plants would likely have to shut down in the interim. I believe that failure to pay these Specialized Parts Suppliers would thus cause significant harm to the Debtors' business. Therefore, I believe it is essential that the Debtors maintain these crucial business relationships with suppliers of specialized equipment, parts, and supplies.

48

ii.   Repair and Maintenance Providers:  The Debtors rely on certain Critical Vendors that provide repair and maintenance services to the Debtors' operating plants, which are necessary to ensure the uninterrupted production of pellets on a postpetition basis (the "***Repair and Maintenance Providers***").  Many of the Debtors' operating plants use specialized equipment at each stage of the production process, and the Debtors rely on the expertise of the Repair and Maintenance Providers and their familiarity with the Debtors' equipment (some of which are made by the Repair and Maintenance Providers).  Without the Repair and Maintenance Providers, I believe that the Debtors' operations may quickly and unpredictably come to a halt due to, among other things, the inability to repair any of the Debtors' machinery, which I believe would cause immediate and irreparable harm to the Debtors' estates.

iii.  Essential Service and Equipment Providers:  Certain other Critical Vendors provide the Debtors with essential services, including (a) information and technology services such as enterprise resource planning software and logistics-management software, (b) broker and management services for essential goods such as utilities, (c) equipment repair services, (d) certain laboratory services for testing and assessing the quality of the produced pellets, and (e) equipment and goods, including health and safety equipment for the Debtors' employees (collectively, the "***Essential Service and Equipment Providers***").  I believe the Essential Service and Equipment Providers are a necessary part of the Debtors' day-to-day operations and cannot be easily replaced.  Without the Essential Service and Equipment Providers, I anticipate the Debtors would face significant disruption to their businesses.  Therefore, I believe the Essential Service and Equipment Providers are essential to the Debtors' continuing operations.

iv.   Lubricant and Chemical Providers:  The Debtors' operations require that they receive daily deliveries of specialized lubricant and chemicals used in various stages of production (the "***Lubricant and Chemical Providers***").  The Debtors' suppliers customize certain lubricants and/or chemicals to meet the requirements of the Debtors' specialty equipment used in their operating plants.  Even if the Debtors could identify alternative chemical and/or lubricant providers that could meet their daily needs, I believe such providers would likely charge the Debtors significantly higher rates than what the Debtors currently pay.  I expect that the Debtors would incur burdensome costs and delays if forced to locate alternative suppliers of lubricant and/or chemicals.  Any chemicals or lubricants provided by a substitute supplier would have to be extensively tested by the Debtors prior to use to, among other things, ensure that such lubricants would not damage the Debtors' valuable heavy machinery.  Alternatively, the Debtors may have to make significant changes to their existing equipment, machinery, and/or infrastructure to accommodate the chemicals and/or lubricants available from such alternative suppliers.  Thus, for all the reasons stated above, I believe that losing access to the Debtors' suppliers of specialty

lubricants and/or chemicals would cause significant harm to the Debtors' business and could result in suspension of operations. I believe that it is therefore critical that the Debtors have the authority to pay these Critical Vendors to preserve their relationships with such suppliers and to avoid any disruption in supply of fuel, lubricant, and chemicals.

I believe the Debtors would be immediately and irreparably harmed if they were to lose access to the goods and services provided by the Critical Vendors. I understand that the Debtors therefore seek authority to honor prepetition obligations to Critical Vendors and pay all or a portion of the Critical Vendor Claims, in the Debtors' discretion, on an interim basis in an amount not to exceed $8.0 million, and on a final basis in an amount not to exceed $16.4 million. I further believe that the requested relief will allow the Debtors to preserve the value of their estates by paying the prepetition claims of certain counterparties that are critical to their businesses. Moreover, I believe the relief requested therein is necessary because many of the Critical Vendors have no obligation to continue providing goods and services under relevant contracts, and, as a result, I understand that the Debtors would be unable to force those vendors to continue to perform. Additionally, I understand that the Debtors do not seek authorization to honor prepetition obligations arising under contract, except where the Debtors determine, in their business judgment, such parties may inflict immediate and irreparable harm on the Debtors by their refusal to continue providing goods or services.

b. **<u>Foreign Vendors</u>**:  The Debtors routinely utilize services from companies located in countries outside of the United States (the "***Foreign Vendors***"), including the use of various services related to the Company's delivery of wood pellets manufactured in the United States to their customers across Europe and Asia (*e.g.*, inspection and port-related services), and to facilitate purchasing wood pellets on the spot market from certain third-party pellet producers located primarily in Asia. Through these transactions, the Debtors incur obligations to Foreign Vendors (the "***Foreign Vendor Claims***") in the ordinary course of business. Selling wood pellets to European and Asian customers represents a core part of the Debtors' operations as foreign-based sales are the primary source of the Debtors' revenues. And, although the Debtors produce a majority of their wood pellets, the Debtors also from time to time purchase a portion of the wood pellets they supply from third parties on the spot market. While wood pellets obtained from third parties represented a smaller fraction of total wood pellets sold by the Debtors in 2023, they have represented a higher percentage in certain past years, and purchased wood pellets are essential to the Debtors' businesses. Therefore, I believe that utilizing the Foreign Vendors to procure certain wood pellets and to facilitate the distribution of all of the Debtors' wood pellets is critical to the Debtors' ability to successfully reorganize. As implied by the term "Foreign Vendors," I understand that substantially all of the Foreign Vendors may lack meaningful, if any, contacts with the United States. I believe that lawsuits in foreign courts and efforts to exercise other remedies in foreign jurisdictions, including asserting liens by the Foreign Vendors, could result from a failure to make payment to such parties in the ordinary course. I believe that it would likely be unduly time-consuming and expensive, thereby compounding the loss and disruption in services, to seek to enforce an order of the Court in the creditor's home

50

country in many instances. Additionally, I understand that many Foreign Vendors provide the Debtors with services at below-market rates. Absent the continued relationships with such Foreign Vendors, I believe the Debtors would be required to procure replacement services from third parties, who would likely charge market rates or higher. Therefore, I believe that maintaining the existing, long-standing relationships with the Foreign Vendors, including paying the Foreign Vendor Claims in the ordinary course, is in the best interests of the Debtors and their estates. As of the Petition Date, approximately $7.2 million in Foreign Vendor Claims has accrued and is outstanding, approximately $5.0 million of which I understand will become due and payable within the first 21 days after the Petition Date.

c. **Lien Claimants**: The Debtors routinely engage a number of third parties that I understand are of the type that may be able to assert and perfect certain liens, including maritime possessory liens, mechanics' liens, construction liens, materialmen's liens, transportation and freight liens, and other similar liens, against the Debtors' property if the Debtors fail to pay for the goods or services rendered (such parties, collectively, the "***Lien Claimants***"). Additionally, I understand that the Debtors have endeavored to identify and limit the universe of potential Lien Claimants with respect to current ongoing construction projects. In the ordinary course of business, the Debtors routinely require lien waivers by their construction contractors in connection with their invoicing process. The Debtors thus are able to mitigate the amount of liens filed against the Debtors' properties and, by extension, reduce the number of, and amounts owed to, the Lien Claimants. The Debtors routinely use various vessel chartering services to facilitate the Company's delivery of wood pellets to its Asian and European customers. The Debtors' pellets are loaded onto ocean-going vessels owned by the vessel owners (the "***Vessel Owners***") at the Debtors' owned or leased deep-water marine terminals, and are then transported to customers overseas. The Vessel Owner maintains possession of the pellets while in transit. I understand that such Vessel Owners may likewise be able to assert possessory liens, under maritime law, over the product being shipped or may otherwise refuse to discharge the Debtors' product until payment obligations are satisfied. Additionally, other Lien Claimants provide goods and services for the Debtors that I believe are vital in the maintenance and operation of their operating plants. Without such Lien Claimants and their equipment and servicing of such equipment, I believe the Debtors would not be able to continue their operations. Moreover, I understand that these Lien Claimants may hold or assert liens against the Debtors' property under applicable law for prepetition work performed for the Debtors. Absent payment of any outstanding prepetition amounts, I believe that Lien Claimants may refuse or attempt to refuse to provide any services for or honor obligations under their existing arrangements with the Debtors on a going-forward basis. The Lien Claimants also include (a) common carriers, trucking and rail transport companies, freight terminal operators, distributors, logistics management companies, transloading and other third-party transport service providers (collectively, the "***Shippers***") that ship, transport, and otherwise facilitate the movement of the Debtors' wood pellets, goods, operating supplies, parts, components, materials, equipment, or other property (collectively, the "***Materials***") among the Debtors' facilities and to their customers, (b) the warehousemen, bailees, storage facilities, and other storage providers (collectively, the "***Warehousemen***") to whom Materials are delivered through established distribution networks to store Materials in transit or machinery for repair, and

51

(c) contractors, mechanics, wood-pellet testing laboratories, and other service providers (collectively, the "*Service Providers*") that repair, maintain, equip, test, and otherwise service necessary equipment and machinery for the Debtors. The Shippers, Warehousemen, and Service Providers may possess Materials that belong to the Debtors, and I believe the failure to pay any of the foregoing may result in such Shippers, Warehousemen, and Service Providers attempting to assert liens against the Debtors' property, attempting to take possession of the Debtors' property, or preventing the Debtors from accessing the Materials. The Debtors require ready access to the Materials as the Materials are essential to the Debtors' production process or are finished product the Debtors must deliver to customers. I believe the Lien Claimants may elect to refuse to deliver or release Materials and other goods in their possession or control before the Debtors satisfy any outstanding prepetition amounts owed (collectively, the "*Lien Claimants Claims*") and any Lien Claimant's liens are released. If the Debtors are unable to timely pay the Lien Claimants Claims, I believe they risk being unable to safely maintain their business operations as they transition into chapter 11, which I, in turn, believe would cause immediate and irreparable harm to the Debtors' estates. As of the Petition Date, approximately $84.2 million in Lien Claims has accrued and is outstanding, approximately $43.1 million of which will become due and payable within the first 21 days after the Petition Date.

    i.    <u>Shippers and Warehousemen</u>: I understand that the Debtors seek to pay certain of the prepetition shipping and warehousing charges with respect to wood pellets and other Materials in transit. I believe the services provided by the Shippers and Warehousemen are essential to the Debtors' day-to-day operations because I believe they are necessary for the Debtors to transport wood pellets from production facilities to dock/rail terminals, and from these terminals to international customers. There are numerous shipments en route to and from various locations across the country and internationally at any given time. Therefore, many of the Shippers and Warehousemen currently possess Materials that I believe to be vital to the Debtors' operations. Further, if shipping and warehousing charges are not paid, I believe that the Shippers and Warehousemen may refuse to perform additional services for the Debtors. In such event, I anticipate that the Debtors would incur significant additional expenses, such as premium replacement shipping and warehousing costs, that I believe would likely exceed the amount of unpaid prepetition shipping and warehousing charges that the Debtors request the authority to pay hereunder. I understand that in many cases, the Shippers and Warehousemen are irreplaceable and represent the only means to transport and store the Debtors' goods. The Debtors' businesses depend critically on their relationships with several trucking and rail transport companies for which I believe there are no adequate or available substitutes in the market. The Debtors also rely heavily on operators of key dock and rail terminals, many of which I understand represent the only practicable method of transporting the Debtors' Materials to terminals or to customers in certain markets. If the Debtors were unable to promptly locate suitable replacements for these and similar Shippers and Warehousemen, I believe the Debtors' operations would likely be significantly impaired and could halt altogether. Because

of the commencement of these chapter 11 cases, I anticipate that certain Shippers and Warehousemen may refuse to deliver or release Goods or other property in their possession or control pending receipt of payment for their prepetition services, which I believe would disrupt the Debtors' operations. I believe that a disruption in the Debtors' chain of shipping and storage arrangements leading from the production facilities to their customers due to nonpayment of shipping and warehouse charges could cause substantial delays and great expense to the Debtors' estates. Accordingly, because the Debtors are dependent on these Shippers and Warehousemen, I believe it is essential that the commencement of these cases not give any Shippers or Warehousemen reason or excuse to cease performing their obligations to the Debtors.

ii. <u>Service Providers</u>: I understand that the Debtors also seek to pay the prepetition charges of the Service Providers. In order to ensure safe and orderly working conditions at their production facilities, the Debtors must repair or replace machine parts and make on-the-spot repairs to machinery on little or no notice. I believe that any disruption in the flow of such parts or services would immediately affect on-time delivery of wood pellets, which I in turn believe is essential to the Debtors' efficient operations given the limited storage capacity of wood pellets generally in the industry. Further, I believe that any disruption in the flow of parts or services would cause the Debtors immediate and substantial economic harm and erode their valuable customer base. Much of the equipment and machinery used by the Debtors is highly customized and industry specific, and the available pool of experienced service providers is therefore limited. The Debtors employ a number of skilled professionals and perform much of their repair work in-house, but they rely on third-party Service Providers to supplement this work and to perform other work that the Debtors cannot have done in-house. Accordingly, in many cases, the Debtors have service agreements, as is customary in the industry, with third-party maintenance Service Providers to provide maintenance services at various production facilities. The Debtors have, over the years, nurtured and developed their relationships with these Service Providers and have come to rely on the high-quality and priority service they receive. I believe that it is essential to the continuity of the Debtors' operations that they maintain their relationships with these Service Providers. Additionally, I believe that even short interruptions in services, while the Debtors seek to compel the Service Providers' performance under their executory contracts, could still temporarily halt the Debtors' operations, cause significant down-stream consequences, and adversely affect the Debtors' ability to deliver product to its customers on a timely basis. Accordingly, I believe that paying these Service Providers pursuant to the Vendors Motion is essential to the continued operation of the Debtors, and that failure to pay these Service Providers will likely cause significant and irreparable harm to the Debtors and their estates. Absent payment of any outstanding prepetition amounts, I believe that Service Providers may refuse or attempt to refuse to provide services for or honor

obligations under their existing arrangements with the Debtors on a going-forward basis.

In sum, because the Debtors are dependent on many third-party Shippers, Warehousemen, and Service Providers, I believe that it is essential that the commencement of these cases not give any third-party Shippers, Warehousemen, or Service Providers reason or excuse to cease performing services or to retain products, equipment, or other Materials.

d. **503(b)(9) Claimants**: I understand that the Debtors may have received certain goods or materials from certain vendors (collectively, the "***503(b)(9) Claimants***") in the ordinary course of business within 20 days before the Petition Date. I understand that amounts owed to such parties may be entitled to administrative priority under section 503(b)(9) of the Bankruptcy Code (such amounts, "***503(b)(9) Claims***"). To the extent such goods are supplied on an order-by-order basis, I believe a 503(b)(9) Claimant might refuse to accept new orders without payment of its prepetition claims. I also believe certain 503(b)(9) Claimants may attempt to reduce the Debtors' existing trade credit or demand payment in cash on delivery, either of which I believe would negatively impact the Debtors' liquidity. One such category of 503(b)(9) Claimants are the Debtors' suppliers of wood and wood shavings, which deliver product to the Debtors' plants on a daily basis. The deliveries are weighed at each plant upon delivery and are invoiced at agreed-upon prices based upon the weight. These suppliers are paid each Thursday for the deliveries received from the prior Friday to Thursday period. I understand that the wood and wood shavings provided by the suppliers are in high demand, and I believe that they can be easily diverted to other customers. If the Debtors do not pay such suppliers each Thursday in the ordinary course, I believe the suppliers will stop providing the product to the Debtors. As of the Petition Date, approximately $7.2 million in 503(b)(9) Claims have accrued and are outstanding, all of which I believe will become due and payable within the first 21 days after the Petition Date.

e. **Prepetition Payment Arrangements**: I understand that the Debtors' wood pellet business depends on maintaining positive and stable relationships with their customers (the "***Customers***"), many of whom purchase pellets under long-term contracts that provide a steady source of revenue and cash flow for the Debtors. The Debtors' Customers rely on the timely and consistent delivery of pellets to meet their own operational and contractual obligations, and I believe any disruption or delay in the supply of pellets could cause harm to their businesses and, in turn, their ability to continue to perform under the contracts. Due to various factors, such as supply chain disruptions, equipment failures, or market conditions, the Debtors occasionally cancel or postpone contracted shipments under the multi-year contracts. When this occurs, the Debtors may negotiate a resolution or settlement with the affected Customer that allows the Debtor to compensate the Customer for the cancelled or postponed shipments over a period of time (the "***Deferred Payment Arrangements***"). Often, these Deferred Payment Arrangements are memorialized with a formal amendment to the relevant contract. These Deferred Payment Arrangements and the related contractual amendments were negotiated and agreed to prior to the Petition Date. Additionally, prior to the Petition Date, certain Customers provided the Debtors with a prepayment (a

54

"**Prepayment**"), which Prepayment would be reduced by the Debtors' subsequent wood pellet deliveries (the "**Prepayment Arrangements**," and together with the Deferred Payment Arrangements, the "**Prepetition Payment Arrangements**").   Although the Debtors believe they are entitled to continue honoring the Prepetition Payment Arrangements in the ordinary course of business pursuant to the contractual terms of such arrangements, I understand that the Debtors request authority to continue to honor these Prepetition Payment Arrangements on a postpetition basis out of an abundance of caution to the extent the Prepetition Payment Arrangements may be considered a prepetition claim of the Customers against the Debtors.   I believe that honoring the Prepetition Payment Arrangements is essential to preserving the value of the Debtors' business and their estates, as well as to ensuring the continued cooperation and support of their Customers.   Moreover, the Prepetition Payment Arrangements that the Debtors seek authority to honor hereunder are arrangements entered into with Customers that the Debtors have identified as essential to their go-forward operations.   If the Debtors fail to honor these Prepetition Payment Arrangements, I believe they risk losing the trust and confidence of these critical Customers, who I believe may seek to withhold payments on future shipments pursuant to potential setoff rights or pursue alternative sources of pellets altogether, either of which I believe would jeopardize the Debtors' ability to operate, generate revenue, and fund their reorganization.   Moreover, I believe that honoring the Prepetition Payment Arrangements is fair and equitable, as the Customers have already suffered a loss of pellets and have agreed to accept pellets at a later date and with revised pricing terms in exchange for the Debtors' performance. I estimate that the aggregate amount of these Prepetition Payment Arrangements that the Debtors would honor in the ordinary course of business during these chapter 11 cases is approximately $13.1 million, of which $3.7 million will be due in the first 21 days after the Petition Date.   I believe that honoring the Prepetition Payment Arrangements is in the best interests of the Debtors' estates and is a sound exercise of their business judgment.

71.     In the ordinary course of business, prior to the Petition Date, I understand the Debtors may have ordered goods that will not be delivered until after the Petition Date (the "**Outstanding Orders**").   I believe that the suppliers who have supplied such goods (the "**Suppliers**") may refuse to ship or otherwise transport such goods to the Debtors to avoid becoming general unsecured creditors of the Debtors unless and until the Debtors re-order such goods postpetition.   I believe that (a) granting administrative expense priority to the undisputed obligations arising from the Debtors' receipt of Outstanding Orders and (b) authorizing the Debtors to pay for the Outstanding Orders in the ordinary course of business will avoid any disruption to the Debtors' businesses.   If the Debtors do not receive such relief, however, I believe

they may be forced to spend significant time and effort substituting the Outstanding Orders with postpetition orders or otherwise provide such claimants with assurance that the claim will receive administrative priority.  I believe that this potential disruption could have a significant negative impact on the Debtors' business operations, as the Debtors may not timely receive raw materials and goods necessary to operate, which would result in a cessation of operations, loss of revenue, and destruction of value of the Debtors' assets.  Therefore, I understand that the Debtors respectfully request that the Court authorize them to pay the undisputed Outstanding Orders in the ordinary course of business and confirm the administrative expense priority of the Outstanding Orders.

72.    As part of the Vendors Motion, I understand that the Debtors request authorization to make payments on account of Vendor Claims in the absence of a Vendor Agreement if the Debtors determine, in their business judgment, that entry into such Vendor Agreements will result in harm to the Debtors' businesses.  For the sake of clarity, I believe it is necessary for the Debtors to request discretion to enter into Vendor Agreements because certain of the Vendors hold claims of modest size, and the anticipated cost to the Debtors' estates, in both time and expense, for the Debtors and their advisors to enter into Vendor Agreements with these Vendors would outweigh the size of the potential Vendor Claims being resolved.

73.    Subject to the Court's approval of the proposed debtor-in-possession financing facility, I believe the Debtors have sufficient liquidity to pay the amounts described in the Vendors Motion in the ordinary course of business.  I further understand that, under the Debtors' existing cash-management system, the Debtors can readily identify checks, wire transfers, or electronic fund transfer requests as relating to an authorized payment in respect of the Vendor payments.

Accordingly, I believe that there is minimal risk that checks, wire transfers, and electronic fund transfer requests that the Court has not authorized will be honored inadvertently.

74.     I believe that the relief requested in the Vendors Motion is necessary to avoid immediate and irreparable harm to the Debtors.  It is my understanding that the Debtors have sufficient liquidity (after approval of the requested debtor-in-possession financing) to pay the amounts described in the Vendors Motion in the ordinary course of business.  Accordingly, on behalf of the Debtors, I respectfully request that the Vendors Motion be approved.

**D.      Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief (the "*Taxes Motion*")**

75.     I understand that, by the Taxes Motion, the Debtors seek entry of interim and final orders (a) authorizing the Debtors to pay certain prepetition Taxes and Fees (as defined below) that will become payable during the pendency of these chapter 11 cases and (b) granting related relief. In the ordinary course of the Debtors' businesses, the Debtors collect, withhold, and incur taxes and fees, including franchise taxes, income taxes, production and severance taxes, property taxes, and sales and use taxes (collectively, the "*Taxes and Fees*").[19]  The Debtors pay the Taxes and Fees monthly, quarterly, semi-annually, or annually, as applicable, to various international, federal, state, and local governments, including taxing and licensing authorities (collectively, the "*Governmental Authorities*").  A schedule identifying substantially all Governmental Authorities is attached to the Taxes Motion as Exhibit C.  The Debtors remit and pay the Taxes and Fees through checks and electronic funds transfers that are processed through their banks and other financial institutions.

---

[19]   The Debtors do not seek authority to collect and pay any employee withholding taxes under the Taxes Motion, but rather request such authority as part of the Wages Motion.

76.     As of the Petition Date, I estimate that the amount of accrued but unpaid Taxes and Fees is approximately $7,961,000, of which approximately $1,511,000 will become due and owing within the first 21 days of these chapter 11 cases.  Such estimated Taxes and Fees are summarized below:[20]

| Category[21] | Estimated Interim Amount | Estimated Final Amount |
|---|---|---|
| Production and Severance Taxes | $20,000 | $97,000 |
| Sales and Use Taxes | $835,000 | $4,441,000 |
| Franchise Taxes and Fees | $0 | $116,000 |
| Property Taxes | $620,000 | $3,124,000 |
| Regulatory and Other Taxes & Fees | $36,000 | $183,000 |
| | $1,511,000 | $7,961,000 |

a.  **Production and Severance Taxes**:  The Debtors incur a variety of taxes, assessments, and fees related to wood-pellet production, which are taxes on "severing" natural resources from the land or waters within a jurisdiction (collectively, "***Production and Severance Taxes***").  Production and Severance Taxes vary by state, but typically are calculated as a percentage of either the gross value of wood products severed, or wood products processed, or some combination thereof.  The Debtors are required to pay Production and Severance Taxes on a monthly or quarterly basis, as applicable.  In 2023, the Debtors paid approximately $425,000 on account of Production and Severance Taxes.  I understand that, as of the Petition Date, the Debtors estimate that the amount of accrued but unpaid Production and Severance Taxes is approximately $97,000, of which $20,000 will become due and owing within the first 21 days of these chapter 11 cases.

b.  **Sales and Use Taxes**:  The Company incurs various state and local taxes in connection with the purchases of a variety of equipment, materials, and supplies necessary for the operation of its businesses (collectively, "***Sales and Use Taxes***").  Sales and Use Taxes are essentially general consumption taxes charged at the point of purchase for certain goods and services, which are usually set up by the applicable Governmental Authority

---

[20]  This table is for illustrative purposes only and is qualified by the Taxes Motion and any Interim Order or Final Order with respect to the Taxes Motion.

[21]  Throughout 2023, the Debtors have operated at a loss, and therefore, do not expect to pay any state or federal income taxes in 2024.

as a percentage of the price of the good or service purchased. Depending on the jurisdiction, I understand that the Company is required to pay Sales and Use Taxes on a monthly, quarterly, or annual basis, as applicable. In 2023, the Company accrued approximately $4.9 million on account of Sales and Use Taxes, including approximately $4.3 million on account of a United Kingdom Value-Added Tax ("*VAT*") (a tax on goods and services that the Company provides in the United Kingdom in the ordinary course of business), of which the Company paid approximately $547,000. I understand that the remainder of this amount is outstanding. I understand that, as of the Petition Date, the Company estimates that the amount of accrued but unpaid Sales and Use Taxes is approximately $4,441,000, of which $835,000 will become due and owing within the first 21 days of these chapter 11 cases.

c.  **Franchise Taxes and Fees**: The Debtors incur various state franchise taxes, annual report fees, and privilege fees (collectively, "***Franchise Taxes and Fees***"). I understand that the Debtors are required to pay Franchise Taxes and Fees on an annual basis in order to remain in good standing and continue conducting their businesses pursuant to applicable state and local laws. In 2023, the Debtors paid approximately $218,000 on account of Franchise Taxes and Fees. I understand that, as of the Petition Date, the Debtors estimate that the amount of accrued but unpaid Franchise Taxes and Fees is approximately $116,000, none of which will become due and owing within the first 21 days of these chapter 11 cases.

d.  **Property Taxes**: The Debtors incur various state and local property taxes against the Debtors' real and personal property (collectively, "***Property Taxes***"). I understand that the Debtors are required to pay Property Taxes on a quarterly, semi-annual, or annual basis, as applicable, to avoid the imposition of statutory liens on their real and personal property. In 2023, the Debtors paid approximately $6,924,000 on account of Property Taxes. I understand that, as of the Petition Date, the Debtors estimate that the amount of accrued but unpaid Property Taxes is approximately $3,124,000. Of that amount, $620,000 will become due and owing within the first 21 days of these chapter 11 cases.

e.  **Regulatory and Other Taxes and Fees**: The Debtors collect or incur various federal and state taxes and fees related to business licensing, regulatory, and other matters (collectively, "***Regulatory and Other Taxes and Fees***"). I understand that the Debtors are required to pay Regulatory and Other Taxes and Fees on a monthly, quarterly, semi-annual, or annual basis, as applicable. In 2023, the Debtors paid approximately $259,000 on account of Regulatory and Other Taxes and Fees. I understand that, as of the Petition Date, the Debtors estimate that the amount of accrued but unpaid Regulatory and Other Taxes and Fees is approximately $183,000, of which approximately $36,000 will become due and owing within the first 21 days of these chapter 11 cases.

77.     I understand that, as of the Petition Date, the Debtors are subject to ongoing audit investigations and may be subject to future audit investigations by certain Governmental Authorities on account of tax returns and/or obligations from prior years, including, but not limited

to audit investigations by the Internal Revenue Service (the "***Audits***").   I believe that the Governmental Authorities performing the Audits may seek to impose additional prepetition Taxes and Fees, including interest on late payment of taxes (if applicable) (such additional Taxes and Fees, the "***Assessments***").   Additionally, I understand that the Debtors may be contesting the Audits and Assessments in appropriate judicial or administrative proceedings, as well as the amount that may need to be posted as collateral to contest asserted Assessment amounts.   The Debtors expressly state that nothing in the Taxes Motion or any related order constitutes or should be construed as an admission of liability by the Debtors with respect to any Audit or Assessment. Furthermore, I understand that the Debtors are reserving all rights with respect to any Audit or Assessment and reserving the right to contest and/or appeal any Assessment as a result of any Audit.   Although I believe paying the Taxes and Fees is critical to the continued operations of the Debtors' businesses, I understand that the Debtors may have appropriate grounds and wish to contest certain Taxes and Fees.   As such, I understand the Debtors respectfully request that such relief granted in the Taxes Motion be without prejudice to the Debtors' rights to contest the amounts of any Taxes and Fees on any grounds they deem appropriate or the Debtors' ability to request further relief related to the Taxes and Fees in the future.   I understand that the Debtors propose that prior to making a payment to any of the Governmental Authorities under the Taxes Motion, the Debtors be authorized, in their discretion, to settle all or some of the prepetition claims of such Governmental Authorities for less than their face amount without further notice or hearing.

78.     Prior to the Petition Date, in certain circumstances and in the ordinary course of business, certain Debtors paid Taxes and Fees on behalf of their non-Debtor affiliates, including Enviva Wilmington Holdings, LLC ("***EWH***") and its wholly owned subsidiary Enviva Pellets Hamlet, LLC ("***Hamlet***" and, together with EWH, the "***Wilmington Facilities***").   As described in

the Debtors' Cash Management Motion, payments made by the Debtors on behalf of their non-Debtor affiliates result in Intercompany Claims (as defined therein), which are recorded and settled on an intercompany basis. In addition, excess cash in EWH's bank account, a shared account with Hamlet, is routinely transferred to the Debtors in satisfaction of relevant Intercompany Claims. As of the Petition Date, I understand that the Debtors estimate that the Wilmington Facilities owe approximately $4.6 million to the relevant Taxing Authorities on account of Taxes and Fees, such as VAT. I believe that payment of certain non-Debtor Taxes and Fees in the ordinary course of business and consistent with prepetition practice, is necessary to maintain the going-concern value of the Wilmington Facilities. I further believe that Wilmington Facilities are valuable directly and indirectly owned assets of the Debtors' estates.

79.   I also understand that, outside of the Wilmington entities, certain other non-Debtor affiliates (*i.e.*, Enviva Cottondale Acquisition I, LLC, Enviva Pellets Amory II, LLC, and IHE Holdings, LLC) collectively owe not more than $500 in Taxes and Fees, which were incurred in the ordinary course of business. I understand that it was the Debtors' prepetition practice to pay these certain other non-Debtor affiliates' Taxes and Fees. I believe that the Debtors' failure to pay these non-Debtor affiliate Taxes and Fees will result in material harm to their estates.

80.   I believe that if certain of the Taxes and Fees are not paid, the Debtors' officers and directors may be subject to lawsuits during the pendency of these chapter 11 cases. I believe such lawsuits would prove distracting for the Debtors and the named officers and directors, whose immediate and full-time attention to the Debtors' operations is required during these chapter 11 cases to ensure a swift restructuring. I further believe it is in the best interest of the Debtors' estates to eliminate the possibility of such time-consuming, costly, and potentially damaging distractions. Moreover, I believe that the payment of the Taxes and Fees is necessary to avoid potential

administrative difficulties.  If the Taxes and Fees were not paid, I believe that the Authorities may attempt to take precipitous action, including additional state audits, lien filings, and lift-stay motions.  Only the prompt and regular payment of the Taxes and Fees will avoid these and other unnecessary governmental actions.

81.     I believe that the Debtors have sufficient liquidity to remit and pay the amounts described in the Taxes Motion in the ordinary course of business.  In addition, under the Debtors' existing cash-management system, I believe that the Debtors can readily identify checks, wire transfers, or electronic fund transfer requests as relating to an authorized payment in respect of the Taxes and Fees.  Accordingly, I believe that there is minimal risk that checks, wire transfers, and electronic fund transfer requests that the Court has not authorized will be honored inadvertently.

82.     I believe that the relief requested in the Taxes Motion is necessary to avoid immediate and irreparable harm to the Debtors.  It is my understanding that the Debtors have sufficient liquidity (after approval of the requested debtor-in-possession financing) to pay the amounts described in the Taxes Motion in the ordinary course of business.  Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

**E.     Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue Their Insurance Policies and Surety Bond Program and to Pay or Otherwise Satisfy Any Insurance Obligations and Surety Bond Obligations and (II) Granting Related Relief (the "*Insurance Motion*")**

83.     I understand that, in the Insurance Motion, the Debtors seek authority to (a) continue their prepetition insurance coverage, (b) satisfy all obligations related thereto, (c) renew, amend, supplement, extend, or purchase insurance coverage on a postpetition basis in the ordinary course, (d) continue the prepetition Surety Bond Program (as defined below) and (e) satisfy all obligations related thereto.

62

84.     The Debtors maintain 80 insurance policies (collectively, the "***Insurance Policies***")

through 43 third-party insurance carriers (collectively, the "***Insurance Carriers***") in the ordinary

course of their businesses.  I understand that the insurance policies provide coverage for, among

other things, losses related to the Debtors' real and personal property, professional and general

liability, crime liability, cyber risk, directors' and officers' liability, automobile liability, pollution

and environmental liability, various forms of marine liability and charterer liability, employee

specialty liability, and workers' compensation.[22]   In addition, I understand that certain of the

Insurance Policies provide layers of excess liability coverage.

85.     I believe it is essential that the Debtors have the ability to continue or renew the

Insurance Policies and enter into new insurance policies or agreements to preserve the value of

their businesses.  I understand that in many cases the Debtors' commercial activities require the

types of coverage provided under the Insurance Policies.  I believe that the relief requested in this

Insurance Motion is necessary to ensure uninterrupted coverage under the Insurance Policies.  The

Debtors, in the ordinary course of business, incur obligations to pay premiums (collectively,

the "***Insurance Premiums***") for the Insurance Policies based upon a fixed rate established and

billed by their respective Insurance Carriers.   The Debtors pay an aggregate amount of

approximately $22.2 million[23] in Insurance Premiums each year, excluding applicable broker and

consulting fees and commissions.  The Debtors pay the Insurance Premiums as they come due in

the ordinary course of business pursuant to various coverage terms which, along with the term of

each of the Insurance Policies, the categories of insurance coverage, the Insurance Carriers' names,

---

[22]     I understand that the Debtors are seeking authority to continue to pay in the ordinary course of business
unpaid obligations under their workers' compensation program (including related third-party insurance
premiums) in the Wages Motion.

[23]     This amount excludes premiums associated with certain directors and officers runoff insurance policies
which are not paid annually.

and the policy numbers, are provided on the schedule of Insurance Policies attached the Insurance Motion as Exhibit C.

86.     The Debtors utilize a financing agreement to finance certain of their Insurance Premiums (the "***Premium Financing Agreement***").  The Premium Financing Agreement is serviced by First Insurance Funding.  Further detail regarding the Premium Financing Agreement is provided in the schedule attached to the Insurance Motion as Exhibit D.  I estimate that, on average, the Debtors pay approximately $9.3 million annually to First Insurance Funding in nine installments over the course of the year.  I estimate that, as of the Petition Date, there is approximately $3.8 million outstanding pursuant to upcoming Premium Financing Agreement installment payments, approximately $940,000 of which will come due during the interim period. Additionally, the Debtors pay the Insurance Premiums related to four of the Insurance Policies in seven installments over the course of the year (the "***Installment Plans***").  I estimate that, as of the Petition Date, there is approximately $121,000 outstanding pursuant to upcoming Insurance Premium installment payments, all of which will come due during the interim period.

87.     Additionally, the Debtors incur various fees, taxes, and deductibles related to their Insurance Policies (together with the Insurance Premiums, collectively, the "***Insurance Obligations***").  As of the Petition Date, I estimate that no amounts are owed on account of prepetition Insurance Obligations related to their Insurance Policies (other than with respect to prepetition Insurance Obligations included in the amounts sought to be paid under the Premium Financing Agreement and the Installment Plans described above).

88.     The Debtors, in the ordinary course of business, provide surety bonds ("***Surety Bonds***") to certain third parties, including governmental units and other public agencies, to secure the Debtors' payment or performance of certain obligations in connection with their

operations, including primarily (a) obligations for environmental and/or operating permits and (b) deposits with utility companies[24] (the "***Surety Bond Program***").  The Debtors obtain the Surety Bonds through Liberty Mutual Insurance Company (the "***Surety Bond Issuer***").  The Debtors' currently maintain one outstanding Surety Bond, information about which is attached as Exhibit E to the Insurance Motion.  As of the Petition Date, the Debtors maintain approximately $8.5 million under the outstanding Surety Bond. I believe that failure to provide, maintain, or timely replace the Surety Bond may result in the Debtors' loss of certain permits required to operate their facilities and other potential consequences that may create an interruption in the Debtors' business operations.  With respect to the Surety Bond, the Debtors have entered into an indemnity agreement that sets forth the Surety Bond Issuer's rights to recover from the Debtors (the "***Surety Indemnity Agreement***").  Under the Surety Indemnity Agreement, I understand that the Debtors agree to indemnify the Surety Bond Issuer from certain losses, costs, or expenses that the Surety Bond Issuer may incur on account of the issuance of any Surety Bonds on behalf of the Debtors (the "***Indemnity Obligations***").[25]

89.    The premium for the Surety Bond (the "***Surety Premium***" and, together with the Indemnity Obligations, the "***Surety Bond Obligations***") is generally determined on an annual basis by the Surety Bond Issuer.  Payment is remitted by the Debtors when the Surety Bond is issued

---

[24]    Substantially contemporaneously with the Insurance Motion, the Debtors have filed the Utilities Motion (defined below), which seeks an order of the Court prohibiting the Debtors' utility providers from altering, discontinuing, or refusing to provide utility services to the Debtors, among other related relief.  As detailed further in the Utilities Motion, the Debtors do not anticipate depositing adequate protection amounts in segregated accounts for those utility providers that are beneficiaries of Surety Bonds, as such utility providers are adequately protected by the Surety Bonds.

[25]    Debtor Enviva Inc. and one of its sureties, Liberty Mutual Insurance Company, have entered into a certain Cash Pledge Agreement, dated December 1, 2023 (the "***Cash Pledge***").  The Cash Pledge gives effect to the cash collateral support that Debtor Enviva Inc. has agreed to provide under a number of indemnity agreements, which are prerequisites for Liberty Mutual to issue bonds to support the obligations of Debtor Enviva Inc. (and its affiliates') obligations.  By the Insurance Motion, the Debtors seek authority to perform under the Cash Pledge on a postpetition basis, including by allowing Liberty Mutual Insurance Company to draw on such cash collateral pursuant to the terms of the Cash Pledge.

and annually upon each renewal, typically 30 days prior to such renewal (which occurs automatically). In the twelve months preceding the Petition Date, the Surety Premium for the Surety Bond that remains active as of the Petition Date totals approximately $127,500. As of the Petition Date, I estimate that no amounts are owed on account of prepetition Surety Bond Obligations.

90.     I believe that the nature of the Debtors' businesses and the extent of their operations make it essential for the Debtors to maintain their Insurance Policies and the Surety Bond on an ongoing and uninterrupted basis. As such, I believe that the relief requested in the Insurance Motion is necessary to avoid immediate and irreparable harm to the Debtors. It is my understanding that the Debtors have sufficient liquidity (after approval of the requested debtor-in-possession financing) to pay the amounts described in the Insurance Motion in the ordinary course of business. Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

**F.      Motion of Debtors for Entry of Interim and Final Orders (I) Approving Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving Debtors' Proposed Procedures for Resolving Additional Adequate Assurance Requests, and (IV) Granting Related Relief (the "*Utilities Motion*")**

91.     I understand that, in the Utilities Motion, the Debtors seek entry of interim and final orders (a) approving the Debtors' proposed adequate assurance of payment for future utility services, (b) prohibiting utility companies from altering, refusing, or discontinuing services, (c) approving the Debtors' proposed procedures for resolving additional adequate assurance requests, and (d) granting related relief.

92.     Certain companies (each, a "*Utility Company*" and collectively, the "*Utility Companies*") provide the Debtors with traditional utility services (the "*Utility Services*"), such as

electricity, water, natural gas, propane, telecommunications, internet, waste management, and other similar services that the Debtors utilize in the ordinary course of business and are necessary for the continued operation of the Debtors' day-to-day businesses.  A non-exclusive list of the Utility Companies that provide Utility Services to the Debtors as of the Petition Date is attached to the Utilities Motion as Exhibit B (the "***Utility Services List***").[26] I understand that the relief requested herein is with respect to all Utility Companies supplying Utility Services to the Debtors and is not limited to those on the Utility Services List.

93.    I believe that uninterrupted Utility Services are critical to the Debtors' ability to operate and maintain the value of their businesses while maximizing value for the benefit of their estates.  I believe the Debtors could not operate their businesses without the Utility Services and that, should any Utility Company alter, refuse, or discontinue service, even for a brief period, the Debtors' business operations could be significantly disrupted, which could immediately and irreparably harm and jeopardize the Debtors' operations and strategic objectives.  Accordingly, I believe it is essential that the Utility Services continue uninterrupted during these chapter 11 cases.

94.    To the best of my knowledge, there are no material defaults or arrearages with respect to the Debtors' undisputed invoices for prepetition Utility Services.  On average, the Debtors pay approximately $8,155,000 each month for Utility Services in the aggregate, which is calculated as the aggregate historical average for the 12-month payment period ended December 31, 2023, for each Utility Company (the "***Average Monthly Utility Company Cost***"). As of the Petition Date, five Utility Companies, Duke Energy, Gas South LLC, Georgia Power,

---

[26]    The Debtors have made a good-faith effort to identify all Utility Companies and list them on the Utility Services List and believe that the Utility Services List includes all of the Utility Companies. However, the Debtors reserve the right to supplement the Utility Services List if they inadvertently omitted any Utility Company.  Furthermore, the inclusion of any entity on the Utility Services List is not an admission by the Debtors that such entity is, or is not, a utility, and the Debtors reserve all rights and defenses with respect to such characterization.

Mississippi Power, and Texican Holdings, Inc., each hold deposits from the Debtors which, in the aggregate, total approximately $6,729,804.

95.     I understand that the Debtors intend to pay postpetition obligations owed to the Utility Companies in the ordinary course of business in a timely manner, and have sufficient funds to do so.  I understand that the Debtors expect that cash generated from operations and anticipated access to cash collateral and debtor-in-possession financing will provide sufficient liquidity to pay obligations related to Utility Services in accordance with prepetition practices.

96.     I understand that, to provide the Utility Companies with adequate assurance of payment, the Debtors propose to deposit $1,944,000 (the "***Adequate Assurance Deposit***") into a segregated account (the "***Adequate Assurance Account***").  The amount of the Adequate Assurance Deposit is, for each Utility Company, (a) approximately half of the Average Monthly Utility Company Cost for such Utility Company, minus (b) any deposit held by such Utility Company. The Adequate Assurance Deposit will be held in the Adequate Assurance Account for the duration of these chapter 11 cases and may be applied to any postpetition defaults in payment to the Utility Companies. I understand that the Debtors propose that the Adequate Assurance Deposit may be adjusted by the Debtors downward upon reconciliation and payment by the Debtors of a Utility Company's final invoice in accordance with applicable non-bankruptcy law following the Debtors' termination of Utility Services from such Utility Company or adjusted upward if the Debtors identify additional Utility Companies.

97.     I further believe that the Utility Companies are adequately assured against any risk of nonpayment for future services, especially in light of the Debtors' general history of paying utility bills on time and in the ordinary course.  I believe that the Adequate Assurance Deposit and the Debtors' ongoing ability to meet obligations as they come due in the ordinary course as a result

of the Debtors' proposed budget provides assurance of the Debtors' payment of their future obligations. Moreover, I believe that termination of Utility Services could result in the Debtors' inability to operate their businesses to the detriment of all stakeholders.

98.     I believe that the relief requested in the Utilities Motion is necessary to avoid immediate and irreparable harm to the Debtors. It is my understanding that the Debtors have sufficient liquidity  (after approval of the requested debtor-in-possession financing) to pay the amounts described in the Utilities Motion in the ordinary course of business. Accordingly, on behalf of the Debtors, I respectfully submit that the Utilities Motion should be approved.

**G.     Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Establishing Notification Procedures; (II) Approving Restrictions on Certain Transfers of Common Stock of the Debtors' Estates and Claiming a Worthless Entity Deduction; and (III) Granting Related Relief (the "*NOL Motion*")**

99.     I understand that, by the NOL Motion, the Debtors seek interim and final orders: (i) establishing and implementing restrictions and notification requirements for certain transfers of the common stock issued by Enviva Inc. ("***Common Stock***") and certain claims (for U.S. federal income tax purposes) of a worthlessness deduction under section 165 of the Tax Code (as defined below) with respect to such common stock; (ii) notifying holders of Common Stock of the restrictions, notification requirements, and procedures set forth herein; (iii) directing that any acquisition, disposition, or other transfer of Common Stock (or declaration of worthlessness with respect to such Common Stock) in violation of the procedures set forth herein shall be null and void *ab initio*; and (iv) granting related relief.

100.    The Debtors estimate that, as of December 31, 2023, the Debtors have a U.S. federal NOL carryforward of approximately $407,973,548 (the "***NOL Carryforward***"), and a carryforward of disallowed business interest described in section 163(j)(2) of Title 26 of the United States Code (the "***Tax Code***") of approximately $144,620,779 (the "***Interest Deduction***

*Carryforward*" and together with any NUBIL, the NOL Carryforward, and certain other tax attributes of the Debtors, the "***Tax Attributes***").[27] I understand that the Debtors may generate additional NOLs and disallowed business interest in 2024. I understand that there may be certain tax advantages available related to the Tax Attributes that could translate into future tax savings over time that enhance the Debtors' cash position for the benefit of all parties in interest. Therefore, I believe the Tax Attributes are extremely valuable assets of the Debtors, could enhance the Debtors' cash position for the benefit of all parties in interest, and could contribute to the Debtors' efforts toward a successful reorganization.

101.    I understand that, under Section 382 of the Tax Code, certain changes in the ownership of the Company's common stock, if substantial enough, may result in an changes to the ownership of certain tax advantages or benefits related to the Company (an "***Ownership Change***"). Likewise, I understand than an Ownership Change might also occur, under certain circumstances, when a 50% shareholder of a corporation claims a "worthless stock deduction" under Section 382 of the Tax Code.  Based on information received from the Debtors and their advisors, I do not believe that an Ownership Change has occurred with respect to the Tax Attributes prior to the Petition Date and, accordingly, believe that the Debtors continue to possess significant Tax Attributes.  Additionally, I believe that these Tax Attributes would be adversely affected if any such Ownership Change occurs during the pendency of these cases, which I believe would severely endanger the Debtors' ability to utilize the Tax Attributes and therefore cause substantial damage to the Debtors' estates.

102.    Aside from preserving the value of the Tax Attributes during the pendency of these chapter 11 cases, I believe it may also be important for the Debtors to take steps to preserve the

---

[27]    The Debtors are in the process of analyzing whether they currently have a NUBIL.

70

value of such Tax Attributes upon the effectiveness of the chapter 11 plan of reorganization.  I understand that a chapter 11 plan that contemplates a reorganization of the Debtors may involve the issuance of new common equity interests in the Debtors (or any successor to the Debtors) and the distribution of such equity to certain creditors in satisfaction, in whole or in part, of their respective Claims.  I further understand that an issuance and distribution could also potentially result in an Ownership Change.

103.    Additionally, I understand that an Ownership Change could occur if a 50% shareholder of Enviva Inc. were to treat the Common Stock as having become worthless, for federal, state, or non-US tax purposes, prior to Enviva Inc. emerging from chapter 11 protection.  Where such an Ownership Change to occur, I understand it would cause an adverse effect on the Debtors' ability to use the Tax Attributes.

104.    Accordingly, I understand that, pursuant to the NOL Motion, the Debtors seek to establish procedures for monitoring acquisitions, dispositions, and transfers of Beneficial Ownership of Common Stock (and declarations of worthlessness with respect to such Common Stock) (the "**_Stock Procedures_**").  I believe it is in the best interests of the Debtors and their stakeholders to establish and implement such Stock Procedures.

105.    I believe the Stock Procedures the Debtors propose are necessary to avoid significantly impairing the Debtors' ability to utilize their Tax Attributes.  I believe the Debtors' ability to preserve their Tax Attributes may be seriously impaired unless the Stock Procedures are established immediately to ensure that acquisitions, transfers, and declarations of worthlessness with respect to Beneficial Ownership of Common Stock are either precluded or closely monitored and made subject to Court approval.

71

106.     Depending on the Debtors' future earnings and the consequences of a restructuring, I believe the Debtors' ability to utilize the Tax Attributes may enhance the Debtors' prospects for a successful emergence from chapter 11. I believe that the relief sought in the NOL Motion is critical because, once an acquisition, transfer or declaration of worthlessness acts to limit the utilization of the Tax Attributes, the ability to reverse the transaction or declaration and maximize the benefit of the Tax Attributes may be permanently lost.  I believe that by establishing and implementing the Stock Procedures, the Debtors will be in a position to object to Ownership Changes that threaten its ability to preserve the value of the Tax Attributes for the benefit of the Debtors' estates.

107.     I believe it is in the best interests of the Debtors and their estates to restrict trading that could result in an Ownership Change prior to plan confirmation or any applicable bankruptcy court order.  I understand that this restriction would permit the Debtors to utilize the Tax Attributes to the extent otherwise available to offset gain or other income recognized in connection with the Debtors' ownership of their assets and operation of their business.  If such an Ownership Change were to occur, however, I believe that the valuation for determining the annual amount of usable Tax Attributes may be adversely affected and, possibly, effectively eliminated.

108.     I believe it is important that the Debtors preserve their ability to propose a chapter 11 plan that could take advantage of any and all available benefits or advantages under the Tax Code.  I believe that the requested relief will ensure that the Debtors will have flexibility, if the Debtors determine it to be desirable, to structure a chapter 11 plan or other distributions to comply with the requirements of any such tax exceptions or advantages and thus to preserve the Tax Attributes to the fullest extent possible.

72

109.    Even if no tax exceptions or advantages are ultimately available to the Debtors or the relief provided thereby would not materially benefit the Debtors in the context of their restructuring, I believe that, in all circumstances, it is in the best interest of the Debtors and their stakeholders for the Court to grant the requested relief to prevent an Ownership Change prior to the effective date of a chapter 11 plan or any applicable bankruptcy court order.  Accordingly, on behalf of the Debtors, I respectfully submit that the NOL Motion should be approved.