David S. Meyer (*pro hac vice* pending)  
Jessica C. Peet (*pro hac vice* pending)  
**VINSON & ELKINS LLP**  
The Grace Building  
1114 Avenue of the Americas, 32nd Floor  
New York, New York 10036-7708  
Telephone:       (212) 237-0000  
Facsimile:        (212) 237-0100  

Matthew J. Pyeatt (*pro hac vice* pending)  
Trevor G. Spears (*pro hac vice* pending)  
**VINSON & ELKINS LLP**  
Trammell Crow Center  
2001 Ross Avenue, Suite 3900  
Dallas, TX 75201  
Telephone:       (214) 220-7700  
Facsimile:        (214) 220-7716  

Michael A. Condyles (VA 27807)  
Peter J. Barrett (VA 46179)  
Jeremy S. Williams (VA 77469)  
**KUTAK ROCK LLP**  
901 East Byrd Street, Suite 1000  
Richmond, Virginia 23219-4071  
Telephone:       (804) 644-1700  
Facsimile:        (804) 783-6192  

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT**  
**FOR THE EASTERN DISTRICT OF VIRGINIA**  
**ALEXANDRIA DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| ENVIVA INC., *et al.*, | Case No. 24–10453 (BFK) |
| Debtors.[1] | (Joint Administration Requested) |

**DECLARATION OF**  
**CHRISTIAN TEMPKE IN SUPPORT OF THE MOTION**  
**OF DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS**  
**(I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION**  
**FINANCING AND (B) USE CASH COLLATERAL, (II) GRANTING LIENS**  
**AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS,**  
**(III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES,**  
**(IV) MODIFYING THE AUTOMATIC STAY, AND (V) GRANTING RELATED RELIEF**

I, Christian Tempke, declare the following under 28 U.S.C. § 1746:

---

[1] Due to the large number of Debtors in these chapter 11 cases, for which joint administration has been requested, a complete list of the Debtor entities and the last four digits of their federal tax identification numbers is not provided herein. A complete list may be obtained on the website of the Debtors' proposed claims and noticing agent at www.kccllc.net/enviva. The location of the Debtors' corporate headquarters is: 7272 Wisconsin Avenue, Suite 1800, Bethesda, MD 20814.

1. I am a Managing Director in the Restructuring Group of Lazard Frères & Co. LLC ("*Lazard*"), a global investment bank with expertise in financial restructuring, strategic advisory services, and mergers and acquisitions, which has its principal office at 30 Rockefeller Plaza, New York, NY 10112. Lazard is the proposed investment banker for the debtors and debtors in possession (collectively, the "*Debtors*," and together with their non-debtor affiliates, the "*Company*") in the above-captioned chapter 11 cases.

2. I submit this declaration (the "*Declaration*") in support of the *Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Granting Adequate Protection to Prepetition Secured Parties, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* (the "*DIP Motion*"),[2] which seeks approval of (a) a $500 million debtor-in-possession credit facility (the "*DIP Facility*") consisting of (i) a secured Tranche A facility in an aggregate principal amount equal to $250 million and (ii) a secured Tranche B facility in an aggregate principal amount equal to $250 million and (b) the consensual use of Cash Collateral. I am over the age of twenty-one years, and if called upon to testify, I would testify competently to the facts and opinions set forth in this Declaration.

3. Lazard is the primary U.S. operating subsidiary of an international financial advisory and asset management firm. Together with its predecessors and affiliates, Lazard has been advising clients around the world for more than 150 years. Lazard is a full-service firm providing financial advisory services, including with respect to capital raising and restructuring

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the DIP Motion or the *Declaration of Glenn Nunziata in Support of Chapter 11 Petitions* filed contemporaneously herewith, as applicable.

2

advice, across a broad range of industries. Since 1990, Lazard professionals have been involved in over 500 restructurings, representing well over $1 trillion in debtor assets. Lazard is registered as a broker-dealer with the United States Securities and Exchange Commission and the Financial Industry Regulatory Authority ("**FINRA**").

4.   Lazard and its senior professionals have extensive experience in the reorganization, restructuring, and sale of distressed companies, both in chapter 11 proceedings and in the out-of-court context. In addition, Lazard's investment banking professionals have extensive experience advising debtors in chapter 11 cases, and have served as investment bankers to numerous debtors, chapter 11 trustees, creditors' committees, and prospective buyers in chapter 11 proceedings. Lazard's business reorganization professionals have served as financial advisors and/or investment bankers in numerous cases, including, among others: *In re Rite Aid Corp.*, No. 23-18993 (MBK) (Bankr. D.N.J. Jan. 22, 2024); *In re Inversiones Latin Am. Power Ltda.*, No. 23-11891 (Bankr. S.D.N.Y. Jan. 3, 2024); *In re Air Methods Corp.*, No. 23-90886 (MI) (Bankr. S.D. Tex. Dec. 6, 2023); *In re SVB Fin. Grp.*, No. 23-10367 (MG) (Bankr. S.D.N.Y. Aug. 16, 2023); *In re Nat'l Cinemedia, LLC*, No. 23-90291 (DRJ) (Bankr. S.D. Tex. June 6, 2023); *In re SiO2 Medical Prods., Inc.*, No. 23-10366 (JTD) (Bankr. D. Del. May 25, 2023); *In re Endo Int'l plc*, No. 22-22549 (JLG) (Bankr. S.D.N.Y. Jan. 13, 2023); *In re Genapsys, Inc.*, No. 22-10621 (BLS) (Bankr. D. Del. Aug. 17, 2022); *In re Rockall Energy Holdings, LLC*, No. 22-90000 (MXM) (Bankr. N.D. Tex. Apr. 27, 2022); *In re Alto Maipo Delaware LLC*, No. 21-11507 (KBO) (Bankr. D. Del. Dec. 17, 2021); *In re Corp Grp. Banking S.A.*, No. 21-10968 (JKS) (Bankr. D. Del. Aug. 26, 2021); *In re Stoneway Cap. Ltd.*, No. 21-10646 (JLG) (Bankr. S.D.N.Y. July 26, 2021); *In re Brazos Electric Power Cooperative, Inc.*, No. 21-30725 (DRJ) (Bankr. S.D. Tex. June 17, 2021); *In re Belk, Inc.*, No. 21-30630 (MI) (Bankr. S.D. Tex. Mar. 31, 2021); *In re Garrett*

*Motion Inc.*, No. 20-12212 (MEW) (Bankr. S.D.N.Y. Feb. 3, 2021); *In re FTS Int'l, Inc.*, No. 20-34622 (DRJ) (Bankr. S.D. Tex. Jan. 20, 2021); *In re Valaris PLC*, No. 20-34114 (MI) (Bankr. S.D. Tex. Oct. 16, 2020); *In re 24 Hour Fitness Worldwide, Inc.*, No. 20-11558 (KBO) (Bankr. D. Del. July 14, 2020); *In re Diamond Offshore Drilling*, No. 20-32307 (DRJ) (Bankr. S.D. Tex. June 5, 2020); *In re J.C. Penney Co., Inc.*, No. 20-20182 (DRJ) (Bankr. S.D. Tex. May 15, 2020); *In re Gavilan Res. LLC*, 20-32656 (MI) (Bankr. S.D. Tex. May 15, 2020); *In re Insys Therapeutics, Inc.*, No. 19-11292 (KG) (Bankr. D. Del. July 15, 2019); *In re Jones Energy Inc.*, No. 19-32112 (DRJ) (Bankr. S.D. Tex. Apr. 14, 2019); *In re Sears Holdings Corp.*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Nov. 9, 2018); *In re Stone Energy Corp.*, No. 16-36390 (MI) (Bankr. S.D. Tex. Dec. 14, 2016); and *In re Sabine Oil & Gas Corp.*, No. 15-11835 (SCC) (Bankr. S.D.N.Y. Sept. 10, 2015).

5.  I have been employed at Lazard since 2007 and specialize in advising public and private companies and creditor groups in complex financial restructurings, recapitalizations, capital raises, and sale transactions. Specifically, I have represented companies and creditor groups in connection with raising capital in the bankruptcy context, including assisting chapter 11 debtors in obtaining and negotiating the terms of debtor-in-possession financing, exit financing loans, and equity rights offerings. During the course of my career, I have been involved in a variety of restructuring and recapitalization engagements involving companies in the energy industry and otherwise, including Rockall Energy, Ursa Resources, Gavilan Resources, PG&E, Jones Energy, Westinghouse, LINN Energy, Stone Energy, RCS Capital, JCPenney, Forever 21, Bed Bath and Beyond, Toys"R"Us, Gymboree, Millennium Health, RadioShack, Chassix, Momentive, Quiznos, OGX, and Eastman Kodak Company, among others.

6.  I obtained a B.A. in economics from Northwestern University. I also hold FINRA Series 24 General Securities Principal and Series 79 Investment Banking Representative licenses.

7. I am authorized to submit this Declaration on behalf of Lazard. All facts and opinions set forth in this Declaration are based upon: (a) my personal knowledge, belief, or opinion; (b) information learned from my review of the Company's books and records; (c) information supplied to me or verified by the Company's employees or advisors and/or employees of Lazard working directly with me or under my supervision, direction, or control; and (d) my knowledge, skill, education, experience, and/or training concerning financial restructurings and capital-raising activities. I am not being compensated specifically for this testimony other than through payments received by Lazard as a professional proposed to be retained by the Debtors as their investment banker in these chapter 11 cases.

## **BACKGROUND**

8. The Company engaged Lazard as its investment banker in October 2023. Since that time, Lazard has worked closely with the Company's management team and other professional advisors to provide a variety of investment banking and capital-raising services, including: (a) advising the Company with respect to strategies for negotiating with the holders of existing funded indebtedness and other obligations; (b) participating in meetings and negotiations with key stakeholders; (c) assessing the Company's capital structure and flexibility in its debt documents; (d) advising and assisting the Company in evaluating, negotiating, and pursuing potential capital structure and liquidity-enhancing solutions, including identifying and evaluating a potential bridge financing, out-of-court financing, refinancing and/or debt exchange, and/or debtor-in-possession financing; and (e) assisting the Company in responding to due diligence requests with respect to the terms of various proposed financings, including the proposed DIP Facility.

9. As a result of these endeavors, the members of the Lazard team and I have become familiar with the Company's assets, capital structure, business operations, and need for and access to postpetition financing.

5

## THE COMPANY EVALUATES ITS POSITION
## AND SEEKS NEW FINANCING

10. Following Lazard's retention, I learned that the Company was focused on improving its EBITDA, gross margins, and cash flows through a variety of initiatives, including: (a) re-negotiating the Company's existing long-term offtake agreements with customers in Japan, the United Kingdom, and Germany to drive long-term stability and sustainability, *i.e.*, "raise the bridge" ("**RTB**"); (b) improving operational performance and driving efficiencies at the Company's plants; and (c) negotiating with RWEST to address potential obligations under the Q4 2022 Transactions.

11. Over time, it became apparent that, even with success in the above efforts, additional financing would be required to, among other things, solve for potential upcoming financial maintenance covenant defaults, provide additional liquidity, and extend or otherwise address maturities on the Company's funded indebtedness.

12. Working with the Company's management team and other advisors, Lazard thus identified various potential financing options for the Company. Beginning at the end of November 2023, in light of operational challenges and liquidity declining faster than initially anticipated, Lazard commenced assisting the Company with actively engaging and soliciting various creditors, equity holders, strategic partners, and third parties outside the current capital structure regarding their interest in participating in a prospective bridge financing. This was designed to facilitate the Company's successful completion of a comprehensive refinancing, recapitalization, or restructuring of its existing indebtedness on an out-of-court basis.

13. Lazard ultimately engaged in discussions with over 30 parties, which included both strategic and financial institutions, regarding a potential bridge financing, with 20 of those parties executing NDAs to obtain additional information. Lazard managed a customary due diligence

process with those 20 parties, who received access to private-side information on the Company's assets, financial forecasts, as well as follow-up diligence and access to management and the Company's advisors to facilitate the diligence process. By mid-January 2024, the Company had received preliminary proposals from five parties with respect to out-of-court bridge financing. However, none of these proposals adequately addressed the Company's near-term capital structure issues and potential upcoming defaults under its debt documents. In addition, given performance challenges and declines in liquidity, the proposals did not meet the capital needs of the Company's business to achieve a long-term out-of-court solution. Several parties also had indicated that they were only interested in financing the Company on an out-of-court basis if the Company could achieve greater certainty through its RTB efforts with customers. In an effort to identify a feasible out-of-court bridge, Lazard continued to work with multiple parties throughout January and February 2024 to refine financing proposals and provide additional diligence.

## THE COMPANY EVALUATES
## MORE COMPREHENSIVE IN-COURT AND OUT-OF-COURT SOLUTIONS

14. While Lazard continued to explore out-of-court bridge financing for the Company, by mid-January 2024, Lazard's focus expanded to solicit proposals for more comprehensive out-of-court and in-court capital-structure solutions, including debtor-in-possession ("**DIP**") financing. Meanwhile, on January 15, 2024, I understand that the Company's Board of Directors voted to forgo making a required semi-annual interest payment due under the 2026 Notes, triggering a 30-day contractual "grace period." I also understand that any further extension of that grace period or forbearance would have required certain waivers and consents from the majority lenders under the Senior Secured Facility Credit Agreement and other debtholders in the capital structure.

7

15. As part of efforts to obtain financing for the Company, Lazard reached out to several of the parties that were previously contacted for bridge financing proposals and expanded the process to solicit others, including large debtholders and third-party investors. Lazard connected with over 20 parties regarding DIP financing, with 17 of those parties executing an NDA. During this time, Lazard also continued its negotiations with parties interested in providing out-of-court financing for the Company. By exploring both options contemporaneously, Lazard was able to create interest and competitive tension among potential financing sources.

16. In January 2024, while Lazard explored potential in-court and out-of-court financing solutions with other parties, Lazard and the Debtors also pursued and received in-court and out-of-court proposals from the Ad Hoc Group. As it became more clear to the Debtors that an out-of-court approach was unlikely to result in an executable restructuring, the Debtors sought to negotiate the best possible terms of an in-court proposal with the Ad Hoc Group. In this context, and with a competitive process still ongoing, the Ad Hoc Group conveyed a desire to work constructively with the Company on a holistic deleveraging transaction to be implemented as part of an in-court restructuring.

17. While negotiating possible in-court solutions with the Ad Hoc Group, the Company also refocused its out-of-court efforts on a potential refinancing of the Senior Secured Credit Facility. As part of that work, the Company and Lazard found significant interest from a consortium of debt and strategic investors (the "*Consortium*"), some of whom had been extensively engaged in the Company's previous bridge-financing process. While the Company's discussions with the Consortium initially were focused on a potential out-of-court solution, the Consortium ultimately indicated it would only provide a shorter-term bridge to an eventual in-court restructuring.

## THE COMPANY NEGOTIATES MULTIPLE PROPOSALS

18. Through the negotiations and discussion with numerous parties during the out-of-court and in-court processes, the Company was able to create competitive tension among various parties for alternative DIP financing proposals, including the ultimately accepted proposal from the Ad Hoc Group, which contained numerous terms advantageous to the Debtors and their estates. Ultimately, the Company received three DIP financing proposals, including proposals from the Ad Hoc Group (which evolved into the DIP Facility proposed in the DIP Motion), the Consortium (whose proposal initially included some out-of-court runway), and a third potential financing party within the Company's capital structure. The Company and its advisors negotiated with each of these potential financing sources throughout January and the first two weeks of February 2024.

19. In early February 2024, the third potential financing party decided not to pursue further negotiations, but the Company continued to engage in extensive, good-faith negotiations with both the Consortium and the Ad Hoc Group. As the Ad Hoc Group's proposal continued to develop, its relative advantages became more clear to the Debtors—including greater execution certainty and clearer sources of financial commitments. It also became clear that the Ad Hoc Group could facilitate a smoother path through an in-court process, supported by the greatest level of stakeholder consensus. The Consortium ultimately withdrew its proposal on February 12, 2024, and the Company, after extensive, continued arm's-length negotiations, reached agreement in principle with the Ad Hoc Group on the terms of the proposed DIP financing on February 13, 2024, just two days before the 30-day grace period concluded. Notably, the Ad Hoc Group was willing to provide the Debtors with the DIP Facility on a non-priming basis, even though I understand that the Ad Hoc Group holds requisite amounts of the Senior Secured Credit Facility sufficient to provide self-priming, debtor-in-possession financing as is customary in many chapter 11

restructurings. Moreover, the Ad Hoc Group offered, as part of its financing package, to provide the Debtors with necessary consent to use prepetition cash collateral and other collateral, in connection with a negotiated adequate protection package compatible with the DIP Facility.

20. In an effort to finalize the requisite details of the RSA and DIP Facility, and ensure an orderly commencement of the Debtors' chapter 11 cases, I understand that the Ad Hoc Group provided forbearances in respect of, among other things, the Company's payment obligations under the 2026 Notes and potential cross-defaults under the Senior Secured Credit Facility and the Epes Green Bonds. In parallel, I understand that the Company secured a forbearance in respect of potential defaults under the Bond Green Bonds.

**Terms of the DIP Facility**

21. The key economic terms of the DIP Facility are summarized below:

| Key Economic Terms of the DIP Facility | |
|---|---|
| **Description** | • Delayed-Draw Term Loans or Delayed-Draw Notes |
| **Facility Size** | • $500 Million:<br>   o $250 Million Tranche A<br>      (To be Equitized or Repaid in Cash Upon Emergence)<br>   o $250 Million Tranche B<br>      (Repaid in Cash Upon Emergence) |
| **Draw Mechanics** | • Initial Draw of $150 Million from Tranche A<br>• Maximum of Four Subsequent Draws (Total, from Tranches A & B)<br>• Minimum Draws of $50 Million, Maximum of $100 Million |
| **Sources** | • Fully Backstopped by Ad Hoc Group<br>• Debtors May Syndicate up to 20% to Eligible Equity Holders |
| **Claims/Collateral** | • Superpriority Lien on Unencumbered Assets<br>• Second-Priority Lien on Collateral Package Securing Senior Secured Credit Facility |
| **Interest Rate** | • SOFR + 800 bps |
| **Roll-Up** | • None |
| **Maturity** | • Nine Months after Petition Date |
| **Backstop Fee** | • 3% |
| **OID** | • 4% |
| **Exit Fee** | • 3% |
| **Early Repayment Fee/Break Fee** | • 5% |

22. While most of the Debtors' assets are already encumbered (upon which the DIP Facility will be secured on a junior basis, as discussed further herein), I understand that there are certain unencumbered assets that would secure the DIP Facility on a first lien basis, including certain long-term ground leases for the use of a port in Pascagoula, Mississippi and a wood pellet production facility in Waycross, Georgia, as well as the real estate owned at the Company's wood pellet production plant under development in Bond, Mississippi (collectively, the "*Unencumbered Property*").

23. In addition to first priority liens on any assets of the Debtors not previously encumbered, I understand that the DIP Facility also will be secured by a junior lien on the collateral securing the Senior Secured Credit Facility and collateral securing the NMTC Loans. In addition, I understand the DIP Facility will benefit from superpriority administrative expense claims against the Debtors for repayment of the obligations thereunder.

24. Among other collateral, Debtor Enviva, LP's equity interest (the "**EWH Equity Interest**") in Enviva Wilmington Holdings, LLC ("**EWH**"), although already encumbered by a lien in favor of its joint-venture counterparty (securing certain contingent indemnification obligations of the Debtors), also presents a source of collateral in respect of the DIP Facility. As proposed, it is my understanding that the DIP Facility will be secured by junior liens on the EWH Equity Interest.

### THE TERMS OF THE PROPOSED DIP FACILITY REFLECT A COMPETITIVE PROCESS AND ARE COMPARABLE TO OTHER POSTPETITION FACILITIES OF THIS SIZE AND COMPLEXITY

25. As described above, the proposed DIP Facility is the culmination of a competitive marketing process to identify the best source of financing that was conducted in good faith over the last few weeks and months. Because no party in interest offered unsecured DIP financing or DIP financing on a superpriority basis, the Debtors negotiated with the Ad Hoc Group to structure the DIP Facility around a junior lien on the collateral package securing the Senior Secured Credit Facility and first priority liens on certain unencumbered assets. As noted above, this junior priority financing package allowed the Debtors to avoid pursuing a priming debtor-in-possession financing facility, and with the support of the Ad Hoc Group, to afford the Debtors the consensual use of their prepetition collateral in connection with consensually negotiated adequate protection.

26. I believe the pricing and maturity terms of the proposed DIP Facility (*i.e.*, an interest rate of SOFR + 800 basis points and a nine-month maturity) are within the ranges of

similarly sized facilities approved recently by bankruptcy courts in comparable cases and circumstances. I further believe that the other key economic terms and conditions of the proposed DIP Facility—including the 3% Backstop Fee, 4% OID for participating DIP Lenders, and 3% Exit Fee—are within the ranges approved by bankruptcy courts in connection with similar DIP financings.

27. The Debtors also negotiated for and obtained a provision allowing each DIP Creditor holding Tranche A Loans and/or Tranche A Notes to elect to participate in the purchase of equity in the reorganized Debtors at a price not yet determined but to be established pursuant to any equity rights offering or similar arrangement associated with a plan of reorganization in these chapter 11 cases, up to the principal amount of any Tranche A Loans and/or Tranche A Notes held by such DIP Creditor, with the purchase price for such equity to be satisfied by offset against repayment of the applicable portion of the principal amount of such Tranche A Loans and/or Tranche A Notes.

28. The proposed terms of any equity rights offering, the related purchase price, and the existence or magnitude of any discount to plan total enterprise value have not yet been determined and, I understand, are subject to Court approval upon subsequent motion. Likewise, I understand that any issuance of equity in the reorganized Debtors, and any findings as to the total enterprise value and plan equity value of the reorganized Debtors, are subject to Court approval of a chapter 11 plan and evaluation in connection with confirmation thereof.

29. This potential equitization of a portion of the DIP Claims was an integral part of the negotiations with the Ad Hoc Group and creates greater flexibility upon exit by potentially reducing the magnitude of any equity rights offering or other capital solutions which otherwise would be needed to fully repay the DIP Claims in cash. I also believe that the agreed potential

equitization features are a common tool utilized in other similarly sized and comparable chapter 11 cases.

30. I believe that the competitive marketing process and extensive, arm's-length negotiations over several weeks resulted in material improvements in the terms of the proposed DIP Facility, including more favorable milestones for the Debtors to conduct a value-maximizing chapter 11 process.

31. It is my belief that the proposed DIP Facility represents the best currently available option for postpetition financing to address the Debtors' projected liquidity needs for the life of these chapter 11 cases and provides the liquidity necessary to achieve the Company's restructuring objectives. It is also my belief that the terms and conditions of the proposed DIP Facility on the whole—including the reporting requirements and the Milestones—are comparable to other postpetition financing facilities approved recently by bankruptcy courts in chapter 11 cases with analogous issues and comparable complexity.

32. The proposed DIP Facility was heavily negotiated by experienced bankers, financial advisors, restructuring counsel, and the respective parties working in good faith and at arm's-length to obtain the best possible outcome under these circumstances. Based on my work with the Debtors and their other professional advisors, the Company—absent approval of the proposed DIP Facility—does not expect to have sufficient cash to operate the business as a going concern, which would be value-destructive. This outcome would harm not only the Debtors, but also the many stakeholders who are invested in a positive outcome for these chapter 11 cases, including approximately 1,200 employees.

33. Based upon the Debtors' liquidity needs and the market-tested approach run by Lazard, the Company, and its other professional advisors as described herein, I believe that the

Debtors are unable to obtain the necessary postpetition financing on an unsecured basis.  Based on those efforts, I do not believe that any alternative sources of postpetition financing are currently available to the Debtors on better or comparable terms.  Accordingly, I believe that the proposed DIP Facility should be approved on the terms and conditions proposed.

[*Remainder of page intentionally left blank.*]

Under 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Executed on March 13, 2024

*/s/ Christian Tempke*
Christian Tempke
Managing Director
Lazard Frères & Co. LLC